**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | CIVIL ACTION |
| BOY SCOUTS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | NO. 08-2429 |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                    September 25, 2008

Presently before the Court is the City of Philadelphia's Motion to Dismiss (Docket No. 9), Cradle of Liberty's ("Cradle's") Opposition to Defendant's Motion to Dismiss (Docket No. 10), Defendant's Reply (Docket No. 11), and Plaintiff's Surreply (Docket No. 12). For the reasons stated below, the Court concludes that there is Subject Matter Jurisdiction and that Defendants' Motion to Dismiss is granted as to Counts V and VI, but otherwise is denied.

**I. BACKGROUND**

**A. The Dispute**

In 1928, the City of Philadelphia granted to the Philadelphia Council of the Boy Scouts of America[1] permission to build its headquarters on a parcel of land owned by the city. Located on the Benjamin Franklin Parkway, the property was to be the home of the Boy Scouts'

---

[1] The City Ordinance addressed the Philadelphia Council of the Boy Scouts of America, the name of the local chapter of the Boy Scouts at the time. The successor in interest is Cradle of Liberty, referred to herein as "Cradle."

regional headquarters.  The terms of the arrangement were set out in a City Ordinance, which granted to Cradle "the privilege of erecting at its own expense on the lot . . . a suitable building to become at once the property of the City and to be used exclusively by the Boy Scouts for their own activities." (Br. Supp. City of Phila. Mot. Dismiss, Ex. 1.)  The Ordinance provided that "such building and lot . . . be kept in good order by said Boy Scouts during their occupancy." (Id.)  The Ordinance further allowed the City to terminate this arrangement, providing that the premises were "to be surrendered within one year after notice given them by the Commissioners of Fairmount Park, with the approval of the Mayor and City Council, of their desire to terminate the arrangement or by said Boy Scouts of their desire to surrender said property." (Id.)

In 1929, the Boy Scouts completed Construction of the building, now known as the Bruce S. Marks Scout Resource Center (the "Center"). (Compl. ¶ 17.)  Since then, Cradle has not paid any rent to the City, but, at its own expense, Cradle has maintained the Center and continues to do so. (Id.)  In recent years, Cradle has spent more than $60,000 annually on maintenance and, in 1994, invested more than $1.5 million to renovate the building. (Id. ¶ 18.)

The current dispute centers on Cradle's membership policy.  According to the terms of its charter, Cradle must adhere to the Boy Scouts of America's membership policies. (Id. ¶ 24.)  Those policies do not allow openly homosexual men to participate in leadership positions in the organization.  Beginning in June 2003, then-Mayor John Street requested that the City Law Department examine whether Cradle's rent-free arrangement conflicted with local law, given Cradle's membership policy.  The City's Law Department concluded that Cradle's membership policies violated the 1982 Fair Practices Ordinance. (Id. ¶ 25.)  Thereafter, the City and Cradle met a series of times, beginning in September 2003, to seek a resolution.  According to the

Complaint, "The City and Cradle of Liberty understood that the purpose of the negotiations was for Cradle of Liberty to take action to allay the City's concerns in exchange for the City's forbearing with its efforts to evict Cradle of Liberty from its headquarters." (Id. ¶ 27.)  With that goal in mind, Cradle made two concessions.  First, on January 23, 2004, Cradle issued a "Non Discrimination Statement," which provided,

> Cradle of Liberty Council, Boy Scouts of America, operates to help children and their families in Delaware, Montgomery, and Philadelphia counties in southeastern Pennsylvania.  As the most diverse youth serving organization in our service area, we are committed to this mission and we oppose any form of unlawful discrimination.  All of our members repeatedly pledge to respect all people and defend the rights of others. Prejudice, intolerance, and unlawful discrimination in any form are unacceptable within the ranks of Cradle of Liberty Council.

(Id. ¶ 28.)  This statement has remained in effect since its passage. (Id. ¶¶ 33-34.)  Second, Cradle agreed to establish "due process protocols" for dealing with individuals whose membership as a Boy Scout leader Cradle revoked under its membership policies. (Id. ¶ 31.)  In exchange for these concessions, Cradle asserts that it was understood that the City agreed to discontinue its efforts at eviction based on Cradle's membership policies. (Id. ¶ 32.)

No further discussion took place on this issue until, in 2005, with a new City Solicitor in office, the City once again contacted Cradle, this time requesting a clarification of the term "unlawful discrimination" in the Non Discrimination Statement. (Id. ¶ 35.)  Then, on July 20, 2006, the City sent Cradle a letter that stated, "The avowed national policy of the Boy Scouts of America is to discriminate in membership and Scout leadership positions against openly gay youths and adults.  The City Law Department has concluded that such discrimination is illegal under the Home Rule Charter and the Philadelphia Code." (Id. ¶ 36.)  The letter offered Cradle

3

two options if it wanted to remain in the building.  Cradle could maintain its policies and pay fair

market rent, or it could change its membership policies.  If Cradle chose neither, the City would

seek to evict Cradle. (Id.)  On July 24, 2006—just four days later and without notice to

Cradle—the Fairmount Park Commission voted to terminate Cradle's use of the building, as per

the terms of the original City Ordinance that granted to Cradle the use of the space. (Id. ¶ 37.)

Cradle made further attempts to negotiate a resolution that would allow it to

remain in the premises. (Id. ¶ 38.)  However, as these discussions were ongoing, on May 31,

2007—a little less than a year later—the Philadelphia City Council passed a resolution approving

of Cradle's eviction from its headquarters. (Id. ¶ 39.)  The Resolution stated, in pertinent part:

> WHEREAS, The national Boy Scouts organizations has a policy of
> discrimination based on sexual orientation with respect to its members and
> scoutmasters and has required the local Boy Scouts to implement its
> discriminatory policy by excluding participation on the basis of sexual orientation;
> and
>
> WHEREAS, the local Boy Scouts unfortunately has implemented that
> discriminatory policy and publicly has declared its intention to continue doing so;
> and
>
> WHEREAS, the non-discrimination provisions of the City's Home Rule
> Charter and the City's Fair Practices Ordinance reflect broad City policy
> abhorring discrimination and the Boy Scouts' policy and conduct is directly
> contrary to the principles of equal access and opportunity enshrined in
> Philadelphia law; and
>
> WHEREAS, Pursuant to this policy, the City seeks to ensure that the
> benefits of City subsidies are made available to all citizens on a non-
> discriminatory basis; and
>
> WHEREAS, The City's ongoing subsidy of a discriminatory organization
> through the allowance of free use of a building is directly contrary to the City's
> policy and practice of refusing to support discrimination, and of ensuring non-
> discriminatory access to City benefits; and

. . . .

