**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CRADLE OF LIBERTY COUNCIL,
INC., BOY SCOUTS OF AMERICA
22ND & Winter Streets
Philadelphia, Pennsylvania  19103

       Plaintiff,

       v.

CITY OF PHILADELPHIA
1515 Arch Street
Philadelphia, PA  19102

       Defendant.

Civil Action No. 08-02429

## ORDER

AND NOW, this ____day of _____, 2010, upon consideration of Plaintiff's Motion for Summary Judgment, and any response thereto:

1.      THE COURT FINDS that, as to each of Plaintiff's claims in this matter, there is no genuine issue of material fact, and Plaintiff is entitled to judgment as a matter of law;

2.      THE COURT FINDS that, as to each of Defendant's counterclaims in this matter, there is no genuine issue of material fact, and Plaintiff is entitled to judgment as a matter of law;

3.      THE COURT GRANTS Plaintiff's Motion for Summary Judgment;

4.      THE COURT ORDERS that Defendant is permanently enjoined from commencing or continuing any proceedings to evict Plaintiff from its headquarters building based on Plaintiff's adherence to its constitutionally protected leadership policy;

5.      THE COURT ORDERS that Defendant is not entitled to recover on its claims for holdover rent;

6.      THE COURTS ORDERS that, because Defendant is now permanently enjoined from any efforts to evict Plaintiff based on Plaintiff's adherence to its constitutionally protected leadership policy, the preliminary injunction entered in this matter on November 18, 2009 is dissolved;

7.      THE COURT DECLARES that Defendant's efforts to evict Plaintiff from its headquarters building due to Plaintiff's adherence to its constitutionally protected leadership policy and Defendant's refusal to afford Plaintiff the same privileges available to other organizations violated Plaintiff's rights guaranteed by the Constitution and laws of the United States and the Commonwealth of Pennsylvania;

8.      THE COURT DECLARES, pursuant to 42 U.S.C. § 1988, that Plaintiff, as the prevailing party, is entitled to reasonable attorneys' fees;

9.      THE COURT ORDERS that future proceedings in this action will be limited to the determination of the amount of damages, interest, and attorneys' fees and costs due.


BY THE COURT:


_____
Buckwalter, S.J.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | CIVIL ACTION |
| BOY SCOUTS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | No. 08-CV-2429-RB |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF CRADLE OF LIBERTY COUNCIL, INC., BOY SCOUTS OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Cradle of Liberty Council Inc., Boy Scouts of America, by and through its undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for an order entering summary judgment in its favor and against Defendant City of Philadelphia.

In support of its Motion for Summary Judgment, Plaintiff relies on the arguments set forth in the attached Memorandum of Law and other documentary evidence of record, which is expressly incorporated herein by reference.

Dated: March 1, 2010

/s/ Jason P. Gosselin
Jason P. Gosselin
William M. McSwain
Daniel B. Scott
Richard M. Haggerty
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA  19103-6996
(215) 988-2700

*Attorneys for Plaintiff, Cradle of Liberty Council, Inc., Boy Scouts of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | CIVIL ACTION |
| BOY SCOUTS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | No. 08-CV-2429-RB |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CRADLE OF LIBERTY COUNCIL, INC., BOY SCOUTS OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America ("Cradle of Liberty"), by and through its undersigned counsel, hereby respectfully submits this memorandum of law in support of its motion for summary judgment on its claims against Defendant City of Philadelphia ("City") and the City's counterclaims against Cradle of Liberty.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ....................................................... 2
      A.    The Boy Scouts of America ..................................................................... 2
      B.    Construction and Use of Headquarters Building ..................................... 4
      C.    First Amendment Violations .................................................................... 4
            i.     The City Created a Forum .............................................................. 5
            ii.    City's Eviction Efforts Motivated Solely By Hostility to Cradle of
                   Liberty's Leadership Policy ........................................................... 7
            iii.   The City Is Placing an Unconstitutional Condition on Cradle of
                   Liberty's Continued Use of Its Headquarters ............................... 9
      D.    Fourteenth Amendment Violations ........................................................ 10
            i.     Organizations With Exclusive Leadership or Membership Policies ....... 11
                   a.    Colonial Dames of America .............................................. 11
                   b.    Saint Joseph's University .................................................. 13
            ii.    Organizations With Apparently Exclusive Leadership or
                   Membership Policies ..................................................................... 15

III.  STANDARD OF REVIEW ............................................................................... 17

IV.   ARGUMENT ..................................................................................................... 18
      A.    There Is No Genuine Issue of Material Fact as to Cradle of Liberty's First
            Amendment Claims ................................................................................ 18
            i.     Viewpoint Discrimination ............................................................ 18
                   a.    The City's Program of Providing Access to City-Owned
                         Property For Free or at Subsidized Rates is a Nonpublic
                         Forum ............................................................................... 18
                   b.    The City Selectively Targeted Cradle of Liberty For
                         Enforcement of Its Anti-discrimination Standards Because
                         the City Disagreed With Cradle of Liberty's Viewpoint ............ 20
            ii.    Unconstitutional Conditions ........................................................ 23
      B.    There is no Genuine Issue of Material Fact as to Cradle of Liberty's Equal
            Protection Claim .................................................................................... 26
            i.     The Evidence Proves Cradle of Liberty's Claim That the City
                   Treated  It Differently Than Other Similarly Situated
                   Organizations ............................................................................... 26
            ii.    The Evidence Demonstrates That the City Had No Rational Basis
                   for  Treating Cradle of Liberty Differently ................................. 28

V.    CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................................................17

*Ark. Educ. Television Comm'n v. Forbes,*
   523 U.S. 666 (1998)............................................................................................19

*Boy Scouts of America v. Dale,*
   530 U.S. 640 (2000).........................................................................1, 3, 18, 22, 23, 24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................................17

*Cleveland v. Policy Mgmt. Sys. Corp.,*
   526 U.S. 795 (1999)............................................................................................17

*Commonwealth v. Albert,*
   758 A.2d 1149 (Pa. 2000)...................................................................................26

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,*
   473 U.S. 788 (1985)..................................................................................19, 20, 21

*Curran v. Mount Diablo Council of the Boy Scouts of America,*
   952 P.2d 218 (Cal. 1998)......................................................................................4

*Dolter v. Wahlert High School,*
   483 F. Supp. 266 (N.D. Iowa 1980).....................................................................14

*Heller v. Doe,*
   509 U.S. 312 (1993)............................................................................................28

*Jackson v. Gordon,*
   145 Fed. Appx. 774 (3d Cir. 2005).......................................................................26

*Knabe v. The Boury Corp.,*
   114 F.3d 407 (3d Cir. 1997).................................................................................17

*Kroger v. O'Hara Twp.,*
   392 A.2d 266 (Pa. 1978)......................................................................................26

*Novak v. Posten Taxi, Inc.,*
   No. 3:08cv912, 2009 U.S. Dist. LEXIS 102903 (M.D. Pa. Nov. 4, 2009).................16

*Pamintuan v. Nanticoke Mem'l Hosp.*,
    192 F.3d 378 (3d Cir. 1999)........................................................................17

*Pap's A.M. v. City of Erie*,
    812 A.2d 591 (Pa. 2002) ..........................................................................26

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..................................................................................6

*In re Sch. Asbestos Litig.*,
    977 F.2d 764 (3d Cir. 1992)........................................................................3

*Schoonejongen v. Curtiss-Wright Corp.*,
    143 F.3d 120 (3d Cir. 1998)......................................................................17

*Trap Rock Indus., Inc. v. Local 825*,
    982 F.2d 884 (3d Cir. 1992)......................................................................17

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000)................................................................................26

*Welsh v. Boy Scouts of America*,
    993 F.2d 1267 (7th Cir. 1993) ....................................................................3

*Williams v. West Chester*,
    891 F.2d 458 (3d Cir. 1989)......................................................................17

## STATUTES

36 U.S.C. § 30902....................................................................................2

Fed. R. Civ. P. 56(c) ................................................................................16

Fed. R. Civ. P. 56(e) ................................................................................17

## I.      **<u>INTRODUCTION</u>**

The central issue in this dispute concerns the use and possession of Cradle of Liberty's

headquarters at 22nd and Winter Streets in Philadelphia.  More than eighty years ago, the City

provided Cradle of Liberty's predecessor[1] a plot of land in Fairmount Park to erect a building for

Cradle of Liberty's activities.  Under this arrangement, the building would become the property

of the City but would remain for Cradle of Liberty's exclusive use.  The arrangement did not

require Cradle of Liberty to pay rent.  Over the years, numerous other non-profit organizations

have enjoyed the use of Fairmount Park properties on similar terms.  In fact, nearly 100 non-

profit organizations presently enjoy the exclusive use of Fairmount Park buildings for free or for

nominal rent.

