IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | |
| BOY SCOUTS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-2429 |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

## ORDER

AND NOW, this _____ day of _____, 2010, upon consideration of

Defendant City of Philadelphia's Motion for Summary Judgment, and any opposition thereto, it

is hereby ORDERED THAT Defendant's motion is GRANTED and judgment is entered in favor

of Defendant on all counts of the Complaint and Defendant's Counterclaims.  It is hereby

ORDERED THAT Plaintiff vacate Defendant's property by _____, 2010 and pay

Defendant the sum of $_____ for its wrongful occupancy and possession of Defendant's

property.

BY THE COURT:

_____

Buckwalter, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRADLE OF LIBERTY COUNCIL, INC.,  :
BOY SCOUTS OF AMERICA,  :
  :
      Plaintiff,  :    CIVIL ACTION
  :
      v.  :    NO. 08-2429
  :
CITY OF PHILADELPHIA,  :
  :
      Defendant.  :

_____

**DEFENDANT CITY OF PHILADELPHIA'S
MOTION FOR SUMMARY JUDGMENT**

_____

Pursuant to Federal Rule of Civil Procedure 56, Defendant City of Philadelphia

("City"), by and through its undersigned counsel, hereby moves for summary judgment on the

Complaint and the Counterclaim.  In support thereof, the City relies on the reasons set forth in

the accompanying Memorandum of Law.

Respectfully,


_____/s/ David Smith_____
David Smith (Attorney I.D.  21480)
Stephenie Yeung (Attorney I.D. 84415)
Rebecca Lacher (Attorney I.D. 203938)

*Attorneys for Defendant,*
  *City of Philadelphia*


SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

Of Counsel.
Dated:  March 15, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRADLE OF LIBERTY COUNCIL, INC.,   :
BOY SCOUTS OF AMERICA,   :
   :
      Plaintiff,   :   CIVIL ACTION
   :
      v.   :   NO. 08-2429
   :
CITY OF PHILADELPHIA,   :
   :
      Defendant.   :

_____

**DEFENDANT CITY OF PHILADELPHIA'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

_____

David Smith (Attorney I.D.  21480)
Stephenie Yeung (Attorney I.D. 84415)
Rebecca Lacher (Attorney I.D. 203938)

*Attorneys for Defendant,
 City of Philadelphia*


SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

                   Of Counsel.
Dated:  March 15, 2010.

TABLE OF CONTENTS

I.    INTRODUCTION........................................................................................... 1

II.   STATEMENT OF UNCONTESTED FACTS .............................................. 2

      A.   History of the Property: 1928 to Present ............................................2

      B.   City Subsidy to Non-Profit Organizations Through Use of City-Owned
           Property for No or Nominal Rent........................................................4

      C.   The City Has a Clearly Established Policy and Practice of Nondiscrimination ....9

      D.   Boy Scouts' Discrimination Against "Known or Avowed Homosexuals" and
           *Boy Scouts of America v. Dale* ...........................................................12

      E.   Complaints Regarding Boy Scouts' Discriminatory Policy and Boy Scouts'
           Loss of Charitable Contributions and Public Support: July 2000 to May 2003..15

      F.   Boy Scouts Reaffirm Discriminatory Policy: May 2003........................................19

      G.   City of Philadelphia's Efforts to Reach a Nondiscrimination Agreement with
           the Boy Scouts: 2003-2006...................................................................21

      H.   Termination of Arrangement and Attempts to Reach Agreement Prior to
           Filing Federal and State Complaints: July 2006 to May 2008...............................23

      I.   Boy Scouts Reject Both Alternatives Presented By City to Allow Its Continued
           Occupancy of the Property ......................................................................27

III.  PROCEDURAL HISTORY ......................................................................... 29

IV.   ARGUMENT................................................................................................. 30

      A.   Standard of Review.............................................................................30

      B.   The Boy Scouts' Equal Protection Claim Fails Because The Boy Scouts
           Cannot Show Rental Subsidies Are Granted by Clear, Non-Discretionary
           Standards, Do Not Provide Evidence of Similarly Situated Entities Treated
           Differently, and the Termination of the Boy Scouts' Subsidy Is Rationally
           Related to the Legitimate Interest of Enforcing the City Policy and Practice of
           Nondiscrimination.................................................................................31

           1.   The Boy Scouts Cannot Prove the Required Clear Standards For
                Providing Rental Subsidies Because the City's Rental Subsidies Are
                Based on Discretionary and Individualized Determinations. ......................33

2. **The Boy Scouts Cannot Meet Their Burden of Showing Similarly Situated Entities Who Were Treated Differently.** ........................................36

    a. **SJU Does Not Discriminate and Signed A Non-Discrimination Agreement.** ..................................................37

    b. **The Colonial Dames Open The City-Owned Property to The Public and Provide Services on a Non-Discriminatory Basis** ...........................38

    c. **The Boy Scouts Do Not Provide Evidence of Any Other Entity With a Discriminatory Membership Policy, Discriminatory Services, or Discriminatory Use of City-Owned Property.** ........................................40

    d. **The City Has Not Received Complaints Regarding the Membership Policy and/or Provision of Services by Any Other Subsidized Occupant of City-Owned Property.** ........................................41

3. **The City Has A Clearly Established Nondiscrimination Practice and Policy, Including the Explicit Fairmount Park Policy Prohibiting Discrimination on the Basis of Sexual Orientation, and Rationally Seeks to Enforce its Policy and Practice by Refusing to Subsidize the Boy Scouts.** ..................................................43

    a. **Courts Have Recognized The History of Discrimination Against Gays and The Need for Anti-Discrimination Protections.** ..............................44

    b. **The City's Policy and Practice of Non-Discrimination Is Clearly Established and Applies to All Subsidized Occupants of City-Owned Property.** ..................................................45

    c. **The City Rationally Evaluated the Boy Scouts' Membership Policy After the Policy was Brought to its Attention by the *Dale* Decision and Numerous Public Complaints and Is in the Process of Using its Limited Resources to Ensure All Subsidized Occupants of City-Owned Property Comply With City Law and Policy.** ...........................49

C. **The Boy Scouts' First Amendment Claims Fail Because the City Has Wide Discretion In Allocating Its Subsidies, the City Did Not Impose An Unconstitutional Condition Upon Continued Receipt of a Subsidy, And The City's Decision to Terminate the Boy Scouts' Subsidy Was Reasonable And Viewpoint Neutral.** ..................................................51

1. **The City's Laws and Policies Regulate Conduct, Not Speech.** .....................53

2. **The City's Subsidized Leases Do Not Create A Forum For Discourse** ........57

3. **To the Extent The Provision of Subsidized Use of City-Owned Property is a Forum for Speech, the Forum Is To Express the City's Message of**

Equality and Fair Treatment, Not the Boy Scouts' Message of Discriminatory Exclusion...............................................................59

    a.    The City-- Not the Boy Scouts- Is Speaking Through Subsidized Use of City-Owned Property ...........................................................59

    b.    The City Has The Right To Control Its Message. ..................................62

4.    The City Has Broad Discretion To Make Selective Subsidy Decisions........62

5.    The City May Condition Its Subsidy on Compliance With Its Reasonable and Viewpoint Neutral Nondiscrimination Laws. .........................................66

    a.    The City's Requirement That All Subsidized Occupants of City-Owned Property Comply With City Law and Policy is Not Intended to Suppress the Boy Scouts' Speech............................................68

    b.    The Scope of the City's Termination of the Subsidy is Limited to the Boy Scouts' Use of the City-Owned Property at 22nd and Winter Streets and Does Not Prevent the Boy Scouts From Espousing Views From Any Other Location. ......................................................68

6.    The City's Termination Of The Subsidy Due To The Boy Scouts' Refusal To Comply With City Laws And Policies, Including Fairmount Park Policy, Is Not Viewpoint Discrimination........................................................70

    a.    The Boy Scouts' Forum Argument is Unavailing...................................70

    b.    Terminating the Subsidy was Reasonable and Content Neutral. ..........72

    c.    The City's Termination of the Boy Scouts' Rent-Free Occupancy of City-Owned Property is a Reasonable Means To Further The Government's Interest in Eliminating Discrimination .........................72

    d.    Termination of the Rent-Free Occupancy is Viewpoint Neutral ..........73

7.    Termination of the Rent-Free Occupancy Does Not Infringe Upon The Boy Scouts' Expressive Association Rights. ...................................................74

**D.**     **The City is Entitled to Summary Judgment on its Counterclaims for Ejectment, Immediate Use and Occupancy, and Mesne Profits**............................75

    **1.**     **The City Followed All Necessary Steps to Properly Eject the Boy Scouts From City-Owned Property and the Boy Scouts Must Therefore Immediately Vacate the Property**....................................................................75

    **2.**     **The City is Entitled to Mesne Profits Equal to the Fair Market Rental Value of the Property For Each Day the Boy Scouts Wrongfully Occupied and Possessed the City-owned Property**........................................76

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*1064 Old River Rd., Inc. v. City of Cleveland*,
  137 Fed. Appx. 760 (6th Cir. 2005)........................................................................43

*ACLU of Tenn. v. Bredesen*,
  441 F.3d 370 (6th Cir. 2006) ................................................................................61

*Acevedo v. City of Philadelphia*, 2010 U.S. Dist. LEXIS 5232 (E.D. Pa. Jan. 22, 2010) ...........31

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................30

*Ariz. Life Coal. Inc. v. Stanton*,
  5`5 F.3d 956 (9th Cir. 2008) ................................................................................60

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998).............................................................................................72

*Armbruster v. Unisys Corp.*,
  32 F.3d 768 (3d Cir. 1994)....................................................................................31

*Ben-Shalom v. Marsh*,
  881 F.2d 454 (7th Cir. 1989) ...............................................................................45

*Benjamin v. Brachman*,
  246 Fed. Appx. 905 (6th Cir. 2007).................................................................33, 34

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
  481 U.S. 537 (1987)........................................................................................44, 56

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000) ....................................62

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983)....................................................................................63,66,67

*Boy Scouts of Am. v. Dale*,
  550 U.S. 640 (2000)....................................................................................10,13,49

*Boy Scouts of Am. v. Till*,
  136 F. Supp. 2d 1295 (2001) ...............................................................................51

*Boy Scouts of Am. v. Wyman*,
  335 F.3d 80 (2d Cir. 2003)................................................................51, 52, 73, 74

*Bradwell v. Illinois*,
    83 U.S. 130 (1872) ................................................................................................46

*Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006)........................................................36

*Cammarano v. United Stastes, 358 U.S. 498 (1959)* ...................................................69

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................................31

*Chambers v. Sch. Dist. of Phil.*,
    587 F.3d 176 (3d Cir. 2009)....................................................................................32

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Kane*,
    2006 U. S. Dist. LEXIS 27347 (N.D. Ca. Apr. 17, 2006)  ............................................ passim

*Christian Legal Soc'y v. Martinez,* 130 S. Ct. 795 (2009)............................................53

*Christian Legal Soc'y v. Walker*,
    453 F.3d 853 (7th Cir. 2006) ..................................................................................54

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)................................................................................................46

*Cogswell v. City of Seattle,* 347 F.3d 809 (9th Cir. 2003) .......................................72,73

*Cordi-Allen v. Conlon*,
    494 F.3d 245 (1st Cir. 2007)...................................................................................36

*Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788 (1985)....................71,72

*Dean v. Dist. of Columbia*,
    653 A.2d 307 (D.C. Cir. 1995) ...............................................................................42

*Engquist v. Oregon Department of Agriculture*,
    128 S. Ct. 2146 (2008) .......................................................................................32,33

*Gay Rights Coal. Of Georgetown Univ. Law Center v. Georgetown Univ.*,
    536 A.2d 1 (D.C. 1987) ..........................................................................................56

*Griffin Industries, Inc. v. Irvin*,
    496 F.3d 1189 (11th Cir. 2007) ..............................................................................42

*Grove City College v. Bell*,
    465 U.S. 555 (1984)........................................................................................63, 66,67

*Harris v. McRae*,
    448 U.S. 297 (1980)................................................................................................63

*High Tech Gays v. Defense Industrial Security Clearance Office,*
    895 F.2d 563 (9th Cir. 1990) ...............................................45

*Hill v. Colorado,*
    530 U.S. 703 (2000) ...........................................................73

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ...........................................................53

*Jews for Jesus, Inc. v. Jewish Cmty Relations Council of New York,*
    968 F.2d 286, 295 (2d Cir. 1992)..............................................53,56,57

*Johanns v. Livestock Marketing Ass'n,* 544 U.S. 550 (2005) .....................61

*Lawrence v. City of Philadelphia,*
    527 F.3d 299 (3d Cir. 2008)...................................................31

*Lawrence v. Texas,*
    539 U.S. 558 (2003)...........................................................44

*Legal Svcs Corp.v. Valazquez,*
    531 U.S. 533 (2001)...........................................................62

*Lerch v. City of Green Bay,*
    218 Fed. Appx. 502 (7th Cir. 2007)...........................................42

*Locke v. Davey,*
    540 U.S. 712 (2004)...........................................................57,58

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...........................................................30,31

*Montanye v. Wissahickon School District,*
    399 F. Supp. 2d 615 (E.D. Pa. 2005) .........................................43

*Mosca v. Cole,*
    217 Fed. Appx. 158 (3d Cir. 2007)............................................36

*Nevada Dep't of Human Res. v. Hibbs,*
    538 U.S. 721 (2003)...........................................................46

*New York State Club Assn., Inc. v. City of New York,*
    487 U.S. 1 (1988) ............................................................44,56

*Perry Education Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983)............................................................58,59

*Pittsburgh League of Young Voters Edu. Fund v. Port Authority of Allegheny Cty,*
    2008 U.S. Dist. LEXIS 63370 (W.D. Pa. August 14, 2008) ....................60,61

*Pleasant Grove City v. Summum,*
129 S.Ct. 1125 (2009)..................................................................................13,62

*Plyler v. Doe,* 457 U.S. 202 (1982)........................................................................44,45

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,*
902 F. Supp. 492 (D.N.J. 1995)...............................................................56

*R.A.V. v. City of St. Paul,* 505 U.S. 377, 385 (1992) ..............................................73

*Rains v. Cascade Indus., In*c., 402 F.2d 241 (3d Cir. 1968).....................................31

*Regan v. Taxation with Representation of Washington,*
461 U.S. 540 (1983).................................................................................. passim

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984)...................................................................................53

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)...........................................................................62,63,73

*Rowland v. Mad River Local Sch. Dist.,*
470 U.S. 1009 (2001)............................................................................44,45

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006) ...........................................................................55,57,65,66

*Rust v. Sullivan,*
500 U.S. 173 (1991)................................................................................... passim

*Scott v. Harris,*
550 U.S. 372 (2007)....................................................................................31

*Showalter v. Univ. of Pittsburgh Med. Ctr.,*
190 F.3d 231 (3d Cir. 1999).........................................................................31

*Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles,*
288 F.3d 610 (4th Cir. 2002) ...................................................................60,61

*Srail v. Village of Lisle,*
588 F.3d 940 (7th Cir. 2009) .........................................................................34

*Student Gov't Ass'n v. The Bd. of Trustees of the Univ. of Mass.,*
868 F.2d 473 (1st Cir. 1989)......................................................................58,64

*Tigg Corp. v. Dow Corning Corp.,*
822 F.2d 358 (3d Cir. 1987).........................................................................28

*United States v. American Library Assoc.*,
   539 U.S. 194 (2003)........................................................................68,69

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962)................................30,31

*United States v. O'Brien,*
   391 U.S. 367 (1968)........................................................................55,56

*Village of Willowbrook v. Olech*,
   528 U.S (2000)..................................................................................31

*Watkins v. United States Army*,
   875 F.2d 699 (9th Cir. 1989) ............................................................45

*Ysura v. Pocatello Educ. Ass'n*,
   129 S. Ct. 1093 (2009)......................................................................66

## STATE CASES

*Abrams v. Sherwin*,
   112 A. 235 (Pa. 1920)........................................................................76

*Evans v. City of Berkeley*,
   129 P.3d 394 (2006).................................................................. passim

*Love v. Stroudsburg*, 597 A.2d 1137 (Pa. 1991) ........................................32

*Mack v. Fennell*,
   171 A.2d 844 (Pa. Super. Ct. 1961)..................................................76

*Pap's A.M. v. City of Erie*, 674 A.2d 338 (Pa. Commw. Ct. 1996)............51

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ..................................................................................28

Fed. R. Civ. P. 65(c) ..................................................................................27

42 U.S.C. § 1983.........................................................................................29

## STATE STATUTES

4 PA. CODE § 5.91 *et seq.*..........................................................................45

ALLEGHENY COUNTY BILL NO. 4201-08.................................................48

351 PA. CODE § 10.10-111 ...................................................................................9,10

CODE OF THE BOROUGH OF WEST CHESTER § 37A .......................................48

CODIFIED ORDINANCES OF ALLENTOWN § 181.02 .........................................48

GENERAL CODE OF SCRANTON § 296 .............................................................48

PHILADELPHIA CODE §§ 659.02-04 ................................................................45

PHILADELPHIA CODE § 5-600 ........................................................................4

PHILADELPHIA CODE §§ 9-1102-05 ...............................................................48

PHILADELPHIA CODE § 9-1102(e)..............................................................10,46

PHILADELPHIA CODE § 9-1103(a)..................................................................10

PHILADELPHIA CODE § 9-1104(a)..................................................................10

PHILADELPHIA CODE § 9-1105(a)..................................................................10

6 PITTSURGH CODE §§ 659.02-04, 07 ...........................................................48

## OTHER AUTHORITIES

Exec. Order No. 13,087, Fed. Reg. 30,097....................................................48

Associated Press Archive, *Gay Boy Scout ousted by council that promised no discrimination* June 12, 2003 (No. D7RK5KJ01). ....................................9

Ken Dilanian, *Street Board to Deal With Gay Matters*, PHILA. INQ., Apr. 4, 2001, at B01..........12

Linda Greenhouse, *Supreme Court Backs Boy Scouts In Ban of Gays From Membership*, N.Y. Times, June 29, 2000, at A1....................................................13

Linda K. Harris, *Scouts closer to antibias policy*, PHILA. INQ., Dec. 21, 2003, at B01............21,49

Linda K. Harris, *City says scouts' use of land is in jeopardy*, PHILA. INQ., Sept. 17, 2003 at B01.....................................................................................21

Linda K. Harris, *United Way pulls funds from Scouts*, PHILA. INQ., Aug. 1, 2003, at A01......21,49

Linda K. Harris, *Area council ousts openly gay scout*, PHILA. INQ., June 12, 2003, at A01 .........19

Deborah Kalb, *Boy Scouts can ban gay leaders, high court rules*, U.S.A. Today, June 28, 2000....................................................................................13

Emilie Lounsberry, *Scouts Can Bar Gay Leader, N.J. Ruling Reversed By Divided High Court*, Phila. Inq., June 29, 2000, at A01; ............................................................13

National Briefing, *Council Reverses on Gay Scout*, N.Y. TIMES, June 13, 2003 ...........................9

Edward Walsh, *Court Says Boy Scouts Can Expel Gay Leader*, WASH. POST., June 29, 2000...........................................................................................................................................3

The City of Philadelphia ("City" or "Philadelphia") submits this memorandum in support of its motion for summary judgment against the Cradle of Liberty Council, Inc., Boy Scouts of America ("Boy Scouts") on its complaint and on the City's counterclaims.

