**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CRADLE OF LIBERTY COUNCIL, INC.,
BOY SCOUTS OF AMERICA
22ND & Winter Streets
Philadelphia, Pennsylvania  19103

      Plaintiff,

      v.

CITY OF PHILADELPHIA
1515 Arch Street
Philadelphia, PA  19102

      Defendant.

Civil Action No. 08-02429

## <u>ORDER</u>

AND NOW, this _____ day of _____ 2010, upon consideration of

Defendant's Motion for Summary Judgment and Plaintiff's response thereto, it is hereby

ORDERED that Defendant's motion is DENIED.

BY THE COURT:

_____
Buckwalter, S.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRADLE OF LIBERTY COUNCIL, INC.,
BOY SCOUTS OF AMERICA
22ND & Winter Streets
Philadelphia, Pennsylvania  19103

       Plaintiff,

       v.

CITY OF PHILADELPHIA
1515 Arch Street
Philadelphia, PA  19102

       Defendant.

Civil Action No. 08-02429

---

**PLAINTIFF CRADLE OF LIBERTY COUNCIL, INC., BOY SCOUTS OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF PHILADELPHIA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America ("Cradle of Liberty"),

by and through its undersigned counsel, hereby opposes the Motion for Summary Judgment filed

by Defendant City of Philadelphia ("City").  For the reasons set forth in the attached

memorandum of law, Cradle of Liberty respectfully requests that the Court deny the motion.


Dated: March 29, 2010

                        /s/ Jason P. Gosselin
                        Jason P. Gosselin
                        William M. McSwain
                        Daniel B. Scott
                        Richard M. Haggerty
                        Drinker Biddle & Reath LLP
                        One Logan Square, Ste. 2000
                        Philadelphia, PA 19103

                        *Counsel for Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    FACTS .................................................................................................................... 4

       A.    Cradle of Liberty's Public Service to the City of Philadelphia ............................ 4

       B.    Learning for Life .................................................................................................. 7

       C.    Scout Reach .......................................................................................................... 9

III.   ARGUMENT ........................................................................................................ 10

       A.    Cradle of Liberty Has Demonstrated a Violation of the Equal Protection
             Clause of the Fourteenth Amendment ............................................................... 10

             1. The City Uses a Clear Standard in Determining Whether It Will Provide
                Use of a Fairmount Park Property for Free or Nominal Rent ..................... 10

             2. Cradle of Liberty Can Meet Its Burden in Showing Similarly Situated
                Entities Who Were Treated Differently ...................................................... 14

             3. The City's Only Asserted "Rational Basis" For Its Selective Eviction of
                Cradle of Liberty Is an Impermissible Inhibition of Constitutional
                Rights .......................................................................................................... 22

       B.    Cradle of Liberty Can Prove that the City Has Violated Its First
             Amendment Rights Under the Doctrines of Viewpoint Discrimination and
             Unconstitutional Conditions .............................................................................. 25

             1. The City Is Attempting to Suppress a Disfavored Viewpoint ...................... 25

             2. The City Created a Forum ........................................................................... 26

             3. The City Created a Forum and Then Acted to Suppress a Viewpoint
                With Which It Disagreed ............................................................................. 28

             4. The City Has Imposed an Unconstitutional Condition on Cradle of
                Liberty's Use of Its Headquarters ............................................................... 31

       C. The City Is Not Entitled to Summary Judgment on Its Counterclaims .................... 35

IV. CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Board of County Comm'rs v. Umbehr*,
    518 U.S. 668 (1996)...............................................................................32

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000)..............................................................21, 25, 26, 31

*Boy Scouts of Am. v. Wyman*,
    335 F.3d 80 (2d Cir. 2003)...............................................................31, 32

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
    473 U.S. 432 (1985)...............................................................................23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985)...............................................................................29

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591, 128 S.Ct. 2146 (2008).....................................................13

*Evans v. City of Berkeley*,
    129 P.3d 394 (Cal. 2006) ......................................................................31

*FCC v. League of Women Voters*,
    468 U.S. 364 (1984)...............................................................................33

*Forum for Academic & Institutional Rights (FAIR) v. Rumsfeld*,
    390 F.3d 219 (3d Cir. 2004), rev'd on other grounds, *Rumsfeld v.
    Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006)...............31

*Griffin Indus., Inc. v. Irvin*,
    496 F.3d 1189 (11th Cir. 2007) .............................................................21

*Heller v. Doe*,
    509 U.S. 312 (1993)...............................................................................23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)...............................................................................26

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993)...............................................................................29

*Le Clair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980)...................................................................23

*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001) ............................................................................................33

*Lerch v. City of Green Bay,*
   218 F. App'x 502 (7th Cir. 2007) ......................................................................21

*Locke v. Davey,*
   540 U.S. 712 (2004) ............................................................................................27

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ................................................................................28, 29, 30

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ............................................................................................31

*Rutan v. Republican Party,*
   497 U.S. 62 (1990) ..............................................................................................32

*Speiser v. Randall,*
   357 U.S. 513 (1958) ............................................................................................32

*Tapalian v. Tusino,*
   377 F.3d 1 (1st Cir. 2004) ..................................................................................23

*Village of Willowbrook v. Olech,*
   528 U.S. 562 (2000) ............................................................................................13

## I.   INTRODUCTION

In the memorandum in support of its motion for summary judgment, the City rambles on for seventy-eight pages, yet somehow manages to miss the entire point of this case. It is not an opportunity to re-litigate the U.S. Supreme Court's *Dale* decision or to serve a political agenda by appeasing certain interest groups. It is not about Cradle of Liberty's constitutionally protected leadership policy and why the City disagrees with it. This case is about the City's actions to suppress a disfavored viewpoint in violation of the First Amendment. It is about the City, in violation of the Fourteenth Amendment, singling out one entity for enforcement of a policy while ignoring those entities similarly situated. Because it cannot justify the actions it has taken, the City instead tries to cloud the issues by making this case about something the Supreme Court settled a decade ago. This Court should not allow the City to distort the actual issues at stake.

The central issue here is whether the City may deny Cradle of Liberty a long-held benefit simply because the City opposes Cradle of Liberty's leadership policy. Conspicuously absent from the City's seventy-eight pages of text (with 107 separate sources of authority)[1] is any substantive reference to the two previous decisions of this Court setting forth the legal standards applicable to Cradle of Liberty's claims. The City's new lawyers ignore this Court's previous decisions and at times disregard the evidence entirely – or at least advance positions on the evidence that are so plainly false that it is difficult to take the City seriously.

---

[1]      If the City had not filed such a bloated memorandum, perhaps it would have been able to file its papers on time. The affidavits of Nelson Diaz, Joyce Wilkerson, Lewis Rosman, Michelle Flamer, Romulo Diaz and Duane Perry and supporting exhibits were all filed on March 16, 2010 – one day beyond the summary judgment deadline. Dkt. #61, dated March 16, 2010.

For example, membership in Colonial Dames of America is restricted to women whose ancestors not only lived in the Colonial era but also served in positions of authority during that time.  Colonial Dames thus directly restricts its membership according to two categories (*i.e.*, sex and ancestry) supposedly prohibited under the City's nondiscrimination policy.  Indeed, Colonial Dames' membership is so restrictive that most Philadelphians, and virtually all non-whites, could not join.  Notwithstanding Colonial Dames' policy, the organization occupies Lemon Hill Mansion free of charge and has never endured the City's scrutiny.  In fact, even as this litigation has brought Colonial Dames' exclusive membership policy into focus, the City continues both to overlook Colonial Dames and to condemn Cradle of Liberty.  Apparently aware that the facts contradict its main argument, the City argues secondarily that Colonial Dames uses only a small portion of Lemon Hill Mansion and employs – but does not accept as members – gay caretakers and an African American tour guide.

The City not only ignores inconvenient facts, but also ignores inconvenient law.  While regurgitating the arguments previously advanced in support of its motion to dismiss, the City makes almost no reference to this Court's 31-page decision disposing of that motion.  That omission says volumes about the City's defenses.  The Court has already set forth the legal framework for evaluating Cradle of Liberty's claims.  The City cannot prevail here under that standard, so it pretends the standard does not exist.  Of course, at those earlier stages of this litigation, the Court was without the benefit of a full record and expected the City at some point to provide actual evidence in support of its arguments.  Discovery has now been closed for more

than two months, and the City has the same evidence it had to support its arguments at those early stages – none.[2]

The City's willful blindness is, indeed, breathtaking.  When the evidence shows that the City has acted unconstitutionally to suppress a disfavored viewpoint, it hides behind a purported policy of nondiscrimination that it has imposed on no other similarly situated entity.  When the evidence shows that other nonprofit organizations are similarly situated to Cradle of Liberty, the City dances around the issue by talking about individual Catholic priests who supported amendment of the Fair Practices Ordinance.  And when the testimony of its *own witness*, Barry Bessler, completely knocks down the City's arguments, it backs away from him as quickly as possible.