RESOLVED, BY THE COUNCIL OF THE CITY OF PHILADELPHIA,
That termination of the arrangement with the Boy Scuts . . . is hereby approved,
subject to withdrawal upon agreement by the Boy Scouts to pay fair market rent or
the Boy Scouts ending its discriminatory policy and practice.

(Br. Supp. City's Mot. Dismiss, Ex. 2.)[2]

The City set a deadline of May 31, 2008, for Cradle to either change its policy,

pay rent of $200,000 per year, or face eviction. (Compl. ¶ 39.)  On May 23, 2008, just five days

before this deadline, Cradle filed its Complaint.

**B.  The Claims**

Cradle first asserts that the City violated its First Amendment and Fourteenth

Amendment rights, and seeks relief under 42 U.S.C. § 1983.  In Count I, Cradle claims that the

City unconstitutionally conditioned receipt of subsidies on foregoing activity protected by the

First Amendment.  Also in violation of the First Amendment, Cradle claims that by seeking

eviction, the City engaged in viewpoint discrimination.  Next, Cradle claims in Count II that the

City violated the Equal Protection Clause of the Fourteenth Amendment by targeting Cradle for

eviction, while numerous other similarly situated groups have not been targeted for termination

of receipt of subsidies.  In Counts III and IV, Cradle asserts the same basic claims under the

Pennsylvania Constitution, Article I, sections 1 and 26.

In Count V, Cradle seeks a declaration from the Court that the City breached an

oral contract in which in exchange for the Non Discrimination Statement and other concessions

---

[2]  As legislative records, the Court may take judicial notice of both the City Council
Resolution and the City Ordinance, quoted above.  Neither party objects to the introduction of
these documents.

by Cradle, the City agreed not to seek eviction.  Finally, Cradle seeks damages in Count VI for unjust enrichment.  Specifically, Cradle asserts that the City should not receive the benefit of the construction, maintenance, and renovation of the headquarters without compensating Cradle.

The City has filed the present Motion, in which it seeks dismissal of all six counts under Federal Rule of Civil Procedure 12(b)(6).  The City has also raised the question of whether the Court has subject matter jurisdiction, a question the Court will turn to first.

## II.  JURISDICTION

Without making an argument one way or the other, the City raises the issue of this Court's subject matter jurisdiction.  The City worries that Cradle's request for relief, though styled as a Complaint, is really the interposition of a defense, and that it is only this defense that raises federal issues; as such, there may not be federal question jurisdiction.  According to Cradle's straightforward response, its Complaint includes allegations of constitutional violations, and the state claims are covered by supplemental jurisdiction.  The Court agrees that there is subject matter jurisdiction.

The Complaint asserts that this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.  Under the well-pleaded complaint rule, determining whether there is a federal question is usually a simple matter of looking at the face of the complaint.  However, when a party's complaint seeks declaratory relief, this simple exercise can become more complicated, because in such cases, the position of the parties is often reversed: the plaintiff asserts a defense to an anticipated action by the declaratory judgment defendant.  The City suggests that Cradle's constitutional claims are really defenses to an anticipated action in ejectment.  In cases where the parties are reversed, it is well understood that it is the character of

the impending action, not the plaintiff's defense, that determines whether there is federal question jurisdiction. <u>Skelly Oil Co. v. Phillips Petrol. Co.</u>, 339 U.S. 667, 672 (1950).  In other words, a district court lacks jurisdiction where, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state-created action. <u>Franchise Tax Board</u>, 463 U.S. 1, 16 (1983) (citing <u>Skelly Oil</u>, 339 U.S. at 672).

       This rule, however, is inapplicable here.  The Court concludes that Cradle's Complaint not only requests declaratory relief, but properly seeks relief under section 1983 for actions already taken by the City.  The City has taken legal steps to evict Cradle—first, when the Commissioners of Fairmount Park gave notice to Cradle that it was ending the lease arrangement, and second, when the City Council voted to approve of this decision.  Both of these acts are required by the City Ordinance in order to put Cradle on notice that their property rights were to be terminated.  These acts have affected Cradle's rights.  Cradle now seeks damages for the loss of those rights, and seeks to prevent any further constitutional violations.  Thus, based on the Complaint, the Court concludes that Cradle's section 1983 claims arise out of the Constitution.  The Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

## III.  STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(6)

       A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  Recently, the standard of review for a 12(b)(6) motion has undergone some revision, with the Supreme Court rejecting the common formulation that "[d]ismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." See Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.

2008) (internal quotation marks omitted) (discussing Bell Atlantic Corp. v. Twombly, 127 S. Ct.

1955 (2007)).

Although Twombly adjusted the 12(b)(6) standard to some extent, the Third

Circuit has reiterated that many of the central aspects of the standard remain unchanged:  The

Plaintiff is still only required to include a "short and plain statement . . . showing that the pleader

is entitled to relief"; detailed factual allegations remain unnecessary. Id. (quoting Twombly, 127

S. Ct. at 1964).  The allegations in the Complaint must be accepted as true, and likelihood of

success on the merits may not be a consideration. Id. (citing Twombly, 127 S. Ct. at 1964-65,

1969 n.8).  Moreover, all reasonable inferences must still be drawn in favor of the non-movant.

See id. (explaining that while the Supreme Court did not explicitly state that this part of the

12(b)(6) standard remained, its Twombly "decision [did not] undermine that principle").