In 2000, the United States Supreme Court ruled that the leadership policy of the Boy

Scouts of America, which excludes from leadership positions individuals whose conduct is

inconsistent with values the Scouts seek to instill, is a constitutionally protected expressive

association.  *See Boy Scouts of America v. Dale*, 530 U.S. 640, 653-54 (2000).  In reaction to that

decision, political activists in the Philadelphia region initiated a campaign against the Scouts'

local chapter, Cradle of Liberty, which serves tens of thousands of youth in the Philadelphia area.

At the urging of these activists, the City demanded that Cradle of Liberty renounce the policy

upheld in *Dale*.  When Cradle of Liberty declined to do so, the City resorted to coercion.  If

Cradle of Liberty did not repudiate the policy, the City advised, then Cradle of Liberty must

either vacate its headquarters or pay a highly punitive rent.

---

[1] The predecessor council was the Philadelphia Council of the Boy Scouts of America.  Both councils are referred to
herein as "Cradle of Liberty."

This lawsuit is not about Cradle of Liberty's leadership policy.  It is about the City's conduct, which violates Cradle of Liberty's First and Fourteenth Amendment rights.  The City's eviction efforts are motivated solely by its hostility to the viewpoint expressed through the leadership policy.  As such, the City has engaged in viewpoint discrimination in violation of the First Amendment.  Similarly, because the City is willing to allow Cradle of Liberty to remain in its headquarters only if it will renounce the leadership policy, the City has attempted to do indirectly what it knows it may not do directly.  An unconstitutional condition such as this violates the First Amendment just as surely as outright coercion.  Furthermore, the City's conduct violates the Fourteenth Amendment's guarantee of Equal Protection.  Several other non-profit organizations that use Fairmount Park properties have "exclusive" membership or leadership policies, but the City has not subjected them to scrutiny or sought to terminate their leases.

As discussed fully below, the material facts here are not in dispute.  This Court should enter summary judgment in favor of Cradle of Liberty on its First and Fourteenth Amendment claims.  For the same reasons, the Court should enter summary judgment in favor of Cradle of Liberty on each of the City's counterclaims.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    The Boy Scouts of America

Cradle of Liberty is one of over 300 local councils chartered by the Boy Scouts of America, the nation's largest membership organization for youth.  Compl. ¶ 7; Declaration of William T. Dwyer, III, in Support of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Motion for Summary Judgment ("Dwyer Decl."), ¶ 3.  Boy Scouts of America was established "to promote . . . the ability of boys to do things for themselves and others, . . . [and] to teach patriotism, courage, self-reliance, and kindred virtues."  36 U.S.C. § 30902.  Its mission

is "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."  Compl. ¶ 12; Dwyer Decl. at ¶ 4.  The Scout Oath states:

> On my honor I will do my best
> To do my duty to God and my country
> and to obey the Scout Law;
> To help other people at all times;
> To keep myself physically strong,
> mentally awake, and morally straight.

*Id.*

The Scout Law provides that a Scout is:

| | |
|---|---|
| Trustworthy | Obedient |
| Loyal | Cheerful |
| Helpful | Thrifty |
| Friendly | Brave |
| Courteous | Clean |
| Kind | Reverent |

*Id.*

These broad values are shared by millions of youth and adults who participate in the traditional programs of Cub Scouts, Boy Scouts, and Venturing.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 636 n.a1  (1984) (O'Connor, J., concurring) (quoting Paul Fussell's observation that Boy Scout Handbook is a "book about goodness"); *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1278 (7th Cir. 1993) (describing Boy Scouts as "one of the seedbeds of virtue that cultivate the sorts of citizens our nation so desperately needs," and noting that "[t]hroughout its eighty-six years of existence, the Boy Scouts have successfully presented its combination of educational, social, athletic, craft, wilderness training and outdoor activities to our young people").  In adhering to the values of the Scout Oath and Law, the Boy Scouts of America does not accept avowed homosexuals as Scout Leaders.  *Boy Scouts of America v. Dale*, 530 U.S. 640,

653-54 (2000); *Curran v. Mount Diablo Council of the Boy Scouts of America*, 952 P.2d 218, 224-25 (Cal. 1998).

As a chartered member of the Boy Scouts, Cradle of Liberty administers five separate programs – Cub Scouts, Boy Scouts, the Adventure Program, the Learning for Life Program and the Explorer Program – which together serve about 72,000 children in both Philadelphia and the surrounding counties.  Transcript of Preliminary Injunction Hearing, dated Nov. 17, 2009, Dkt. #37 ("Inj. Tr.") at 7:17:8:21.  All but the Cub Scouts and Boy Scouts programs are coeducational.  *Id*. at 8:22-9:1.  The Learning for Life program is a "multifaceted in-school program" for students in grades one through twelve that involves field trips as well as "career interest gatherings" and is administered in conjunction with the students' schools.  *Id*. at 40:3-14, 41:23-42:11.  The Adventure Program provides programming for young men and women aged 14 to 21 throughout the region, and the Explorer Program is a coeducational "career-based" program for teenagers.  *Id*. at 7:20-8:7.

**B.**   **Construction and Use of Headquarters Building**

In 1928, Philadelphia Mayor Harry A. Mackey signed an ordinance providing Cradle of Liberty with the use of a City-owned plot of land to erect, at the council's own expense, a building for its activities.  Declaration of Daniel B. Scott in Support of Cradle of Liberty Council, Inc., Boy Scouts of America's Motion for Summary Judgment ("Scott Decl."), Ex. 1 ("An Ordinance").  The ordinance also provided that the building, erected on land under the control of the Fairmount Park Commission, would immediately become the property of the City but remain for the exclusive use of Cradle of Liberty for its activities.  *Id*.  For more than eight decades, Cradle of Liberty has had its headquarters on this plot of land at 22nd and Winter Streets on the northern edge of Philadelphia's Center City neighborhood.  Dwyer Decl. at ¶ 5.

Although the City owns the building and property, Cradle of Liberty built the headquarters and has maintained the headquarters and property at its own expense.  Compl. ¶¶ 3, 15; Dwyer Decl. at ¶ 6.

### C.      First Amendment Violations

Fairmount Park is the park system of the City of Philadelphia, currently comprising approximately 9,200 acres of land.  Inj. Tr. at 51:7-19.  The City owns all of the land within the system.  *Id*.  From 1867 through June 30, 2009, the Fairmount Park Commission – a board of 16 appointed and elected officials – oversaw the operation and management of the Fairmount Park System.  *Id*. at 54:9-55:22.  Included in the duties of the Fairmount Park Commissioners was the power to make decisions on all policy matters relating to land within Fairmount Park.  *Id*. at 55:11-14.