## I.      INTRODUCTION

This case presents the issue whether the City must continue to provide rent-free occupancy of a City-owned property at 22nd and Winter Streets to an organization that openly discriminates in their use of that property in violation of the City's anti-discrimination laws, policies and practices.

By way of quick background, in 2000, the Supreme Court decided *Boy Scouts of America v. Dale* regarding the right of the private organization's choice to associate in its private activities with whomever it chooses.  *Dale* attracted enormous public attention and public service orientated charitable organizations and municipalities considered withdrawing their support for Boy Scouts of America's ("BSA") discriminatory activities.

In May of 2003, after losing financial support from Philadelphia charitable organizations, the Boy Scouts announced that they would no longer discriminate against gays in their programs, employment and adult leadership.[1]  However, under extreme pressure from their parent organization, the BSA, the Boy Scouts quickly reverted to BSA-mandated policies and

---

[1]      The City recognizes that the "Boy Scouts" is a singular party, but elects to treat the organization, and any others ending in "s" (e.g., Colonial Dames) as plural throughout the brief, because although grammatically incorrect, it is easier on the eyes and ears.

practices to discriminate against gays and non-believers in their membership, adult participation, and employment.

The Boy Scouts' reversion to the BSA-mandated discriminatory policies and practices in their use of a rent-free City facility put them squarely in violation of the City's nondiscrimination laws and policies, and the City received numerous complaints from the public regarding the Boy Scouts' receipt and enjoyment of City subsidies while they adhered to policies and practices that exclude individuals on the basis of sexual orientation and religion.  After a multi-year negotiation failed to restore the Boy Scouts' non-discrimination pledge, the City notified the Boy Scouts that it was terminating the Boy Scouts' rent-free occupancy of the City's property under the 1928 ordinance governing that occupancy.   Even then, the City offered the Boy Scouts that they could remain in the property either by complying with the City's non-discrimination laws or by agreeing to pay fair market rent for the property, which would at least end the City's subsidy of the Boy Scouts' discrimination.  The Boy Scouts refused both, and filed this lawsuit seeking to retain their rent-free occupancy of City property.

## II.      STATEMENT OF UNCONTESTED FACTS

### A.      History of the Property: 1928 to Present

In 1925, the Commissioners of Fairmount Park appropriated the land currently occupied by the Boy Scouts for park purposes.  *See* Philadelphia, PA, Ordinance (December 14,

1928) ("1928 Ordinance"), Ex. 9.[2]  The Fairmount Park Commissioners, by resolution adopted

July 11, 1928, authorized the Philadelphia Council of the Boy Scouts of America, the

predecessor to the Cradle of Liberty Council, to occupy "for headquarters" a portion of city-

owned land along the Benjamin Franklin Parkway at 22nd and Spring Streets ("22nd Street

Property").  Philadelphia, PA Resolution (July 11, 1928), Ex. 10.  The Council of the City of

Philadelphia approved the resolution by Ordinance dated December 14, 1928, authorizing the

Boy Scouts to erect a building at their own expense:

> to become at once the property of the City and to be used
> exclusively by the Boy Scouts, for their own activities, such
> building and lot to be kept in good order by said Boy Scouts during
> their occupancy and to be surrendered within one year after notice
> given them by the Commissioners of Fairmount Park, with the
> approval of the Mayor and City Council, of their desire to
> terminate the arrangement or by said Boy Scouts of their desire to
> surrender said property to said Commissioners, and upon the
> removal of the Boy Scouts therefrom the property to be held and
> managed by the Commissioners as part of the Parkway.

1928 Ordinance at § 1, Ex. 9.

The building was completed in 1929 and the Boy Scouts have occupied the 22nd

Street Property since that date.  Compl. ¶ 15-16.  In 1996, the Cradle of Liberty Council merged

with the Valley Forge Council and the majority of the Boy Scouts' operations are currently based

in their Valley Forge office where approximately thirty full-time staff work, including the

traditional scout staff.  Transcript of Nov. 17, 2009 Preliminary Injunction Hearing ("Inj. Tr.")

---

[2]     All exhibit references in this brief, unless otherwise noted, are to the exhibits filed as
attachments to the Affidavit of Rebecca Lacher in Support of the City of Philadelphia's
Motion for Summary Judgment.

(Testimony of William T. Dwyer, III[3] ("Dwyer Test.")) at 43:3-44:4, Ex. 3.  Only ten to fifteen

staff members work in the city-owned 22nd Street Property.  *Id.*  The Boy Scouts operate a Scout

Shop, which sells Boy Scouts of America merchandise, at the 22nd Street Property.  *See* Cradle

of Liberty Parents - Scout Shop: Valley Forge & Philadelphia Scout Shops,

http://colbsa.org/openrosters/ViewOrgPageLink.asp?LinkKey=13002&orgkey=1869 (last visited

Mar. 9, 2010), Ex. 30; Binswanger Summary Appraisal Report ("Binswanger Appraisal") at 11,

Ex. 7; Reaves C. Lukens, Co. Summary Appraisal Report & Market Rent Analysis ("Lukens

Appraisal") at 15, 17, Ex. 8.

 

      **B.**       **City Subsidy to Non-Profit Organizations Through Use of City-Owned Property for No or Nominal Rent**

      The City owns numerous properties, controlled by the City's Department of

Public Property and Fairmount Park, (Inj. Tr. (Testimony of Barry Bessler[4] ("Bessler Test.")) at

51:7-52:8, 56:12-19; (Testimony of John Herzins[5] ("Herzins Test.")) at 117:17-24), Ex. 3).  All

of the land within Fairmount Park is owned by the City.  Inj. Tr. (Bessler Test.) at 51:13-15, Ex.

3.

 

      The Fairmount Park Commission was incorporated in 1867 by the Pennsylvania

Legislature[6] and the Department of Fairmount Park was incorporated in the Philadelphia Home

---

[3]     Mr. Dwyer was the executive director of the Boy Scouts through the relevant time period.

[4]     Mr. Bessler is Chief of Staff of Fairmount Park.

[5]     Mr. Herzins is Deputy Commissioner of the City Department of Public Property.

[6]     The Fairmount Park Commission was dissolved on June 30, 2009. following an amendment approved by voters November 4, 2008, which merged the Fairmount Park

*…Continued*

Rule Charter in 1951.  Act of March 26, 1867, P.L. 547; Inj. Tr. (Bessler Test.) at 54:19-23, Ex.

3.  The Fairmount Park Commission consisted of a sixteen-member board of directors who were

responsible for management and policies of Fairmount Park and either approved or rejected all

lease proposals by a majority vote.  Inj. Tr. (Bessler Test.) at 54:12-16, 74:24-75:21, Ex. 3;

Bessler Dep. at 21:1-19, Ex. 2.  Any long-term lease required the additional approval of City

Council.  Inj. Tr. (Bessler Test.) at 75:22-76:5, Ex. 3.

Available properties are advertised and made known to non-profit organizations.

Inj. Tr. (Bessler Test.) at 73:18-23, Ex. 3.  The Guidelines for Making a Proposal For a

Fairmount Park Property To the Fairmount Park Commission ("Fairmount Park Guidelines")

require non-profit entities to submit "[e]vidence that Applicant Organization has *open

participation*, not limited or restricted in any way because of race, religion, sex, sexual

orientation, or country of origin."  Fairmount Park Guidelines, Ex. 14 (emphasis added).

An organization wishing to occupy a city-owned property located in Fairmount

Park is required to submit a written statement of its proposed use to the Fairmount Park

Executive Director or senior staff and must fill out an occupancy questionnaire.  Inj. Tr. (Bessler

Test.) at 71:14-22, 74:3-8, 81:8-13, Ex. 3.  The Questionnaire collects information on the

prospective occupant's membership by asking about the process for admission to membership

---

*Continued from previous page*
> Commission and the Department of Recreation, (*see* Bill No. 080169), and thus the
> Commission was in existence during all relevant events at issue in this litigation.
> PHILADELPHIA CODE § 5-600; Inj. Tr. ("Bessler Test") 74:17-21, Ex. 3; Deposition of
> Barry Bessler, dated Aug. 21, 2009 ("Bessler Dep.") at 21:1-19, Ex. 2.  References to
> "Fairmount Park Commission" should be read interchangeably as "Fairmount Park."

(question No. 4) and whether membership is "limited or restricted because of race, color, sex,

religion, national origin or ancestry, age, sexual orientation, or disabling condition" (question

No. 5).  Fairmount Park Commission Occupancy Practices Questionnaire at 2 (Feb. 6, 2003), Ex.

16; Inj. Tr. (Bessler Test.) at 85:2-86:2, Ex. 3.  Barry Bessler, Chief of Staff of Fairmount Park,

acknowledged that "question Number 5 [is] a clause in the occupancy practices questionnaire

requiring nondiscrimination."  Inj. Tr. (Bessler Test.) at 86:23-87:3, Ex. 3.

Organizations who wish to occupy city-owned property in Fairmount Park must

be "within the mission of Fairmount Park and an acceptable community use."  Inj. Tr. (Bessler

Test.) at 78:17-25, Ex. 3.  The Fairmount Park policy, adopted March 9, 1994, states:

> *It is and continues to be* the policy of the Fairmount Park
> Commission in its overall responsibility for the management of
> park facilities and park properties *to prohibit discrimination in the
> renting, leasing or use of any park property because of* race,
> creed, religion, color, national origin or ancestry, sex, *sexual
> orientation*, or any disability condition, and to provide the full
> realization of equal opportunities through positive, continuing
> programs aimed at eliminating discrimination in any form.  *The
> policy of equal opportunity applies to every aspect of park use
> and requires that all individuals using park facilities or any
> individuals or organizations acting through or under their leases
> or contracts to abide by the same requirements.*
>
> . . . .
>
> Certainly, one of the most complex and tragic problems which
> confronts our city and out nation today is the absence of true equal
> opportunity for all people, with regard to race, creed, religion,
> color national origin or ancestry, sex, sexual orientation, or any
> disabling condition.  The denial of equal access to opportunities for
> all of the citizens of Philadelphia has permitted discrimination to
> continue in a variety of forms.  This means that proposed remedies
> must go beyond the mere announcement of an equal opportunity
> policy.  We, the Fairmount Park Commission, recognize and
> accept our responsibility to design and implement programs which

strike at the total problem, rather than simply its overt
manifestations.

Utilization of any park facility is predicated upon full compliance
with our equal opportunity policy. ***Those found to be in violation
of this policy*** will be rejected for consideration for the use of park
facilities and properties, or ***if contracts have already been entered
into, will have those contracts cancelled for failure to follow
those policies.***

Fairmount Park Commission Policy for Properties ("Fairmount Park Policy for Properties")

(Mar. 9, 1994) at 3, Ex. 15 (emphasis added).

The reason the City leases[7] city-owned property to non-profit entities for no or

nominal rent is to benefit the community at large and is in keeping with the mission of Fairmount

Park to restore, preserve and maintain the properties, shifting the cost burden to outside

organizations.  Inj. Tr. (Bessler Test.) at 105:19-106:6, Ex. 3.  The purpose of providing these

organizations with the use and occupancy of city-owned property is *not* to create a diversity of

viewpoints or to allow these organizations to exercise First Amendment rights.  *Id*. at 106:22-

107:2.

In leasing Fairmount Park property to nonprofit entities, the executive director of

Fairmount Park and senior staff meet and discuss "the issue of a property use and potential lease

. . . with everyone at the table having input from their particular and appropriate perspective."

Bessler Dep. at 41:21-42:14, Ex. 2.  The executive director thus "gets input from all of us [senior

staff] about a decision such as who goes into a building, who stays in a building or how they get

---

[7]     The City has entered into a number of agreements-- in the form of both leases and
licenses-- for the occupancy of city-owned property.  The City uses the term "lease" to
mean "lease and/or license" throughout the brief.

in there, or what the adaptive reuse of the building might be." *Id*. at 48:18-49:10.  The

Fairmount Park also receives advice from the City Law Department in considering assignment of

properties. *Id.* 57:13-58:15.

The executive director then presents a recommendation, which prior to July 1,

2009 went to the Fairmount Park Commission, and since that date goes to the City's

Commissioner of Parks and Recreation.  All decisions prior to July 1, 2009 were made by the

Fairmount Park Commission board, consisting of sixteen members who voted individually at

each members' discretion.  *Id*. at 58:16-24.  All leases now require approval of the City's

Commissioner of Parks and Recreation.  Inj. Tr. (Bessler Test.) at 111:14-112-1, Ex. 3.

The City also leases approximately 75 city-owned properties not located in

Fairmount Park through its Department of Public Property.  Inj. Tr. (Herzins Test.) at 117:19-24,

Ex. 3.  The City has no written policies or guidelines for consideration of non-Fairmount Park

city-owned property and no written policies or guidelines for appealing the City's decision to

grant or deny a lease request.  Deposition of John Herzins, dated August 20, 2009 ("Herzins

Dep.") at 119:15-21, 120:13-21, Ex. 1.  The Department of Public Property handles direct

requests for leasing city-owned property by verifying the City's ownership and referring the

entity to City Council.  The Department of Public Property also receives requests from members

of City Council.  *Id*. at 21:8-22:20.  When a request is supported by a City Council member, the

Department of Public Property works with an organization on the lease terms.  The resulting

lease must be approved by City Council.  Inj. Tr. (Herzins Test.) at 127:9-129:7, Ex. 3.  John

Herzins, deputy commissioner of the Department of Public Property, testified that in handling

requests to lease City property "there's not a checklist, there's not a formal procedure to follow."

Herzins Dep. at 23:19-24:2, Ex. 1.  After describing the process for reviewing applicants, Mr.

Herzins testified:

> Q:  Okay.  Now, the process as you've described it seems to imply
> that although an applicant may express interest to the Department
> of Public Property, the ultimate decision making as to whether or
> not that proposal will be approved lies elsewhere.
>
> A:  The City Council has the final approval in the ordinance.
>
> Q: "Okay.  In other words, the applicant cannot come in-- is it true
> the applicant cannot just meet certain criteria or requirements to
> lease a property, and, therefore, establish a right to a particular
> property?"
>
> A: No.  I mean, if -- no.

Inj. Tr. (Herzins Test.) at 131:4-15, Ex. 3.

The Department of Public Property is in the process of reviewing all of the leases

with the plan to redraft and bring them into compliance with the contemporary standard

containing "standard language in there about the, the tenant must comply with all standard city

ordinances, practices, etcetera."  *Id*. at 117:25-118:11, 130:17-25.

## C.     The City Has a Clearly Established Policy and Practice of Nondiscrimination

The City has a longstanding, strong policy and practice of nondiscrimination that

extends protection on the basis of sexual orientation and religion.  The City's Home Rule

Charter, established in 1949, states "No officer or employee and no department, board or

commission of the City shall in the exercise of his or its powers and the performance of his or its

duties or in the granting of the use of City property discriminate against any person because of

race, color, religion or national origin but this paragraph shall not prohibit the use of City

property by any fraternal, religious or sectarian organization." 351 PA. CODE § 10.10-111.

The principle of non-discrimination has evolved over the past 60 years to extend

protections from discrimination on the basis of race, color, national origin, and religion to other

groups, including with the 1982 Amendment to the Fair Practices Ordinance, sexual orientation.

PHILADELPHIA CODE § 9-1102(e), § 9-1103(a), § 9-1104(a), § 9-1105(a); amended, 1982

ORDINANCES at p. 1533.   The Fair Practices Ordinance prohibits discrimination in employment,

housing, and public accommodations on the basis of race, sex, sexual orientation, gender

identity, religion, national origin, ancestry, physical handicap or marital status. *See id.*

The record of the public hearing on the bill amending the Fair Practice Ordinance

includes numerous statements from civic and religious leaders and community organizations

supporting the prohibition of discrimination on the basis of sexual orientation. *See e.g., Hearing*

*on B. 1358 Before the Comm. on Rules*, July 27, 1982, Ex. 11 ("Fair Practices Hearing

Testimony") (statements of: Joseph Schmukler, President of the Jewish Community Relations

Council;  Rev. L. Joiner, Minister of Mother of Bethel A.M.E. Church; Fr. Vince Inghilterra,

Archdiocese of Trenton; Rev. Frank Johnson, Mt. Olivet Tabernacle Baptist Church; Rabbi

Richard F. Address, Regional Dir. of Pa. Council of Union of Am. Hebrew Congregations; Fr.

John Mazatello, Jesuit order of Catholic Church; Margaret Bacon, Am. Friends Service

Committee; Priest Mary Adebonojo, St. Mathias Episcopal Church; Rabbi Linda Holtzman; Rev.

Richard Price, Philadelphia Assoc. of United Church of Christ; Rev. Patrick Chase, United

Presbyterian Church; Rev. Russell Bechtel, St. Mark's Episcopal Church; Dr. Mary Cochran,

Clinical Dir. EROMIN Ctr. and member of Mayor's Commission on Women; Joseph E.

Coleman, President of City Council; Sara Clavez, President of Pa. Nat'l Org. for Women; James

Crawford and Hilda Silverman, Greater Phil. ACLU; Clarence Farmer, Chairman of Phil.

Commission on Human Relations).