Mr. Bessler's testimony is particularly devastating to the City.  As the chief of staff to the executive director of Fairmount Park, Mr. Bessler has more insight than anyone into the City's program of leasing Fairmount Park properties to nonprofit organizations for free or nominal rent.  At both his deposition and at the hearing on Cradle of Liberty's motion for a preliminary injunction, Mr. Bessler offered testimony that proves the City has treated Cradle of Liberty differently than any other similarly situated entity and has taken *no* action to enforce its purported policy of nondiscrimination on any other Fairmount Park lessee:

> Q:     Would you agree with me that Fairmount Park does not know whether other organizations are following this policy because it has not scrutinized their activities in this regard? . . .
>
> A:     Yes.

---

[2]     While the City still has not produced evidence in support of its arguments, it did ignore the Court's discovery deadline and deliver thousands of pages of documents to Cradle of Liberty for the first time on March 1, 2010.  To the extent the City relies on exhibits from that belated production, Cradle of Liberty has moved to strike them.  *See* Motion to Strike Certain Exhibits to Defendant's Motion for Summary Judgment, Dkt. #63, dated March 19, 2010.

Transcript of Preliminary Injunction Hearing ("Inj. Tr."), Dkt. #37, dated Nov. 17, 2009, at 114:23-115:4.

The City is not entitled to summary judgment on any of Cradle of Liberty's constitutional claims or on any of its own counterclaims.  As Cradle of Liberty demonstrated in its motion for summary judgment, it is the only party that has presented sufficient evidence demonstrating that there is no genuine issue of material fact on any of its claims and is the only party entitled to summary judgment.[3]  The Court should deny the City's motion and, in fact, grant Cradle of Liberty's motion for summary judgment.

## II.    FACTS

The City has gone to great lengths to portray Cradle of Liberty in a negative light.  Cradle of Liberty presents the following statement of facts to give the Court a fuller and more accurate representation of Cradle of Liberty's contributions to the City of Philadelphia.

### A.    Cradle of Liberty's Public Service to the City of Philadelphia

In an urban setting such as Philadelphia, the role of a Boy Scouts council is, by necessity, much different than in a suburban setting because of the difficulty of recruiting parents to be Scout volunteers.  Declaration of William T. Dwyer, III, in Support of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Memorandum in Opposition to Defendant City of Philadelphia's Motion for Summary Judgment ("Dwyer Decl.") at ¶ 7.  In addition, urban Scout councils spend much more of their time and charitable resources on the Learning for Life program than do other Scout councils.  *Id*. at ¶ 8.  Learning for Life is a separate corporation affiliated with Boy Scouts of America, which operates character and career development

---

[3]      Cradle of Liberty filed its motion for summary judgment on March 1, 2010.  Pl.'s Mot. Summ. J. ("COL MSJ"), Dkt. #49.  Cradle of Liberty hereby incorporates all arguments made and facts presented therein by reference.

programs in public schools and other locations.  *Id.*  Cradle of Liberty assists Learning for Life

by raising money from its local charitable donors in order that Learning for Life may deliver to

schools, at no cost, a curriculum supplement concerning ethical decision-making.  *Id.*  Learning

for Life is a public service provided for the benefit of public school children and their teachers.

*Id.*  Cradle of Liberty provides Learning for Life free of charge to any interested public school,

raising from donors all the money to run the programs.  *Id.*

　　　　In 2009, Cradle of Liberty served approximately 72,000 youth.  Of that number, about

56,000 were children from the City of Philadelphia.  *Id.* at ¶ 9.  Of the approximately 56,000

youth served in Philadelphia in that year, approximately 50,000 were public school children who

participated in Learning for Life rather than a Scout program.  *Id.* at ¶ 10.  Of the approximately

6,000 Philadelphia youth in Scout programs in that year, about 3,500 of those youth were in

traditional Cub Scout Packs, Boy Scout Troops, or Venture Crews with volunteer parent

leadership.  *Id.* at ¶ 11.  The other 2,500 youth, the vast majority of whom are inner-city African-

American and Hispanic boys ages 7 to 10, have had the opportunity to experience Cub Scouting

only because of Cradle of Liberty's "ScoutReach" initiative.  *Id.* at ¶ 12.

　　　　In ScoutReach, Cradle of Liberty uses its charitable donations to compensate adult

leaders for the time they spend in Scouting, and to provide uniforms, camping gear, and even

camping and outdoor trips to the boys without cost to them.  *Id.*  The uniforms, gear, and

camping are provided through a system of rewards, designed to incentivize the boys to stay in

Scouting and therefore learn a sense of responsibility and leadership.  *Id.*  The awards system

also incentivizes the parents, many of whom are single parents, to teach and reward responsible

behavior in their sons.  *Id.*  Through ScoutReach, boys can experience Cub Scouting in parts of

Philadelphia where few other youth programs exist.  *Id.*  For example, ScoutReach provides Cub

Scout programs after school in homeless shelters and in dozens of schools in West and South Philadelphia. *Id*. Cradle of Liberty's ScoutReach initiative in 2008 received the National President's Award for excellence in the service of disadvantaged youth. *Id*. at ¶ 13.

Cradle of Liberty expends almost half of its operating budget on youth who live within the City of Philadelphia, for a total charitable outlay benefitting the City of Philadelphia alone of more than $2 million in 2009. *Id*. at ¶ 15. All of these funds were raised from private, charitable sources. *Id*. Cradle of Liberty spent approximately $748,000 of these funds on Learning for Life (approximately $533,000) and ScoutReach (approximately $215,000) activities for youth in the City of Philadelphia. *Id*. Another approximately $1.3 million was spent on programs for youth in the City of Philadelphia, including camping and outdoor activities, special events, training events for adults, recruiting events for youth, and other expenses such as the approximately $60,000 that Cradle of Liberty expends annually to maintain the building at 22nd and Winter. *Id*.

The headquarters building at 22nd and Winter services programs provided to the youth of the City of Philadelphia and provides offices for personnel devoted to the programs in the City. *Id*. at ¶ 17. The building provides a central location for special events for youth from the City, such as ScoutReach. *Id*. Cradle of Liberty has used the building, for example, for a gathering of hundreds of Cub Scouts for a ScoutReach Pinewood Derby event (*i.e*. a race of homemade wooden cars), a program honoring veterans, and a program teaching Scout skills. *Id*. Parents in the City have told Cradle of Liberty that these day-long programs provide a great service because they provide positive activities to children when they do not have school and their parents must work. *Id*.

### B.      Learning for Life

Learning for Life's mission is "to enable young people to become responsible individuals by teaching positive character traits, career development, leadership, and life skills so they can make moral choices and achieve their full potential."  *Id*. at ¶ 18.  Learning for Life offers two basic programs, one for use by schools and another for career education:

> **Schools**.  Learning for Life offers more than 145 lesson plans for use by educators in elementary, junior high, and senior high schools, as well as special-needs educators who serve youth with disabilities.  Learning for Life helps prepare youth to successfully handle the complexities of today's society and to enhance their self-confidence, motivation, problem-solving abilities, and self-worth.

> ***Exploring***.  Learning for Life offers Exploring, a career education program for young men and women aged 14 through 20.  Exploring is a worksite-based program through which local employers — *e.g.*, law enforcement, firefighting, aviation, engineering, journalism, or construction — initiate an Explorer Post by matching their people and program resources to the interests of young people in the community.

*Id*. at 20-21.

Learning for Life helps young people to build self-confidence, learn the value of helping others, learn the value of resolving conflict through compromise, develop a sense of personal and social responsibility, and become fully participating citizens in their communities.  *Id*. at 22.  Last year, over 1.7 million youth in over 16,000 schools and community organizations participated in Learning for Life programs nationwide.  *Id*. at ¶ 23.  In Philadelphia, approximately 50,000 youth participated in Learning for Life in over 75 schools and community organizations.  *Id*.  The youth population served by Learning for Life in Philadelphia mirrors the ethnicity of the Philadelphia student population:  approximately 44% African-American, 43% Caucasian, and 13% Hispanic, Asian, and other ethnic groups.  *Id*.