The Third Circuit did observe two ways in which Twombly altered the 12(b)(6)

standard.  First, sufficient pleading " 'requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do.' " Id. (quoting Twombly, 127 S.Ct. at

1964-65).  The allegations in the complaint must "possess enough heft to 'sho[w] that the pleader

is entitled to relief.' " Id. (quoting Twombly, 127 S. Ct. at 1966).  Put another way, "a

complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative

level.' " Id. at 232 (quoting Twombly, 127 S. Ct. at 1965 & n.3).  Second, "the Supreme Court

disavowed . . . the "no set of facts" language . . . .  It is clear that the "no set of facts" language

may no longer be used as part of the Rule 12(b)(6) standard." Id.  In sum, the "no set of facts"

language was essentially replaced with the "plausibility paradigm": "The Court explained that a

plaintiff must 'nudge [his or her] claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Id. at 233-34 (quoting Twombly, 127 S.Ct. at 1974).  The Third Circuit summarized the adjusted standard as follows:

> '[S]tating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.

Id. at 234 (quoting Twombly, 127 S. Ct. at 1965 n.3).  It is under this modified formulation that we analyze the City's Motion to Dismiss.

## IV.  THE CONSTITUTIONAL CLAIMS

As discussed above, Cradle's constitutional claims are cast as section 1983 claims.  A plaintiff may bring a claim under 42 U.S.C. § 1983 by alleging that a person acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution. Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993).  Section 1983 is not itself a source of substantive rights; to establish a claim, a plaintiff must allege a violation of federal rights established "elsewhere in the Constitution or the federal laws." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  According to the arguments set forth in the City's Motion to Dismiss, Cradle's section 1983 claims fail because the Complaint fails to sufficiently allege predicate constitutional violations.  Therefore, the Court considers in turn each of the constitutional claims.

### A.  Equal Protection Claim

Cradle's equal protection claim is based on a "class of one" theory, under which a plaintiff who is not asserting membership in a protected class may still assert a claim under the Equal Protection Clause. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  By

bringing a class-of-one claim, a plaintiff can protect against "intentional and arbitrary discrimination" by the government. Id. Such claims are intended to allow recourse when "a public official, with no conceivable basis for his action, penalizes a hapless private citizen." Montanye v. Wissahickon School Dist., 327 F. Supp. 2d 510, 518 (E.D. Pa. 2004) (citing Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005)). A plaintiff asserting a class-of-one claim must allege (1) that the defendant, acting under color of state law, intentionally treated plaintiff differently from others similarly situated; and (2) that there is no rational basis for the difference in treatment. Olech, 528 U.S. at 564; Jackson v. Gordon, 145 Fed. Appx. 774, 776-77 (3d Cir. 2005). These two elements are discussed in turn.

### 1. Allegations of Unequal Treatment

Cradle's allegations clearly establish the first element of its class-of-one claim. In the same opinion discussing the changes Twombly brought to the 12(b)(6) standard, the Third Circuit observed that the Supreme Court has "relaxed" the pleading requirements of a class-of-one claim. Phillips v. County of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) (discussing Olech, 528 U.S. 562). The plaintiff need not "identify in the complaint specific instances where others have been treated differently for the purposes of equal protection." Id. at 245. Rather, the Third Circuit concluded that a "more general allegation that similarly situated" persons were treated differently "could fairly be construed as a sufficient allegation for stating an equal protection claim." Id. (internal quotation marks omitted)).

Turning to the allegations here, Cradle does more than necessary to satisfy these pleading requirements, by alleging that the City provides property either rent free or below market to "a variety of individuals, community groups, and even for-profit entities." (Compl. ¶

52.)  The Complaint also states that among these other groups are "several other[s]" who similarly "exclude from their membership classes of individuals." (Id. ¶ 56.)  The Complaint sets forth three arrangements the City has with other tenants, each of which is alleged to have similar membership policies as Cradle and yet none of which has been the target for eviction. (Id. ¶ 21.)  Such allegations establish the first element of a class of one claim, differential treatment.

### 2.  Allegations of No Rational Basis

The second issue in Cradle's class-of-one claim is whether the Complaint sufficiently alleges that there was no rational basis for the City's differential treatment.  Differential treatment does not violate the Equal Protection Clause if there is a rational relationship between the treatment and a legitimate government interest. Heller v. Doe, 509 U.S. 312, 320 (1993). "Because the City's action involves neither fundamental rights nor suspect classifications, it is accorded a strong presumption of validity." Leheny v. City of Pittsburgh, 183 F.3d 220, 226 (3d Cir.1999).

Here, we are confronted with what courts have acknowledged to be a "perplexing situation." See, e.g., Wroblewski v. City of Washburn, 965 F.2d 452, 460 (7th Cir. 1991).  On one hand, the Court is considering a motion to dismiss, meaning that all inferences must be drawn in favor of the non-movant and dismissal is appropriate only if, as discussed above, the Plaintiff has failed to provide factual allegations with the heft to raise the complaint beyond the speculative level.  On the other hand, the City may not be held liable under Cradle's class-of-one claim unless there is no conceivable rational relationship between the differential treatment and a legitimate governmental interest.  Applying the 12(b)(6) standard, every benefit of the doubt goes

to the Cradle, but applying rational basis review, the Court must grant great deference to the City.

Confronted with this question, the Seventh Circuit Court of Appeals explained,

> The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard.  The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim.

Wroblewski, 965 F.2d at 460.  This Court agrees with this reasoning, as have other courts in this Circuit. See, e.g., Good v. Trish, No. 1:06-CV-1736, 2007 WL 2702924, at *7 (Sept. 13, 2007); Montanye v. Wissahickon Sch. Dist., 327 F. Supp. 2d 510, 520 (E.D. Pa.2004).

In examining the Complaint here, the first observation is that at no time does Cradle specifically state that the City's differential treatment bore no rational relationship to a legitimate governmental objective.  However, mere failure to state these specific words does not doom the Complaint. See Montanye, 327 F. Supp. 2d at 520 (finding that general allegations of the government's actions being "arbitrary and wholly irrational" sufficiently stated the second element of Plaintiff's class-of-one claim).  In an opinion the Third Circuit has expressly endorsed, the Second Circuit concluded, "Although [Plaintiff's] complaint does not actually use the word "irrational[]" . . . the allegation of an impermissible motive and of animus is sufficient to establish an equal protection issue"). DeMuria v. Hawkes, 328 F.3d 704, 707 (2d Cir. 2003), discussed in Phillips, 515 F.3d at 245.  Here, the Complaint states that Cradle was "singled out for disfavored treatment" with the intent "to punish Cradle of Liberty for its constitutionally protected membership policy." (Compl. ¶ 36.)  While the Complaint does not spell it out, the implication is that there is no reason—other than its intent to punish Cradle—for the City's action.