### i.      The City Created a Forum

The Fairmount Park System currently has 469 buildings which are situated on its land throughout the city.  *Id*. at 56:17-19.  Among these 469 buildings are approximately 100 buildings that the City leases to non-profit organizations on a rent-free or nominal rent basis.  *Id*. at 59:4-8, 60:4-6, 63:23-64:19.  The City's program for allowing the use of such buildings is not haphazard.  To the contrary, Barry Bessler, Park Public Relations and Recreation Director for Fairmount Park and Chief of Staff to the Executive Director of Fairmount Park, has testified as to the detailed process by which non-profit organizations apply for and obtain use of Fairmount Park property for free or nominal rent.  *Id*. at 69:9-12.

When buildings within Fairmount Park are available for potential tenancies of one year or longer, the City makes that availability known to non-profit organizations through advertising and other means.  *Id*. at 70:3-10, 71:9-13, 73:8-23.  Interested non-profit organizations may then

make written proposals to the senior staff of Fairmount Park for use of the available building.  *Id.* at 73:24-74:8.  When deciding whether to confer a lease, the City considers whether the proposed use is "within the mission of Fairmount Park and an acceptable community use."  *Id.* at 78:22-79:6.  Depending upon the specific property and the group that seeks to use it, buildings within Fairmount Park could be used for various purposes.  *Id.* at 78:1-7.  For example, the City currently rents out facilities for free or nominal rent to organizations that provide art classes, equestrian lessons and rowing activities.  *Id.* at 78:8-16.

Each non-profit organization that applies for use of a Fairmount Park property must also complete a questionnaire.  *Id.* at 81:8-82:21; Ex. 2 to Scott Decl. (Fairmount Park Commission Occupancy Practices Questionnaire, dated Feb. 6, 2003, City 67-69 ("Fairmount Park Questionnaire")).  The purpose of the questionnaire is to "gather information on applicants seeking to occupy premises in Fairmount Park."  Inj. Tr. at 82:15-18.  Although the City has only used the formal questionnaire since "the early 2000s," the procedure of gathering information on applicant organizations had been in place before that time.  *Id.* at 81:24-82:21.  One question on the questionnaire asks whether the applicant organization is a for-profit or not-for-profit entity, because the City would not lease a building to a for-profit entity for free or nominal rent.  *Id.* at 83:2-18.  Another question seeks to ascertain the purpose of an applicant organization, so that the senior staff of Fairmount Park may determine whether the purpose is consistent with the  "goals of Fairmount Park."  *Id.* at 84:10-15.  An applicant organization also must answer a question that asks, "What is the process for admission to membership in or to the organization?"  *Id.* at 85:2-5.  Mr. Bessler testified that this question simply provides "another point of information" for the senior staff of Fairmount Park to evaluate.  *Id* at 85:11-21.

If the senior staff of Fairmount Park approved of the proposed use, the staff would then forward it to the Fairmount Park Commission, which would vote on whether to approve the lease.[2]  *Id*. at 74:24-75:5.  If the duration of a lease was more than four years, City Council would also need to vote on whether to approve it.  *Id*. at 76:12-77:23.  Similarly, a lease of one year could be renewed up to four times without City Council approval, but City Council would need to vote on any lease renewals beyond the fourth year.  *Id*.

### ii.      City's Eviction Efforts Motivated Solely By Hostility to Cradle of Liberty's Leadership Policy.

In 2003, the City Law Department, at the request of Mayor John F. Street and at the urging of certain political activists opposed to the Boy Scouts' constitutionally protected leadership policy, demanded that Cradle of Liberty repudiate the policy.  Compl. ¶ 25; Dwyer Decl. at ¶ 7.  Cradle of Liberty declined to do so.  Inj. Tr. at 19:4-20.  For the next several months, the City and Cradle of Liberty conducted negotiations to resolve the dispute amicably and, eventually, they did.  Compl. ¶¶ 26-34; Dwyer Decl. at ¶ 8.[3]

On January 23, 2004, at the City's request, Cradle of Liberty adopted the "Non Discrimination Statement of Cradle of Liberty Council, Boy Scouts of America."  Compl. ¶¶ 28-32; Dwyer Decl. at ¶ 9; Ex. 3 to Scott Decl. ("Non Discrimination Statement," COL-0097). Among other things, the Non Discrimination Statement affirmed Cradle of Liberty's opposition

---

[2]  As of July 1, 2009, the Fairmount Park Commission no longer exists, and the senior staff of Fairmount Park forwards proposals to the Commissioner of the Department of Parks and Recreation.  Inj. Tr. at 74: 17-21.  The Fairmount Park Commission, however, was in existence at the time this lawsuit was filed and during the entire time period relevant to this litigation.  While the process today may be slightly different, this statement of facts focuses on the process that was in place until June 30, 2009.

[3] In this action, Cradle of Liberty asserted certain state common law claims based on the City's breach of an agreement reached in 2004.  Those claims have been dismissed.  Cradle of Liberty recounts the facts leading up to the agreement because they are also relevant to the First and Fourteenth Amendment claims (*i.e*., they demonstrate the City's motive for seeking to evict Cradle of Liberty and they demonstrate how the City has treated Cradle of Liberty differently from other similarly situated organizations).

to "any form of unlawful discrimination."  Compl. ¶ 28; Non Discrimination Statement.  Based

on Cradle of Liberty's adoption of the Non Discrimination Statement and other protocols, the

City agreed that it would not move to evict Cradle of Liberty from its headquarters based on the

Boy Scouts' constitutionally protected leadership policy.  Compl. ¶¶ 29, 32; Dwyer Decl. at ¶ 10.

The City has never alleged or even suggested that Cradle of Liberty has violated the Non

Discrimination Statement.  Compl. ¶¶ 34; Dwyer Decl. at ¶ 12.

 More than a year passed without incident following Cradle of Liberty's adoption of the

Non Discrimination Statement.  In 2005, however, Romulo Diaz, a new City Solicitor, wrote to

Cradle of Liberty's Executive Director, William T. Dwyer, III, demanding that Cradle of Liberty

"clarify" the meaning of the term "unlawful discrimination" as used in the Non Discrimination

Statement.  Compl. ¶ 35; Dwyer Decl. at ¶ 13; Ex. 4 to Scott Decl. (June 15, 2005

Correspondence from Solicitor Romulo L. Diaz, COL-0100-101).  Cradle of Liberty did not hear

from the City again until July 20, 2006, when Mr. Diaz wrote to inform Cradle of Liberty that

the City had concluded that the constitutionally protected leadership policy is "illegal under the

Home Rule Charter and the Philadelphia Code."  Compl. ¶ 36; Dwyer Decl. at ¶ 14; Ex. 5 to

Scott Decl. (July 20, 2006 Correspondence from Solicitor Romulo L. Diaz, COL-0220-221).

The letter provided Cradle of Liberty with an ultimatum:  repudiate the leadership policy or pay

rent (which is punitive and not required of any other similarly situated non-profit community

organization).  Compl. ¶ 36; Ex. 5 to Scott Decl.  If Cradle of Liberty refused to meet either of

the demands, the City advised, Cradle of Liberty would be evicted from its headquarters.

Compl. ¶ 36; Ex. 4 to Scott Decl.

 On May 31, 2007, Councilman Darrell Clark of the Philadelphia City Council introduced

a resolution approving the eviction of Cradle of Liberty from its headquarters.  Compl. ¶ 39; Ex.

6 to Scott Decl. (Resolution No. 070522 of the Council of the City of Philadelphia, dated May 31, 2007, authorizing ejectment of Cradle of Liberty, COL-0223-226 ("Resolution No. 070522")).  City Council passed the resolution without debate and demanded that Cradle of Liberty vacate its headquarters within one year.  Resolution No. 070522.  The City's attempt to evict Cradle of Liberty is and has been motivated solely by its hostility to Cradle of Liberty's leadership policy.