        The Fairmount Park Policy for Properties extends protection to all classes listed in

the Fair Practices Ordinance and is "aimed at eliminating discrimination in any form."  Policy for

Properties at 3, Ex. 15.  The Guidelines for Making a Proposal For a Fairmount Park Property

require non-profit entities to submit evidence of "*open participation*, not limited or restricted in

any way because of race, religion, sex, sexual orientation, or country of origin."  Fairmount Park

Guidelines (emphasis added), Ex. 14.  Furthermore, the City's leases have been updated to

include a non-discrimination provision requiring the lessee to abide by City and Park policy and

explicitly prohibit discrimination on the basis of race, color, religion, national origin, sexual

orientation, sex, ancestry or disability.  *See e.g.,* SJU Lease § 22 (dated Feb. 9, 2000), Ex. 18;

Work to Ride, Inc. Lease §§ 14, 15 (dated June 22, 1994) (stating the "Lease is entered into

under the terms of the Philadelphia Home Rule Charter and in its performance of its obligations

hereunder and use and/or occupancy of the Premises, Tenant shall not discriminate nor permit

discrimination against any person because of race, color, religion, sex, sexual orientation,

national origin or ancestry in connection with the use of the Premises by Tenant" and committing

tenant to comply with "all present and future laws, ordinances, orders, rules, regulations and

requirements of all federal, state and municipal governments, courts, departments, commissions,

boards or any other body . . . including, without limitation . . . the Philadelphia 'Fair Practice

Ordinance'"), Ex. 19; Allens Lane Art Center Sub-Sublease, (dated Jan. 19, 2007), § 14.1

("Lessee shall not discriminate nor permit discrimination against any person because of race,

color, religion, sex, sexual orientation or national origin in connection with the use of the

Premises by Lessee"), Ex. 20; Cobbs Creek Community Environmental Education Center, Inc.

Lease (dated Oct. 27, 1994) ("Cobbs Creek Lease"), § 15 ("Tenant shall not discriminate nor

permit discrimination against any person because of race, color, religion, sex, national origin or

ancestry in connection with the use of the Premises by Tenant" and extending same requirement

to "membership in the Tenant corporation or from use of the Premises or from participation in

the activities at the Premises" and "from being elected or appointed an officer or member of the

Board of Directors of the Tenant"), Ex. 21; Inj. Tr. (Herzins Test.) at 117:25-118:11, 130:17-25,

Ex. 3.

      The City has continued its commitment to ending discrimination on the basis of

sexual orientation.  That commitment is exemplified by Mayor Street's establishment of the

Office of LGBT Affairs and an LGBT Advisory Board in 2001 and Mayor Nutter's 2008

appointment of the LGBT Liaison to a salaried position operating out of the Mayor's office.  *See,*

"Mayor Nutter Announces Gloria Casarez As Mayor's Office Liaison to the LGBT

Communities," City of Philadelphia News Release (Apr. 29, 2008) ("LGBT Advisory Board

News Release"), https://ework.phila.gov/philagov/news/prelease.asp?id=385 (last visited Mar.

12, 2010), Ex. 72; Ken Dilanian, *Street Board to Deal With Gay Matters*, PHILA. INQ., Apr. 4,

2001, at B01.

    **D.**    **Boy Scouts' Discrimination Against "Known or Avowed Homosexuals" and**
           ***Boy Scouts of America v. Dale***

      On June 28, 2000, the Supreme Court decided *Boy Scouts of America v. Dale,* 550

U.S. 640 (2000), holding that the Boy Scouts were not required to accept a scoutmaster who was

described as "open and honest about [his] sexual orientation" and a "gay rights activist," because

"a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would

significantly burden the organization's right to oppose or disfavor homosexual conduct." *Id.* at

659.  The decision was widely publicized and reported on the front page of major newspapers.

*See, e.g.* Linda Greenhouse, *Supreme Court Backs Boy Scouts In Ban of Gays From*

*Membership*, N.Y. TIMES, June 29, 2000, at A1; Emilie Lounsberry, *Scouts Can Bar Gay*

*Leader, N.J. Ruling Reversed By Divided High Court*, PHILA. INQ., June 29, 2000, at A01;

Edward Walsh, *Court Says Boy Scouts Can Expel Gay Leader*, WASH. POST., June 29, 2000, at

A1;  Deborah Kalb, *Boy Scouts can ban gay leaders, high court rules*, U.S.A. TODAY, June 28,

2000, at A01.


        As set forth in *Dale*, the BSA has issued numerous position statements clarifying

its policy and practice of discriminating against "known or avowed homosexuals," as well as

agnostics and atheists, by excluding them from membership and leadership positions:

- "We believe that *homosexual conduct is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed,* and that homosexuals do not provide a desirable role model for Scouts."  530 U.S. at 652 (quoting 1991 BSA Position Statement) (emphasis added).

- "We do not believe that homosexuals provide a role model consistent with these expectations.  Accordingly, we do not allow for the registration of avowed homosexuals *as members or as leaders* of the BSA." *Id.* (quoting 1993 BSA Position Statement) (emphasis added).

        The BSA has represented: "*All Boy Scouts and their adult leaders* agree to follow

the Scout Oath and Law, which embody traditional values. . . . In adhering to these values, Boy

Scouts does not accept *as members* atheists or agonistics . . . or avowed homosexuals."  Brief of

BSA as Amici Curiae Supporting Respondent, *Pleasant Grove City v. Summum*, 129 S. Ct. 1125

(2009) (No. 07-665) at *1-2 (internal citations omitted) (emphasis added), Ex. 82; Brief of BSA

as Amici Curiae Supporting Plaintiffs-Appellants, *Evans v. City of Berkeley*, 129 P.3d 394

(2006) (No. S112621) at *1-2, Ex. 83.

The BSA "Application for Professional Commission," used by the Boy Scouts,

draws the attention of employment applicants to the Boy Scouts' discriminatory policy, setting

forth in bold print "**Read Carefully Before Proceeding**," followed by: "the Boy Scouts of

America will not employ atheists, agnostics, known or avowed homosexuals."  *See* Application

for Commission, Affidavit of Duane Perry ("Perry Aff.") ¶ 14, Ex. D.

The BSA further clarifies its policy of discrimination as applied to youths, stating:

"The conduct of youth members must be in compliance with the Scout Oath and Law, and

membership in Boy Scouts of America is contingent upon the willingness to accept Scouting's

values and beliefs.  Most boys join Scouting when they are 10 or 11 years old.  As they continue

in the program, all Scouts are expected to take leadership positions.  In the unlikely event that an

older boy were to hold himself out as homosexual, he would not be able to continue in a youth

leadership position."  Boy Scouts National Council, "Morally Straight,"

http://www.bsalegal.org/morally-straight-cases-225.asp, Ex. 28.

The BSA's Frequently Asked Questions webpage confirms that their

discriminatory policies apply to both youth members and adult leaders.  Admitting being gay or

not believing in God disqualifies one from being "a volunteer Scout leader *or member*."  BSA,

Frequently Asked Questions, http:www.bsalegal.org/faqs-195.asp?v=p& (last visited Jan. 5,

2010), Ex. 29.  The BSA explanation for the disqualification is the alleged "harm [that] would

come of admitting young people who are unwilling to do their duty to God" and the resulting

"disservice to over five million youth and adult members of Scouting to allow members to pick and choose among the elements of the Oath or Law."  *Id.*

     **E.**     **Complaints Regarding Boy Scouts' Discriminatory Policy and Boy Scouts' Loss of Charitable Contributions and Public Support: July 2000 to May 2003**

     The Supreme Court's decision in *Dale* attracted considerable attention to the Boy Scouts' discriminatory membership policy.  The City received numerous complaints regarding the Boy Scouts' discriminatory policies and the City's subsidization of the Boy Scouts.  For example, the School District of Philadelphia's Chief of Staff, Germaine Ingram, forwarded to the City Law Department his response to a complaint "recommending that the School District prohibit the Boy Scouts of America from conducting activities in our schools due to Boy Scouts' policies and practices that discriminate on the basis of sexual orientation."  Letter from Germaine Ingram ("Ingram") to Joseph Sorrentino (Aug. 14, 2000), Ex. 60; Email correspondence between Diaz and Arthur Kaplan (Sept. 17, 2005), Ex. 65; Letter from Kaplan to Mayor Street (Aug. 14, 2006), Ex. 66; Email from Andrew Chirls to Shelley Smith (Apr. 4, 2008), Ex. 6.

     The City Law Department immediately investigated the City's relationship with the Boy Scouts and evaluated their discriminatory membership policy and provision of services as compared to the City policy and practice of nondiscrimination.  In September of 2000, Lewis Rosman, then Assistant City Solicitor of Appeals and Litigation, and Howard Lebofsky, then Acting Chief Deputy City Solicitor of Special Litigation, met with Dwyer and another representative of the Boy Scouts to review the Boy Scouts' policies and practices with respect to gay members, leaders and employees.  Affidavit of Lewis Rosman ("Rosman Aff.") at ¶ 3.  Dwyer told the City that the Boy Scouts were obligated to follow national policy.  *Id.*

15

Shortly thereafter, the City recommended that the Boy Scouts be removed from the City's Employees' Combined Charitable Giving Campaign and it was removed in 2001. Affidavit of Michelle Flamer, ¶ 3.

Organizations nationwide similarly began to review their relationships with their local BSA affiliates.  By January 2001, 21 United Way chapters, 13 corporate and charitable organizations, 19 public schools, 7 public entities, and 11 religious organizations had dissociated or distanced themselves from the Boy Scouts.  Lambda Legal Defense and Education Fund, Dissociating From Discrimination ("Dissociating From Discrimination"), Ex. 69.  The Religious Action Center of Reform Judaism, the Board of Church and Society of the United Methodist Church, and the Unitarian Universalist Association all issued statements criticizing the Boy Scouts' membership policy.  *See,* Exs. 74-76.  The withdrawal of support from the Boy Scouts was highly publicized, appearing in major newspapers and news outlets throughout the country. *See e.g,* Selected Articles on Withdrawal of Support to Boy Scouts, Ex. 79.

Charitable organizations in and around Philadelphia also reacted to the *Dale* decision by examining their grant-making relationship with the Boy Scouts and their withdrawal of support was likewise publicized in the *Philadelphia Inquirer*, *Daily News*, and *Philadelphia Gay News*.  *See* Selected Articles on Regional Organizations Withdrawal of Support to Boy Scouts, Ex. 79.  On August 30, 2000, United Way of Southeastern Pennsylvania ("UWSEPA") sent a fax enclosing a "Non Discrimination policy sign off" signed by Dwyer for one of the Boy Scouts' subsidiaries, that stated: "The Cradle of Liberty Council, Learning for Life Subsidiary and its Board of Directors agrees not to discriminate in employment or the provision of services on the basis of race, color, sex, sexual orientation, religion, national origin, ancestry, age or

handicap." Ex. 61. Shortly thereafter, on September 19, 2000, the UWSEPA announced it

would restrict funding to the Boy Scouts to their subsidiary program, Learning For Life, which is

not subject to the National Boy Scouts' membership policy. Elisa Ung, *United Way adds a*

*stipulation to Boy Scout funds*, PHIL. INQ., Sept. 20, 2000 at B 1, Ex. 78. Negotiations between

the Boy Scouts and UWSEPA  continued for the next three years, culminating in the Boy Scouts'

very temporary adoption of the "United Way Southeastern Nondiscrimination Disclosure" in

May 2003. Perry Aff. ¶ 7; United Way Southeastern Nondiscrimination Disclosure, Ex. 22.

The Philadelphia Foundation, a public charity community foundation that

manages more than 775 permanent, charitable trust funds, also took action. On November 15,

2000, its Board of Managers adopted a resolution with respect to its unrestricted funds that it

would not award grants to area organizations that discriminated against any sector of society.

*See* R. Andrew Swinney, *Letter from the President: On the Horns of an Ethical Dilemma* (Dec.

2000), Ex. 73.

In December 2001, the Pew Charitable Trusts severed their long-standing

relationship with the Boy Scouts because of their exclusion of scouts and leaders based on their

sexual orientation. Perry Aff. ¶ 12; Letter from Rebecca Rimel, President of Pew Charitable

Trusts ("Rimel"), to Dwyer (June 13, 2003), Ex. 64. In 2002, the Pew Charitable Trusts rejected

the Boy Scouts' request for support for its Learning For Life program because the exclusionary

policy remained in effect for the Boy Scouts and at the national level. *Id.*

In this same time period, numerous BSA affiliates throughout the country,

including the Boy Scouts, wrote to all council presidents noting that "Scouting leaders across the

country have wrestled with the BSA leadership policy as applied to homosexuals" and proposing

a new BSA Statement on Matters of Sexuality that "embodies a policy interpretation that is respectful of differing views."  Letter from Council Leaders to all Council Presidents (Nov. 15, 2001) (signed by, among others, Tom Lynch, Chairman of the Boy Scouts, submitting resolution for consideration at 2001 Annual Meeting of BSA and enclosing letter dated Apr. 27, 2001 from council leaders to the BSA Resolutions Committee, also signed by Tom Lynch), Ex. 62.

In May of 2003, just prior to the BSA's annual national meeting held in Philadelphia, the Boy Scouts signed a non-discrimination disclosure titled "United Way of Southeastern Pennsylvania Nondiscrimination Disclosure" signed by Dwyer and David Lipson, Jr., then Chairman of the Boy Scouts Executive Board.  United Way Nondiscrimination Disclosure (May 14, 2003), Ex. 22.  The disclosure acknowledged United Way's requirement to promise to "'operate, by policy and practice, on a nondiscriminatory basis' including 'sexual orientation.'"  *Id.*  The Boy Scouts stated: "It is our duty to live up to that promise fully in our policy and practice, *including all programs, employment and adult leadership*."  *Id.* (emphasis added).

Soon thereafter, Dwyer met with Rebecca Rimel, President of the Pew Charitable Trusts, and shared that the Boy Scouts had adopted a policy and practice of nondiscrimination. Perry Aff. ¶ 6.

After the Boy Scouts adopted the United Way Nondiscrimination Disclosure, the BSA threatened to revoke the Boy Scouts' charter.  Inj. Tr. (Dwyer Test.) at 19:8-20; Letter from Girifalco to Diaz (June 28, 2007), Ex. 49.  The Boy Scouts are "chartered by the Boy Scouts of America to administer Boy Scouts' programs" (Compl. ¶ 7) and do not "have the authority to adopt a policy that eschews policies put in place by the National Boy Scouts of America

organization" Letter from Sandra Girifalco ("Girifalco"), Boy Scouts counsel, to Romulo L.

Diaz, Jr., City Solicitor ("Diaz") (Jun. 11, 2007), Ex. 47; *see also*, Letter from Girifalco to Diaz

(June 28, 2007) (notifying the City they "[were] faced with revocation of [their] Charter, and,

therefore, the elimination of Boy Scouts in Philadelphia, when [their] Board adopted, on [their]

own, without *any* urging by the City or other interest groups, a policy contrary to the national

policy")   Ex. 49.

      In the same time period, the Boy Scouts revoked the membership of Gregory

Lattera, then a seventeen-year-old Life Scout, less than one week after he spoke at a press

conference during the BSA annual convention and acknowledged that he is gay.  Letter from

Dwyer to Lattera (June 6, 2003), Ex. 63.  The Boy Scouts requested that Lattera "sever any

relationship [he] may have with the Boy Scouts of America." *Id.*   Lattera's expulsion from the

Boy Scouts was reported on the front page of the Philadelphia Inquirer and in many other news

sources.  *See, e.g.* Harris, *Area Council Ousts Openly Gay Scout*, PHILA. INQ., June 12, 2003, at

A01, Ex. 80; National Briefing, *Council Reverses on Gay Scout*, N.Y. TIMES, June 13, 2003, at

30; Associated Press Archive, *Gay Boy Scout Ousted by Council That Promised No*

*Discrimination*, June 12, 2003 (No. D7RK5KJ01).  The City Law Department and the Mayor's

office were aware of the Boy Scouts' expulsion of Lattera following his public statement

regarding his sexual orientation.  Affidavit of Joyce Wilkerson ("Wilkerson Aff.") at ¶ 6

Affidavit of Nelson Diaz ("N. Diaz Aff.") at ¶ 4.

    **F.**    **Boy Scouts Reaffirm Discriminatory Policy: May 2003**

      Following Lattera's expulsion, the Boy Scouts publicly "affirm[ed] that it will

carry out all policies as set forth by the national organization" in a June 9, 2003 Position

Statement.  Boy Scouts Position Statement, Ex. 25.  *See also,* Memorandum from Roy Williams to Scout Executives, Ex. 23; BSA Press Release, Ex. 24.  The Boy Scouts stated: "Applications for leadership *and membership* do not inquire into sexual orientation.  However, an individual who declares himself to be a homosexual *would not be permitted to join Scouting*.  *All members* in Scouting must affirm the values of the Scout Oath and Law, and all leaders must be able to model those values for youth."  Boy Scouts Position Statement (emphasis added), Ex. 25.  The Boy Scouts further clarified that "[t]olerance for all does not mean that all behavior must be accepted as appropriate *for those in Scouting*."  *Id.* (emphasis added).

The BSA also issued a News Release explaining that the Boy Scouts' statement was meant "to clarify any misconceptions that may have arisen during the BSA National Annual Meeting held May 28-30."  BSA Press Release, Ex. 24.

The Pew Charitable Trusts, without knowing of these press releases, presented a funding request for the Boy Scouts on June 11, 2003, and awarded the Boy Scouts a $100,000 grant to promote scouting in inner city neighborhoods.  Perry Aff. ¶ 12.  The following day, Ms. Rimel learned that the Boy Scouts had expelled gay Life Scout Gregory Lattera, and upon confirmation, the Trusts rescinded the award.  *Id.  See also,* Letter from Rimel to Dwyer (June 13, 2003), Ex. 64.

As a result of the Boy Scouts' continued adherence to their discriminatory membership policy, as exemplified in Lattera's expulsion, the UWSEPA also announced on July 31, 2003 that it had withdrawn funding from the Boy Scouts.  Ex. 78.

20

The Boy Scouts' issuance and repeal of the nondiscrimination policy received prominent press coverage.  *See e.g.,* Linda K. Harris, *Scouts Closer to Antibias Policy*, PHILA. INQ., Dec. 21, 2003, at B01; Harris, *City Says Scouts' Use of Land is in Jeopardy*, PHILA. INQ., Sept. 17, 2003, at B01; Harris, *United Way Pulls Funds from Scouts*, PHILA. INQ., Aug. 1, 2003, at A01.