As Learning for Life's agent, Cradle of Liberty provides personnel, facilities, equipment and supplies needed to deliver the Learning for Life programs to schools and other organizations.

*Id*. at ¶ 25.  Cradle of Liberty hires employees who work exclusively on Learning for Life programs, and they are not required to adhere to the Scout Oath and Law.  *Id*. at ¶ 24.  Learning for Life programs are open to any youth, male or female, within the age group for which the lesson plans are designed.  *Id*. at ¶ 26.  Similarly, the specific school or community organization determines who teaches the lesson plans.  *Id*.

Cradle of Liberty serves as the local agent for the Learning for Life programs pursuant to an "Administrative Services Agreement."  *Id*. at ¶ 24.  Cradle of Liberty maintains separate accounts, books, and records and financial statements for Learning for Life apart from its other activities and funds.  *Id*. at ¶ 27.  All contributions that are made to Learning for Life programs in the area that Cradle of Liberty serves are placed in a separate account established by Cradle of Liberty and are used solely for Learning for Life.  *Id*.  Approximately 50,000 youth in the City of Philadelphia benefited from Learning for Life activities in 2009.  *Id*. at ¶ 28.  Depending on the level of charitable giving to Cradle of Liberty, anywhere from 30,000 to 60,000 youth participate in any given year.  *Id*.

Cradle of Liberty provides about 1,000 elementary school children in Learning for Life with a Day Camp each spring, at no cost to them.  *Id*. at ¶ 29.  The Day Camp program includes sessions on nature, science, and ecology.  *Id*.  Cradle of Liberty provides a different group of about 1,000 middle and high school students with a full day of adventure designed to build teamwork and leadership skills.  *Id*. at ¶ 30.  None of the children who participate in such activities pays anything to do so.  *Id*.  Finally, the Learning for Life program within Cradle of Liberty plans and sponsors a Career Fair every year at the Wachovia Center for about 1,000 high school students.  *Id*. at ¶ 31.  Cradle of Liberty coordinates the representation at the Fair of 70

different career, educational, and volunteer opportunities, and sponsors workshops on how to write a resume, how to dress for an interview, and how to interview.  *Id.*

### C.      ScoutReach

The ScoutReach program is Cradle of Liberty's charitable effort to work with the hardest to reach boys in the City of Philadelphia.  *Id.* at ¶ 32.  Of the 6,000 boys in Scout programs in the City, about 2,500 of them are served only because of the ScoutReach program, and almost all of those boys are African-American and Hispanic.  *Id.*

The 2,500 boys participate in about 50 Scout groups, mostly Cub Scout Packs for boys ages 7 to 10.  *Id.* at ¶ 33.  These groups meet after school in about 50 schools and a homeless shelter in Philadelphia.  *Id.*  Cradle of Liberty pays the Pack Cubmaster or the Troop Scoutmaster for each of these 50 groups for the time they spend on the programs.  *Id.*  This is necessary because it is often difficult to find volunteer leaders in the most impoverished areas.  *Id.*  At the same time, there is a tremendous need for a program to teach boys positive skills after school hours.  *Id.*  Because the parents, often single mothers, are generally unfamiliar with Scouting and its benefits, Cradle of Liberty incentivizes the boys and their parents to stay in the program through a rewards system.  *Id.* at ¶ 34.  Leaders assign the boys points for their attendance, attendance by their parents, their good behavior, and development of skills.  *Id.*  Through the point system, boys who cannot otherwise afford them will earn uniforms, merit badges, camping gear, and eventually camping and other outdoor trips.  *Id.*  These are items for which Scouts not in the ScoutReach program generally have to pay.  *Id.*

For example, in Woodstock Street Family Shelter, a homeless shelter in West Philadelphia, Cradle of Liberty has operated a Cub Scout ScoutReach Pack with a compensated leader when the funding and the leader are available.  *Id.* at ¶ 35.  There are, at any given time,

about 15 to 20 young children in this Pack.  *Id*.  Through the rewards system, about 10 to 15 children from the homeless shelter have earned their way to Scout camp each summer.  *Id*. Through ScoutReach last summer, about 200 Scouts from Philadelphia and their families attended Cradle of Liberty's Jamboree (a Council-wide camping event held in the Council's camp in Montgomery County); about 45 Cub Scouts from Philadelphia and their families attended Cradle of Liberty's Cub Scout Day camp; and about 150 Scouts from Philadelphia and their families attended overnight Scout camp – all of these activities at no cost to the boys or their families.  *Id*. at ¶ 36-38.

Any boys in the ScoutReach program who cannot afford camp are given partial or full "camperships" to offset the camping fee so that they may attend camp when their families cannot afford it.  *Id*. at ¶ 39.  Overall, approximately 450 boys benefitted from camperships funded by Cradle of Liberty last year; about half of them reside in Philadelphia.  *Id*.

## III.   ARGUMENT

### A.   Cradle of Liberty Has Demonstrated a Violation of the Equal Protection Clause of the Fourteenth Amendment.

The City has attempted to provide three reasons for the supposed failure of Cradle of Liberty's Equal Protection claim.  As described below, all three of these reasons are woefully deficient.

#### 1.   The City Uses a Clear Standard in Determining Whether It Will Provide Use of a Fairmount Park Property for Free or Nominal Rent.

At the hearing on Cradle of Liberty's motion for a preliminary injunction, Barry Bessler, the chief of staff to the executive director of Fairmount Park, testified that the City's process for granting leases to nonprofit organizations within Fairmount Park was not *ad hoc*, as the City would have this Court believe.  Transcript of the Preliminary Injunction Hearing ("Inj. Tr."),

Dkt. #37, dated November 17, 2009, at 69:9-12.  To the contrary, there is a detailed, multi-step process.  Moreover, there was a clearly defined standard for determining whether a nonprofit that subjects itself to the City's process would ultimately be granted the use of such a property.  The only "discretion" involved related to whether the entity seeking the property meets the clearly defined standard.

When buildings within Fairmount Park are available for potential tenancies of one year or longer, the City makes that availability known to nonprofit organizations through advertising and other means.  *Id.* at 70:3-10, 71:9-13, 73:8-23.  Interested nonprofits may then make written proposals to the senior staff of Fairmount Park for use of the available building.  *Id.* at 73:24-74:8.  When deciding whether to confer a lease, the City considers whether the proposed use is "within the mission of Fairmount Park and an acceptable community use."  *Id.* at 78:22-79:6.  Depending upon the specific property and the group that seeks to use it, buildings within Fairmount Park could be used for various purposes.  *Id.* at 78:1-7.  For example, the City currently rents out facilities for free or nominal rent to organizations that provide art classes, equestrian lessons and rowing activities.  *Id.* at 78:8-16.

Each nonprofit organization that applies for use of a Fairmount Park property must also complete a questionnaire.  *Id.* at 81:8-82:21; COL MSJ, Ex. 2 to the Declaration of Daniel B. Scott ("Scott Decl") (Fairmount Park Commission Occupancy Practices Questionnaire, dated Feb. 6, 2003, City 67-69 ("Fairmount Park Questionnaire")).  The purpose of the questionnaire is to "gather information on applicants seeking to occupy premises in Fairmount Park."  Inj. Tr. at 82:15-18.  One question on the questionnaire asks whether the applicant organization is a for-profit or not-for-profit entity, because the City would not lease a building to a for-profit entity for free or nominal rent.  *Id.* at 83:2-18.  Another question seeks to ascertain the purpose of an

applicant organization, so that the senior staff of Fairmount Park may determine whether the purpose is consistent with the "goals of Fairmount Park." *Id*. at 84:10-15. An applicant organization also must answer a question that asks, "What is the process for admission to membership in or to the organization?" *Id*. at 85:2-5. Mr. Bessler testified that this question simply provides "another point of information" for the senior staff of Fairmount Park to evaluate. *Id* at 85:11-21.

If the senior staff of Fairmount Park approves of the proposed use, the staff then forwards it to the Fairmount Park Commission, which votes on whether to approve the lease.[4] *Id*. at 74:24-75:5. If the duration of a lease is more than four years, City Council also needs to vote on whether to approve it. *Id*. at 76:12-77:23. Similarly, a lease of one year can be renewed up to four times without City Council approval, but City Council would need to vote on any lease renewals beyond the fourth year. *Id*.