12

This poses a close question, but on a Motion to Dismiss, this Court concludes that the allegations are sufficient.  In <u>Trish</u>, the District Court for the Middle District of Pennsylvania similarly chose not to grant a motion to dismiss, even after finding that the government "clearly possesses a legitimate government interest in enforcing its sidewalk ordinance, which is designed to protect the safety and welfare of the community by reducing the tripping hazards posed by uneven brick sidewalks." 2007 WL 2702924, at *7.  The court reasoned, "the question of whether [defendant's] decision to selectively enforce the sidewalk ordinance against [plaintiff] bore a rational relationship to this legitimate government objective is better suited for summary judgment." <u>Id.</u>  Thus, following <u>Trish</u>'s reasoning, even if this Court assumes that there was a legitimate government interest for ending subsidized use of city properties to those who engage in discrimination, there is still the question of selective enforcement—why did the City target Cradle specifically?  Cradle's Complaint could have been better crafted, but a fair reading suggests that while there were other groups similarly situated to Cradle, the City chose to selectively evict Cradle.  There is no rational basis for this differential treatment evident in the

Complaint or in some other admissible form, and the City does not argue otherwise.[3]   Therefore,

the City's Motion to Dismiss is denied with respect to Cradle's equal protection claim.

### B.  First Amendment Claims

#### 1.  Viewpoint Discrimination

In its Complaint, Cradle claims that the City "has created a government forum by

leasing or otherwise allowing the use of scores of properties to a variety of individuals,

community groups, and even for-profit entities for numerous social, recreational, civic,

charitable, religious, and operational purposes." (Compl. ¶ 46.)  By creating a forum, according

to the Complaint, the City must make "decisions regarding allocation of funds or resources . . . in

---

[3]  In determining on a motion to dismiss whether there is a rational basis for the government's action, courts typically look to the complaint itself for evidence of a rational basis. Here, the Complaint states that, at the time the events transpired, the City justified its decision to evict first by arguing that Cradle's membership policy violated the Fair Practices Ordinance, (Compl. ¶ 24), and then later by arguing that it violated the Home Rule Charter and the Philadelphia Code, (id. ¶ 36; see also Br. Supp. City's Mot. Dismiss, Ex. 2.).  However, the City does not argue in its motion or in any of its briefs that these statutes or regulations constitute evidence that there was a rational basis for the treatment.  In fact, the City does not argue in any way that its actions were rationally related to a legitimate government purpose.  Instead, the City merely points out that the Complaint fails to state that there was no rational basis.  As explained above, these words are not necessary, and this Court concludes that a reasonable inference from the Complaint is that there was no rational basis for the City's differential treatment.  As discussed above, Twombly did not work such a sea change as to disallow reasonable inferences when considering a motion to dismiss. See Phillips, 515 F.3d at 231.

Additionally, the City's argument that Cradle is only asserting animus on the part of the City, rather than no rational basis, misunderstands Cradle's allegation.  Cradle is alleging that the only potential reason that the City can proffer for its actions is that it wanted to punish Cradle for its protected speech.  Because such reasons are impermissible standing alone, this would not be a rational basis, according to Cradle.  We make no judgment as to whether this was in fact the City's basis for its actions.  After discovery, no doubt the City will put forward further bases for its decision to end its rent-free relationship with Cradle.  But as of right now, the City has failed to argue that a rational basis for its actions are evident from the Complaint or any other admissible source.

14

a manner that is viewpoint neutral." (<u>Id.</u> ¶ 47.)  The City argues that it has not created a government forum at all, and therefore Cradle's claim has no merit.

The Supreme Court has identified three types of forums: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." <u>Cornelius</u> <u>v. NAACP Legal Defense & Ed. Fund, Inc.</u>, 473 U.S. 788, 802 (1985).  "Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.' " <u>Ark. Educ.</u> <u>Television Comm'n v. Forbes</u>, 523 U.S. 666, 677 (1998) (quoting <u>Perry Ed. Ass'n v. Perry Local</u> <u>Educators' Ass'n</u>, 460 U.S. 37, 45 (1983)).  "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.' " <u>Id.</u> (quoting <u>Cornelius</u>, 473 U.S. at 802).

The government creates a designated public forum not "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." <u>Cornelius</u>, 473 U.S. at 802.  "[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." <u>Id.</u>  In this kind of forum, strict scrutiny is only applied if the government excludes a speaker who falls within the class to which a designated public forum is made generally available. <u>Forbes</u>, 523 U.S. at 677.

Other government properties are either nonpublic fora or not fora at all. <u>Id.</u>  The government can restrict access to a nonpublic forum "as long as the restrictions are reasonable

and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." <u>Cornelius</u>, 473 U.S. at 800.

Before determining what kind of government forum, if any, we are dealing with,[4] the Court must determine what exactly Cradle alleges to be the forum in question, or, as the <u>Cornelius</u> Court put it, the Court must "define[] the relevant forum." <u>Id.</u>  The City suggests that the forum in question is the building itself; by contrast, Cradle argues that the forum it is concerned with is the policy of leasing city property to numerous organizations.  Under this view, we could imagine the forum as all city property leased at subsidized rates.  In <u>Cornelius</u>, the Court explained, "In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." <u>Id.</u> at 801.  Accordingly, the Court has found that a program overseeing who could use the mail system within a school building was the relevant forum, <u>id.</u> (citing <u>Perry Ed. Ass'n</u>, 460 U.S. 37); similarly, determination of who could use classrooms within a school system also was the relevant forum, <u>see, e.g.</u>, <u>Good News Club v. Milford Cent. Sch.</u>, 533 U.S. 98, 106 (U.S. 2001); and in <u>Cornelius</u> itself, the Court found that a federal program overseeing what charitable organizations could solicit funds within the federal workplace was the relevant forum, 473 U.S. at 801-02.  Here, based on these cases, the Court concludes that the City's program of leasing

---

[4] In <u>Cornelius</u>, the Supreme Court advised that the first question to be answered in this kind of claim is whether the activity impacted by the government action is "speech protected by the First Amendment, for, if it is not, we need go no further." 473 U.S. at 797.  Without going into great detail, the Court concludes that Cradle is, through it's membership policies, engaging in speech protected by the First Amendment.  In <u>Boy Scouts of Am. v. Dale</u>, the Supreme Court held that the "Boy Scouts is an expressive association and that the forced inclusion of [a gay scoutmaster] would significantly affect its expression." 530 U.S. 640 (2000).  Thus, it is clear that Cradle's membership policy is a form of expression protected by the First Amendment, which may be impacted by the government action here.

out space throughout the city at subsidized rates, assuming there is such a program as we must in

a motion to dismiss, is the relevant forum.