### iii.     The City Is Placing an Unconstitutional Condition on Cradle of Liberty's Continued Use of Its Headquarters.

Cradle of Liberty was permitted to use its City-owned headquarters for nearly seventy-five years without any protest from the City.  (Indeed, the City's Fair Practices Ordinance, which provides the legal veneer purportedly covering the City's conduct, was in force for nearly two decades before the City ever suggested that Cradle of Liberty's leadership policy was in conflict with the ordinance.)  Evidently aware that it could not directly force Cradle of Liberty to change its policy, the City has instead attempted to force a change by threatening – and moving forward with its threat – to end a public benefit that Cradle of Liberty has long enjoyed.  The record makes it clear that the City's eviction efforts would cease if only Cradle of Liberty would renounce its constitutionally protected leadership policy.

When Mr. Diaz wrote to Mr. Dwyer on July 20, 2006, he stated:  "We believe that ejectment, subject to a fair market rent agreement, is an appropriate measure that recognizes the many contributions made by your organization.  It also is an action that provides the Council with the opportunity to end its longstanding discrimination.  *In the absence of such a change, however, ongoing City subsidy of the Scouts cannot continue*."  Ex. 5 to Scott Decl (emphasis added).  Again, when City Council passed a resolution to evict Cradle of Liberty from its headquarters, the resolution included the following language:

> RESOLVED, BY THE COUNCIL OF THE CITY OF
> PHILADELPHIA, That termination of the arrangement
> with the Boy Scouts, whereby the Boy Scouts occupy City
> land and a City building located at 22nd and Spring Streets,
> is hereby approved, subject to withdrawal upon agreement
> by the Boy Scouts to pay fair market rent *or the Boy Scouts
> ending its discriminatory policy and practice*.

Resolution No. 070522 (emphasis added).

Following passage of this resolution, Mr. Diaz again wrote to Cradle of Liberty, inviting General Counsel Sandra A. Girifalco "to meet with me at the earliest mutually convenient date to discuss whether the Cradle of Liberty Council will now *consider a change in policy* or, alternatively, is willing to pay fair market rent for the property." Ex. 7 to Scott Decl. (June 1, 2007 Correspondence from Solicitor Romulo L. Diaz, COL-0227-228) (emphasis added). Mr. Diaz informed Cradle of Liberty that if it did not change its policy, it had one year to vacate the property. *Id.* Eleven months later, the new city solicitor, Shelley R. Smith, wrote to Cradle of Liberty to notify the council that it must vacate its headquarters "[u]nless the Council agrees in writing that it will end its discriminatory policy[.]" Ex. 8 to Scott Decl. (May 6, 2008 Correspondence from Solicitor Shelley R. Smith, COL-0109-110).

### D.     Fourteenth Amendment Violations

In granting access to a Fairmount Park property, the City inquires as to whether the organization's membership policies are based on race, color, sex, religion, national origin or ancestry, age, sexual orientation, or disabling condition. (The Fair Practices Ordinance prohibits discrimination based on these characteristics.) Several organizations that use Fairmount Park buildings for nominal rent have exclusive leadership or membership policies – or, based on publicly available information, appear to have exclusive leadership or membership policies. The City, however, has never attempted to terminate those arrangements.

Among the questions an applicant organization must answer during the process for obtaining a Fairmount Park property is one that asks whether membership in the group is "limited or restricted in any way because of race, color, sex, religion, national origin or ancestry, age, sexual orientation, or disabling condition." Fairmount Park Questionnaire; Inj. Tr. at 85:22-86:6. Mr. Bessler testified that no other non-profit organization, to his knowledge, was ever denied use of a Fairmount Park property due to its answer to that question. Inj. Tr. at 86:7-10. In addition, Mr. Bessler could not recall the staff of Fairmount Park ever examining the membership policies of organizations whose Fairmount Park leases were in effect before the City began using the questionnaire as part of the application process. *Id*. at 87:4-10. Mr. Bessler did note, however, that were an organization to state that it did restrict membership based on one of the listed attributes, it would violate the City's policy of non-discrimination. *Id*. at 91:7-1. For example, if a non-profit organization limited its membership to women, that restriction would be a violation. *Id*. at 92:2-6, 94:3-7.

### i.       Organizations With Exclusive Leadership or Membership Policies

Facts elicited through discovery show that certain organizations that use Fairmount Park property rent-free also limit their leadership or membership in a manner that is inconsistent with the attributes identified in the City's Fair Practices Ordinance. These include the Colonial Dames of America and Saint Josephs University.

### a.       Colonial Dames of America

The Colonial Dames of America is a "patriotic and hereditary" society for women founded in 1890. Ex. 9 to Scott Decl. (Transcript of Deposition of Eleanor Penniman, dated Jan. 6, 2010, at 12:13-13:16 ("Penniman Dep.")). The purpose of the Colonial Dames is "to maintain its properties for educational purposes, to award scholarships in all fields of learning, to collect

manuscripts, traditions, relics and mementoes of bygone days for preservation, to commemorate the history of the thirteen original Colonies which became the UNITED STATES OF AMERICA, to diffuse healthful and intelligent information in regard to American history and tending to create popular interest therein, to inspire patriotism and love of country, to promote social intercourse and fellowship and to inculcate among the young, the obligations of patriotism and reverence for the founders of the American Constitutional Liberty."  Ex. 10 to Scott Decl. (Certificate of Incorporation and By-Laws, Colonial Dames of America ("Colonial Dames Certificate of Incorporation and By-Laws")) at 1 (emphasis in original); Penniman Dep. at 15:2-16:17.

In achieving that mission, the Colonial Dames limits its membership to women whose genealogy meets certain requirements.  To become a member of the Colonial Dames, one must meet the following criteria:

> The members of the Society shall be women legitimately descended from an ancestor of worthy life who within the period beginning with the settlement of Jamestown, Virginia, May 13, 1607, and extending to but not including the Battle of Lexington, April 19, 1775, served one or more of the thirteen original Colonies by: (a) Holding public office, (b) Holding a commission in the armed forces, or (c) Serving in any capacity specified in the Eligibility List of the Society.

Colonial Dames Certificate of Incorporation and By-Laws at 3; Penniman Dep. at 20:17-21:14.

There are currently 31 regional chapters of the Colonial Dames, and each chapter must adhere to the membership criteria established by the national organization.  Penniman Dep. at 14:15-17, 23:2-9.  As a result of this policy, the Colonial Dames have never had a man as a member.  *Id*. at 74:23-25.  In addition, while the Colonial Dames do not formally discriminate on the basis of race, the fact that leadership posts in the colonial days were dominated by white men

means that minorities generally do not qualify for membership.  *Id*. at 38:21-39:25.  Not one

member of the Colonial Dames is African-American.  *Id*. at 41:20-42:3.

Since 1957, pursuant to an agreement with the City, Chapter II of the Colonial Dames has

occupied Lemon Hill Mansion, a building situated on Fairmount Park property.  Ex. 11 to Scott

Decl. (Leases between City and Colonial Dames of America, City 718-727); Penniman Dep. at

28:24-29:5.  Built in the early 19th century, Lemon Hill Mansion is a historical building known

for its architectural style.  Penniman Dep. at 23:10-16.  The Colonial Dames pay no rent to the

City for the use of Lemon Hill Mansion.  *Id*. at 26:7-16.

The membership policy of the Colonial Dames of America explicitly discriminates based

upon sex, national origin, and ancestry.  Further, due to the narrowness of its membership

criteria, its membership has the effect of excluding non-whites.  Although the Colonial Dames'

arrangement with the City for the rent-free occupation of Lemon Hill Mansion has been in place

for more than five decades, the City has never informed the Colonial Dames that it must change

its membership policy in order to remain in the building.  *Id*. at 37:17-38:6.  According to

Eleanor Penniman, the current vice president of Chapter II and a former president general of the

national organization, there have never been any communications at all between the City and the

Colonial Dames regarding the membership policies of the Colonial Dames and the group's lease

to occupy Lemon Hill Mansion.  *Id*.; *see also* Ex.12 to Scott Decl. (Transcript of Deposition of

Barry A. Bessler, dated Aug. 21, 2009, at 84:5-15, 118:9-13 ("Bessler Dep.")).