### G. City of Philadelphia's Efforts to Reach a Nondiscrimination Agreement with the Boy Scouts: 2003-2006

The City was reminded of the Boy Scouts' discriminatory policy and practice by the press reports regarding Lattera and was informed of the decisions by the United Way of Southeastern Pennsylvania and the Pew Charitable Trust to cease all funding support of the Boy Scouts because of their discrimination against homosexuals.  *See,* Perry Aff. ¶ 12, 13; Wilkerson Aff.  at ¶ 10; Letter from Rimel to Dwyer, Ex. 64.  The Mayor requested the City Solicitor to evaluate terminating the City's arrangement with the Boy Scouts regarding their rent-free occupancy of City property.  City Solicitor Nelson Diaz responded in a privileged and confidential memorandum provided to Chief of Staff, Joyce Wilkerson, on July 2, 2003. Wilkerson Aff. at ¶ 7; N. Diaz Aff. at ¶ 5.

The City met with the Boy Scouts in late January of 2004 and received a copy of the Boy Scouts' "Non Discrimination Statement" and "Registration Review Panel" in a letter dated February 13, 2004.  Letter, from David Lipson, Jr. and Dwyer to "Chris and Joyce [Wilkerson]," Ex. 32; Wilkerson Aff.  at ¶ 12.  Rather than pledge non-discrimination, the "Nondiscrimination Statement" pledged only that the Boy Scouts would not "unlawfully" discriminate.

On October 15, 2004, Romulo Diaz, Jr. ("Diaz"), then Chair of the City's Regulatory and Government Law Department wrote to Dwyer, noting recent press reports that raised questions about the Boy Scouts' ejection of gay participants. Letter from Diaz to Dwyer (Oct. 15, 2004), Ex. 31.  He explained his understanding of the Boy Scouts' policy, set forth in their "Nondiscrimination Statement," to include a ban of discrimination on the basis of sexual orientation and requested Dwyer to confirm that the Boy Scouts' had implemented a local review process to ensure compliance with the policy.  *Id.*  Diaz further requested that Dwyer indicate any disagreement by written response and explanation.  *Id.*

In a further attempt to clarify the Boy Scouts' policy and practice, and to confirm a mutual understanding of the policies to be adopted, Diaz again wrote the Boy Scouts on June 15, 2005 and asked that they agree to comply with the nondiscrimination provisions in the Home Rule Charter and Fair Practices Ordinance.  Letter from Diaz to Dwyer (June 15, 2005), Ex. 33.

Diaz spoke with the Boy Scouts' counsel, Sandra Girifalco ("Girifalco") on July 21, 2005.  He then confirmed by letter dated July 26, 2005 that Dwyer did not agree with the City's June 15, 2005 letter requesting the Boy Scouts to publicize their agreement "to comply with the nondiscrimination provisions of the City Charter and the City's Fair Practices Ordinance."  Letter from Diaz to Girifalco (July 26, 2005), Ex. 34.  The City requested a meeting to discuss the Boy Scouts' policy.  *Id.*

The LGBT community continued to request that the City eliminate the Boy Scouts' continued rent-free use of City property because of the Boy Scouts' policy of discrimination against openly gay youth and adults and pressed the City to require the Boy Scouts to pay fair market rent for their continued occupancy.  Wilkerson Aff.  at ¶ 13.  Although

22

the City extended an offer to arrange a meeting between the Boy Scouts and the LGBT

community, the Boy Scouts' Board of Directors declined to meet with representatives of the

LGBT community.  Letter from Diaz to Girifalco (August 17, 2005), Ex. 35.  Shortly thereafter,

the City expressed its opinion that adherence to its nondiscrimination policy is required by

recipients of the City's "discretionary privileges, including the [Boy Scouts'] continued use, on a

rent-free basis, of City-owned land for its headquarters."  *Id*.

H.      **Termination of Arrangement and Attempts to Reach Agreement Prior to
        Filing Federal and State Complaints: July 2006 to May 2008**

On July 20, 2006, Diaz, acting on behalf of the Mayor and the Fairmount Park

Commission, notified the Boy Scouts of ejectment, subject to withdrawal upon agreement to pay

fair market rent.  Letter from Diaz to Dwyer (July 20, 2006), Ex. 36.  The City stated that the

avowed national policy of the BSA to discriminate against openly gay youth and adults is illegal

under the Home Rule Charter and Philadelphia Code.  *Id*.  The City noted its attempts to obtain

assurances from the Boy Scouts that they would not discriminate in violation of City policy, and

concluded that the "ongoing City subsidy of the Scouts cannot continue."  *Id*.

On July 24, 2006, the Fairmount Park Commission held a public meeting and

approved the July 20, 2006 notice of ejectment and the termination of the arrangement with the

Boy Scouts, subject to withdrawal upon agreement by the Boy Scouts to either (1) pay fair

market rent, or (2) cease their discriminatory policy and practice.  Fairmount Park Commission

Meeting Summary, Ex. 13.

The City learned by an article in the *Daily News* of the Boy Scouts' willingness to

meet and discuss the July 20, 2006 notice and offered  to schedule a meeting.  Letter from Diaz

to Dwyer (July 26, 2006), Ex. 37; Diaz Aff. at ¶ 12.   Having received no response, Diaz again

wrote to Dwyer on November 29, 2006, to request a meeting. Letter from Diaz to Dwyer (Nov.

29, 2006), Ex. 38; Diaz Aff. at ¶ 12.   On December 4, 2006, Diaz spoke with the Boy Scouts'

counsel, Girifalco, and agreed to meet and discuss the Boy Scouts' willingness to "sign an

agreement containing standard non-discrimination language typically included in City leases

pursuant to which the Boy Scouts would agree not to discriminate based on, *inter alia*, sexual

orientation in connection with the use of the building."  Letter from Diaz to Girifalco (Dec. 4,

2006), Ex. 39.  The meeting took place on December 12, 2006.  The City presented the Boy

Scouts with a proposed agreement permitting the Boy Scouts to continue their occupancy if they

would "agree that [they] will not utilize the City owned Property in furtherance of any

discriminatory policy or practice."  Letter from Diaz to Girifalco (Dec. 15, 2006), Ex. 40; Diaz

Aff. at ¶ 13.  Diaz wrote to the Boy Scouts, enclosing a copy of the proposed agreement, and

requested the Boy Scouts to inform the City of their response to the proposal at the earliest

possible date.  *Id.*

One month later, the City wrote to the Boy Scouts, reiterating its request for a

response to the proposed agreement.  Letter from Diaz to Girifalco (Jan. 12, 2007), Ex. 41.  The

following month, the Boy Scouts informed the City that, "at the direction of the National Council

of the Boy Scouts of America, The Cradle of Liberty Council is unable to execute an agreement

with the City in the form [the City] proposed on December 12, 2006."  Letter from Girifalco to

Diaz (Feb. 15, 2007), Ex. 42.  The Boy Scouts requested the City to indicate its willingness to

discuss alternative resolutions.  *Id*.  The City then offered to meet with the Boy Scouts in late

February 2007, but the Boy Scouts claimed to be unavailable, and the City again attempted to

schedule a meeting in March 2007.  *See* Letter from Diaz to Girifalco (Feb. 23, 2007), Ex. 43;

Letter from Girifalco to Diaz (Feb. 26, 2007), Ex. 44; Letter from Diaz to Girifalco (Mar. 6, 2007), Ex. 45.

On May 31, 2007, the Philadelphia City Council approved termination of Boy Scouts' use and occupancy of the 22nd Street Property "subject to withdrawal upon agreement by the Boy Scouts to pay fair market rent or the Boy Scouts ending its discriminatory policy and practice."  Resolution No. 070522, Ex. 13.  The Resolution stated:

> WHEREAS, The national Boy Scouts organization has a policy of discrimination based on sexual orientation with respect to its members and scoutmasters and has required the local Boy Scouts to implement its discriminatory policy by excluding participation on the basis of sexual orientation; and
>
> WHEREAS, The local Boy Scouts unfortunately has implemented that discriminatory policy and publicly has declared its intention to continue doing so; and
>
> WHEREAS, The non-discrimination provisions of the City's Home Rule Charter and the City's Fair Practices Ordinance reflect broad City policy abhorring discrimination and the Boy Scouts' policy and conduct is directly contrary to the principles of equal access and opportunity enshrined in Philadelphia law; and
>
> WHEREAS, Pursuant to this policy, the City seeks to ensure that the benefits of City subsidies are made available to all citizens on a non-discriminatory basis; and
>
> WHEREAS, the City's ongoing subsidy of a discriminatory organization through the allowance of free use of a building is directly contrary to the City's policy and practice of refusing to support discrimination, and of ensuring non-discriminatory access to City benefits . . .

*Id*.

On June 1, 2007, the City notified the Boy Scouts that all of the conditions required for termination had been met and the Boy Scouts therefore had one year to vacate the property.  Letter from Diaz to Girifalco (June 1, 2007), Ex. 46.  The City again stated that the

ejectment was subject to withdrawal based on the Boy Scouts' agreement to either (1) pay fair market rent, or (2) end its discriminatory policy and practice; and invited a meeting to discuss whether the Boy Scouts' wished to accept either alternative.  *Id.*

The Boy Scouts understood that the City had presented two alternatives regarding the Boy Scouts' continued rent-free occupancy of the city-owned property.  Dwyer testified:

> A:  Option one is to change the policy on leadership standards; option two is to pay fair market rent.
>
> Q: With respect to Option two, payment of fair market rent, would that require the Council to change its membership policy?
>
> A: No.
>
> Q: So subject to this City Council resolution, the Cradle would be able to remain in the building with the permission of the City and continue to maintain its—
>
> A:  Correct.
>
> Q: -- membership policy?  Okay.  Also, would it be fair to characterize the first option—I'm sorry, the option that we just discussed, the payment of fair market rent as an elimination of the City's subsidy of rent-free use of that building?
>
> A: Yes.

Inj. Tr. (Dwyer Test.) at 38:13-39:4, Ex. 3.

I.       **Boy Scouts Reject Both Alternatives Presented By City to Allow Its Continued Occupancy of the Property**

The Boy Scouts informed the City by letter dated June 11, 2007,[8] that they do not "have the authority to adopt a policy that eschews policies put in place by the National Boy Scouts of America organization."  Letter from Girifalco to Diaz (June 11, 2007), Ex. 47.  The Boy Scouts requested the City to provide an amount for "fair market rent" to enable them to consider the fair-market rent proposal.  *Id.*

The City acknowledged the Boy Scouts' refusal to end their discrimination. Letter from Diaz to Girifalco (June 22, 2007), Ex. 48.  In response, the Boy Scouts informed the City that they could face revocation of their national charter if they adopted a policy contrary to the national policy and requested an appraisal of the property to assess the option of paying fair market rent.  Letter from Girifalco to Diaz (June 28, 2007), Ex. 49.  The City responded the same day and noted that its appraiser would contact the Boy Scouts to arrange a date to inspect the property. Letter from Diaz to Girifalco (June 28, 2007), Ex. 50.

On August 6, 2007, the City provided the Boy Scouts with an appraisal report determining the fair rental value to be $200,000/year and again invited a meeting with the Boy Scouts.  Letter from Diaz to Girifalco (Aug. 6, 2007), Ex. 51; Keystone Summary Appraisal Report, Ex. 6.

---

[8]       The letter is a fax copy stamped with the date June 21, 2007 and the City did not receive the letter until that date.  For  purposes of summary judgment, the City accepts the Boy Scouts' assertion that the letter was mailed on June 11, 2007.

On October 16, 2007, the Boy Scouts acknowledged receipt of the rental appraisal, requested a copy of a previously performed external appraisal, and denied that they had communicated to the City an agreement to pay fair market rent.  Letter from Girifalco to Diaz (Oct. 16, 2007), Ex 52. The City responded the next day, providing the Boy Scouts with a proposed lease agreement, giving the Boy Scouts until December 3, 2007 to accept the lease terms, and informing the Boy Scouts of the City's need for time to find another use for the property following the Boy Scouts' occupancy.  Letter from Diaz to Girifalco (Oct. 17, 2007), Ex. 53.

The Boy Scouts rejected the rent payment alternative, as they had the non-discrimination alternative.  Inj. Tr. (Dwyer Test.) at 39:10-12, Ex. 3.

The City further attempted resolution with the Boy Scouts in a March 18, 2008 meeting between City Solicitor Shelly Smith ("Smith") and counsel for the Boy Scouts.  *See* Letter from Jason Gosselin ("Gosselin") to Smith (Mar. 21, 2008), Ex. 54.  Shortly after, the Boy Scouts reiterated that they "ha[ve] not repudiated" "the national Boy Scouts of America's policy of prohibiting known or avowed homosexuals from serving in positions of leadership" and argued the Boy Scouts' First Amendment right of expressive association did not permit the City to eject them from the city-owned property.  *Id.*  The City responded that "the Mayor stands by the notice of ejectment because the [Boy Scouts'] policy of discriminating against openly gay scouts and scout leaders violates City policy, established among other places, in the City's Fair Practices Ordinance and the City has a policy against subsidizing such discrimination."  Letter from Smith to Gosselin (Mar. 25, 2008), Ex. 55.

Finally, on May 6, 2008, the City restated the Mayor's position on the Boy Scouts' use of the city-owned 22nd Street Property, stating: "Unless the [Boy Scouts] agrees in writing that it will end its discriminatory policy against openly gay youth and adults, or unless the [Boy Scouts] signs a lease agreeing to pay fair market rent to the City, the [Boy Scouts] must vacate the Property."  Letter from Smith to Girifalco (May 6, 2008), Ex. 56.  The City gave the Boy Scouts until June 1, 2008 to sign the previously provided lease or vacate the property.  *Id.*

The Boy Scouts did not sign the lease and have refused to vacate the property.

## III.    PROCEDURAL HISTORY

On May 23, 2008, just days before the Boy Scouts were required to vacate the property, they filed this action asserting federal and state claims of unconstitutional conditions, viewpoint discrimination, and equal protection, as well as state law claims of breach of contract and unjust enrichment.  The City filed an action for ejectment and holdover rent in the Philadelphia Court of Common Pleas on June 2, 2008.  Compl. in *City of Philadelphia v. Cradle of Liberty Council, Inc., Boy Scouts of America*, No. 080600149 (filed June 2, 2008) ("Phil. Compl."), Ex. 83.  The parties jointly moved for a stay of the state court action on July 2, 2008 and the court granted the stay only as it pertained to the constitutional claims and federal questions.  Phil. Stay, Ex. 84.

This Court dismissed the Boy Scouts' claims for breach of contract and unjust enrichment on September 25, 2008.  Dkt. 13.

On October 29, 2009, the state court vacated its order granting the stay, denied the Boy Scouts' motion for judgment on the pleadings, and scheduled oral argument on the City's

29

motion for summary judgment.  Thereafter, the Boy Scouts moved to enjoin the City from

pursuing ejectment in state court and on November 19, 2009, following a hearing the day before,

the Court granted the Boy Scouts' motion and enjoined the City from taking any further steps to

eject the Boy Scouts from the property.  Dkt. 30.

        The City timely filed a motion for reconsideration and on January 7, 2010, the

Court granted the motion in part, as it related to the omission of a bond.  Dkt. 41.  The parties

attended a hearing on January 19, 2010 and agreed to submit briefs on the requirement of a bond

pursuant to Rule 65(c).  On March 2, 2010, the Court ordered that the Boy Scouts are required to

post a bond.  Dkt. 50.  The hearing on the amount of the bond will be held on March 30, 2010.

## IV.    ARGUMENT

### A.    Standard of Review

        Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  A "material fact" is one that might affect the outcome of

the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). For an issue to be

"genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving

party.  *Id*

        The court must consider the evidence, and all reasonable inferences which may be

drawn from it, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S.

654, 655 (1962)); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

The moving party can meet its burden at summary judgment by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586; *Celotex Corp.*, 477 U.S. at 323. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994), distinguished on other grounds *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999). These rules are " no different where there are cross-motions for summary judgment." *Lawrence*, 527 F.3d at 310. *See also, Acevedo v. City of Philadelphia*, 2010 U.S. Dist. LEXIS 5232, *30 (E.D. Pa. Jan. 22, 2010) (quoting *Lawrence* and *Rains v. Cascade Indus., In*c., 402 F.2d 241, 245 (3d Cir. 1968)).

**B.    The Boy Scouts' Equal Protection Claim Fails Because The Boy Scouts Cannot Show Rental Subsidies Are Granted by Clear, Non-Discretionary Standards, Do Not Provide Evidence of Similarly Situated Entities Treated Differently, and the Termination of the Boy Scouts' Subsidy Is Rationally Related to the Legitimate Interest of Enforcing the City Policy and Practice of Nondiscrimination.**

This Court has recognized that the Boy Scouts' "equal protection claim is based on a 'class of one' theory, under which a plaintiff who is not asserting membership in a protected class may still assert a claim under the Equal Protection Clause." Sept. 25, 2008 Memorandum on Motion to Dismiss, Dkt. No. 13 at 9 ("MTD Opinion") (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

31

To succeed on a claim for denial of equal protection under 42 U.S.C. § 1983,[9] a plaintiff "must prove the existence of purposeful discrimination. . . .  They must demonstrate that they received different treatment from that received by other individuals similarly situated." *Chambers v. Sch. Dist. of Phil.*, 587 F.3d 176, 196 (3d Cir. 2009).  "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference . . ."  *Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146, 2153 (2008).

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.  The plaintiff must show clear standards by which to measure a departure of treatment and the absence of "discretionary decision-making based on a vast array of subjective, individualized assessments." *Id.* at  2154.

The Boy Scouts' class of one equal protection claim fails for three independent reasons: (1) the Boy Scouts cannot prove the required clear standards for providing rental subsidies because the City's rental subsidies are based on discretionary and individualized determinations; (2) the Boy Scouts cannot meet their burden of showing similarly situated

---

[9]     "The equal protection provisions of the Pennsylvania Constitution are analyzed  . . .under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution." *Love v. Stroudsburg,* 597 A.2d 1137, 1139 (Pa. 1991).  The Boy Scouts' equal protection claims asserted under Article I, § 26 of the Pennsylvania Constitution are therefore deficient for the same reasons asserted here.

entities who were treated differently; and (3) the City's refusal to subsidize the Boy Scouts is rationally related to its legitimate interest in upholding the important City policy and practice of nondiscrimination.