In addition to having a clearly defined process for awarding rent-free properties, the City also applies a clearly defined standard to those entities that choose to submit themselves to the City's process. To obtain the use of a Fairmount Park building, the entity must demonstrate that the proposal involves an "acceptable community use." Mr. Bessler confirmed that if a nonprofit organization followed the specific procedures for obtaining use of a Fairmount Park property and the proposed use was "something that the Fairmount Park Commission believes benefits the community at large," that organization would meet the City's standard. Inj. Tr. at 79:2-6; *see also* Inj. Tr. At 84:20-85:1 (testifying that organization needed to show a broad community

---

[4]        As of July 1, 2009, the Fairmount Park Commission no longer exists, and the senior staff of Fairmount Park forwards proposals to the Commissioner of the Department of Parks and Recreation. Inj. Tr. at 74: 17-21. The Fairmount Park Commission, however, was in existence at the time this lawsuit was filed and during the entire time period relevant to this litigation. While the process today may be slightly different, this statement of facts focuses on the process that was in place until June 30, 2009.

benefit, *i.e.* that "[t]here's some public good that will be derived by allowing this nonprofit organization to use" the building).

Contrary to the City's arguments, the only "discretion" is in determining whether the proposed entity meets the City's clearly defined standard.[5]  The City's argument is particularly astonishing in light of the testimony of Mr. Bessler, who testified not only that Fairmount Park applies a standard, but that Cradle of Liberty met that standard:

> Q:    And the use that the Cradle of Liberty Council [made of] the building, is that something that was compatible with the Fairmount Park Commission's standards throughout the time that they've occupied the building?
>
> A:    Yes.

*Id*. at 112:18-22.

Indeed, apart from the $60,000 in maintenance costs which the City defrays with its lease to Cradle of Liberty, the "public good" the City seeks through the leasing program is more than satisfied by Cradle of Liberty:  Cradle of Liberty expends almost half of its operating budget on youth who live within the City of Philadelphia, for a total charitable outlay benefitting the City of Philadelphia alone of more than $2 million in 2009.  *See* Dwyer Decl. at ¶ 16.  And the vast majority of these funds were expended for the Learning for Life program alone, which is open to all public school children.  *Id*.

---

[5]    The City attempts to rely on the testimony of John Herzins of the Department of Public Property to show that there are no clear standards in the way the City awards leases for properties outside of Fairmount Park.  As the Court noted in granting Cradle of Liberty's motion for a preliminary injunction, the testimony of Mr. Herzins has "no connection with Plaintiff's termination."  Memorandum on Plaintiff's Motion for a Preliminary Injunction ("PI Opin."), Dkt. #29, dated Nov. 19, 2009, at 3.  Cradle of Liberty's Equal Protection claim involves similarly situated organizations within Fairmount Park; properties on non-Fairmount Park land are irrelevant.

2.      **Cradle of Liberty Can Meet Its Burden in Showing Similarly Situated Entities Who Were Treated Differently.**

Numerous nonprofit organizations that occupy Fairmount Park property for free or for nominal rent have leadership or membership policies that exclude certain groups of people.  The City has taken no action to terminate its lease agreements with any of these other organizations, nor has it even investigated any of them to see if they are in compliance with the City's purported policy of nondiscrimination.  The City has previously attempted to argue that Cradle of Liberty can show no similarly situated entities, but the Court rightly rejected that argument.  PI Opin. at 3 ("Defendant argues that Plaintiff has not presented facts to find entities similarly situated, but the court disagrees.  The Fairmount Park Lessees shown in Exhibit 15 and specifically, 17, 18, 19, 20 and 21 support the similarly situated argument of Plaintiff.").  With the benefit of additional discovery, Cradle of Liberty's position is now even stronger.

a.      **Saint Joseph's University**

The City argues that Saint Joseph's University ("SJU") is not similarly situated to Cradle of Liberty because it signed a sublease agreeing that it "shall not discriminate *or permit discrimination* against any person because of race, color, religion, national origin, sexual orientation, sex, ancestry or disability."  Mem. in Support of Def.'s Mot. Summ. J. ("City MSJ") at 37 (emphasis added).  However, this does not demonstrate that SJU is different from Cradle of Liberty.  It only demonstrates that the City gives lip service to its nondiscrimination policy without actually enforcing it.

When explaining the relationship between SJU and the Jesuit order of Roman Catholic priests, SJU's designee stated:  "We are, first, a university.  We are Catholic.  And its founding was inspired by the principles of the Society of Jesus, known as the Jesuits."  Transcript of Deposition of Dominick DiJulia ("DiJulia Dep."), dated Jan. 6, 2010, at 32:5-9.  Jesuit priests

serve both on the faculty and in the administration of SJU.  *Id.* at 32:16-23.  The City cannot

deny that SJU is a Catholic university that "espouse[s] to and promote[s] the Jesuit philosophy of

education."  *Id.* at 32:12-14.  As Cradle of Liberty pointed out in its own motion for summary

judgment, Jesuit priests – like all ordained clergy in the Roman Catholic Church – are required to

be baptized, Catholic men, according to the Code of Canon Law.  1983 Code c.1024 ("A

baptized male alone receives sacred ordination validly.").[6]

In addition, the Roman Catholic Church excludes avowed homosexuals from the

priesthood.  The City claims that the "Boy Scouts' assumption that religious organizations must

discriminate is demonstrated false by SJU . . . and the numerous statements offered by religious

leaders in support of amending the Fair Practices Ordinance to prohibit discrimination based on

sexual orientation."  City MSJ at 40 (internal citations omitted).  The City, however, does not

have the power to rewrite policy that is decided by the Vatican and published worldwide.[7]  It is

indisputable that, in ordaining its clergy, the Roman Catholic Church selects its leaders on the

basis of sex, sexual orientation and religion – three of the attributes listed in the Fair Practices

---

[6]     In support of its motion for summary judgment, the City notes that, among other things, SJU opens its leased property "for use by the disabled rowing program."  City MSJ at 38.  SJU's support for the disabled rowing program is admirable, but it is irrelevant to the constitutional analysis, as it does not magically change the fact that the Society of Jesus discriminates on the basis of sex, religion and sexual orientation.  As noted above, Cradle of Liberty also provides innumerable benefits to youth in the Philadelphia region.

[7]     On August 31, 2005, Pope Benedict XVI approved and ordered the publication of the "Instruction Concerning the Criteria for the Discernment of Vocations with regard to Persons with Homosexual Tendencies in view of their Admission to the Seminary and to Holy Orders."  Written by the Vatican's Congregation for Catholic Education, this publicly available instruction states, in relevant part:

> [T]his Dicastery, in accord with the Congregation for Divine Worship and the Disciple of the Sacraments, believes it necessary to state clearly that the Church, while profoundly respecting the persons in question, cannot admit to the seminary or to holy orders those who practise homosexuality, present deep-seated homosexual tendencies or support the so-called "gay culture."

Ex. 1 to the Declaration of Richard M. Haggerty in Support of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Opposition to Defendant City of Philadelphia's Motion for Summary Judgment ("Haggerty Decl.") ("Instruction").

Ordinance and the Fairmount Park Occupancy Practices Questionnaire, one of which is the exact basis for which the City is trying to evict Cradle of Liberty.  Yet, the City has no trouble subsidizing SJU's use of a Fairmount Park property.  Nor has the City asked SJU to renounce the "membership policy" of the Society of Jesus or the Roman Catholic Church generally.  Because SJU clearly "permits discrimination" on the basis of religion, sex and sexual orientation, it stands in the same position with the City as Cradle of Liberty does.  SJU's sublease does not constitute evidence of dissimilarities between SJU and Cradle of Liberty, but just the opposite.  The City has demanded that Cradle of Liberty denounce and repudiate a leadership policy based on Scouting's moral values and prohibiting open homosexuals from serving as leaders, but has not made the same demands on SJU.

> ### b.      The Colonial Dames of America

In trying to argue that the Colonial Dames of America is not similarly situated to Cradle of Liberty, the City descends into absurdity.  The City makes the following statement in support of its position:  "Although the membership policy limits members to women descended from an ancestor who, between May 13, 1607 and April 19, 1775, served one or more of the original thirteen colonies, the Colonial Dames do not exclude members on the basis of race, sexual orientation, religion, national origin, or disability."  City MSJ at 39 (internal citations omitted).  This statement exposes the hollowness of the City's arguments here.