Having established this, the Court finds that the Complaint alleges enough to at

least suggest that the alleged program or policy is a nonpublic forum.[5]  According to the

Complaint, the City opens up the use of its properties to numerous organizations who then use

them for whatever purpose they choose.  Implicit in this allegations is that these groups often

engage in speech.  By opening up city property to such use, the Complaint supports the

conclusion that the City may have created at least a non-public forum.

Of course, this does not end the inquiry.  As stated above, when the government

seeks to limit access to a nonpublic forum, the limitation does not violate the First Amendment if

it is reasonable and viewpoint neutral. See Cornelius, 473 U.S. at 800; Boy Scouts of Am. v.

Wyman, 335 F.3d 80, 92 (2d Cir. 2003).  Here, we cannot begin to analyze these issues because

the City has not set forth in its briefing the justifications for its actions, nor are the reasons

---

[5]  To differentiate a nonpublic forum and a designated public forum, the Supreme Court
has crafted

> a distinction between "general access," which indicates the property is a
> designated public forum, and "selective access," which indicates the property is a
> nonpublic forum.  On one hand, the government creates a designated public
> forum when it makes its property generally available to a certain class of speakers, as the
> university made its facilities generally available to student groups in Widmar. On
> the other hand, the government does not create a designated public forum when it
> does no more than reserve eligibility for access to the forum to a particular class
> of speakers, whose members must then, as individuals, "obtain permission," to
> use it.

Forbes, 523 U.S. at 679 (citations omitted).  The Court cannot apply this distinction here.  The
details of the City's process for leasing subsidized properties—again, assuming there is one—is
not evident from the Complaint.  Discovery is clearly necessary to make such a determination.

evident in the Complaint.  See supra n.2.  In another case involving the Boy Scouts and in which

this standard was applied, the Second Circuit examined the legislative purpose of the statute used

to deny access to the Boy Scouts, Wyman, 335 F.3d at 93-95; examined a fully developed record

to determine whether the government "applied the Gay Rights Law in a viewpoint discriminatory

manner," see id. at 93-96; and carefully examined that record to determine if the state's acts were

reasonable, see id. at 97-98.  See also Cornelius, 472 U.S. at 808-12 (finding the restriction on

access to a nonpublic forum to be reasonable after examining the justifications advanced by the

government, but remanding to the district court to determine whether the purported justification

concealed bias amounting to viewpoint discrimination).  This Court lacks a developed record at

this stage in the litigation.  Without the benefit of discovery, it is clear that determining whether

the City's actions were reasonable and viewpoint neutral would be premature.  Thus, the Motion

to Dismiss Cradle's viewpoint discrimination claim is also denied.

## 2.  Unconstitutional Conditions

Cradle claims that the City is unconstitutionally conditioning its subsidized use of

City property on sacrificing its First Amendment right to expressive association.  The general

idea behind the unconstitutional conditions doctrine is that the government "may not deny a

benefit to a person on a basis that infringes his constitutionally protected interests—especially his

interest in freedom of speech." Perry v. Sinderman, 408 U.S. 593, 597 (1972).  "Put another way,

the Government may not propose a penalty 'to produce a result which [it] could not command

directly.' " Forum for Academic and Institutional Rights (FAIR) v. Rumsfeld (FAIR I), 390 F.3d

219, 229 (3d Cir. 2004) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)), rev'd, Rumsfeld

v. Forum for Academic & Institutional Rights (FAIR II), 547 U.S. 47 (2006).  Unconstitutional

18

conditions claims have proven troublesome, and courts have wrestled with how to best apply a series of Supreme Court cases that appear to be in some conflict.  Additionally, there is a great deal of overlap between the doctrine of unconstitutional conditions and claims of viewpoint discrimination like the one addressed above. See Wyman, 335 F.3d at 92 (observing that "[t]he case before us," which also involved the Boy Scouts, "lies at the intersection of these two lines of authority").

The Third Circuit recently examined the unconstitutional conditions doctrine in FAIR I.  There, a group of law schools challenged the Solomon Amendment, which withheld a broad array of federal funding from universities that did not provide access to military recruiters. Id. at 224.  As the Third Circuit succinctly put it, "if the law schools' compliance with the Solomon Amendment compromises their First Amendment rights, the statute is an unconstitutional condition." Id. at 229.  The court went on to find that forcing the law schools to accommodate military recruiters both violated the law schools' right of expressive association and impermissibly compelled speech. Id. at 230-42.  Having established this, the court applied strict scrutiny and determined that the government could not demonstrate that its actions survived this test. Id. at 243.

The Supreme Court reversed in Fair II, stating that "[b]ecause the First Amendment would not prevent Congress from directly imposing the Solomon Amendment's access requirement, the statute does not place an unconstitutional condition on the receipt of federal funds." 547 U.S. 47, 60 (2006).  In other words, the Supreme Court disagreed that the Solomon Amendment compromised FAIR's First Amendment rights, whether framed as FAIR's right to be free of compelled speech or its right of expressive association. See id. at 61-68.

19

Because no First Amendment right had been compromised, the Supreme Court observed that "[t]his case does not require us to determine when a condition placed on university funding . . . becomes an unconstitutional condition." Id. at 59.  Therefore, it would seem that the overarching structure of the Third Circuit's unconstitutional conditions analysis went undisturbed: If a condition compromises a First Amendment right, then that condition may be subject to heightened scrutiny.