### b.       Saint Joseph's University

Saint Joseph's University ("SJU") is a Catholic university located in the city of

Philadelphia.  Ex. 13 to Scott Decl. (Transcript of Deposition of Dominick DiJulia, dated Jan. 6,

2010, at 31:13-18 ("DiJulia Dep.")).  The founding of the university was "inspired by the

principles of the Society of Jesus, known as the Jesuits." *Id.* at 32:5-14.  Members of the Jesuit

order of Roman Catholic priests serve in administrative and faculty positions at SJU.  *Id.* at

32:16-23.  Pursuant to the Vatican's Code of Canon Law, like all Roman Catholic priests,

members of the Jesuit order must be baptized Catholic men.  1983 Code c.1024 ("A baptized

male alone receives sacred ordination validly.").[4]

 In 1989, SJU – along with Saint Joseph's Preparatory School ("SJP"), a Philadelphia-area

high school – began discussions with the Fairmount Park Commission about obtaining land

along the Schuylkill River for the construction of a boathouse.  DiJulia Dep. at 22:24-24:8.

Representatives of the university, including Athletic Director Dominick DiJulia, were aware –

"through practical experience" – that it was possible for a non-profit organization to enter into an

agreement with the City for the use of Fairmount Park property for nominal rent or no rent at all.

*Id.* at 24:10-25:13.  After several years of discussion, SJU and SJP entered into an agreement

with the Philadelphia Authority for Industrial Development ("PAID") to construct a boathouse

on Fairmount Park property.  *See* Ex. 14 to Scott Decl. (Ground Lease Agreement By and

Between City of Philadelphia and Philadelphia Authority for Industrial Development); Ex. 15 to

Scott Decl. (Ground Sublease Agreement By and Between Philadelphia Authority for Industrial

Development and Saint Joseph's University ("SJU Sublease")).  PAID was the party to the lease

agreement with the City, and SJU signed a sublease agreement with PAID to use the land.  *Id.*

The term of the lease was for forty years, and provided that there is no default of the lease

agreement, the term will renew automatically for up to four successive ten-year renewal terms.

SJU Sublease, §§ 2.1, 2.2.  The rent for the term and each renewal term is ten dollars.  *Id.* at §

---

[4] *See also Dolter v. Wahlert High School*, 483 F. Supp. 266, 270 n.3 (N.D. Iowa 1980) ("The court takes judicial notice of the fact that as of this time the Catholic Church does not ordain women as priests.").

3.1.  SJU and SJP paid all construction costs of the boathouse and continue to pay for all

maintenance costs.  DiJulia Dep. at 25:14-21.

Today, the SJU men's and women's rowing teams, as well as the rowing team at SJP, use

the boathouse as their primary facility for storing equipment and as a base for all practices and

competitions.  *Id*. at 26:4-27:14.  The university rowing teams also use the boathouse to host a

summer rowing program for Philadelphia public high school students as well as a rowing

program for people with physical disabilities.  *Id*. at 27:15-21, 28:13-29:8.  The sublease

agreement between PAID and SJU specifies that the Philadelphia Home Rule Charter and the

Philadelphia Code govern the agreement, requiring that the subtenant not discriminate "on the

basis of race, color, religion, national origin, sexual orientation, sex, ancestry or disability."  SJU

Sublease, § 22.1; DiJulia Dep. at 29:9-30:9.

The leadership standards of the Society of Jesus explicitly discriminate on the basis of

religion and sex.  Since entering into the sublease agreement with PAID, however, SJU has never

received any communications or inquiries from the City about whether the university

discriminates in any manner in deciding who may serve in the university administration, the

university faculty or the university athletic staff.  DiJulia Dep. at 33:17-34:13.  In addition, the

City has never communicated with or inquired of the university regarding the fact that the Canon

Law of the Roman Catholic Church restricts membership in the priesthood to men.  *Id*. at 36:10-

23.

      **ii.**      **Organizations With Apparently Exclusive Leadership or Membership Policies**

Many other non-profit community organizations that occupy buildings on Fairmount Park

property appear to limit their leadership or membership in a manner that would violate the City's

non-discrimination policies.  However, the City has not investigated any of these other organizations.

In addition to Colonial Dames of America and Saint Joseph's University, the City also provides use of one of the boathouses on Boathouse Row to the Philadelphia Girls' Rowing Club.  Ex. 16 to Scott Decl. (Lease between the City and the Philadelphia Girls' Rowing Club, City 283-285); Inj. Tr. at 78:14-16.  At the preliminary injunction hearing, Mr. Bessler testified that an organization that limited its membership to women would be in violation of City policy.  Inj. Tr. at 92:2-6, 94:3-7.  Although the membership of the Philadelphia Girls' Rowing Club appears to be limited according to sex, the City has never investigated, scrutinized, or attempted to terminate the arrangement on the basis of sex discrimination.  *See* Bessler Dep. at 84:5-85:13, 96:15-100:21, 106:6-12, 107:17-108:5, 118:9-120:6, 146:20-147:6, 150:9-152:4, 155:19-166:14, 161:1-162:21, 163:11-166:14, 174:19-191:2, 213:7-216:5, and 218:5-221:4.  The same can be said for several other organizations that lease Fairmount Properties for nominal rent, including: the Roman Catholic Church of the Nativity, B.V..M. (sex, religion); Women for Greater Philadelphia (sex); and The Royal Heritage Society of the Delaware Valley (national origin and ancestry).  *See id.*; *see also* Ex. 17 to Scott Decl. (Leases between City and the Roman Catholic Church of the Maternity, B.V.M., dated April 6, 1935 and June 2, 1982, City 736-46); Ex. 18 to Scott Decl. (Lease between City and Women for Greater Philadelphia, dated Sept. 7, 1976, City 703-05); Ex. 19 to Scott Decl. (Lease between City and The Royal Heritage Society of the Delaware Valley, dated Feb. 9, 1983, City 933-43).

In determining whether an organization is worthy of a building in Fairmount Park, the City has reserved its anti-discrimination enforcement efforts solely for Cradle of Liberty.

III.     <u>**STANDARD OF REVIEW**</u>

Under Federal Rule of Civil Procedure 56, "the judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. C. Pro. 56(c).  "This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Novak v. Posten Taxi, Inc.*, No. 3:08cv912, 2009 U.S. Dist. LEXIS 102903, at \*\*8-9 (M.D. Pa. Nov. 4, 2009).  The mechanism of Rule 56 is based in part on the policy that "movants are entitled to avoid the expense and tribulations of trial if they can prove that there is no triable issue." *In re Sch. Asbestos Litig.*, 977 F.2d 764, 794 (3d Cir. 1992).

As the party seeking summary judgment before trial, the movant bears the initial burden of showing the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant adequately supports its motion, the burden shifts to the nonmoving party to defend the motion.  *Id.*  To satisfy this burden, the nonmovant must go beyond the mere pleadings by presenting specific evidence showing that a genuine issue of material fact for trial does exist with regard to an essential element of the movant's claims.  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999); *Celotex*, 477 U.S. at 322, 324; *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999); *Knabe v. The Boury Corp.*, 114 F.3d 407, 409 n.4 (3d Cir. 1997); Fed. R. Civ. P. 56(e).

An issue of fact is "material" only if it might affect the outcome of the suit under the controlling substantive law.  An issue of fact is considered genuine when, in light of the nonmovant's burden of proof at trial, the nonmovant produces evidence such that a reasonable jury could return a verdict against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

- 17 -

242, 248 (1986); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998).

More than a mere scintilla of evidence must be produced.  *Anderson*, 477 U.S. at 251-52.