          1.       **The Boy Scouts Cannot Prove the Required Clear Standards For Providing Rental Subsidies Because the City's Rental Subsidies Are Based on Discretionary and Individualized Determinations.**

The Supreme Court clarified its analysis of "class of one" claims in *Engquist*, noting "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed" is necessary for a "class of one" equal protection claims. *Id*. at 2153. The Court held:

> There are some forms of state action . . . which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.

*Id*. at 2154. The Court found that employment decisions "are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify," and held that the class-of-one theory of equal protection did not apply in the public employment context. *Id*.

Similarly, the Sixth Circuit rejected a class of one claim where plaintiff asserted his medical privileges had been unconstitutionally revoked. *Benjamin v. Brachman*, 246 Fed. Appx. 905, 907 (6th Cir. 2007). The Court found that multiple doctors participated in the review, the deciding committee considered the recommendation of numerous independent

reviewers, and each member of the committee voted individually.  *Id.* at 928.  The Court held "[t]his type of review is inherently discretionary" and thus could not support a class of one claim. *Id.  See also, Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009) (denying class of one equal protection claim because plaintiff failed to show that utility's decision to extend water mains was based on "clear standards," noting the "determinations are merely ad hoc and individualized and consequently offer no standard by which we can assess departures in conduct").

In leasing Fairmount Park property to nonprofit entities, the executive director of Fairmount Park and senior staff meet and discuss "the issue of a property use and potential lease . . . with everyone at the table having input from their particular and appropriate perspective." Bessler Dep. at 41:21-42:14, Ex. 2.  Bessler testified that "the executive director . . . [will] confer with individuals or as a group when it comes to a matter like a property lease . . .  He gets input from all of us [senior staff] about a decision such as who goes into a building, who stays in a building or how they get in there, or what the adaptive reuse of the building might be."  *Id*. at 48:18-49:10.

The Fairmount Park staff consider numerous factors in deciding whether to allow an entity to occupy a city-owned property for no or nominal rent, including those listed on the Guidelines for Making a Proposal (Ex. 14), such as a statement of proposed uses, evidence of open participation, completed Occupancy Practices Questionnaire (Ex. 16), and information contained in the by laws, articles of incorporation, and mission statement of the organization. *See,* Inj. Tr. (Bessler Test.) at 71:14-22, 73:24-74:5, 81:8-86:6, Ex. 3.  The Fairmount Park also

receives advice from the City Law Department in considering assignment of properties.   Bessler Dep. at 57:13-58:15, Ex. 2.

The executive director then presents a recommendation, which prior to July 1, 2009, went to the Fairmount Park Commission, and since goes to the Commissioner of Parks and Recreation.  All decisions relating to Fairmount Park properties prior to July 1, 2009 were made by the Fairmount Park Commission board, consisting of sixteen members who voted individually at each members' discretion.  *Id*. at 58:16-24.  All leases now require approval by the Commissioner of Parks and Recreation.  Inj. Tr. (Bessler Test.) at 111:14-112-1, Ex. 3.

For city properties outside of Fairmount Park, the City has no written policies or guidelines and no written policies or guidelines for appealing the City's decision to grant or deny a lease request.  Herzins Dep. at 119:15-21; 120:13-21, Ex. 1.  The Department of Public Property handles direct requests for leasing city-owned property by verifying the City's ownership and referring the entity to City Council.  The Department of Public Property also receives requests from members of City Council.  *Id*. at 21:8-22:20.  When a request is supported by a City Council member, the Department of Public Property works with an organization on the lease terms and the lease must be approved by City Council.  Inj. Tr. (Herzins Test.) at 127:9-129:7, Ex. 3.  John Herzins, deputy commissioner of the Department of Public Property, testified that in handling requests to lease City property "there's not a checklist, there's not a formal procedure to follow."  Herzins Dep. at 23:19-24:2, Ex. 1.  Mr. Herzins testified:

> Q: "[I]s it true the applicant cannot just meet certain criteria or
> requirements to lease a property, and, therefore, establish a right to
> a particular property?"

A: No.  I mean, if -- no.

Inj. Tr. (Herzins Test.) at 131:12-15, Ex. 3.

Therefore, just as with the "subjective and individualized" evaluation in *Enguist* and the individual votes by a committee based on independent recommendations in *Benjamin*, the Boy Scouts cannot point to any clear standards by which to measure the City's alleged departure in the treatment they have received.  The Boy Scouts' class of one equal protection claim therefore must be dismissed.

### 2.      The Boy Scouts Cannot Meet Their Burden of Showing Similarly Situated Entities Who Were Treated Differently.

"[T]he case law makes clear that the burdens of production and persuasion must be shouldered by the party asserting the equal protection violation.  Thus, '[p]laintiffs claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently.'"  *Cordi-Allen v. Conlon*, 494 F.3d 245, 250-51 (1st Cir. 2007) (alternation and emphasis in original) (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)); *see, also Mosca v. Cole*, 217 Fed. Appx. 158, 164 (3d Cir. 2007).  "To carry the burden of proving substantial similarity, 'plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. . . . While the applicable standard does not require that there be an '[e]xact correlation,' . . . there must be sufficient proof *on the relevant aspects of the comparison* to warrant a reasonable inference of substantial similarity."  *Cordi-Allen*, 494 F. 3d at 251 (alteration in original) (internal citations omitted) (emphasis added).

The Boy Scouts' argument that others who are similarly-situated have been permitted to both discriminate and retain their rent-free occupancy is unsupported by any competent evidence. Indeed, this Court sustained the City's objection, at the Preliminary Injunction Hearing, to the Boy Scouts' repeated hypothetical questions regarding other entities where the Boy Scouts failed to offer any evidence as to those entities' membership criteria. Inj. Tr. at 97:7-98:12, Ex. 3. The Boy Scouts acknowledged that they could have subpoenaed these organizations, *id*. at 98:15-16, yet they elected to subpoena just two: Saint Joseph's University ("SJU") and the Colonial Dames of America, Chapter II ("Colonial Dames"). Neither organization is similarly situated to the Boy Scouts.

### a.  SJU Does Not Discriminate and Signed A Non-Discrimination Agreement.

SJU entered into a sublease to construct a boathouse, dock and ancillary facilities on city-owned land, requiring it to pay $10 in rent for the 40 year lease term. SJU Ground Sublease, Ex. 18. SJU agreed to "observe and comply with all Applicable Laws that pertain to [its] use and occupancy of the Premises," including "all laws, statutes, ordinances, rules regulations . . . of all federal, state, municipal and local governments, courts, departments, commissions, boards . . . regulating Subtenant, and/or the . . . maintenance, operation, use and/or occupancy of the Premises" and "the 'Fair Practice Ordinance.'" *Id.* § 1.2(1)(i) and (iv). Furthermore, SJU agreed to "comply with all the rules and regulations of the Fairmount Park Commission" and acknowledged that the "Sublease is executed under the Philadelphia Home Rule Charter and the Philadelphia Code, and Subtenant shall not discriminate or permit discrimination against any person because of race, color, religion, national origin, sexual orientation, sex, ancestry or disability." *Id*. § 22.1; 26.1.

Unlike the Boy Scouts, SJU:

- Agreed in writing not to discriminate against any person "because of race, color, religion, national origin, sexual orientation, sex, ancestry or disability."  Deposition of Dominick DiJulia ("SJU Dep."), dated January 7, 2010 at 29:9-30:9, Ex. 4; SJU Ground Sublease at § 22.1, Ex. 18.

- Does not discriminate in its university leadership positions, including those in the president's cabinet, faculty composition, or athletic leadership positions on the basis of any of the above characteristics.  SJU Dep. at 49:15-55:18, Ex. 4.

- Provides rowing programs to public high school students with no restrictive membership policy or restrictive access based on any of the above criteria.  *Id.* at 46:9-25.

- Opens the property for use by the disabled rowing program. *Id.* at 27:15-28:12.

SJU is clearly not similarly situated to the Boy Scouts and cannot support its claim of unequal treatment.[10]

**b.    The Colonial Dames Open The City-Owned Property to The Public and Provide Services on a Non-Discriminatory Basis**

The Colonial Dames license the use of the Lemon Hill Mansion from the City for no rent.  Colonial Dames License Agreement, Ex. 17; Deposition of Eleanor Penniman, dated January 6, 2010 ("Col. Dames Dep.") at 26:12-16, Ex. 5.  Eleanor Penniman, vice president of the Colonial Dames and a fifty-year member, testified that the Colonial Dames' "primary job and function is to keep Lemon Hill Mansion in Fairmount Park open to the public, providing educational programming, making it available to students for research, providing tours for

---

[10]    The City notes that the Boy Scouts do not, in their motion for summary judgment, advance any facts that would challenge this conclusion.

groups wishing to visit, and individuals, and maintaining the collection and insuring it." *Id.* at 19:17-20:3.  Although the membership policy limits members to women descended from an ancestor who, between May 13, 1607 and April 19, 1775, served one or more of the original thirteen colonies, (Brief History of Colonial Dames, Ex. 77), the Colonial Dames do not exclude members on the basis of race, sexual orientation, religion, national origin, or disability.  Col. Dames Dep. at 41:20-47:5.

The Colonial Dames' non-exclusionary policy and provision of services and maintenance of the Lemon Hill Mansion is supported by the Friends of Lemon Hill, a board consisting of up to 21 members created to assist in maintaining Lemon Hill Mansion.  Friends of Lemon Hill has an open membership policy to anyone "according to skill sets."  *Id.* at 66:16-67:13; 68:17-25.  Furthermore, the Colonial Dames employ a gay couple to serve as caretakers and reside on the ground floor (*id.* at 77:15-21) and a house tour-guide who is African-American and a member of the Friends of Lemon Hill.  *Id.* at 54:23-56:10; 76:25-77:14.  The Colonial Dames have never received any complaints that they have excluded anyone on the basis of race, sexual orientation, religion, national origin, or disability.  *Id.* at 50:9-12.

Unlike the Boy Scouts, the Colonial Dames:

- Open the city-owned property to any member of the public, regardless of race, religion, national origin, sexual orientation, gender, ancestry, or disability (*id.* at 49:7-50:8);

- Limit their exclusive use of the property to just one corner of the kitchen and one filing cabinet in the basement (*id.* at 80:3-9); and

- Pay to bus Philadelphia school children to the Lemon Hill Mansion for educational programming and welcome any student who would like to enter (*id.* at 47:11-48:19).

39

The Colonial Dames are therefore not similarly situated to the Boy Scouts and, just as with SJU, they cannot be considered similarly situated for comparison in the equal protection context.[11]

> **c.** **The Boy Scouts Do Not Provide Evidence of Any Other Entity With a Discriminatory Membership Policy, Discriminatory Services, or Discriminatory Use of City-Owned Property.**

The Boy Scouts' speculative allegation in their Complaint that "[s]everal of the leases involve organizations that limit membership or services to particular groups," including the Roman Catholic Church, the Zion Baptist Church, and the Women For Greater Philadelphia (Compl. ¶ 21), fails to satisfy their "heavy burden" of showing similarly situated entities who were treated differently.[12]  Indeed, the Boy Scouts' assumption that religious organizations must discriminate is demonstrated false by SJU, whose association with the Catholic Church does not equate to the exclusion of other religions or gays, and by the numerous statements offered by religious leaders in support of amending the Fair Practices Ordinance to prohibit discrimination based on sexual orientation.  *See e.g.,* Fair Practices Hearing Testimony, Ex. 11 (statement of Fr. Vince Inghilterra, Archdiocese of Trenton, Diocesan Liaison for Sexual Minorities and member of Advisory Board to the United States Catholic Conference, that "[t]here is not a shred of scripture nor a tenet of moral theology that could justify the stripping of a person's basic rights . . . No longer can God or the Church be used as scapegoats in what is truly societal and cultural

---

[11]    The City notes that the Boy Scouts do not, in their motion for summary judgment, advance any facts that would challenge this conclusion.

[12]    We note that Boy Scouts again advance this unsupported speculative argument in their summary judgment motion.

discrimination.  The Vatican II Church upholds and reveres the dignity and rights of every

human person.  It's about time that we all realize the days of the Inquisition are over."); *id.*

(statement of Father John Mazatello, ordained priest of Jesuit order, imploring City Council to

"help[] to prevent further such abuse of our fellow gay and lesbian American in Philadelphia by

specifically including sexual orientation in the Fair Practices Code.  Such a place I find to be

perfectly consistent with the Roman Catholic Church's commitment to the cause of social justice

and its identification with the poor and the oppressed people of society, a better example of

which can hardly be found than that of our own gay and lesbian community members.").

Similarly, the Boy Scouts' assumptions based on an organization's name are

proven false by the Women for Greater Philadelphia, licensee of the Laurel Hill Mansion, whose

membership is "open to any one interested in furthering the purposes of the corporation" and

stated purpose is "to promote and enhance the historical, philosophical, educational and cultural

values of Greater Philadelphia."  Women For Greater Philadelphia By Laws, Ex.70.

Furthermore, just as with SJU and the Colonial Dames, Women For Greater Philadelphia operate

the city-owned property they occupy as a tour house open to the public without restriction on the

basis of sexual orientation or religion.  *See,* Lease Organization Questionnaire, Ex. 16.

> **d.      The City Has Not Received Complaints Regarding the
> Membership Policy and/or Provision of Services by Any Other
> Subsidized Occupant of City-Owned Property.**

The mere fact that the Boy Scouts are the only subsidized occupants of City

property that have attracted complaints eliminates any possibility that they are similarly situated

to those whose subsidy has not been revoked.  Courts of Appeals have held that the burden of

showing substantial similarity in equal protection claims is not met where one entity was the

subject of complaint and another was not.  In *Lerch v. City of Green Bay*, 218 Fed. Appx. 502, 504 (7th Cir. 2007), the Court affirmed summary judgment against the plaintiff who asserted an equal protection claim, alleging he was unfairly cited for violations also committed by other nearby landlords.  The Court held that he failed to meet the "'very significant burden' of introducing evidence of other individuals similarly situated *in all relevant respects*," specifically noting that he offered no proof that the city had received (and ignored) complaints relating to the other properties.  *Id*. (emphasis added).  Similarly, in *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007), the Court required the "class of one" plaintiff  "to show that [its] professed comparison is sufficiently apt" and found that citizen complaints were a relevant comparison factor and the plaintiff failed to reference citizen complaints against the allegedly similarly situated company.  *Id*. at 1206.

The summary judgment record demonstrates numerous complaints that the City should not be providing rent-free occupancy to the Boy Scouts while they are openly discriminating against gays and others.  *See e.g.,* Wilkerson Aff. ¶¶ 9, 13; Diaz Aff. ¶ 8; Email correspondence between Diaz and Arthur Kaplan (Sept. 17, 2005), Ex. 65; Letter from Kaplan to Mayor Street (Aug. 14, 2006), Ex. 66; Email from Andrew Chirls to Shelley Smith (Apr. 4, 2008), Ex. 67.  By contrast, The Boy Scouts have not provided evidence-- and none exists-- of any other entity leasing city-owned property for no or nominal rent that has been the subject of complaint based on its discriminatory membership policy, provision of services, or private use of city-owned property.

3.     **The City Has A Clearly Established Nondiscrimination Practice and Policy, Including the Explicit Fairmount Park Policy Prohibiting Discrimination on the Basis of Sexual Orientation, and Rationally Seeks to Enforce its Policy and Practice by Refusing to Subsidize the Boy Scouts.**

The City's actions are rationally related to its legitimate interest in enforcing its non-discrimination policy and practice.  As this Court noted, the City is not liable "unless there is *no conceivable rational relationship* between the differential treatment and a legitimate government interest."  Sept. 25, 2008 Op. at 11 (emphasis added).  Indeed, a class of one equal protection plaintiff's "burden of showing that there was no conceivable rational basis for the disparate treatment" has been described as a "daunting standard." *1064 Old River Rd., Inc. v. City of Cleveland*, 137 Fed. Appx. 760, 765 (6th Cir. 2005).  That is true even if the Court were to find that there may be organizations other than the Boy Scouts who discriminate in their membership policies, provision of services, and use of city-owned property.

For example, in *Montanye v. Wissahickon School District*, 399 F. Supp. 2d 615 (E.D. Pa. 2005), this Court rejected a teacher's "class of one" equal protection claim where she alleged differential treatment because she was the first teacher to be subjected to a hearing prior to termination and to receive a "Directives letter."  *Id*. at 621.  The Court held that the school district "has a significant interest in seeing its procedures followed" and therefore had a rational basis for its treatment of plaintiff.  *Id*. at 627.

The City's termination of its subsidy to the Boy Scouts is rationally related to its legitimate interest in eliminating discrimination, including discrimination based upon sexual orientation.

43

a.      **Courts Have Recognized The History of Discrimination Against Gays and The Need for Anti-Discrimination Protections.**

The City clearly has a rational, indeed a compelling, interest in protecting its citizens from discrimination based on sexual orientation.  The harm from government-condoned discrimination cannot be overstated.  As the Supreme Court noted in *Lawrence v. Texas*, 539 U.S. 558, 575 (2003), "[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and private spheres."  Indeed, the Supreme Court has held that the interest of a state or local government in ending discrimination is a "compelling state interest of the highest order." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (holding California's interest in ending discrimination through the Unruh Civil Rights Act is "compelling" and finding anti-discrimination laws promote "compelling state interest of the highest order"); *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 17 (1988) (upholding New York City Human Rights Law, noting the "city's compelling interest in eliminating discrimination").

The Supreme Court and Courts of Appeals have recognized the history of discrimination suffered by gays.  Justice Brennan, joined by Justice Marshall, recognized that "homosexuals constitute a significant and insular minority of this country's population.  Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena.  Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and  it is fair to say that discrimination against homosexuals is 'likely  . . . to reflect deep-seated prejudice rather than . . . rationality.'"  *Rowland v. Mad River Local Sch.*

*Dist.*, 470 U.S. 1009 (Brennan, J. dissenting) (ellipses in original) (quoting *Plyler v. Doe*, 457

U.S. 202, 216 n.14 (1982).