Even while acknowledging that the Colonial Dames "limits members to women," the City somehow argues that Colonial Dames is not similarly situated to Cradle of Liberty.  In defending Colonial Dames, the City fails to point out that its nondiscrimination policy applies to sex just as well as it applies to sexual orientation.  Therefore, even if it were true that Colonial Dames does not discriminate based on race, sexual orientation, religion, national origin, or

disability, this would be meaningless.  The City willingly provides a subsidy to an organization

that excludes men from membership, and it cares little about this parallel violation of its

nondiscrimination policy.  The City's refusal to acknowledge the obvious at this stage of the

proceedings is troubling.  At the preliminary injunction hearing, the City's own witness – in

response to a question from *the Court* – noted that the exclusion of men from an organization

would violate the City's nondiscrimination policy:

> The Court:    The question is simple.  It says there – well, what happens if an
> organization puts there, yes, we only permit women?  What
> happens in that process?
>
> Mr. Bessler:    Then that would be a violation, yes.

Inj. Tr. at 91:7-11.

The City's omission of ancestry from its assertion that the Colonial Dames does not

discriminate is equally noteworthy.  A person whose ancestry is, for example, exclusively

Mexican or Kenyan cannot be a member.  Indeed, an American whose ancestors have lived in

the United States for only three generations cannot be a member.  In fact, the Colonial Dames'

membership criteria is based almost exclusively on ancestry.

Further, not everyone whose ancestors lived in the Colonial era can be members.

Although the City refuses to acknowledge the clear language of the Colonial Dames'

membership policy, a person seeking membership in this organization must have descended from

a prominent Colonial era ancestor who served in a position of leadership:

> a.    By holding public office in the government thereof;
> b.    By holding a commission in the armed forces thereof; or,
> c.    By otherwise serving one or more of said Colonies in the capacities
> specified in the Eligibility List.

*See* COL MSJ, Ex. 10 (Certificate of Incorporation and By-Laws of the Colonial Dames). Indeed, the Colonial Dames employs an official genealogist to certify the legitimacy of the ancestor.  *Id.*[8]

As a result of this exclusive membership policy, many Americans whose ancestors lived in the Colonial era, particularly descendents of American slaves, cannot join.  Because white Anglo-Saxon men held the overwhelming majority – if not all – of the public offices and military commissions in the colonial era, the Colonial Dames' membership policy has the practical effect of excluding African Americans.  Transcript of Deposition of Eleanor Penniman ("Penniman Dep."), dated Jan. 6, 2010, at 41:20-42:9.  Eleanor Penniman, who has been a member of the Colonial Dames since 1960, testified that the organization has *no* African-American members and that she only knows of one African-American woman nationwide who is even *eligible* to join.  *Id.*  The City is apparently not at all bothered by this sort of discrimination.

Instead of acknowledging the obvious and admitting that it enforces its nondiscrimination policy irrationally, the City argues that Colonial Dames has a "non-exclusionary policy" because it employs a gay couple to serve as caretakers of Lemon Hill Mansion and an African American tour guide.  So what?  These individuals are not members of Colonial Dames and they do not alter the fact that Colonial Dames both receives a rent-free building and excludes certain people based on so-called prohibited categories.

Even while advancing the untenable argument that Colonial Dames is not a discriminatory organization, the City argues that Colonial Dames limits its "exclusive use" to only a portion of the property.  This is a curious admission.  The City seems to be saying it is

---

[8]       The candidate herself must also be deemed worthy for membership.  The membership policy states: "A candidate must be judged worthy of becoming a member and be deemed acceptable by the Board of Managers." Certificate of Incorporation and By-Laws of the Colonial Dames.

acceptable to subsidize a discriminatory nonprofit organization as long as it's just a little bit of discrimination.  Lastly, the City argues that Colonial Dames is not similarly situated to Cradle of Liberty because Colonial Dames pays "to bus Philadelphia school children to the Lemon Hill Mansion for educational programming and welcome any student who would like to enter."  City MSJ at 39.  Providing for the educational needs of Philadelphia school children is commendable, but this does not make Colonial Dames different from Cradle of Liberty.  Quite the contrary: precious few organizations, if any, can come close to matching Cradle of Liberty's record of service to children in the Philadelphia area.

### c.      Other Similarly Situated Entities

It is undisputed that the City rents land in the Fairmount Park system to the Roman Catholic Church of the Maternity, B.V.M. ("Church").  *See* COL MSJ, Ex. 17 to the Declaration of Daniel B. Scott ("Scott Decl.") (Leases between City and the Roman Catholic Church of the Maternity, B.V.M., dated April 6, 1935 and June 2, 1982, City 736-46).  As noted above, the Roman Catholic Church selects its ordained clergy on the basis of religion, sex and sexual orientation.

Mr. Bessler testified at both his deposition and at the preliminary injunction hearing that the City has not scrutinized the membership policy of any organization other than Cradle of Liberty, which would necessarily include the Church.  Transcript of the Deposition of Barry Bessler ("Bessler Dep."), dated Aug. 21, 2009, at 84:5-15, 118:9-13; Inj. Tr. at 101:6-102:18; 114:23-115:4.  Indeed, it has not taken any action against the Church despite the Roman Catholic Church excluding members from the priesthood on the exact same basis at issue here.  Bessler Dep. at 160:12-162:1, 163:11-17, 164:14-17 (confirming that the City has taken no action with

regard to the Church, and specifically recognizing that it has never considered the Church's policy of excluding women from the priesthood).

The City also wrongly asserts that Cradle of Liberty's argument regarding similarly situated entities is supposedly disproven by the Women for Greater Philadelphia.[9]  As Mr. Bessler has testified, however, the City has never made any inquiry into whether the membership policy of the Women for Greater Philadelphia violates the City's policy of nondiscrimination. *Id.* at 181:22-183:4.  Similarly, the City has never investigated the membership policy of the Philadelphia Girls Rowing Club with regard to its lease for a boathouse on Boathouse Row.  *Id.* at 180:19-181:1.  The title of that organization alone suggests that only half the population of Philadelphia would even qualify for membership in the Girls Rowing Club.  As Mr. Bessler agreed at the preliminary injunction hearing, the City *does not even know* whether organizations besides Cradle of Liberty are following the City's supposed policy of nondiscrimination because it has not scrutinized their activities in this regard.  Inj. Tr. at 114:23-115:4.

In short, the City has treated similarly situated entities differently, and the City's attempts at obfuscation do not change the fact that the above entities are similarly situated.

> ### d.  Evidence of Complaints Does Not Show that Other Entities Were Not Similarly Situated.

The City argues that the fact that it received complaints about Cradle of Liberty "eliminates any possibility" that other entities were similarly situated.  This is a frivolous argument.

---

[9]      The City did not produce a copy of the Women for Greater Philadelphia's by-laws until nearly two months *after* discovery ended and after Cradle of Liberty had filed its motion for summary judgment.  Cradle of Liberty has moved to strike this document as one of the City's exhibits.  *See* Motion to Strike Certain Exhibits to Defendant's Motion for Summary Judgment ("Motion to Strike"), Dkt. #63, dated March 19, 2010.

The non-binding cases in other jurisdictions relied upon by the City shed no light on whether other entities were similarly situated to Cradle of Liberty.  In *Lerch v. City of Green Bay*, 218 F. App'x 502 (7th Cir. 2007), for example, the court found that the complaints were only one factor in a failure to show similarly situated persons.  *Id.* at 504 (finding owner of rental properties cited for code violations failed to show similarly situated owners).  "[Lerch] offered no proof, for instance, that the owners of those properties owned many rental properties containing multiple code violations, that their tenants had complained to the city, or that the other owners were not cited, much less that the same inspector made the decision in each case."  *Id.* (internal citation omitted).  Here, unlike the plaintiff in *Lerch*, Cradle of Liberty has shown that other nonprofit organizations:  (1) have lease arrangements for free or nominal rent with the City within Fairmount Park; (2) have membership policies that exclude certain people according to attributes contained in the City's Fair Practice Ordinance; and (3) have not been subject to any action by the City because of those membership policies.  The City's assertion that it has not received complaints about other entities means nothing.[10]

Significantly, it is worth noting that the City received complaints about Cradle of Liberty only *after* the Supreme Court's decision in *Dale*, which established that the membership and leadership policies of the Boy Scouts were protected by the First Amendment.  *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000).  Unlike the cases upon which the City relies, the only

---

[10]    The City's reliance on *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007), is also misplaced. Complaints were merely one factor mentioned by the *Griffin* court, which found the government's action to be "undeniably multi-dimensional." *Id.* at 1203.  Additionally, the court contrasted this situation with *Olech*, where "[t]he similarity between Olech and her neighbors was obvious because the Village, as the governmental decisionmaker, had a policy that did not involve a large number of factors in its application." *Id.* Here, the factors involved in the City's enforcement of its policy are similarly obvious.

complaints here were aimed at Cradle of Liberty exercising its protected First Amendment

rights.[11]

### 3. The City's Only Asserted "Rational Basis" For Its Selective Eviction of Cradle of Liberty Is an Impermissible Inhibition of Constitutional Rights.