However, in Fair I, the Third Circuit identified an "exception to the unconstitutional conditions doctrine for selective spending programs." 390 F.3d at 229 n.9.  The court cited two cases that the City relies on in the Motion to Dismiss presently before this Court. In Rust v. Sullivan, the Supreme Court held that the government's choice to limit certain medical funding to non-abortion-related activities was not an unconstitutional condition. 500 U.S. 173 (1991).  And in United States v. Am. Library Ass'n, Inc., the Supreme Court held that certain conditions on federal funding to libraries that required libraries to install filtering software on their computers likewise was not an unconstitutional condition. 539 U.S. 194 (2004).  The Third Circuit explained that this exception—exemplified by these two cases—did not apply in FAIR, because "the Solomon Amendment does not create a spending program." 390 F.3d at 229 n.9. According to the Third Circuit, the Solomon Amendment applied a penalty. Id.  The failure to provide access to military recruiters resulted in the termination of federal funding across the university, affecting university programming unrelated to on-campus recruiting.

Though approaching the issue from a very different angle, the California Supreme Court, in Evans v. City of Berkeley, 129 P.3d 394 (Ca. 2006), has essentially described a similar framework to the unconstitutional conditions doctrine.  The Evans court was presented with a

20

very similar factual scenario to the one here.  There, the City of Berkeley terminated the Sea

Scouts' free use of a marina berth. Id. at 397-98.  The City of Berkeley did so as a result of the

Sea Scouts' failure to ensure that it would not discriminate against homosexuals in its activities

related to the use of the marina berth. Id. at 399.  The Evans court examined the unconstitutional

conditions doctrine, stating, "The [Supreme Court] has generally approved, against First

Amendment challenges, programs of governmental financial assistance that limit the expressive

activities for which the funds may be used." Id. at 400.  The California court relied on Rust, in

which the U.S. Supreme Court stated,

> The Government can without violating the Constitution, selectively fund a
> program to encourage certain activities it believes to be in the public interest,
> without at the same time funding an alternative program which seeks to deal with
> the problem in another way.  In so doing, the Government has not discriminated
> on the basis of viewpoint; it has merely chosen to fund one activity to the
> exclusion of the other.  A legislature's decision not to subsidize the exercise of a
> fundamental right does not infringe the right.

500 U.S. at 198.

Having concluded that restrictions on the use of government funding are

presumptively valid, the Evans court then identified two exceptions:  "First, a funding restriction

that has as its purpose the suppression of a disfavored viewpoint . . . is subject to strict scrutiny

...", Evans, 129 P.3d at 401; and  "[s]econd, a restriction is suspect to the extent it goes beyond

limiting the government funded expressive activity of the recipient and attempts further to limit

expressive activities that are not government funded," id. at 403.  The first of these exceptions

essentially states the requirement that conditions must be viewpoint neutral. See Wyman, 335

F.3d at 92 (citing Regan v. Taxation with Representation of Washington, 461 U.S. 540, 550

(1983))

The second of these exceptions actually describes the way the Third Circuit managed to distinguish FAIR I from Rust. The Third Circuit observed that unlike the statute in Rust, the Solomon Amendment did more than refuse to allow its funds to be used for disfavored speech; it punished those who engaged in disfavored speech by de-funding university activities unrelated to on-campus interviews. 390 F.3d at 229 n.9. The scope of the Solomon Amendment was far broader than the scope of the statute at issue in Rust. In Rust, the Supreme Court stated that a condition is suspect when it places "a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." 500 U.S. at 197 (emphasis in original). The Rust Court found it vital that under the statute it was analyzing, recipients of federal aid could "'continue to . . . engage in abortion advocacy . . . through programs that were separate and independent from' the federally assisted project." See Evans, 129 P.3d at 403 (quoting Rust, 500 U.S. at 196.) There was no such option, in FAIR I, for a university. If a university did not provide equal access to military recruiters, it would be subject to losing federal funding across the university.

Viewed in this light, these cases produce a coherent analytical framework The first question is whether the government's condition compromises a First Amendment right. The next question is the scope of the condition. If the condition seeks to limit the use of the government subsidy only, and the condition does not impose a penalty beyond the withdrawal of the subsidy itself, then the condition need merely be reasonable and viewpoint neutral. If the condition, on the other hand, is broader in scope, a heightened level of scrutiny may be applied.

Turning to the facts here, the Complaint provides sufficient allegations to conclude that the City's actions may have compromised Cradle's First Amendment rights.  In Boy Scouts of Am. v. Dale, the Supreme Court held that the "Boy Scouts is an expressive association and that the forced inclusion of [a gay scoutmaster] would significantly affect its expression." 530 U.S. 640, 656 (2000).  Unlike in FAIR II,—where the Supreme Court found that the Solomon Amendment in no way compromised FAIR's constitutional rights because the government could outright require that universities provide access to military recruiters—under Dale, it is clear that the City could not outright require Cradle to change its membership policies. According to Cradle's Complaint, the City has explicitly demanded that Cradle change its policy of excluding homosexuals, conditioning Cradle's continued use of its headquarters on this change.  Allegations of such conditions, assuming they were imposed, constitute a claim that Cradle's First Amendment rights were compromised.

As to the second step of the analysis, the Court cannot, at this stage of the litigation, make a determination as to the scope of the regulation.  It appears clear that the City sought only to withdraw the subsidized use of City property, and therefore that the condition was narrow in this sense.  What is unclear is whether the City is seeking to limit expressive activities that are not government funded.  In other words, it is unclear from the present record whether the City is asking Cradle to ensure that there is no discrimination in activities related to the Center, or if the City's demands touch on activities unrelated to the Center as well.

Furthermore, even assuming that the condition was narrow in scope, the Court would still have to determine if the City's actions were viewpoint neutral and reasonable.  As

discussed above in the section concerning Cradle's viewpoint discrimination claim, it would be premature at this time to make that determination.

Therefore, as with the other constitutional claims, the City's Motion to Dismiss must be denied as to Cradle's unconstitutional conditions claim.[6]

## V. STATE LAW CLAIMS

### A. Contract

Under Pennsylvania law, to state a claim for breach of contract, a plaintiff must allege three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (internal quotation marks omitted). The City argues that Cradle has failed to state a claim for breach of contract because the Complaint does not properly allege the first of these elements, formation of an enforceable contract. Specifically, the City states that under the Philadelphia Home Rule Charter, a contract must be in writing and approved by the City Law Department; absent allegations of the contract meeting these requirements, Cradle has failed to state a viable contract claim.