Critically, parties may only rely on evidence that would be admissible at trial and may not rely

on hearsay, conclusory allegations, general denials, vague statements, unsupported assertions, or

mere suspicions.  *See, e.g., Trap Rock Indus., Inc. v. Local 825*, 982 F.2d 884, 890 (3d Cir.

1992); *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.   ARGUMENT

### A.   There Is No Genuine Issue of Material Fact as to Cradle of Liberty's First Amendment Claims.

#### i.   Viewpoint Discrimination

As Cradle of Liberty alleged in its Complaint, the City "created a government forum by

leasing or otherwise allowing the use of scores of properties to a variety of individuals,

community groups, and even for-profit entities for numerous social, recreational, civic,

charitable, religious, and operational purposes."  Compl. ¶ 46.  As such, under the First

Amendment, the City must make "decisions regarding allocation of funds or resources . . . in a

manner that is viewpoint neutral."  *Id*. ¶ 47; *see also* Memorandum of Court on City's Motion to

Dismiss, dated Sept. 25, 2008, Dkt. #13 ("MTD Opin.") at 14-18.  In denying the City's motion

to dismiss, the Court concluded that "the City's program of leasing out space throughout the city

at subsidized rates, assuming there is such a program as we must in a motion to dismiss, is the

relevant forum."[5]  *Id*. at 16-17.  Moreover, in granting Cradle of Liberty's motion for a

---

[5] As a preliminary matter, the Court concluded in its opinion on the City's motion to dismiss that "it is clear that Cradle's membership policy is a form of expression protected by the First Amendment, which may be impacted by the government action" at issue in this case.  MTD Opin. at 16 n.4 (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 656 (2000) ("Boy Scouts is an expressive association and . . . the forced inclusion of [a gay scoutmaster] would significantly affect its expression.")).

preliminary injunction, the Court found that the evidence presented at the hearing established the

likelihood of a nonpublic forum in the City's program of renting out property within Fairmount

Park to non-profits for little or no rent.[6]  Opinion on Plaintiff's Motion for Preliminary Injunction

("PI Opin."), Dkt. #29, at 4..  As outlined below, discovery has confirmed that the City, indeed,

has a program by which it leases buildings in Fairmount Park to non-profit organizations

according to defined criteria.

> **a.      The City's Program of Providing Access to City-Owned
> Property For Free or at Subsidized Rates is a Nonpublic
> Forum.**

A plaintiff makes out a claim for viewpoint discrimination under the First Amendment by

first establishing that the relevant forum is either a "traditional public forum, [a] public forum

created by government designation, [or a] nonpublic forum."  MTD Opin. at 15 (citing *Cornelius*

*v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985)).  A "nonpublic forum" is

a forum that is created by the government and for which the government "reserve[s] eligibility

for access to a particular class of speakers," whose members must then obtain permission to

access the forum.  *Id.* at 17 n.5 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666,

679 (1998) (citations omitted)).

The City has a program of providing access to City-owned property at subsidized rates to

non-profit organizations that "do good work" for the citizens of the city of Philadelphia,

particularly within Fairmount Park.[7]  Bessler Dep. at 130:16-136:16, 155:19-156:10, 156:20-

---

[6]  Cradle of Liberty has already extensively briefed the legal issues on its claims of viewpoint discrimination,
unconstitutional conditions, and denial of the guarantee of Equal Protection in both its opposition to the City's
Motion to Dismiss, Dkt. #10, and its Motion for Preliminary Injunction, Dkt. #25.  Cradle of Liberty incorporates
those arguments by reference.  Because the Court has twice provided its analysis on these issues, Cradle of Liberty
cites to the Court's own prior opinions in this matter.

[7]  As the Deputy Commissioner for the Department of Public Property testified during his deposition, the City also
leases City-owned property outside of Fairmount Park for a number of non-profits, including the Boys and Girls

(Continued)

159:6, and 164:17-165:10.   As Mr. Bessler testified, the City has permitted and continues to

permit a number of non-profit organizations to occupy property within Fairmount Park for free

or at subsidized rates.  *Id.* at 107:17-108:5, 118:9-120:6, 146:20-147:6, 150:9-152:4, 155:19-

166:14, 161:1-162:21, 163:11-166:14, 179:9-19, 188:3-191:2, 213:7-216:5, and 218:5-221:24.

Moreover, each of the organizations to whom the City leases property within Fairmount

Park engages in speech.  For example, the Roman Catholic Church of the Maternity, B.V.M.

("The Church"), to whom the City leases property in Pennypack Park, is a member of the

Archdiocese of Philadelphia.  Ex. 21 to Scott Decl. ("Mission Statement" of the Church).  Its

Mission Statement states, in part, "[w]ith the help of the Blessed Virgin Mary, may we echo her

commitment, as we strive to be open to God's plan of salvation by our welcoming spirit, our

spirit-filled worship, our teaching and proclaiming our faith, our living responsibly, and by our

Christian Stewardship in loving service of God and others."  *Id.*  SJU is an educational

institution, which seeks to instill in its students:  a "love of learning and of the highest

intellectual and professional achievement; moral discernment reflecting Christian values; and a

transforming commitment to social justice."  Ex. 22 to Scott Decl. ("SJU Mission Statement").

In addition to using its boathouse as a base for its own rowing teams, SJU also uses it to provide

instruction to local high school students and to people with physical disabilities.  The "mission"

of the Colonial Dames (to whom the City leases the Lemon Hill Mansion) is to, among other

things, "diffuse healthful and intelligent information in regard to American history . . ., to inspire

patriotism and love of country, to promote social intercourse and fellowship and to inculcate

---

(Continued)

Clubs, to occupy City-owned property for below market rent (such as $1 per year).  Ex. 20 to Scott Decl. (Transcript of the Deposition of John Herzins, dated Aug. 20, 2009) at 34:10-36:22, 63:10-65:2, and 69:3-11.

among the young, the obligations of patriotism and reverence for the founders of the American

Constitutional Liberty."  Colonial Dames Certificate of Incorporation and By-Laws.

> **b.     The City Selectively Targeted Cradle of Liberty For Enforcement of Its Anti-discrimination Standards Because the City Disagreed With Cradle of Liberty's Viewpoint.**

The mere existence of a forum does not end the inquiry.  As this Court has noted, "when

the government seeks to limit access to a nonpublic forum, the limitation does not violate the

First Amendment if it is reasonable and viewpoint neutral."  MTD Opin. at 17 (citing *Cornelius*,

473 U.S. at 800).  The government cannot restrict access by a person or organization to a

nonpublic forum if the restriction is really an "effort to suppress expression merely because

public officials oppose the speaker's view."  *Id.* at 15-16.  As the Supreme Court recognized in

*Cornelius*, inconsistent application of even a viewpoint-neutral law might be evidence of

impermissible viewpoint discrimination.  473 U.S. at 812.  In this case, the City's attempted

restriction is neither reasonable nor viewpoint neutral.

The attempt to evict Cradle of Liberty arises solely from the City's opposition to the

Scouts' policy of not including avowed homosexuals in positions of leadership.  Even if one is

inclined to agree with the City's position on the merits of that policy, that does not make the

City's conduct reasonable.  Cradle of Liberty is a voluntary membership organization.  Its

mission is to prepare young people to make ethical and moral choices by instilling in them the

values of the Scout Oath and Law, and the leadership policy is a manifestation of the Scouts'

values system.  Cradle of Liberty understands that this policy has become part of a broader

national debate that has taken place in recent years – a debate involving issues such as whether

homosexuals may adopt children, marry one another, and serve openly in the military, among

other things.  While the City's efforts to evict Cradle of Liberty might be seen as substantively

reasonable by some, the City's conduct is wholly unreasonable in the context of a First

Amendment analysis.  Reasonableness here concerns whether the City – *i.e.*, the government – may use its coercive powers to *suppress* a view with which it disagrees.  Under the First Amendment, it cannot.