In *Watkins v. United States Army*, 875 F.2d 699 (9th Cir. 1989), Judges Norris

and Canby wrote:

> Discrimination against homosexuals has been pervasive in both the
> public and private sectors.  Legislative bodies have excluded
> homosexuals from certain jobs and schools, and have prevented
> homosexuals marriage.  In the private sphere, homosexuals
> continue to face discrimination in jobs, housing and churches. . . .
> Moreover, reports of violence against homosexuals have become
> commonplace in our society.  In sum, the discrimination faced by
> homosexuals is plainly no less pernicious or intense than the
> discrimination faced by other groups already treated as suspect
> classes, such as aliens or people of a particular national origin.

(Norris, J. concurring).  *See also, High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d

563, 573 (9th Cir. 1990) (rejecting Judge Norris' finding of  heightened scrutiny, but agreeing

"that homosexuals have suffered a history of discrimination"); *Dean v. District of Columbia*, 653

A.2d 307, 344-45 (D.C. Cir. 1995) (quoting *Watkins* discussion of the pervasive history of

discrimination against homosexuals); *Ben-Shalom v. Marsh*, 881 F.2d 454, 465-66 (7th Cir.

1989) (finding against discharged United States Army Sergeant, but noting that "[h]omosexuals

have suffered a history of discrimination and still do").

        **b.**     **The City's Policy and Practice of Non-Discrimination Is
Clearly Established and Applies to All Subsidized Occupants
of City-Owned Property.**

The City has a longstanding, strong policy and practice of nondiscrimination that

extends protection from mistreatment based on sexual orientation and religion.  The City's Home

Rule Charter, established in 1949, sets forth a principle of non-discrimination that has evolved

over the past 60 years to extend protections from discrimination on the basis of race, ethnicity

and religion to other groups once treated as lesser citizens, including women and gays.   For

example, although gender was not included in the 1949 Home Rule Charter, evolving standards

reflect that women once believed "destin[ed] . . . to fulfill the noble and benign offices of wife

and mother" and deemed  "unfit[] . . .for many of the occupations of civil life," *Bradwell v.*

*Illinois*, 83 U.S. 130, 141-2 (1873) (Bradley, J. concurring), are now protected by a heightened

standard of review.  That standard recognizes that "statutes distributing benefits and burdens

between the sexes in different ways very likely reflect outmoded notions of the relative

capabilities of men and women" and that gender "generally provides no sensible ground for

differential treatment."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  *See*

*also, Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003) (recognizing that "States

continue to rely on invalid gender stereotypes in the employment context" and holding that

"[r]eliance on such stereotypes cannot justify the States' gender discrimination in this area. . . .

The long and extensive history of sex discrimination prompted us to hold that measures that

differentiate on the basis of gender warrant heightened scrutiny . . .").

         Philadelphia is a leader in extending its protections against discrimination. It

exemplified that commitment to decency and equality in the City's 1982 Amendment to the Fair

Practices Ordinance, which expanded protection from discrimination on the basis of race, color,

sex, religion, national origin, ancestry, age and handicap to include sexual orientation.

PHILADELPHIA CODE § 9-1102(e); amended, 1982 Ordinances at p. 1533.  As the Chairman of

the Commission on Human Relations stated at the public hearings on the 1982 amendment,

"pointless embarrassment, personal agony and hardships are perpetrated against many

Philadelphia citizens because of their sexual orientation . . .  Much unjustified and unwarranted

persecution and discrimination brought to bear on members of the gay community would be

relieved if sexual preference were added to the classes of people protected by our fine anti-discrimination laws."  Fair Practices Hearing Testimony (statement of Clarence Farmer), Ex. 11

The contemporary standards of non-discrimination are further reflected in the Fairmount Park Nondiscrimination Policy which mirrors the classes protected by the Fair Practices Ordinance, including sexual orientation, and  is "aimed at eliminating discrimination in any form."  Fairmount Park Nondiscrimination Policy, Ex. 15.  The Fairmount Park Guidelines require non-profit entities to submit evidence of  "*open participation*, not limited or restricted in any way because of race, religion, sex, sexual orientation, or country of origin."  Fairmount Park Guidelines (emphasis added), Ex. 14.  "Utilization of any park facility is predicated upon full compliance with our equal opportunity policy.  Those found to be in violation of this policy will be rejected for consideration for the use of park facilities and properties, or if contracts have already been entered into, will have those contracts cancelled for failure to follow those policies."  Fairmount Park Nondiscrimination Policy, Ex. 15.

Furthermore, the City's leases have been updated over time to include a non-discrimination provision.  The provision requires the lessee to abide by City and Park policy and explicitly prohibits discrimination on the basis of race, color, religion, national origin, sexual orientation, sex, ancestry or disability.  *See e.g.,* SJU Ground Sublease, Ex. 18; Work to Ride, Inc. Lease, Ex. 19; Allens Lane Art Center Sub-Sublease, Ex. 20; Cobbs Creek Lease, Ex. 21; Inj. Tr. (Herzins) at 118:1-11; 130:17-25, Ex. 3.  Finally, the City's commitment to ending discrimination on the basis of sexual orientation is exemplified by the Mayoral advisory board on LGBT affairs established in 2001 and Mayor Nutter's decision to make the LGBT Liaison a

47

salaried position operating out of the Mayor's office.  Philadelphia Executive Order 13-08;

LGBT Advisory Board News Release, Ex. 72.

Philadelphia's anti-discrimination protection afforded to gays is in conformity

with other Pennsylvania municipalities, states, and the national trend.  *See e.g.,* Pennsylvania

Executive Order 1975-5, now 4 PA. CODE § 5.91 *et seq*.  ("committing this administration to

work towards ending discrimination against persons solely because of their affectional or sexual

preference" and establishing the Pennsylvania Council for Sexual Minorities to recommend

policy and legislative changes to the Governor "needed to further the goal of obtaining equal

rights for all persons"); PHILADELPHIA CODE §§ 9-1102-05 (amended 1982); 6 PITTSURGH CODE

§§ 659.02-04, 07 (amended 1990); CODIFIED ORDINANCES OF ALLENTOWN § 181.02 (amended

2002); GENERAL CODE OF SCRANTON § 296 (adopted 2003);  CODE OF THE BOROUGH OF WEST

CHESTER § 37A (added 2006);  ALLEGHENY COUNTY BILL NO. 4201-08 (approved July 1, 2009);

*High Tech Gays*, 895 F.2d at 574 n.11 (listing states and major cities with anti-discrimination

regulations protecting gays); Exec. Order No. 13,087, Fed. Reg. 30,097 (May 28, 1998) (adding

a prohibition of "discrimination based on sexual orientation" to the Federal Government's equal

employment opportunity mandate); Dissociating From Discrimination (listing organizations and

public entities that have withdrawn support from Boy Scouts of America by 2001), Ex. 69.

The City's termination of the Boy Scouts' rent-free occupancy of city-owned

property is consistent with-- indeed compelled by-- the City's anti-discrimination laws, policies,

and practices.  The City has consistently stated it "simply [is] not willing to subsidize an

organization's discrimination against vulnerable youth who are stigmatized and degraded by the

Scouts' maintenance and application of its exclusionary policies."  Mayor Nutter Letter to Hon.

Charles W. Dent, dated July 9, 2008, Ex. 68.  For all these reasons, the City's decision to terminate its subsidy to the Boy Scouts is rationally related to the City's legitimate law and policy of prohibiting discrimination.

> **c.** **The City Rationally Evaluated the Boy Scouts' Membership Policy After the Policy was Brought to its Attention by the *Dale* Decision and Numerous Public Complaints and Is in the Process of Using its Limited Resources to Ensure All Subsidized Occupants of City-Owned Property Comply With City Law and Policy.**

The City focused on the Boy Scouts' discriminatory policy of excluding participation on the basis of sexual orientation following the highly publicized *Dale* decision and the numerous complaints from the general public and the gay community concerning City subsidies to the Boy Scouts.  Wilkerson Aff. ¶¶ 9, 13; Diaz Aff. ¶ 6; Perry Aff. ¶ 4.  In the three years following the *Dale* decision, numerous municipalities, public institutions, charities, and corporations withdrew their financial support and facilities from BSA-affiliated organizations because of the national policy, implemented by local affiliates such as the Boy Scouts, of discriminating against gays, agnostics, and atheists.  *See e.g.,* Harris, *United Way Pulls Funding From Scouts*, PHILA. INQ., Aug. 1, 2003, at A01; Harris, *Scouts Closer to Antibias Policy*, PHILA. INQ., Dec. 21, 2003, at B01; Dissociating From Discrimination, Ex. 69.

The Boy Scouts have provided no evidence that any other organization occupying a City-owned property for little or no rent discriminates in membership and the provision of services in violation of City law and policy.  And certainly there is no evidence that the City has received complaints about the discriminatory policies or practices of any rent-free occupant of City-owned property other than the Boy Scouts.

The City has limited resources, and although it has begun to review its many lease and license arrangements for compliance with City law and policy, it has not completed its review and the initial focus of the broad review process has been on verifying the properties are properly insured and the potential recoupment of money. *See e.g.,* Herzins Dep. at 146:21-147:16, Ex. 1; Inj. Tr. (Herzins Test.) at 117:25-118:16, 119:5-12, Ex. 3; Bessler Dep. at 216:13-217:18, Ex. 2; Letter from Robert N. C. Nix, III, Treasurer of Commissioners of Fairmount Park ("Nix") to Alma R. Jacobs, Pres. Women for Greater Phil. (June 18, 1996), Ex. 57; Letter from Nix to Mrs. C. Cresson Wistar, Colonial Dames of America (June 18, 1996), Ex. 58; Letter from Dennis A. Waller, Deputy Dir. Bus. Admin. of Fairmount Park to Rev. Monsignor Anthony W. McGuire (Aug. 7, 1996), Ex. 59.  The City did not single out the Boy Scouts' lease for review, but was drawn to evaluate it in light of the publicity over the Boy Scouts' discrimination against gays and the complaints the City received in regard to that discrimination.

*       *       *

For each of these reasons, the Boy Scouts' have clearly failed to establish the necessary elements of an equal protection claim:  The City's decisions to permit the use of a City-owned property for no or nominal rent are not based on any clear standard as is required by *Enguist*, but rather involves discretionary, individualized decision-making that does not meet the clear standards required by *Enguist*; the Boy Scouts utterly fail to meet their burden of evidencing similarly situated entities who were differently treated; and the Boy Scouts fail to meet the "daunting standard" of proving that the City had no rational reason for the terminating their subsidy, where the City consistently pointed to its nondiscrimination law and policy.  The Boy Scouts' equal protection claim must therefore be dismissed.

50

C.    **The Boy Scouts' First Amendment Claims Fail Because the City Has Wide Discretion In Allocating Its Subsidies, the City Did Not Impose An Unconstitutional Condition Upon Continued Receipt of a Subsidy,  And The City's Decision to Terminate the Boy Scouts' Subsidy Was Reasonable And Viewpoint Neutral.[13]**

Both appellate courts that have considered the issue -- the Second Circuit and the California Supreme Court -- have held that a government may condition a subsidy on the Boy Scouts' compliance with the government's nondiscrimination laws, finding the condition to be valid and viewpoint neutral.  *Boy Scouts of Am. v. Wyman,* 335 F.3d 80 (2d Cir.  2003), *cert. denied,* 124 S. Ct. 1602 (2004) and *Evans v. City of Berkeley,* 129 P.3d 394 (CA 2006).[14]  The City's actions here are likewise constitutionally permissible.

In *Wyman,* the Court of Appeals considered whether the First Amendment rights of the Connecticut Rivers Council of the Boy Scouts of America ("Connecticut Scouts") were violated where the Connecticut Scouts were excluded from Connecticut's annual workplace charitable campaign because the Connecticut Scouts' membership policies violated the state's Gay Rights Law.  335 F.3d at 88.  The Second Circuit held that the exclusion was not unconstitutional, whether analyzed under the nonpublic forums doctrine or the doctrine of

---

[13]    "The Pennsylvania Constitution provides essentially the same protection of expression as does the United States Constitution."  *Pap's A.M. v. City of Erie*, 674 A.2d 338, 345 (Pa. Commw. Ct. 1996).  The Boy Scouts' free speech claims asserted under Article I, § 7 of the Pennsylvania Constitution are therefore deficient for the same reasons asserted here.

[14]    One earlier trial court decision had found the other way. *Boy Scouts of America v. Till,* 136 F. Supp. 2d 1295 (S.D. Fla. 2001).  In *Till,* the Court preliminarily enjoined the School Board from terminating an agreement with the Scouts for after-hours use of the school.  The Court framed the question at issue as "whether homosexuality is a matter of private sexual orientation that should be protected against discrimination or whether it is immoral conduct inconsistent with the values of being 'morally straight' and "clean.'"  *Id.* at 1298.  The Court then held that the school was a limited public forum, and the exclusion was impermissibly based on viewpoint.  *Id.*  at  1310-1311.

unconstitutional conditions, because it was both viewpoint neutral and reasonable.  *Id.* at 92, 97.

The Court held that (1) the purpose of the exclusion was to discourage harmful conduct, not to

suppress expressive association, making the exclusion viewpoint neutral; (2) the exclusion was

applied in a viewpoint neutral manner; and (3) the State had reasonably concluded that the Gay

Rights Law required the Boy Scouts' exclusion from the campaign.  *Id.* at 97-98.

In *Evans*, the Berkeley Sea Scouts, a troop operating under the Mount Diablo

Council of the Boy Scouts of America, alleged that the City of Berkeley violated their First

Amendment rights when it discontinued a lease subsidy for a berth in the city's marina.  129

P.3d at 396.  Berkeley had terminated the subsidy when the Sea Scouts refused to provide

assurances that they would abide by Berkeley's nondiscrimination policy barring discrimination

on the basis of religion and sexual orientation.  *Id.* at 399.  The Court held that the government is

permitted to condition distribution of public benefits and found that Berkeley's refusal to

subsidize the Sea Scouts' discriminatory activities did not encroach upon the Sea Scouts' free

speech or association rights.  The Court further held that Berkeley's policy did not require the

Sea Scouts to abandon their viewpoint and adopt that of the city, and it did not prohibit the Sea

Scouts from exercising their First Amendment rights in private.  Thus, the Court held that

conditioning the berth subsidy upon compliance with the nondiscrimination policy was both

viewpoint neutral and reasonable.  *Id.* at 402-404.

Here, as in *Wyman* and *Evans*, the Boy Scouts argue that the City has violated

their First Amendment right of expressive association recognized in *Dale* and allege that the City

has conditioned their receipt of a subsidy -- the rent-free occupancy of city-owned property -- on

a change in their membership policies.  The Boy Scouts' claims must fail because, first and

foremost, the City's laws and policies the Boy Scouts refuse to abide by regulate conduct and not

52

speech, thus making the First Amendment inapplicable.  Furthermore, in offering non-profit

entities the opportunity to occupy city-owned properties for no or nominal rent the City, did not

create a forum, which again requires dismissal of the First Amendment claims.  In addition, if

and to the extent the subsidized occupancy of city-owned property is found to constitute a forum

for speech, it is a forum for the City's message of equality and fair treatment, not the Boy

Scouts' message on religious and sexual orientation discrimination.  Finally, terminating the

subsidized lease and conditioning a new lease upon compliance with City laws and policies is

both reasonable and viewpoint neutral.

### 1.   The City's Laws and Policies Regulate Conduct, Not Speech.

Regulations prohibiting discrimination, such as the City's Home Rule Charter,

Fair Practices Ordinance and the nondiscrimination policy of Fairmount Park, regulate conduct,

not speech.  *See e.g., Christian Legal Soc'y Chapter of Univ. of Cal. v. Kane*, No. C 04-04484,

2006 U.S. LEXIS 27347 (N.D. Ca. Apr. 17, 2006), *aff'd,* 319 Fed. Appx. 645 (9th Cir. 2009),

*cert. granted, Christian Legal Soc'y v. Martinez,* 130 S. Ct. 795 (2009); *Hurley v. Irish-*

*American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 572 (1995) (the

Massachusetts Public Accommodations law "[did] not, on its face, target speech or discriminate

on the basis of its content, the focal point of its prohibition being rather on the act of

discriminating against individuals"); *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)

(Minnesota Human Rights Act did "not aim at the suppression of speech, [did] not distinguish

between prohibited and permitted activity on the basis of viewpoint); *Jews for Jesus, Inc. v.*

*Jewish Cmty Relations Council of New York*, 968 F.2d 286, 295 (2d Cir. 1992) (the state anti-

discrimination statute prohibiting discrimination on the basis of, *inter alia*, race and religion, was

"plainly aimed at conduct, i.e., discrimination, not speech.").

In *Christian Legal Society v. Kane*, the court found the nondiscrimination policy of University of California's Hastings College of Law was a regulation of conduct, not speech. 2006 U.S. LEXIS 27327 at *17-46.  The Christian Legal Society ("CLS") bylaws required members and officers to sign a Statement of Faith and barred individuals who engage in "unrepentant homosexual conduct" from being members and officers.  *Id.* at *10-11.  A local chapter of CLS sought to register as a student organization to obtain benefits such as use of school facilities and funding, but the law school found that CLS did not comply with its requirement that registered organizations allow any student to participate, become a member, or seek leadership positions regardless of their status or beliefs.  *Id.* at *5-8.  The court held that the law school's nondiscrimination policy "targets *conduct, i.e. discrimination, not speech* . . . because it affects what CLS must *do* if it wants to become a registered student organization-- not engage in discrimination, not what CLS may or may not say regarding its beliefs on non-orthodox Christianity or homosexuality."  *Id.* at *23-24.  (emphasis added).[15]

Similarly, the City's laws and policies, including the Fairmount Park policies, prohibit discrimination on city property, ensuring equal access to the community at large.  The laws and policies direct what the Boy Scouts must *do* to remain in City-owned property for no or

---

[15]     *But see Christian Legal Soc'y v. Walker,* 453 F.3d 853 (7th Cir. 2006), where the Seventh Circuit held that the rights of a religious student group were violated when its registered status was revoked.  The Court did not address whether the law school's policies regulated conduct or speech, found the law school failed to offer any compelling interest justifying infringement on the group's right to expressive association, and cited evidence that the law school declined to revoke the status of other organizations with discriminatory membership policies.

nominal rent; they do not compel the Boy Scouts to make any statement about religion, homosexuality, or any speech whatsoever.[16]

The City's laws and policies, like Hasting's student support contingent upon compliance with its non-discrimination policy and the federal government's funding to law schools contingent on providing equal access to military recruiters, mandate what the Boy Scouts must do to remain in the subsidize lease program and thus affect conduct, not speech.