In arguing that it has a rational basis for its selective eviction of Cradle of Liberty among

all similarly situated entities, the City has still failed to answer the question first posed by this

Court in its Memorandum on the City's Motion to Dismiss:

> [E]ven if this Court assumes that there was a legitimate government interest for ending subsidized use of city properties to those who engage in discrimination, there is still the question of selective enforcement – why did the City target Cradle specifically?  Cradle's Complaint could have been better crafted, but a fair reading suggests that while there were other groups similarly situated to Cradle, the City chose to selectively evict Cradle.  There is no rational basis for this differential treatment evident in the Complaint or in some other admissible form, and the City does not argue otherwise.

Memorandum on Defendant's Motion to Dismiss ("MTD Opin."), Dkt. #13, dated Sept. 25,

2008, at 13-14; *see also* PI Opin. at 3-4 ("Defendant then argues that even if Plaintiff can

establish the 'similarly situated' issue, it fails to demonstrate that there is no rational basis.

However, the City has offered no evidence to contradict the reason alleged by Plaintiff; namely,

to punish Plaintiff for its policy.  While there may be legitimate justification, Defendant has yet

to present evidence to support that position.").  Although the City rambles on about its supposed

policy and practice of nondiscrimination, it studiously avoids the Court's question:  why

selectively evict Cradle of Liberty?  With discovery now completed, Cradle of Liberty has

demonstrated that the City treated Cradle of Liberty differently from similarly situated entities –

including entities, like the Church, that exclude individuals on the *exact same basis* at issue here.

---

[11]     Moreover, three of the alleged complaints cited by the City are documents produced for the first time on March 1, 2010, and are included in Cradle of Liberty's Motion to Strike.

Yet the City still cannot provide any legitimate reason for its decision to enforce its nondiscrimination policy only against Cradle of Liberty. The Court has already noted that differential treatment violates the Equal Protection Clause unless there is a "rational relationship" between the treatment and a legitimate government interest. MTD Opin. at 11 (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993)). In *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), the Supreme Court ruled that there was no rational basis for a city's requirement that a group home for the mentally retarded be subject to special use permitting while other types of multiple dwellings were not. The Court did so because it found no rational basis for the city's belief that the group home would pose any special threat to the city's legitimate interests, but instead rested on irrational prejudices. "[M]ere negative attitudes" were not "[a] permissible bas[is]" for treating the proposed home differently from all the other multiple dwelling units in the same vicinity. 473 U.S. at 448. Furthermore, concern that the home would be located on a flood plain similarly did not distinguish it from other potentially vulnerable populations already situated on the flood plain. *Id*. at 449.

The City's reliance on its disagreement with Cradle of Liberty's exercise of a protected constitutional right simply cannot serve as a rational basis for its actions. *See, e.g., Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004) (noting that a plaintiff must prove that he was treated differently from others similarly situated based on an impermissible reason such as "to inhibit or punish the exercise of constitutional rights"); *Le Clair v. Saunders*, 627 F.2d 606, 609 (2d Cir. 1980) (stating that a plaintiff proves an equal protection violation by showing that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional right[.]").

Tellingly, the City admits that it "focused on the Boy Scouts' discriminatory policy of excluding participation on the basis of sexual orientation following the highly publicized *Dale* decision." City MSJ at 49. Thus, not only can the City not articulate a rational basis for its actions, but it specifically admits that its only reason for evicting Cradle of Liberty was the one already found invalid by this Court – to punish Cradle of Liberty for its exercise of constitutionally protected rights.[12]

The dirty secret of this case is that the City is selectively enforcing its policies – and targeting Cradle of Liberty specifically – because the City is bowing to political pressure exerted by an aggressive and vocal interest group. There is nothing principled about that; it is raw politics in an ugly form. The gay community in Philadelphia that has targeted Cradle of Liberty evidently cares nothing about Cradle of Liberty's myriad good works – it cares only about its own political agenda. The sad part about this case is that the City has been co-opted into this agenda and is therefore more than willing to trample on Cradle of Liberty's constitutional rights while jeopardizing and ignoring the desperately needed services and benefits that Cradle of Liberty brings to the City. Unlike the City, however, our federal courts are immune to such crass political pressures and can decide disputes such as this one according to the law. The City is not entitled to summary judgment on Cradle of Liberty's Equal Protection claim and, in fact, the undisputed evidence demonstrates that Cradle of Liberty should be granted summary judgment on this claim.

---

[12]    The City notes that it has begun a review of its leases and licenses, but that the initial focus has been "on verifying the properties are properly insured and the potential recoupment of money." City MSJ at 50. The Court has already found that these reviews are irrelevant to this case. PI Opin. at 2-3.

**B.**   **Cradle of Liberty Can Prove that the City Has Violated Its First Amendment Rights Under the Doctrines of Viewpoint Discrimination and Unconstitutional Conditions.**

While the City's First Amendment arguments are presented in a confused and chaotic fashion, they generally break down along four lines.  The City believes that it has not violated Cradle of Liberty's rights under the First Amendment because (1) it is not regulating speech; (2) it did not create a forum; (3) to the extent it created a forum, the City was the speaker; and (4) its actions were reasonable and viewpoint neutral.  These arguments are dispatched below.

**1.**   **The City Is Attempting to Suppress a Disfavored Viewpoint.**

The City argues repeatedly throughout the memorandum in support of its motion that it is not trying to suppress Cradle of Liberty's speech; rather, it is attempting to regulate conduct by prohibiting discrimination.  This argument, however, is in direct conflict with the Supreme Court's holding in *Dale*.

As this Court has correctly explained, "under *Dale*, it is clear that the City could not outright require Cradle to change its membership policies.  According to the Complaint, the City has explicitly demanded that Cradle change its policy of excluding open homosexuals, conditioning Cradle's continued use of its headquarters on this change.  Allegations of such conditions, assuming they were imposed, constitute a claim that Cradle's First Amendment rights were compromised."  MTD Opin. at 23.  When the Court wrote that opinion, the parties were at the pleading stage.  But now, at the summary judgment stage, the City repeatedly *admits* in its memorandum that Cradle of Liberty's continued participation in the City's nonprofit leasing program *is* conditioned on abandoning its constitutionally protected policy.  *See, e.g.*, City MSJ at 25-26 ("The City again stated that the ejectment was subject to withdrawal based on the Boy Scouts' agreement to either (1) pay fair market rent, or (2) end its discriminatory policy and

practice, and invited a meeting to discuss whether the Boy Scouts wished to accept either alternative."); Ex. 46 to the Affidavit of Rebecca Lacher (June 1, 2007 Letter from Romulo Diaz to Sandra A. Girifalco); Ex. 56 (May 6, 2008 Letter from Shelley R. Smith to Sandra A. Girifalco).

As this Court has noted, "'Boy Scouts is an expressive association and . . . the forced inclusion of [a gay scoutmaster] would significantly affect its expression.'" MTD Opin. at 23 (quoting *Dale*, 530 U.S. at 656). The City nonetheless stubbornly argues that the First Amendment is inapplicable, because the City is supposedly acting to "regulate conduct and not speech." City MSJ at 52-53. The City is wrong. As the U.S. Supreme Court stated in *Dale*:

> While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.

*Dale*, 530 U.S. at 661 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995)). In short, the City's demands impact Cradle of Liberty's First Amendment rights.

### 2.    The City Created a Forum

The City argues that it has not created a forum, because it did not intend to encourage a diversity of views. The Court has already rightly rejected that argument.