Pennsylvania courts have held that "government officials cannot bind the government without the necessary statutory approval." See Chainey v. Street, 523 F.3d 200, 211 (3d Cir. 2008) (citing City of Scranton v. Heffler, Radetich & Saitta, LLP, 871 A.2d 875, 880

---

[6] Pennsylvania courts have indicated that Pennsylvania's constitutional provisions concerning speech and equal protection mirror the Federal Constitution's. Kroger v. O'Hara Twp., 392 A.2d 266, 274 (Pa. 1978) ("Although the view of the United States Supreme Court concerning proper guidelines for its interpretation of the federal constitution is not binding upon us in interpreting the Pennsylvania Constitution, we agree that we should be guided by the same principles in interpreting our Constitution."). Therefore, for the same reasons outlined above, the City's Motion to Dismiss is denied with respect to Cradle's state constitutional claims.

(Pa. Commw. Ct. 2005).  "Where a municipality must execute a contract in a particular manner under legislative pronouncement, failure to comply with the pronouncement renders the contract unenforceable." City of Scranton, 871 A.2d at 880.  The City argues that Cradle fails to allege that the agreement met Philadelphia's contracting requirements.  The City asserts that any contract with the City of Philadelphia must be "(1) in writing, and (2) prepared or approved by the City Law Department." (City's Mem. Supp. Mot. Dismiss 26.)  To support this understanding of the law, the City cites two sections of the Philadelphia Home Rule Charter:

> Contracts and Bonds. The [City Law] Department shall prepare or approve all contracts, bonds and other instruments in writing in which the City is concerned, and shall approve all surety bonds required to be given for the protection of the City.  It shall keep a proper registry of all such contracts, bonds and instruments.

351 Pa. Code § 4.4-400(c).

> Contracts. Before any contract shall be effective, the [City] Director of Finance shall approve it as to the availability of appropriated funds.  He shall designate on every such contract, the appropriation under which it is made and shall give it a number in the order of its date.  He shall, in the order in which each contract is numbered, charge the appropriation out of which expenditures thereunder will be made.

351 Pa. Code § 6.6-104.

        The first of these provisions clearly requires that the City Law Department prepare or approve and keep a registry of all contracts.  It is undisputed that the City Law Department did not "prepare" a contract, and the Court agrees with the City that Cradle's allegations do not sufficiently allege that the City Law Department approved of the agreement.  The Complaint alleges that in June 2003, the City Solicitor—the head of the Law Department—began an inquiry into the legality of Cradle's rent-free arrangement with the city. (Compl. ¶ 25.)  The Complaint continues, "In an effort to reach an amicable resolution of the dispute, a series of meetings

involving differing combinations of representatives of the Mayor's office, the City Law

Department, certain activists, Cradle of Liberty and others occurred between September 2003 and

January 23, 2004." (Id. ¶ 26.)  These meeting culminated in the drafting of the Non

Discrimination Statement, in exchange for which, the City—the Complaint does not state who

specifically—agreed to forego further attempts to evict. (Id. ¶¶ 30-32.)  There is no allegation

about who specifically entered into the agreement, or who, if anyone, approved of the agreement

on behalf of the City Law Department.  Pennsylvania law is clear that " '[p]ersons contracting

with a governmental agency must, at their peril, know the extent of the power of its officers

making the contract.' " Chainey, 523 F.3d at 211 (quoting Innes v. Sch. Dist. of Nanticoke, 20

A.2d 225, 227 (Pa. 1941).  Likewise, in drafting a complaint, a party must understand the legal

contracting requirements and lend some specificity to its claims suggesting proper authority and

procedure.  The allegations in this Complaint have not pushed this part of the contract claim

beyond the speculative, and therefore the claim must be dismissed.  See Phillips v. County of

Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).

      The next question is whether the above-quoted provisions from the Philadelphia

Home Rule Charter create a writing requirement.  The provisions neither clearly state that all

contracts with the City must be in writing, nor is there any case cited by the City, or that this

Court is aware of, that has interpreted these provisions to require a writing.[7]  The City, however,

---

[7]  In Chainey, the Third Circuit refused to enforce promises made by the former Mayor of Philadelphia. 523 F.3d at 211-12.  The Mayor had written a letter to several constituents promising to pay for new housing to replace homes the City had destroyed many years before. Because "Plaintiffs presented no evidence that the City Law Department or Finance Department prepared or approved the Rendell Letter," id. at 211, the court held that "the Rendell letter lacked actual authority to bind the city," id. at 212.  The Chainey court never interpreted the Home Rule Charter to require all contracts be in writing.  The issue there was not whether the agreement was

argues that a writing requirement is implicit in the following language: "The Department shall prepare or approve <u>all contracts</u>, bonds <u>and other instruments in writing</u> . . . ." (<u>See</u> City's Reply Br. 12 (quoting 351 Pa. Code § 4.4-400(c) (emphasis added by the City)).)  The Court agrees. The "other instruments in writing" language clearly suggests that contracts and bonds must also be in writing.  The fact that the Law Department must keep a registry of all contracts further implies a writing requirement. 351 Pa. Code § 4.4-400(c).  Similarly, the following provision concerning budgeting approval assumes that all contracts are to be in written form: "Before any contract shall be effective, the [City] Director of Finance shall approve it as to the availability of appropriated funds.  He <u>shall designate on every such contract</u>, the appropriation under which it is made and shall give it a number in the order of its date." 351 Pa. Code § 6.6-104 (emphasis added).  Taken together, this Court concludes that to be enforceable, a contract with the City must be in writing.  Cradle admits that the alleged agreement was not in writing. (<u>See</u> Cradle's Br. Opp'n 24 ("The complaint alleges the existence of an oral agreement . . . .").)