Regardless, even if the Court were to view the City's conduct as a "reasonable" effort to promote its non-discrimination agenda, the City's conduct nevertheless violates the First Amendment because the restriction is not viewpoint neutral.  The Supreme Court has held that "the Boy Scouts is an expressive association and that the forced inclusion of [a gay scoutmaster] would significantly affect its expression.'"  MTD Opin. at 23 (quoting *Dale*, 530 U.S. at 656).  Since the dispute arose nearly seven years ago, the City has made it clear that its goal was to force a change to Cradle of Liberty's leadership policy.  In other words, the clearly stated intent – as well as the effect – of the City's restriction is to penalize a disfavored viewpoint and to promote a favored viewpoint.

The record also makes it clear that the City does not apply its purported anti-discrimination policies evenly, but has instead targeted Cradle of Liberty.  *See, e.g.*, City's Motion to Dismiss Complaint, dated June 16, 2008, Dkt. #9 ("City's MTD") at 3.  For example, the City permits several religious organizations to utilize Fairmount Park property for nominal rent despite the fact that these religious organizations have restrictive leadership policies among the ordained clergy.  Several other organizations are organized around gender, national origin and ancestry.  Yet, the testimony of Barry Bessler makes it clear that the City has failed to take similar ejectment measures against *any* other non-profit organization that has membership policies that exclude persons on bases that fall within the scope of the City's anti-discrimination standards.  As discussed above, Mr. Bessler testified that the City has never even considered nonrenewal of the leases of the Church or SJU.  Bessler Dep. at 160:12-23, 163:11-17, and

166:1-14; *see also* DiJulia Dep. at 36:10-23.  Similarly, the City has never considered

nonrenewal of the lease of Lemon Hill Mansion to the Colonial Dames, despite the fact that its

membership is overwhelmingly composed of Caucasian women whose direct ancestors held

positions of leadership in the thirteen original colonies.  Colonial Dames Certificate of

Incorporation and By-Laws; Penniman Dep. at 37:17-38:6.  The City's actions are not part of an

even-handed effort to advance an agenda of non-discrimination.  They are intended solely to

suppress a disfavored viewpoint.

### ii.      Unconstitutional Conditions

As Cradle of Liberty alleged in the Complaint, the City demanded that Cradle of Liberty

repudiate its constitutionally protected leadership policy, conditioning continued use of its

headquarters on this change.  Compl. ¶¶ 40-45.  In doing so, the City imposed an

unconstitutional condition upon Cradle of Liberty's access to City-subsidized property.[8]  As the

Court has recognized, "under *Dale*, it is clear that the City could not outright require Cradle to

change its membership policies."  MTD Opin. at 16, n.4 (citing *Dale*, 530 U.S. at 656).  Yet, this

is precisely the outcome the City has sought to achieve.  By threatening to revoke Cradle of

Liberty's rent-free status if Cradle of Liberty did not change its leadership policy, the City has

impermissibly conditioned Cradle of Liberty's participation in the City's program of allowing

non-profit organizations to use City-owned property for nominal rent on Cradle of Liberty's

relinquishment of its First Amendment right to expressive association.

---

[8] As the Court recognized in its decision on the City's motion to dismiss, the "'Boy Scouts is an expressive association and that the forced inclusion of [a gay scoutmaster] would significantly affect its expression.'"  MTD Opin. at 23 (quoting *Dale*, 530 U.S. at 656).

This Court has previously noted that a review of applicable cases involving unconstitutional conditions "produce[s] a coherent analytical framework."  MTD Opin. at 22. The Court has described this analytical framework as follows:

> The first question is whether the government's condition compromises a First Amendment right.  The next question is the scope of the condition.  If the condition seeks to limit the use of the government subsidy only, and the condition does not impose a penalty beyond the withdrawal of the subsidy itself, then the condition need merely be reasonable and viewpoint neutral.  If the condition, on the other hand, is broader in scope, a heightened level of scrutiny may be applied.

*Id.*  Here, there is no question that the City's ultimatum constitutes an unconstitutional condition.

The first step in this analysis is simple.  As noted above, the Supreme Court has held that the leadership policy at issue here is protected by the First Amendment and that forcing the Scouts to alter this policy would significantly affect the Scouts' expression.  *See* MTD Opin. at 23 (quoting *Dale*, 530 U.S. at 656).  This Court has also noted that, under *Dale*, "the City could not outright require Cradle [of Liberty] to change its membership policies," and conditioning the continued use of its headquarters on such a change would compromise Cradle of Liberty's rights. *Id.*  The City has, in fact, imposed such a condition on Cradle of Liberty.

The Court must next examine the scope of the condition.  If the Court were to find that the City only seeks to limit the use of the government subsidy and does not impose a penalty beyond the withdrawal of the subsidy, then the condition need merely be reasonable and viewpoint neutral.  For the reasons discussed above, the condition here is neither reasonable nor viewpoint neutral.  Therefore, the City has imposed an unconstitutional condition in violation of Cradle of Liberty's First Amendment rights, which is the end of the analysis.

Nevertheless, it is worth noting that the condition imposed by the City is broad and thus should be subject to a heightened standard of review.  In addressing the City's motion to dismiss,

the Court noted initially that it "appears that the City sought only to withdraw the subsidized use

of City property, and therefore that the condition was narrow in this sense.  What is unclear is

whether the City is seeking to limit expressive activities that are not government funded.  In

other words, it is unclear from the present record whether the City is asking Cradle [of Liberty]

to ensure that there is no discrimination in activities related to the Center, or if the City's

demands touch upon activities unrelated to the Center as well." *Id.*  With the benefit of a full

record, it is evident that the City's demands do not merely relate to the headquarters building, but

broadly apply to Cradle of Liberty's activities.

Within the greater Philadelphia area, Cradle of Liberty serves approximately 72,000

youth through the Cub Scouts, Boy Scouts, the Adventure Program, the Learning for Life

Program and the Explorer Program.  Inj. Tr. at 7:17-8:21.  In administering these programs,

Cradle of Liberty maintains two headquarters buildings.  *Id*. at 42:20-43:10.  While Cradle of

Liberty has only ten to fifteen staff members who work out of its building at 22nd and Winter

Streets, it employs approximately 30 employees at a suburban headquarters building near Valley

Forge National Park, in addition to the scores of volunteer Scout Leaders throughout the region.

*Id*. at 43:3-44:4.  Currently, only a few staff members who administer the traditional Cub Scouts

and Boy Scouts programs operate out of the Winter Street property, while "the lion's share" of

the Boy Scouts administrative personnel work out of the Valley Forge building.  *Id*. at 43:19-

44:22.  Indeed, Learning for Life – an educational program that does not have a leadership policy

that addresses homosexuality – conducts much of its operations out of the Winter Street

property.  *Id*.

Despite Cradle of Liberty splitting its operations between an urban and a suburban

headquarters and having Scout Leaders throughout the region, the City has never limited its

demand to Cradle of Liberty repudiating the leadership policy only for staff members who work within the headquarters building at 22nd and Winter.  Besides the rent-free occupation of the headquarters building, Cradle of Liberty receives no other subsidy from the City, yet the City has demanded that Cradle of Liberty repudiate the Boy Scouts' leadership policy for *all* Scout Leaders under its purview, not simply those who work on City property.  *Id.* at 15:1-6.  Because the City is trying to impose such a broad condition upon Cradle of Liberty's activities, the Court should apply the heightened standard of scrutiny.