Moreover, courts have found regulation of conduct to be valid even if it infringes upon speech as long as: (1) the regulation is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on the alleged

---

[16]      Such equal access requirement is akin to the Solomon Amendment's mandate in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47 (2006) ("FAIR"). *FAIR* involved a challenge by an association of law schools and faculty to the Solomon Amendment, which requires law schools who wish to receive federal funding to offer military recruiters the same access to their campuses and students that it provides to nonmilitary recruiters. *Id.* at 51. The association objected to the military's discriminatory policy against gays, asserting that the forced inclusion and equal treatment of the military recruiters violated its First Amendment freedom of speech and association rights by forcing it to disseminate and accommodate the military's message. *Id.* at 53. The Supreme Court disagreed, holding:

> The Solomon Amendment neither limits what law schools may say nor requires them to say anything. Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds…. As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools *must do . . . not what they may or may not say.*"

*Id.* at 60 (emphasis added).

First Amendment freedoms is no greater than is essential to the furtherance of that interest. *United States v. O'Brien,* 391 U.S. 367 (1968).

The City's nondiscrimination laws and policies meet all four requirements.

1.  The City's constitutional authority to enact nondiscrimination laws is beyond question.  *See New York State Club Assn.,* 487 U.S. at 12 (upholding New York City Human Rights Law, noting the "city's compelling interest in eliminating discrimination"); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (holding California's interest in ending discrimination through the Unruh Civil Rights Act is "compelling" and finding anti-discrimination laws promote "compelling state interest of the highest order").

2.  The eradication of discrimination, including on the basis of religion and sexual orientation, is "a substantial, indeed compelling, interest."  *Kane,* 2006 U.S. LEXIS 27347 at *27-28 (citing *Jews for Jesus*, 968 F.2d at 295 ("New York has . . . a substantial, indeed compelling, interest in prohibiting racial and religious discrimination in obtaining public accommodations")); *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 902 F. Supp. 492, 521 (D.N.J. 1995) ("New Jersey has described its interest in eliminating discrimination on the basis of  . . . sexual orientation . . . as being of 'preeminent social significance.' . . .  New Jersey's interest is not only substantial but also can be characterized as compelling"); and *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 38 (D.C. 1987) (incorporating prohibition against discrimination based on sexual orientation into the D.C. Human Rights Act and finding "[t]he eradications of sexual orientation discrimination is a compelling governmental interest").

3.   The City's nondiscrimination laws and policies further its interest of combating and eliminating discrimination, and are wholly unrelated to suppressing free expression.

4.   To the extent that City laws and policies might actually encroach upon any free speech rights, such encroachment is incidental and is limited to activities in the City-owned 22nd Street Property.  The Boy Scouts may freely exercise their First Amendment rights in non-City-owned properties.  Several courts have found such incidental restrictions that occur when a government enforces a nondiscrimination law to be no greater than essential to the furtherance of the government's interest in prohibiting discrimination.  *F.A.I.R.*, 547 U.S. at 67 ("an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien,* so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."); *Kane*, 2006 U.S. LEXIS 27347 at *30-31 (*citing Jews for Jesus*, 968 F.2d at 296 (New York's anti-discrimination laws "are no broader than necessary to further the legitimate goal of eradicating discrimination)).

As a consequence, the City's nondiscrimination laws and policies do not unconstitutionally infringe on the Boy Scouts' freedom of speech and expressive association.

**2.     The City's Subsidized Leases Do Not Create A Forum For Discourse.**

The Boy Scouts' argument that the City has "created a government forum by leasing or otherwise allowing the use of scores of properties" by various entities for "numerous" purposes (Compl. ¶ 46) is not supported by competent evidence.

In *Locke v. Davey*, 540 U.S. 712 (2004), Washington state established a scholarship program to assist students from low- and middle-income families with the cost of

postsecondary education.  However, the scholarship could not be used to pursue a degree in

theology because the state Constitution prohibited public money to be used for religious

instruction.  *Id.* at 715.  The plaintiff refused to abide by the requirement to certify that the funds

would not be used to pursue a degree in devotional theology and did not receive scholarship

funds.  The Supreme Court held that his exclusion from the scholarship program did not violate

the First Amendment.  *Id.*  Addressing the issue of viewpoint discrimination, the Court found

that the scholarship program was not a forum for speech because its purpose was "to assist

students from low- and middle-income families with the cost of postsecondary education, not to

encourage a diversity of views from private speakers."  *Id.* at 720 n.4.

        Likewise, the purpose of the City's subsidized use of city-owned property for no

or nominal rent is not to encourage a diversity of views, but is meant to both benefit the

community at large and ensure that city-owned properties are restored, preserved and maintained

at minimal cost to the City.  Inj. Tr. (Bessler Test.) at 105:4-18, 131:17-132:2, Ex. 3.  Since the

purpose of the subsidy was not to create a forum for expressive activity, the subsidy is not a

forum for speech.  Moreover, the City's provision of city-owned property for no or nominal rent

is not used as a channel of communication.  *See Student Gov't Ass'n v. The Bd. of Trustees of the*

*Univ. of Mass.*, 868 F.2d 473, 476 (1st Cir. 1989) (program providing students with criminal

representation and legal assistance in litigation against the University was an in-kind subsidy, not

a forum for discourse).  The forum analysis under the First Amendment is therefore inapplicable

to this case.

        The Supreme Court has held that "on government property that has not been made

a public forum, not all speech is equally situated, and the State may draw distinctions which

relate to the special purpose for which the property is used."  *Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n,* 460 U.S. 37, 55 (1983).  The City may thus draw distinctions-- such as terminating the lease subsidy to the Boy Scouts-- to further its purpose of ensuring that the properties are restored, preserved, and maintained while lessening the financial burden on the City and to benefit the community at large.  To promote that the "community at large" does indeed benefit from this subsidy, the City requires all lessees to comply with the Fairmount Park Nondiscrimination Policy and City laws and practices prohibiting discrimination.  Since the Boy Scouts' membership policy denies benefits to certain segments of the community at large, the City is well within its power to terminate the lease subsidy.

> **3.      To the Extent The Provision of Subsidized Use of City-Owned Property is a Forum for Speech, the Forum Is To Express the City's Message of Equality and Fair Treatment, Not the Boy Scouts' Message of Discriminatory Exclusion.**

If and to the extent the provision of rent-free city-owned property may constitute a forum for speech, it is a forum for the City's message of equality and fair treatment, not the Boy Scouts' message of discriminatory exclusion based on religion and sexual orientation.  Since at least 1994, prospective lessees must agree to the City's nondiscrimination laws and policies and once approved, the lessees are bound to abide by Fairmount Park policies and to promote this message by opening the City-owned property to all in a nondiscriminatory fashion.

> **a.      The City -- Not the Boy Scouts -- Is Speaking Through Subsidized Use of City-Owned Property**

To delineate between government speech and private speech, courts have examined the following four elements: (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4)

whether the government or the private entity bears the "ultimate responsibility for the content of

the speech. *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles,*

288 F.3d 610, 618 (4th Cir. 2002) (citations omitted); *Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d

956, 965 (9th Cir. 2008) (adopting Fourth Circuit's four-factor test); *Pittsburgh League of Young*

*Voters Educ. Fund v. Port Auth. of Allegheny Cty,* 2008 U.S. Dist. LEXIS 63370, *22-23 (W.D.

Pa. August 14, 2008) (adopting four-factor test).

   These factors weigh in favor of finding government speech in this case.  First, as

discussed above, the purpose of the subsidized use of city-owned property is both to benefit the

community -- including all members -- and to ensure that the properties are restored, preserved,

and maintained while lessening the financial burden to the City.  Second, the City exercises

"editorial control" over the message of equality, as demonstrated by the Fairmount Park

Nondiscrimination Policy which states that "contracts [will be] cancelled for failure to follow

those policies."  Fairmount Park Nondiscrimination Policy, Ex. 15.  Indeed, the City's actions in

relation to the Boy Scouts represent a prime example of such control.  After the City was made

aware of the Boy Scouts' discriminatory membership policy, it repeatedly invited the Boy Scouts

to engage with the City to reconcile their practice with the City's long- standing law and policies.

Although the Boy Scouts had signed a letter imploring the BSA to change its policy of exclusion

on the basis of sexual orientation (Ex. 62) and signed a commitment not to discriminate on the

basis of sexual orientation in 2003 (United Way of Southeastern Pennsylvania

Nondiscrimination Disclosure, Ex. 22), the Boy Scouts quickly changed their stance when the

BSA threatened to revoke their charter.  Boy Scouts of America Press Release, Ex. 24.  After

years of negotiations with the Boy Scouts proved ineffective, the City finally took all necessary

steps to terminate the Boy Scouts' subsidized lease.  Letter from Diaz to Dwyer (July 20, 2006), Ex. 36.

The third factor takes into account the identity of the "literal speaker," i.e., to whom the message is attributed.  *Pittsburgh League of Young Voters,* 2008 U.S. Dist. LEXIS 63370 at *40-41.  While the speaker may be the private organization, "a government-crafted message is government speech even if the government does not explicitly credit itself as the speaker."  *ACLU of Tenn. v. Bredesen,* 441 F.3d 370, 377 (6th Cir. 2006) (citing *Johanns v. Livestock Marketing Ass'n,* 544 U.S. 550 (2005)).  Furthermore, the ownership of the channel of communication is a valid consideration in determining whether it contained government speech.  *Sons of Confederate Veterans,* 288 F.3d at 621.  Here, the City has set forth the overarching message through its nondiscrimination laws and the Fairmount Park Policy, and the channel of communication is the city-owned property.  This factor weighs in favor of finding government speech.

The fourth factor asks whether the government or the private entity is ultimately responsible for the content of the speech.  *Pittsburgh League of Young Voters,* 2008 U.S. Dist. LEXIS 63370 at *42.  This factor likewise weighs in favor of finding government speech.  The City owns the property.  The City created and has maintained a policy of allowing non-profit entities that agree not to engage in discriminatory conduct to use city-owned property for no or nominal rent.  The city laws and policies that apply to the subsidy program clearly promote a message of nondiscrimination.

**b.      The City Has The Right To Control Its Message.**

A government entity has the right to speak for itself.  *Pleasant Grove City v.*

*Summum*, 129 S. Ct. 1125, 1131 (U.S. 2009) (*quoting Bd. of Regents of Univ. of Wis. Sys. v.*

*Southworth*, 529 U.S. 217, 229 (2000)) (city's decision to accept certain privately donated

religious monument while rejecting another was a form of government speech; placement of the

accepted monument in a public park was likewise government speech and not subject to the Free

Speech Clause).  Even ordinarily impermissible viewpoint-based distinctions drawn by the

government will be sustained where the government itself speaks or where it uses private

speakers to transmit its message.  *Legal Svcs. Corp.v. Valazquez*, 531 U.S. 533, 541 (2001)

(*quoting Southworth,* 529 U.S. at 229).  The City's decision to provide subsidies only to

organizations that will agree to abide by its nondiscrimination laws to benefit the community at

large is a form of government speech.  The Boy Scouts' refusal to agree to comply with City

laws and policies erodes the City's message of equality and fair treatment.[17]  The City is within

its rights to refuse to fund an organization that refuses to transmit its message.

**4.      The City Has Broad Discretion To Make Selective Subsidy Decisions.**

When the government provides a subsidy to private entities to convey a

government message, it may take legitimate and appropriate steps to ensure that its message is

neither garbled nor distorted by the grantee.  *Rosenberger v. Rector & Visitors of Univ. of Va.,*

---

[17]      The continuation of the Boy Scouts' subsidy necessarily muddies the City's message of
nondiscrimination.  Some inevitably will view the City as adopting a hypocritical "do as I
say, not as I do" approach to nondiscrimination.  Others will conclude that the non-
discrimination message does not apply when it conflicts with the preferences of well-
financed, influential and entrenched groups such as the Boy Scouts. The City should not
be compelled to risk its message for the private benefit of the Boy Scouts.

515 U.S. 819, 833 (1995).  The Boy Scouts' membership policy is a marked departure from the

City's inclusive message of equality and fair treatment.  As such, the City may terminate its

subsidy to the Boy Scouts in a legitimate and appropriate attempt to ensure that its message is

clearly presented.

The government may selectively fund a program to encourage certain activities it

believes to be in the public interest.  *Rust v. Sullivan,* 500 U.S. 173, 193 (1991).  The mere

choice of funding one activity or program over another does not raise the specter of viewpoint

discrimination.  *Id.*  "A refusal to fund protected activity, without more, cannot be equated with

the imposition of a penalty."  *Harris v. McRae*, 448 U.S. 297, 317 n.20 (1980) (the government's

selective denial of one particular subsidy out of numerous benefits did not violate First

Amendment rights).  Furthermore, "[a] legislature's decision not to subsidize the exercise of a

fundamental right does not infringe the right."  *Regan v. Taxation with Representation of Wash.*,

461 U.S. 540, 549 (1983).  Here, the City has merely chosen to end its financial support of the

Boy Scouts through subsidized use of City-owned property.  The Boy Scouts' ability to exercise

their fundamental free speech rights remains intact.

The Supreme Court has upheld a government's subsidy decisions against

numerous First Amendment challenges.  For example, in *Bob Jones University v. United States*,

461 U.S. 574, 585 (1983), the Supreme Court upheld the government's denial of tax exempt

status because of the University's racially discriminatory admissions policies.  Similarly, the

Supreme Court found no constitutional violation in a denial of federal funding where a college

refused to provide an "Assurance of Compliance" with Title IX's prohibition against sex

discrimination.  *Grove City College v. Bell,* 465 U.S. 555, 559 (1984).  In *Regan*, the Court

found no first amendment violation in denying tax exempt status to lobbying organizations

whose activities involved attempts to influence legislation.  461 U.S. at 545.   In *Rust v. Sullivan*, the Supreme Court held that Congress had not denied the subsidy recipients the right to conduct abortion counseling and related activities by merely refusing to fund such activities out of the public fisc. 500 U.S. at 177-181.

Courts reach the same conclusion whether the subsidy is monetary or in-kind.  *See e.g., Student Gov't Ass'n*, 868 F.2d at 479 (finding "[t]he state [did] not violate an individual's First Amendment rights if it refuse[d] to subsidize those activities of that individual that are protected by the First Amendment" where the university terminated its provision of legal services to students in litigation against the University).

The Supreme Court has identified only two caveats to the general rule that governments are free to make their funding decisions: (1) the state may not deny an individual any independent benefit on account of his decision to exercise his First Amendment rights; and (2) the state must not discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas.  *Id. (citing Regan,* 461 U.S. at 545-46).

The City is not terminating the subsidy to the Boy Scouts because the Boy Scouts exercised their First Amendment rights.[18]  Rather, the City is terminating the subsidy because the

---

[18]  Interestingly, the anti-gay message the Boy Scouts claim to be protecting appears to be imposed on them by the BSA. Thus, the Boy Scouts did renounce discrimination on the basis of sexual orientation for a brief period, but relapsed when the BSA threatened to withdraw the Boy Scouts' charter and pull their funding.  *See, e.g,* Inj. Tr. (Dwyer Test.) at 19:11-20, Ex. 3; Letter from Council Leaders to Boy Scouts of America (Nov. 15, 2001), Ex. 62; United Way of Southeastern Pennsylvania Nondiscrimination Disclosure, Ex. 22;  Memorandum from Roy L. Williams to Scout Executives, Ex. 23; Letter from Girifalco to Diaz (June 11, 2007), Ex. 47; Letter from Girifalco to Diaz (June 28, 2007), Ex. 49.

Boy Scouts refuse to comply with the City's nondiscrimination laws and policies.  As the

Supreme Court noted in *FAIR*, "a reasonable choice" is not an "unconstitutional condition."  547

U.S. at 59.  Unlike many organizations, the Boy Scouts' choice is not a Hobbes choice of

receiving the City's subsidy, or no subsidy at all.  Instead, the Boy Scouts have the luxury of

choosing between the national organization's support and agreeing to exclude members on the

basis of sexual orientation, or continuing to receive the City's subsidy of rent-free use of the city-

owned property contingent upon obeying City law and policy. As noted in *Evans*, a requirement

that the Boy Scouts document a nondiscriminatory membership policy in order to qualify for free

use of city-owned property does not condition receipt of a public benefit on the Boy Scouts'

giving up its national charter.

> To the extent compliance with the city's requirement would have that
> effect, it would be by the choice of a third party, BSA. Were BSA, that is,
> to cut its ties with a local scouting program because the program made
> assurances of nondiscrimination to a local government, the decision to
> sever the association would be BSA's, not the government's. We are aware
> of no authority for the extraordinary proposition that government infringes
> on associational rights by offering one group a financial benefit that, if
> accepted, could lead another group to sever its association with the
> recipient.

129 P.3d 404.

The broad application of the nondiscrimination laws and policies to all lessees

refutes any implication that the City is using its subsidies to invidiously suppress "dangerous

ideas."  The City's laws and policies endeavor to eliminate discrimination in all forms, whether

based on race, sex, national origin, physical ability, religion, or sexual orientation.

5.    **The City May Condition Its Subsidy on Compliance With Its Reasonable and Viewpoint Neutral Nondiscrimination Laws.**

The City is not required to subsidize private speech,  *see Ysura v. Pocatello Educ. Ass'n*, 129 S. Ct. 1093, 1098 (2009) (holding the government "is not required to assist other in funding the expression of particular ideas"), and may "attach reasonable and unambiguous conditions" to its subsidies.  *See FAIR*, 547 U.S. at 59.

The Boy Scouts' claim that the City has violated their First Amendment rights by imposing unconstitutional conditions is unavailing.  To the contrary, the City has permissibly conditioned further subsidy on the Boy Scouts' compliance with reasonable and viewpoint neutral City laws and policies:  As the Fairmount Park Nondiscrimination Policy makes plain, the so-called "condition" applies to <u>all</u> subsidy recipients and is not targeted only at the Boy Scouts.