Repeating the same erroneous argument it made when it opposed Cradle of Liberty's motion for a preliminary injunction, the City compares its program of leasing Fairmount Park properties to nonprofit organizations for nominal rent to the scholarship program at issue in *Locke v. Davey*, 540 U.S. 712 (2004). *See* Def.'s Mem. in Opp'n to Pl.'s Mot. Prelim. Inj. ("City PI Opp."), Dkt. #27, dated Nov. 16, 2009, at 8-9 ("[T]here is no evidence that the City granted COL its rent subsidy to encourage diversity of views[.]"). The Court rejected that argument at

the preliminary injunction stage, and it should reject it again.  *See* PI Opin. at 4 ("In this court's memorandum of September 25, 2008, the court found sufficient allegations for motion to dismiss purposes to support Plaintiff's theory that the Defendant's program of leasing out space throughout the City at subsidized rates, 'assuming there is such a program,' is the relevant non-public forum.  The evidence presented at the hearing on this motion establishes the likelihood of such a program.").

The City claims that the purpose of its program is twofold:  "to both benefit the community at large and ensure that city-owned properties are restored, preserved and maintained at minimal cost to the City."[13]  City MSJ at 58.  The second proffered reason obviously does not apply to all nonprofit organizations with Fairmount Park leases, as is demonstrated, for example, by both Cradle of Liberty and SJU.  At the time these entities entered into leases for Fairmount Park property, there were no structures on the land to restore, preserve or maintain.  *See* COL MSJ, Ex. 1 to Scott Decl. ("An Ordinance"); Ex. 14 to Scott Decl. ("SJU Ground Lease"); Ex. 15 to Scott Decl. ("SJU Ground Sublease").

The other reason – to benefit the community at large – is the purpose that Mr. Bessler has repeatedly cited for the City's program.  Bessler Dep. at 106:13-107:8, Inj. Tr. at 78:1-79:11; 84:20-85:1; 105:6-11.  Furthermore, Mr. Bessler confirmed that Cradle of Liberty's use of its headquarters was consistent with the purpose of the City's program:

> Q:     From 1929 up until the – let's say 1995, just to pick a date at random, the Boy Scouts occupied a Fairmount Park building, correct?
>
> A:     Yes.

---

[13]     Later in its memorandum, the City argues that if there is a forum, its purpose is to promote equality and fair treatment.  In fact, there is plenty of evidence that the forum may include organizations which themselves have membership limitations.

Q:      And they were using it for their purposes, correct?

A:      Yes.

Q:      And nobody from the Fairmount Park Commission ever suggested that they were using it in a way that doesn't benefit the community?

A:      Correct.

Inj. Tr. at 79:23-80:7.

When the Court found that Cradle of Liberty's complaint sufficiently alleged that "the City opens up the use of its properties to numerous organizations who then use them for whatever purpose they choose," it also noted that "[i]mplicit in this allegation is that these groups often engage in speech."  MTD Opin. at 17.  As Cradle of Liberty demonstrated in its motion for summary judgment, there is no dispute that these groups do in fact engage in speech in connection with their Fairmount Park properties.  *See* COL MSJ at 20-21.

In sum, by opening up properties in Fairmount Park for use by nonprofit organizations which benefit the community, the City has created a forum.

**3.      The City Created a Forum and Then Acted to Suppress a Viewpoint With Which It Disagreed.**

The City created a forum for nonprofits which serve the community, then acted to censor one disfavored group.  Yet a public entity which facilitates a forum does not speak through individual participants in the forum – even when the public entity makes a cash subsidy to individual participants in the forum – and, therefore, does not have a right to censor the speech of an individual participant.[14]  *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S.

---

[14]      The City's argument that the Fourth Circuit's four-factor test, which has never been adopted by the Third Circuit, weighs in favor of government speech is faulty.  *See* City MSJ 59-61.  The argument's premise relies on the purpose of the forum being the City's message of nondiscrimination, an assertion for which there is no evidentiary support.  Moreover, the actual evidence shows that the individual participants in the forum are the speakers:  (1) the purpose of the forum is to "benefit the community," a standard Cradle of Liberty had met for 75 years; (2) the City

(Continued)

819, 829 (1995) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806

(1985)).  In *Rosenberger*, the University of Virginia had set up a Student Activities Fund

("SAF") to pay for a broad range of extracurricular student activities that were "related to the

educational purpose of the University" and that "tend[ed] to enhance the University

environment."  *Id.* at 825.  When the student publisher of a Christian magazine attempted to use

the SAF to pay its printing costs, it was excluded as a "religious activity."  *Id.* at 827.

The Supreme Court invalidated the exclusion of the Christian magazine from the forum,

noting that once the University opened a forum dealing with certain subject matter, it may act to

preserve the purposes of the forum as previously determined, but it may *not* engage in viewpoint

discrimination against disfavored perspectives on otherwise included subject matter.  *Id.* at 830.

*See also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 385 (1993)

(viewpoint discrimination to exclude religious group from use of school facilities open to social

and other groups, even on assumption that forum is nonpublic).

As the Supreme Court explained, "[t]he necessities of confining a forum to the limited

and legitimate purposes for which it was created may justify the State in reserving it for certain

groups or for the discussion of certain topics."  *Rosenberger*, 515 U.S. at 829 (citing *Cornelius*,

473 U.S. at 806).  "Once it has opened a limited forum, however, the State must respect the

lawful boundaries it has itself set.  The State may not exclude speech where its distinction is not

---

(Continued)

exercises no editorial control over the participants' speech; the speech at issue – such as the religious message of the Church or the patriotic message of the Colonial Dames – belongs to the groups themselves; (3) the "literal speakers" are the participant entities; for example, no one would attribute messages conveyed at the Church's Sunday Mass to the City; and (4) for the same reasons that no one would attribute such speech to the City, the City does not bear the ultimate responsibility for it.  *See Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 618 (4th Cir. 2002) (internal citations omitted).

'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." *Id*. (internal citations omitted).

Here, the uncontradicted testimony of Barry Bessler confirms that the City makes Fairmount Park properties available to nonprofit organizations who do work that "benefits the community." Inj. Tr. at 84:20-25; PI Opin. at 4. This purpose is legally indistinguishable from the University of Virginia's stated purpose in *Rosenberger* – that the activity be "related to the educational purpose of the University" and "tends to enhance the University environment." *Rosenberger*, 515 U.S. at 824. Moreover, for seventy-five years, the City deemed the work of Cradle of Liberty to be compatible with the purpose of its forum. Inj. Tr. at 112:18-22. The City now attempts to argue (in parts of its memorandum) that the purpose of this forum is to spread its "message of equality and fair treatment." City MSJ at 59. Mr. Bessler is the only witness to testify on the City's program of renting Fairmount Park properties to nonprofits at nominal rates, and he offered not *one word* of testimony that suggested the purpose of the program was to spread this supposed message. Requiring new lessees to answer questions about their membership policies on a questionnaire does not change the purpose of the forum. As much as the City may want to distance itself from Mr. Bessler's testimony now, he was the only witness it designated on the topic of Fairmount Park during the discovery period.[15]

Further, if the purpose of the City's program in Fairmount Park was to promote "equality and fair treatment," why has it taken no action with regard to entities like SJU or the Church, which are connected to an organization – the Roman Catholic Church – that does not allow women or homosexuals to become priests, or the Colonial Dames, whose membership policy

---

[15]     The City contends in a footnote that Cradle of Liberty's argument "that the rent-free occupancy somehow has created a forum . . . has no *factual* support." City MSJ at 71 n.19 (emphasis in original). Again, ignoring the facts to which Mr. Bessler testified will not make them go away.

serves to exclude men and nearly all racial minorities?  The answer is simple:  because this is not the purpose of the City's program, but instead a litigation-driven rationalization for which there is no evidentiary support.

> **4.      The City Has Imposed an Unconstitutional Condition on Cradle of Liberty's Use of Its Headquarters.**

In arguing that it has not imposed an unconstitutional condition on Cradle of Liberty's use of its headquarters building, the City cites to the same cases the Court had previously analyzed when considering this claim; however, the City reaches the incorrect conclusion.  When examined through the "coherent analytical framework" that the Court has recognized, it becomes obvious that the City has subjected Cradle of Liberty to an unconstitutional condition.  *See* MTD Opin. at 22.[16]

> **a.      The City Is Attempting to Suppress Cradle of Liberty's Viewpoint.**

"The first question is whether the government's condition compromises a First Amendment right."  *Id.*  The legitimacy and constitutionality of Cradle of Liberty's leadership policy is settled.  *See Dale*, 530 U.S. at 656.  The City "could not outright require" Cradle of Liberty to change this policy.  MTD Opin. at 23.  As this Court has previously recognized, a government is also prohibited from proposing a penalty "to produce a result with which [it] could not command directly."  *Id.* at 18 (quoting *Forum for Academic & Institutional Rights (FAIR) v. Rumsfeld (FAIR I)*, 390 F.3d 219, 229 (3d Cir. 2004), rev'd on other grounds, *Rumsfeld v. Forum for Academic & Institutional Rights (FAIR II)*, 547 U.S. 47 (2006)).