Cradle argues that even if the alleged agreement did not meet the formal contracting requirements set forth in the Philadelphia Home Rule Charter, the Complaint sufficiently alleges that the City ratified the oral agreement.  "It is well settled that a municipal corporation may ratify contracts which are within its corporate powers and made by its officers without authority, or in excess of their authority." <u>Eckert v. Pierotti</u>, 553 A.2d 114, 118 (Pa. Commw. Ct. 1989). "Ratification may consist of affirmative action by the proper officials or by other action or inaction that amounts to approval of the contract under the circumstances.  But where a previously unauthorized contract is retroactively ratified by post-contract approval, such

_____

in writing—clearly, it was—rather the issue was the Mayor's authority.

post-contract ratification must be approved by everyone whose approval was previously required under applicable law." <u>Chainey</u>, 523 F.3d at 213 (internal quotation marks and alterations omitted).

The Court finds no allegations suggesting post-contract approval by the City Law Department.  In <u>Chainey</u>, the Third Circuit held that because "plaintiffs presented no evidence of post-contract approval from either the City Law Department or Finance Department, [] they cannot establish ratification." <u>Id.</u>  Similarly, here, there is no allegation that the City Law Department somehow accepted the terms of the agreement after the oral agreement had been made.  Mere failure to evict Cradle does not constitute "inaction that amounts to approval of the contract under the circumstances." <u>Id.</u>  According to the Complaint, the next year, the City once again contacted Cradle and requested a clarification of the Non Discrimination Statement.  This action directly contradicts the allegation that the agreement was ratified.

Because the Complaint does not properly allege that the Contract met Philadelphia's contracting requirements and the Complaint provides no allegations suggesting ratification, Cradle's contract claim is dismissed.

**B.  Unjust Enrichment**

The City argues that Cradle's unjust enrichment claim should be dismissed because Pennsylvania law does not recognize unjust enrichment when there is a contract setting forth the rights of the parties.  It is well-established in Pennsylvania that where an express or implicit contract governs the relationship, there may be no recovery for unjust enrichment. <u>Hershey Foods Corp. v. Ralph Chapek, Inc.</u>, 828 F.2d 989, 999 (3d Cir. 1987); <u>see also</u> <u>Rahemtulla v. Hassam</u>, 539 F. Supp. 2d 755, 780 (M.D. Pa. 2008) ("[T]he doctrine of unjust

enrichment is inapplicable when the relationship between the parties is founded upon written agreements, no matter how harsh the provisions of such contracts may seem in the light of subsequent happenings." (internal quotation marks omitted)).  In explaining this rule, one court reasoned that "the essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover." Synesiou v. DesignToMarket, Inc., Civ. A. No. 01-5358, 2002 WL 501494, at *4 (E.D. Pa. Apr. 3, 2002).  Thus, where a direct relationship already exists, there is no need for the equitable remedy of unjust enrichment.

The City argues that the City Ordinance conveying to Cradle its interest in the property created a contractual relationship, and thus Cradle should not be allowed to maintain a claim of unjust enrichment.  The Court agrees.  As the parties acknowledge, there are no cases that can be found in which Pennsylvania courts have weighed in on whether a state statute can create a contractual relationship. See Young v. Bethlehem Area Vo-Tech School, 06-2285, 2007 WL 674617, at *13 (E.D. Pa. Feb. 28, 2007) ("This Court is aware of no case applying Pennsylvania law to decide whether a statute, or something perhaps resembling a statute . . . is a contract.").  However, in the federal context, the Supreme Court has stated that "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 18 n.14 (U.S. 1977).  The Third Circuit has applied this rule in a case involving a Virgin Islands statute. West Indian Co., Ltd. v. Gov't of Virgin Islands, 844 F.2d 1007, 1016-17 (3d Cir. 1988).  There, upon finding that "both sides compromised legitimate claims in reaching [an] agreement"memorialized in a statute, and after observing that the language of the statute stated that the "Agreement shall be binding upon and shall inure to the

benefit of the parties," the Third Circuit concluded "that there [was] unambiguous evidence [] of legislative intent to create enforceable private rights." Id.

The Court finds these cases persuasive as to determining if and when a statute creates a contractual relationship. Applying this standard here, the Court concludes that the Ordinance created such a relationship. The Ordinance clearly establishes the rights and obligations for both the City and Cradle with respect to use of the City property in question. Cradle received the benefit of the use of City land, upon which Cradle was empowered to build its headquarters. There were several limits on Cradle's use of the property set forth in the Ordinance: the Ordinance required that the building and lot "be kept in good order;" the building was to be "used exclusively by the Boy Scouts for their own activities;" and upon completion, the building would "become at once the property of the City." (Br. Supp. City's Mot. Dismiss, Ex. 1.) The City, on the other hand, was required by the Ordinance to give Cradle one year's notice, after approval by the Fairmount Park Commissioners and the City Council, before it could take back possession of the property. (Id.) The language of the Ordinance suggests that by enacting this law, the City intended to create private rights of a contractual nature. If the City had failed to provide one year's notice, for example, Cradle could have enforced the terms of the Ordinance to avoid eviction.

Even if the Ordinance is not a "contract" by name, it carries all the attributes of a contract that have led Pennsylvania courts to disallow an unjust enrichment claim when there is a formal relationship set out in a contract. As explained above, the "the essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover." Synesiou, 2002 WL 501494, at *4. Here, Cradle had a formal

relationship of a contractual nature as expressed in the Ordinance.  Therefore, under

Pennsylvania law, the unjust enrichment claim must fail.

**VI.  CONCLUSION**

        For the reasons stated above, the Court denies Defendant's Motion to Dismiss on

the constitutional claims.  The Court grants the Motion to Dismiss on the contract and unjust

enrichment claims.  An Order consistent with this Memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | CIVIL ACTION |
| BOY SCOUTS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | NO. 08-2429 |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

**AND NOW**, this 25th day of September, 2008, upon consideration of Defendant

City of Philadelphia's Motion to Dismiss (Docket No. 9), Plaintiff Cradle of Liberty's

Opposition to Defendant's Motion to Dismiss (Docket No. 10), Defendant's Reply (Docket No.

11), and Plaintiff's Surreply (Docket No. 12), it is hereby **ORDERED** that:

    1.  Defendant's Motion to Dismiss is **DENIED** as to Counts I, II, III, and IV; and

    2.  Defendant's Motion to Dismiss is **GRANTED** as to Counts V and VI.

BY THE COURT:

*s/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.