> **B.      There is no Genuine Issue of Material Fact as to Cradle of Liberty's Equal Protection Claim.**

In rejecting the City's argument that Cradle of Liberty failed to state a claim under the Equal Protection Clause, the Court found that Cradle of Liberty sufficiently alleged "intentional and arbitrary discrimination" by the City.[9]  MTD Opin. at 10.  As the Court recognized in its opinion denying the City's Motion to Dismiss, a plaintiff can make out a claim for violation of the Equal Protection Clause by establishing "(1) that the defendant, acting under the color of state law, intentionally treated plaintiff differently from others similarly situated, and (2) that there was no rational basis for the difference in treatment."  *Id.* at 10 (citing *Village of*

---

[9]  Cradle of Liberty also alleged equal protection and free speech claims under the Pennsylvania Constitution.  In denying the City's motion to dismiss those claims, the Court wrote:  "Pennsylvania courts have indicated that Pennsylvania's constitutional provisions concerning speech and equal protection mirror the Federal Constitution's. [citation omitted]  Therefore, for the same reasons outlined above, the City's Motion to Dismiss is denied with respect to Cradle's state constitutional claims."  MTD Opin. at 24, n.6 (citing *Kroger v. O'Hara Twp.*, 392 A.2d 266, 274 (Pa. 1978)); *see also Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000) ("This Court has held that 'the equal protection provisions of the Pennsylvania Constitution are analyzed . . . under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment.").  Cradle of Liberty's free expression rights may actually be broader under the Pennsylvania Constitution than under the United States Constitution.  *See Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002) (noting that the free expression rights guaranteed in the federal constitution provide a floor to Article I § 7, and that the state constitution may allow for broader expression rights in certain areas, but it can never allow for less).

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) and *Jackson v. Gordon*, 145 Fed. Appx. 774, 776-77 (3d Cir. 2005)).

> **i.     The Evidence Proves Cradle of Liberty's Claim That the City Treated It Differently Than Other Similarly Situated Organizations.**

There is no dispute that the City intentionally treated Cradle of Liberty differently from any other non-profit organization permitted to occupy City-owned property within Fairmount Park for free or at subsidized rates.  Mr. Bessler testified that the City provides access to property in Fairmount Park to non-profit organizations for below-fair market rent because they contribute to the wellbeing of the community by providing "recreational opportunities to citizens and visitors throughout Philadelphia," one of the intended uses that furthers the mission of Fairmount Park.  Bessler Dep. at 132:1-2.  Notably, Mr. Bessler did not recall any circumstances in which another such organization was subject to the same treatment as Cradle of Liberty.  *See, e.g., id.* at 84:5-10 and 118:9-119:10.

Mr. Bessler confirmed that Cradle of Liberty is the only group that the City has ever sought to evict from City-owned property within Fairmount Park or raise the rent for such property because of its membership policy:

> Q:     What about their membership policy?  Are you aware of any [other] instances in which the City did not renew a lease on Fairmount Park property because of membership policies of an organization?
> A:     No.

*Id.* at 84:5-15.

> Q.     Are you aware of any [other] circumstances where somebody was asked to leave because of their membership policy?
> A.     No, not because of their membership policy[.]

*Id.* at 118:9-13.

Remarkably, the City has not taken *any* action against other non-profit organizations that have membership policies that are at odds with the City's anti-discrimination policy with respect to their use or occupancy of City-owned property within Fairmount Park.

Mr. Bessler testified that he did not even recall the City ever requesting a copy of the membership policy of any other organization, or inquiring into such in connection with a decision as to whether to permit such organizations to occupy or continue occupying City property within Fairmount Park. *Id*. at 106:6-12 and 107:17-108:5. Other than Cradle of Liberty, Mr. Bessler was not aware of any instances in which senior staff of Fairmount Park made a recommendation to the Commission that an organization not be granted a lease or an extension on a lease based upon its membership policy. *Id*. at 119:4-10. Moreover, Mr. Bessler was not even aware of a single instance in which the City even *considered* the membership policy of another organization in connection with a decision as to whether to permit the organization to occupy or continue occupying property within Fairmount Park. *See, e.g*., *id*. at 84:5-85:13. Even the Colonial Dames, whose membership policy is so restrictive that it has never had a male member and currently has no African-American members, has not faced the type of treatment the City has aimed toward Cradle of Liberty. Penniman Dep. at 37:17-38:6.

### ii.     The Evidence Demonstrates That the City Had No Rational Basis for Treating Cradle of Liberty Differently.

Cradle of Liberty alleged in its Complaint that the only reason for the City's actions was to punish Cradle of Liberty for exercising its free speech rights. Compl. at ¶ 57. As the Court held in its opinion denying the City's Motion to Dismiss, differential treatment violates the Equal Protection Clause unless there is a "rational relationship" between the treatment and a legitimate government interest. MTD Opin. at 11 (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

The City has failed to demonstrate that it has a legitimate government interest and that there was a rational basis for its decision to confront Cradle of Liberty with the "choice" of disclaiming its core values, agreeing to eviction or paying "fair market rent" well above the value of the property.  In its opinion denying the City's motion to dismiss, assuming *arguendo* that the City had a legitimate government interest, the Court queried why the City chose to selectively evict Cradle of Liberty, based upon Cradle of Liberty's allegations of selective enforcement.  *Id.* at 13.  And when the Court issued its opinion granting Cradle of Liberty's motion for a preliminary injunction, it noted that "the City has offered no evidence to contradict the reason alleged by Plaintiff; namely, to punish Plaintiff for its policy.  While there may be legitimate justification, Defendant has yet to present evidence to support that position."  PI Opin. at 3-4.

Since the Court entered its decision on the City's motion to dismiss, Cradle of Liberty has obtained testimony directly supporting its allegations of selective enforcement, while the City has presented no evidence of a legitimate justification.  As discussed above, Mr. Bessler testified – at both his deposition and at the preliminary injunction hearing – to the fact that the City continues to lease City property within Fairmount Park to numerous other organizations, such as the Church, SJU, the Colonial Dames and the Philadelphia Girls' Rowing Club, all of which have membership policies that exclude certain persons from membership in contravention of the anti-discrimination policy supposedly espoused by the City.  In addition, representatives of both the Colonial Dames and SJU testified that these two organizations have *never* received any communications from the City regarding their membership policies and their leases with the City.

The City has not even attempted to point to any evidence of a rational basis for its selective eviction of Cradle of Liberty.  Rather, it continues to rely solely upon its disagreement

with Cradle of Liberty's leadership policy, as demonstrated by the City's memorandum in support of its motion for summary judgment, filed in the since-dismissed state court action. *See* City's Motion for Summary Judgment, dated Aug. 17, 2009, *City of Philadelphia v. Cradle of Liberty Council, Inc., Boy Scouts of America*, No. 00149, June Term 2008 (Phila. C.C.P.), ¶ 6 (Ex. 23 to Scott Decl.).

It is apparent that there is no genuine issue of material fact concerning Cradle of Liberty's Equal Protection claim, given the City's failure to demonstrate a legitimate government interest and a rational basis for singling out Cradle of Liberty among the numerous organizations that have "exclusionary" membership policies.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff Cradle of Liberty respectfully requests that this Court grant its motion for summary judgment.

Respectfully submitted,

Dated: March 1, 2010

/s/ Jason P. Gosselin
Jason P. Gosselin
William M. McSwain
Daniel B. Scott
Richard M. Haggerty
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103

*Counsel for Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America*

## <u>CERTIFICATE OF SERVICE</u>

I, Richard M. Haggerty, hereby certify that on this day I caused a true and correct copy of the foregoing Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Motion for Summary Judgment, Proposed Order, and Memorandum, Statement of Undisputed Material Facts, Declaration of Daniel B. Scott and Declaration of William T. Dwyer, III, in Support Thereof, to be filed electronically, such that it is available for viewing and downloading from the ECF system, and to be served thereby upon counsel listed below:

David Smith, Esquire
Rebecca Lacher, Esquire
Schnader, Harrison, Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286

Dated:  March 1, 2010

/s/ Richard M. Haggerty
Richard M. Haggerty