The California Supreme Court addressed this exact issue in the *Evans* case.  The city of Berkeley had decided not to continue to give the Berkeley Sea Scouts a subsidized berth at the city-owned marina because they refused to comply with Berkeley's nondiscrimination policies.  *Evans*, 129 P.3d at 396.   The court held that compliance with Berkeley's nondiscriminatory participation policies did not force the scouts to espouse or to denounce any particular viewpoint and did not compel the Scouts to form or break any association or affiliation.  *Id.* at 400.  The court noted that "[t]he high court has generally approved, against First Amendment challenges, programs of governmental financial assistance that limit the expressive activities for which the funds may be used."  *Id.*  In reaching that result, the court relied on the United States Supreme Court cases discussed above, including  *Rust v. Sullivan, Regan v. Taxation With Representation of Washington, Grove City College v. Bell* and *Bob Jones*

66

*University v. United States*, and relied on the principle set forth in *Grove City* that "[the government] is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept." *Id.* at 401 (citing 465 U.S. at 575). The *Evans* court likewise found no constitutional violation in Berkeley's condition, finding that the Sea Scouts were free to terminate their participation to avoid the city's nondiscrimination provision. *Id.* at 401-402.

Like Berkeley, the City of Philadelphia is free to require the Boy Scouts to comply with its laws and policies to retain the lease subsidy, and the Boy Scouts are free to decline any subsidy offered by the City and thereby avoid the nondiscrimination requirement altogether.

Although the *Evans* court noted two exceptions to the general rule permitting a government to impose conditions on the receipt of a subsidy, neither is applicable here. The two exceptions are: (1) A funding restriction that is intended to suppress a disfavored viewpoint is subject to strict scrutiny; and (2) A restriction is suspect to the extent it goes beyond limiting the government funded expressive activity and attempts to further limit other expressive activities. *Id.* at 402-03. Neither Berkeley nor Philadelphia, "in requiring assurances that [their] subsidy and property will be used without discrimination on the basis of religion or sexual orientation, [demands] adherence to the viewpoint that motivated [the] nondiscrimination provision." *Id.* at 402. Nor does the funding restriction attempt to control the Boy Scouts' exercise of speech or associational rights outside of the government program.

**a.** **The City's Requirement That All Subsidized Occupants of City-Owned Property Comply With City Law and Policy is Not Intended to Suppress the Boy Scouts' Speech.**

The Boy Scouts do not-- and cannot-- claim that the City has demanded that the Boy Scouts abandon their viewpoint on religious or sexual orientation discrimination.  Nor can they claim that the City has required the Boy Scouts to espouse the City's viewpoint.  Rather, the Boy Scouts object that the City seeks assurance from its subsidy recipients that they will abide by the City's laws and policies.  Moreover, the City only seeks the assurance of nondiscrimination with respect to the Boy Scouts' activities in connection with the Boy Scouts' subsidized occupancy of City property.  The City has not, and does not, seek to expand the condition beyond the scope of the subsidized occupancy.  *See, e.g.,* Letter from Diaz to Girifalco (December 4, 2006) (scheduling meeting to discuss the Boy Scouts' willingness to "sign an agreement containing standard non-discrimination language typically included in City leases pursuant to which the Boy Scouts would agree not to discriminate based on, *inter alia*, sexual orientation *in connection with the use of the building*") (emphasis added), Ex. 39; Letter from Diaz to Girifalco (Nov. 29, 2006), Ex. 38 (same).

**b.** **The Scope of the City's Termination of the Subsidy is Limited to the Boy Scouts' Use of the City-Owned Property at 22nd and Winter Streets and Does Not Prevent the Boy Scouts From Espousing Views From Any Other Location.**

In assessing the scope of the condition imposed, courts look to the relationship between the benefit conferred and the condition imposed, and the Supreme Court has deferred to the government's definition of the scope of its own programs.  *See e.g., Rust*, 500 U.S. at 194 (holding that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program"); *United States v. Am. Library Assoc.*, 539 U.S. 194,

68

211 (2003) (same). Courts further look to whether the condition is imposed upon the particular program or upon the recipient of the subsidy.

In *Regan*, the Supreme Court held that the government was not required by the First Amendment to subsidize the plaintiff's lobbying, noting that the plaintiff was still permitted "to receive deductible contributions to support its non-lobbying activity." 461 U.S. at 545. The Court held that "Congress has merely refused to pay for the lobbying out of public moneys," and explicitly "reject[ed] the 'notion that *First Amendment* rights are somehow not fully realized unless they are subsidized by the State.'" *Id.* at 545-46 (citing *Cammarano v. United States,* 358 U.S. 498 (1959)).

Similarly, in *Rust v. Sullivan*, the Court found no unconstitutional condition where the regulation at issue "le[ft] the grantee unfettered in its other activities." 500 U.S. at 196. The Court held the "*grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives [the government subsidy]." *Id.* The Court further held that although the subsidy recipients' freedom of expression was limited, the limitation was constitutional because it was a consequence of their decision to accept the subsidy. *Id.* at 199.

The Boy Scouts, just as the plaintiffs in *Rust* and *Regan*, have ample alternatives to exercise their First Amendment rights despite the condition imposed in connection with the subsidy. They can turn down the subsidy and face no restriction whatsoever. Or they can accept the subsidy, abide by the City's non-discrimination laws and policies in connection with their use of the subsidized occupancy and discriminate to their hearts' content other than in connection

with the subsidized use of city-owned property.  Accordingly,  the condition on the subsidy will

not render the Boy Scouts incapable of pursuing their First Amendment protected activities, the

condition upon the subsidy is not unconstitutional.

Thus, the City has not denied the Boy Scouts the right to engage in private

discrimination, it has "merely refused to fund such activities out of the public fisc." *Rust*, 500

U.S. at 198.

Furthermore, as discussed below, the condition upon subsidized occupants of city-

owned properties is both reasonable and viewpoint neutral.

> **6.     The City's Termination Of The Subsidy Due To The Boy Scouts'
> Refusal To Comply With City Laws And Policies, Including
> Fairmount Park Policy, Is Not Viewpoint Discrimination.**

The City, by allowing the Boy Scouts and others to occupy City-owned property

for little or no rent, has not created a forum for public discourse.  As a consequence, First

Amendment forum analysis is inapplicable.  However, even if the Court were to conclude

otherwise, the termination of the subsidy is both reasonable and viewpoint neutral and therefore

valid.

> **a.     The Boy Scouts' Forum Argument is Unavailing.**

The Boy Scouts' rent-free occupancy of city-owned property is not a public forum

for discourse.  Nor is the occupancy of other city-owned properties by other organizations.

Rather, such occupancies are for the purpose of preserving perhaps 100 properties in Fairmount Park and throughout the City.[19]

Moreover, even if the City's use of rent-free occupancy to protect its properties somehow has created a forum, it could only be a non-public forum.  Courts have recognized three types of fora: (1) a traditional public forum, (2) a designated public forum; and (3) a nonpublic forum.  *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788 (1985).  The subsidized occupancy of city-owned property is clearly not a public forum that is traditionally devoted to public debate.  *Id.*  Nor is it a designated public forum that has been created by purposeful government action.  "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse."  *Id.*  Here, organizations that receive subsidized rent in City-owned properties engage in activities that involve no expression, including facilitating sporting activities, such as SJU.  *See* SJU Ground Sublease, Ex. 18.  There is no evidence to show that the City has taken any deliberate action specifically for public discourse.  Rather, the uncontradicted evidence is that the City's intent in providing subsidized rent of city-owned property is to lessen its financial burden of maintaining these properties and to benefit the community at large.  Inj. Tr. (Bessler Test.) at 105:19-107:2, Ex. 3.  The subsidized occupancy of city-owned property is not a designated public forum.

---

[19] While the Boy Scouts *argue* that the rent-free occupancy somehow has created a forum-- and this Court accepted at an early-stage of this litigation that such argument had a likelihood of success-- the Boy Scouts' argument simply has no *factual* support.  For that reason, summary judgment is appropriate on the Boy Scouts' first amendment claims.

In a nonpublic forum, the government "reserves eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' . . . to use it. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998).  The City maintains control over access to the subsidized use of city-owned property through an application process and reviews the organization's mission statement and proposed uses for the property, ensuring compliance with Park policies and the Park's mission.  *See*, Inj. Tr. (Bessler Test.) at 71:14-22, 74:3-8, 78:17-79:6, 81:8-13, Ex. 3; Fairmount Park Guidelines, Ex. 14.  Thus, to the extent rent-free occupancy of city-owned property can be construed as a forum, it is a nonpublic forum.

### b.       Terminating the Subsidy was Reasonable and Content Neutral.

Control over access to a nonpublic forum can be based on subject matter or speaker's identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.  *Cornelius,* 473 U.S. at 806.  Exclusion of a speaker from a nonpublic forum must be reasonable in light of the purpose of the property and must not be based on the speaker's viewpoint.  *Id*.

### c.       The City's Termination of the Boy Scouts' Rent-Free Occupancy of City-Owned Property is a Reasonable Means To Further The Government's Interest in Eliminating Discrimination

If the Boy Scouts' rent-free occupancy somehow has created a forum, the reasonableness of a governmental restriction limiting access to a nonpublic forum must be assessed in light of the purpose of the forum and all of the surrounding circumstances.  *Kane*, 2006 U. S. Dist. LEXIS 27347 at *43 (citing *Cogswell v. City of Seattle,* 347 F.3d 809, 817 (9th

Cir. 2003)).  The reasonableness analysis emphasizes the consistency of the limitation in the context of the forum's intended purpose.  *Id.* at *44.

As discussed above, the purpose of providing occupancy of city-owned property for no or nominal rent is to ensure that the properties are restored, preserved, and maintained, while lessening the financial burden to the City and benefitting the community at large.  The City has a substantial, if not compelling, interest in eliminating discrimination.  *See* discussion *supra*, Part B(3)(a).  To that end, the condition that the Boy Scouts agree to abide by City laws and policies in their use of City property is consistent with the nonpublic forum's purposes and is a reasonable means of furthering the City's interest.

### d.      Termination of the Rent-Free Occupancy is Viewpoint Neutral

That the Boy Scouts' viewpoint is at odds with the City's nondiscrimination laws and policy does not mean that the City's actions constitute viewpoint discrimination.  "[V]iewpoint disparity, standing alone, does not constitute proof of viewpoint discrimination."  *Wyman*, 335 F.3d at 93-94 (citing *R.A.V. v. City of St. Paul,*  505 U.S. 377, 385 (1992).  *See Hill v. Colorado,* 530 U.S. 703, 724-25 (2000) (holding that a statute providing an 8 feet buffer between demonstrators and patients within 100 feet of the entrance to a health care facility was content neutral because it applied to all demonstrators regardless of viewpoint and is "the level of neutrality that the Constitution demands").  When deciding whether a speech restriction is content based or content neutral, the government's purpose is the controlling consideration.  *Rosenberger*, 515 U.S. at 892; *see also, Wyman,* 335 F.3d at 92.  Viewpoint discrimination occurs when the government targets "particular views taken by speakers on a subject."  *Kane*, 2006 U.S. Dist. LEXIS 27347 at *35 (quoting *Rosenberger*, 515 U.S. at 829).  A law is

viewpoint discriminatory only if its purpose is to impose a differential adverse impact upon a viewpoint. *Wyman,* 335 F.3d at 92.

The City has not terminated the Boy Scouts' subsidy because of the Boy Scouts' views on religion and sexual orientation. Rather, the City has terminated the subsidy because the Boy Scouts have not and will not comply with the City's non-discrimination laws and policies that are imposed upon all subsidy recipients in their subsidized use of City property. As the Fairmount Park Nondiscrimination Policy clearly states, the subsidy is available only to organizations that are willing to abide by those laws and policies. *See,* Ex. 15. The Boy Scouts have refused to do so. *See e.g.*, Girifalco letters to Diaz, Exs. 42, 47, 49. It is that conduct, and not the Boy Scouts' views on religion and sexual orientation, that prompted the City's actions.

Neither the compliance condition nor the subsidy termination adversely impacts the Boy Scouts' ability to express their dislike of agnostics, atheists, and gays. The City has only chosen to stop subsidizing the occupancy of a lessee who will not comply with the requirements of the subsidy. Because neither the City's compliance condition nor its subsidy termination is directed at suppressing the Boy Scouts' ability to express their viewpoint on religion or homosexuality, the restriction is viewpoint neutral.

   **7.    Termination of the Rent-Free Occupancy Does Not Infringe Upon
          The Boy Scouts' Expressive Association Rights.**

The City's funding decisions do not encroach upon the Boy Scouts' expressive association rights under the First Amendment.

This is not a case of forced inclusion. Facing a nearly identical claim, the *Evans* court found that Berkeley did not prohibit the Sea Scouts from "operating in a discriminatory

74

manner," and that the Sea Scouts were free to dissociate with Berkeley if it did not agree with the

nondiscrimination provision.  *Evans*, 129 P.3d at 402.  There is nothing in the City's funding

decision that would prohibit the Boy Scouts from exercising their expressive associational rights

in any program not funded by the City.[20]  The Boy Scouts' claim is without merit.

> **D.      The City is Entitled to Summary Judgment on its Counterclaims for Ejectment, Immediate Use and Occupancy, and Mesne Profits**

The City has produced evidence of its entitlement to the immediate use,

occupancy and possession of the city-owned property and the Boy Scouts must therefore vacate

the property and pay mesne profits.  The City took all necessary steps to properly eject the Boy

Scouts from the city-owned property and is therefore entitled to ejectment of the Boy Scouts,

immediate use and occupancy of the property, and mesne profits from June 2, 2008 through the

entry of dismissal of the Boy Scouts' claims.

> **1.      The City Followed All Necessary Steps to Properly Eject the Boy Scouts From City-Owned Property and the Boy Scouts Must Therefore Immediately Vacate the Property.**

The Boy Scouts' occupancy of the City-owned property is pursuant to the 1928

Ordinance, which provides that the property is "to be surrendered within one year after notice

given [the Boy Scouts] by the Commissioners of Fairmount Park, with the approval of the Mayor

and City Council, of their desire to terminate the arrangement . . . and upon the removal of the

Boy Scouts therefrom the property to be held and managed by the Commissioners as part of the

Parkway."  Philadelphia, PA, Ordinance § 1 (December 14, 1928), Ex. 9.  The Boy Scouts were

---

[20]      Indeed, we note that the bulk of the Boy Scouts activities were moved to non-city-owned property in Valley Forge long ago.  Inj. Tr. (Dwyer Test.) at 42:20-43:21, Ex. 3.

provided with notice of the Mayor's approval on July 20, 2006 (Ex. 36), the Fairmount Park

Commission's approval on July 24, 2006 (Ex. 12), and the City Council's approval by

Resolution on May 31, 2007 (Ex. 13).  The City gave the Boy Scouts the requisite one-year

notice to vacate the property on June 1, 2007, subject to withdrawal upon agreement to end its

policy and practice of discriminating on the basis of sexual orientation or payment of fair market

rent.  Ex. 46.

      The Boy Scouts refused the City's offers and have remained in the property rent-

free and continued to discriminate in violation of City policy and practice.  Inj. Tr. (Dwyer) at

39:10-12, Ex. 3.  The Boy Scouts have no basis for continuing to occupy the city-owned property

and must be ejected, returning the property to the City for its immediate use, occupancy, and

possession.

      **2.**    **The City is Entitled to Mesne Profits Equal to the Fair Market Rental Value of the Property For Each Day the Boy Scouts Wrongfully Occupied and Possessed the City-owned Property**

      "In holding over after the expiration of [a] lease, the [tenant] must be understood

as consenting to pay what would be a reasonable and compensatory rent, and for that he is

liable." *Abrams v. Sherwin*, 112 A. 235 (Pa. 1920) (dismissing appeal of entry of judgment for

landlord).  *See also, Mack v. Fennell*, 171 A.2d 844 (Pa. Super. Ct. 1961) (finding landlord

entitled to rent for eight-month period of tenant's unlawful continued occupancy after notice of

termination).

      The City timely filed an action in the Philadelphia Court of Common Pleas for

ejectment and mesne profits upon the Boy Scouts' refusal to vacate the property when their right

of occupancy ended on June 1, 2008.  Phil. Compl.,  Ex. 83.  The City thus clearly put the Boy

Scouts on notice that if it remained in the city-owned property, the City would seek to recover

"an amount equal to the fair market rental value of the Property for each day wrongfully

occupied and possessed by [the Boy Scouts] commencing June 2, 2008."  *Id.* ¶ 24.  In addition,

the City timely asserted counterclaims in this action for ejectment, mesne profits, and immediate

use and occupancy of the property.  Dkt. 14.

        The Boy Scouts must be ordered to pay the City the fair market rent for its

occupancy from June 2, 2008 through the date of this Court's summary judgment order.  The

Boy Scouts' expert opined that the fair market rental value is $56,573 per year ($4,714.42 per

month).  Doyle Rent Comparability Study Appraisal (Feb. 18, 2010), Ex. __.  While the City

would at trial introduce expert testimony that the fair rental value actually is $160,000 per year,

for purposes of this motion for summary judgment only, the City will accept the Boy Scouts'

estimate of fair rental value and judgment should be entered in the amount of $4,714.42 per

month from June 2, 2008 through the date judgment is entered.

**CONCLUSION**

Wherefore, the City of Philadelphia respectfully requests this Honorable Court grant summary judgment in its favor and dismiss all remaining counts of the Complaint and grant the City's counterclaim, ejecting the Boy Scouts and requiring the Boy Scouts to pay fair market rent for its occupancy from June 2, 2008 through the date of this Court's order.

Respectfully,

_____/s/ David Smith_____
David Smith (Attorney I.D.  21480)
Stephenie Yeung (Attorney I.D. 84415)
Rebecca Lacher (Attorney I.D. 203938)

*Attorneys for Defendant,*
 *City of Philadelphia*

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

Of Counsel.

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2010, I electronically filed a copy of the Defendant City Of Philadelphia's Motion for Summary Judgment and accompanying affidavits and exhibits, which will send notification of such filings to CM/ECF participants, including:

Jason P. Gosselin, Esquire
Daniel B. Scott, Esquire
Richard M. Haggerty, Jr., Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

/s/ Rebecca Lacher
Rebecca Lacher (Attorney I.D. 203938)