---

[16]      In announcing the proper framework for this claim, the Court considered several of the cases relied upon by the City in its motion, including *Rust v. Sullivan*, 500 U.S. 173 (1991), *Boy Scouts of America  v. Wyman*, 335 F.3d 80 (2d Cir. 2003) and *Evans v. City of Berkeley*, 129 P.3d 394 (Cal. 2006).  *See* MTD Opin. at 18-23.

The Supreme Court has left no doubt "that constitutional violations may arise from the deterrent, or chilling, effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights." *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (internal quotations and citations omitted).  Put another way, the Court has held that '[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party*, 497 U.S. 62, 77-78 (1990).  Conditioning receipt of a financial benefit on a limitation of speech rights has, of course, been held to be unconstitutional since *Speiser v. Randall*, 357 U.S. 513 (1958).

In arguing that it is not attempting to punish Cradle of Liberty's exercise of free speech, the City contends that it simply "seeks assurance from its subsidy recipients that they will abide by the City's laws and policies." City MSJ at 68.  As Cradle of Liberty has pointed out throughout this litigation, the City's demonstrated failure to take action against any other subsidy recipient makes this argument ring hollow.[17]  Clearly, the conditions that the City is attempting to impose here compromise Cradle of Liberty's First Amendment rights.

### b.    The City's Mandate Is Not Limited to the 22nd Street Property.

After determining that a First Amendment right has been compromised, the "next question is the scope of the condition." MTD Opin. at 22.

> If the condition seeks to limit the use of the government subsidy only, and the condition does not impose a penalty beyond the withdrawal of the subsidy itself, then the condition need merely be reasonable and viewpoint neutral.  If the

---

[17]    Indeed, as the Second Circuit noted in *Wyman*, "Both the nonpublic-forum and the unconstitutional-conditions cases hold, however, that it is not enough that a law appear viewpoint neutral on its face.  A reviewing court must also determine that the rule is not a façade for viewpoint discrimination." *Wyman*, 335 F.3d at 93 (citing *Cornelius*, 472 U.S. at 811-13).  While the *Wyman* court found that Connecticut did not apply its Gay Rights Law in a viewpoint discriminatory manner, the City's enforcement of the Fair Practices Ordinance on a single Fairmount Park lessee shows that this ordinance is nothing more than a façade for viewpoint discrimination.  *See id.*

> condition, on the other hand, is broader in scope, a heightened level of scrutiny may be applied.

*Id.*; s*ee also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542, 548 (2001) (conditioning grants to lawyers on their agreement to refrain from challenging the validity of welfare laws was unconstitutional); *FCC v. League of Women Voters*, 468 U.S. 364, 402 (1984) (conditioning grants to public broadcasters on their agreement to refrain from editorializing was impermissible).

As Cradle of Liberty explained in its motion for summary judgment, it is evident that the City's demands do not merely relate to the headquarters building, but broadly apply to Cradle of Liberty's activities, and therefore the Court should apply a heightened level of scrutiny.  *See* COL MSJ at 24-26.  All of the evidence points to this conclusion.  *See, e.g.,* COL MSJ, Ex. 5 to Scott Decl. (July 20, 2006 Letter from Romulo L. Diaz to William T. Dwyer, III), Ex. 6 to Scott Decl. (Resolution 070522 of the Council of the City of Philadelphia); Ex. 7 to Scott Decl. (June 1, 2007 Letter from Romulo L. Diaz to Sandra A. Girifalco); Ex. 8 to Scott Decl. (May 6, 2008 Letter from Shelley R. Smith to Sandra A. Girifalco).

Yet the City makes a feeble attempt in its motion for summary judgment (without citing to any evidence) to avoid a heightened level of scrutiny by suggesting that Cradle of Liberty is free to "discriminate to their hearts' content other than in connection with the subsidized use of city property."  City MSJ at 69-70.  But as the evidence demonstrates, the City has never limited its demand to Cradle of Liberty repudiating the leadership policy only for staff members who work within the headquarters building at 22nd and Winter.  The City demands that Cradle of Liberty repudiate the Boy Scouts' leadership policy for *all* Scout leaders under its purview, not simply those who work on City property.  *E.g.*, Ex. 5 to Scott Decl. (July 20, 2006 Letter from Romulo L. Diaz to William T. Dwyer, III).  It has never once stated that Cradle of Liberty was

free to have another type of membership policy for activities outside of its headquarters as long

as it adhered to the City's viewpoint within the building.  The City's flippant comment in its

memorandum about Cradle of Liberty being free to "discriminat[e] to their hearts' content" does

not change the evidence in this case.

> ### c.   The City's Condition Is Neither Reasonable Nor Viewpoint Neutral Because It Is Based Solely Cradle of Liberty's Constitutional Protected Membership Policy.

Even without heightened scrutiny, the City's argument still fails.  The condition that the

City is placing on Cradle of Liberty's continued participation in its Fairmount Park program

relies exclusively on the City's disagreement with the membership policy for Scout programs.

*See* City MSJ 72-74.  When it opposed Cradle of Liberty's motion for a preliminary injunction,

the City also justified its actions as an effort to promote its policy of nondiscrimination.  City PI

Opp. at 9-10 ("[T]he City's requirement that entities receiving subsidies not engage in illegal

discrimination on City property which they were enjoying rent-free is a reasonable means to

discourage harmful conduct to City residents injured by acts of discrimination and not to

suppress the COL's freedom of expression.").  In considering that argument, the Court noted:

> Having concluded the possible compromising of a First Amendment right, which the testimony at the hearing supports, here again, no evidence has been offered as to the scope of the condition.  At this point the record only supports that the sole basis for termination is [Plaintiff's] policy.  As noted in the prior memorandum, the scope of the condition appears to be narrow.  Again, even assuming a narrow scope, evidence with respect to viewpoint neutrality and reasonableness is missing.

PI Opin. at 4-5.  That evidence is still missing – glaringly so.  As Cradle of Liberty demonstrated

in its motion for summary judgment, the proposed restriction here is neither reasonable nor

viewpoint neutral.  *See* COL MSJ at 18-23.

**C.      The City Is Not Entitled to Summary Judgment on Its Counterclaims.**

For the reasons stated above, the City has violated Cradle of Liberty's Equal Protection rights under the Fourteenth Amendment and its Free Speech rights under the First Amendment doctrines of viewpoint discrimination and unconstitutional conditions.  Because the City has violated Cradle of Liberty's rights, it cannot proceed on any eviction action and is not entitled to any amount of back rent.  As Cradle of Liberty argued fully in its own motion for summary judgment, it is the only party entitled to summary judgment.

The Court should deny the City's motion for summary judgment on both of its counterclaims.

**IV.     <u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff Cradle of Liberty respectfully requests that this Court deny Defendant City of Philadelphia's motion for summary judgment.

Respectfully submitted,

Dated: March 29, 2010

/s/ Jason P. Gosselin
Jason P. Gosselin
William M. McSwain
Daniel B. Scott
Richard M. Haggerty
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103

*Counsel for Plaintiff Cradle of
Liberty Council, Inc., Boy Scouts of
America*

## CERTIFICATE OF SERVICE

I, Richard M. Haggerty, hereby certify that on this day I caused a true and correct copy of the foregoing Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Memorandum in Opposition to Defendant City of Philadelphia's Motion for Summary Judgment, Proposed Order, Declaration of Richard M. Haggerty and Declaration of William T. Dwyer, III, in Support Thereof, to be filed electronically, such that it is available for viewing and downloading from the ECF system, and to be served thereby upon counsel listed below:

> David Smith, Esquire
> Stephenie W. Yeung, Esquire
> Rebecca Lacher, Esquire
> Schnader, Harrison, Segal & Lewis, LLP
> 1600 Market Street, Suite 3600
> Philadelphia, PA  19103-7286

Dated:  March 29, 2010                          /s/ Richard M. Haggerty
                                                Richard M. Haggerty