**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CRADLE OF LIBERTY COUNCIL, INC.,
BOY SCOUTS OF AMERICA
22ND & Winter Streets
Philadelphia, Pennsylvania 19103

Plaintiff,

v.

CITY OF PHILADELPHIA
1515 Arch Street
Philadelphia, PA 19102

Defendant.

Civil Action No. 08-02429

**PLAINTIFF CRADLE OF LIBERTY COUNCIL, INC., BOY SCOUTS OF AMERICA'S REPLY MEMORANDUM TO DEFENDANT CITY OF PHILADELPHIA'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America ("Cradle of Liberty"), by and through its undersigned counsel, hereby submits this reply memorandum in further support of its motion for summary judgment. For the reasons set forth below, Cradle of Liberty respectfully requests that the Court grant its motion for summary judgment.

## I. INTRODUCTION

In order to punish the speech of Cradle of Liberty by revoking a benefit provided to numerous nonprofits and one that Cradle of Liberty has enjoyed since 1929, Defendant City of Philadelphia ("City") has violated the First and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution. There is no genuine issue of material fact on any of Cradle of Liberty's constitutional claims. As it argued extensively in its motion for summary judgment and its opposition to the City's motion for summary judgment, Cradle of Liberty has proven that the City has violated the Equal Protection

Clause of the Fourteenth Amendment as well as the First Amendment doctrines of viewpoint discrimination and unconstitutional conditions.

The City does not see it that way, but it is tough to see anything when your eyes are shut. In repeatedly refusing to acknowledge the evidence in front of it, the City is playing its own game of "out of sight, out of mind." Whether the evidence is the Colonial Dames' membership policy, the testimony of Barry Bessler or any other fact that inconveniences the City's arguments, the City's reaction is the same. It ignores the facts and argues that Cradle of Liberty can point to no evidence to support its claims. No matter how intently the City ignores the evidence in this case, however, it cannot erase it from existence.

As Cradle of Liberty has demonstrated in its motion for summary (with numerous citations to the factual record), there is no genuine issue of material fact on any of its constitutional claims. The Court should grant Cradle of Liberty's motion for summary judgment.

## II. ARGUMENT

### A. The City Has Violated Cradle of Liberty's Rights Under the First Amendment Doctrines of Viewpoint Discrimination and Unconstitutional Conditions.

Perhaps knowing that the evidence shows the City to have violated Cradle of Liberty's free speech rights under the First Amendment, the City attempts to argue that the First Amendment does not apply. This contention has no merit.

#### 1. The City Has Created A Forum.

In both its own motion for summary judgment and its response to the City's motion, Cradle of Liberty has demonstrated that the City's program of leasing Fairmount Park properties

to nonprofit organizations for free or for nominal rent constitutes a forum.[1] The City's contention that there is no forum, which simply rehashes its previously discredited arguments, should again be rejected.

As Cradle of Liberty pointed out in its opposition to the City's motion for summary judgment, the Court has already rejected the City's arguments that its program of leasing Fairmount Park properties is akin to the scholarship program at issue in *Locke v. Davey*, 540 U.S. 712 (2004). *See* COL Response at 25-26. The City contends that because it did not explicitly state that the purpose of its program was to "promote public discourse," it has not established a forum. The City is correct that it has not used those words to describe its program, but nonpublic forums are not created through the invocation of magic words. As Barry Bessler, the chief of staff to the executive director of Fairmount Park has testified, the City opens its Fairmount Park program to nonprofit organizations who do work that "benefits the community." Transcript of the Preliminary Injunction Hearing ("Inj. Tr."), Dkt. #37, dated Nov. 17, 2009, at 84:20-25; Mem. on Pl.'s Mot. Prelim. Inj. ("PI Opin."), Dkt. #29, dated Nov. 18, 2009, at 4.

This purpose is indistinguishable from the stated purpose of the University of Virginia in *Rosenberger v. Rector & Visitors of the University of Virginia*, where the U.S. Supreme Court found that the refusal of the University's Student Activities Fund ("SAF") to pay for the publication of a Christian magazine was unconstitutional. 515 U.S. 819, 829 (1995); *see also Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993) (finding it was viewpoint discrimination to exclude religious group because of its perspective from use of

---

[1] *See* Pl.'s Mot. Summ. J. ("COL MSJ"), Dkt. #49, dated March 1, 2010, at 5-7, 19-21; Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. ("COL Response"), Dkt. #85, dated March 29, 2010, at 26-28. Cradle of Liberty hereby incorporates by reference all arguments made and facts presented in support of its motion for summary judgment and in opposition to the City's motion for summary judgment.

school facilities open to social and other groups, even on assumption that forum is nonpublic). In *Rosenberger*, the purpose of the SAF was to fund a broad range of student organizations which "related to the educational purpose of the University" and "tend[ed] to enhance the University environment." *Rosenberger*, 515 U.S. at 825.

Here, the City cannot explain why its program is any different from the program in *Rosenberger*. When considering the City's motion to dismiss this claim, the Court found that Cradle of Liberty had sufficiently alleged that the City's "program or policy is a nonpublic forum." Mem. on Def.'s Mot. to Dismiss ("MTD Opin."), Dkt. #13, dated Sept. 25, 2008, at 17. Significantly, the Court also noted that "[i]mplicit in this allegation is that these groups often engage in speech." *Id*. Yet, for some reason, the City contends that "[t]he Boy Scouts' self-serving statement that '[e]ach of the organizations to whom the City leases property within Fairmount Park engages in speech' is a non-sequitor." Def.'s Mem. in Opp'n to Pl.'s Mot. Summ. J. ("City Response"), Dkt. #68, dated March 22, 2010, at 7-8 (internal citation omitted). In support of its motion for summary judgment, Cradle of Liberty provided examples of how some of these other groups engage in speech, demonstrating that the allegation recognized by the Court has factual support. *See* COL MSJ at 20-21.[2] The City's argument against the creation of a forum consists solely of its current contention that it did not intend to create a forum. Unfortunately for the City, arguments made in the course of litigation cannot retroactively change the facts.

---

[2] Later in its response memorandum, the City makes the following erroneous statement: "Instead, despite conceding that the mission statements of the Roman Catholic Church and SJU, which they attach as Exhibits 21 and 22, are offered only to show they are publicly available and not for their truth, the Boy Scouts' (sic) repeatedly rely on the content of these statements throughout their brief." City Response at 22. Contrary to the City's bizarre accusation, there is not one instance in Cradle of Liberty's brief where it contends that the content of Church's speech or SJU's speech is true. The fact that these groups engage in speech, however, is indisputable.

**2. The City's Attempts to Evict Cradle of Liberty Were Neither Reasonable Nor Viewpoint Neutral.**

Trying to refute an argument that was never made, the City states: "There is no evidence in the record to dispute the purpose of the City's subsidy – to both benefit the community at large and to ensure that City-owned properties are restored, preserved and maintained at minimal cost to the City." City Response at 9. Cradle of Liberty does not dispute these purposes and agrees they are reasonable. What is unreasonable is creating a forum for nonprofits who "benefit the community" and then unconstitutionally trying to suppress the viewpoint of a forum participant.

**a. Cradle of Liberty Has Shown that the City Has Not Imposed Its Compliance Requirement on All Fairmount Park Lessees.**

Cradle of Liberty has consistently shown that the City has enforced its supposed policy of nondiscrimination on no other participant in its Fairmount Park forum, which makes it difficult to take seriously the City's contention that "[t]he Boy Scouts offer no evidence, and indeed cannot offer evidence that the compliance requirement is not imposed upon all subsidy recipients." City Response at 9 (internal citation omitted).

The City's strategy appears to be that if it keeps saying there is no evidence, maybe the actual evidence will disappear. Without going into details that it has already presented numerous times, Cradle of Liberty has definitively shown that it is the only Fairmount Park lessee to endure the City's scrutiny regarding its membership policy. *See* Inj. Tr. at 101:6-102:18, 114:23-115:4; COL MSJ, Ex. 9 to the Declaration of Daniel B. Scott ("Scott Decl.") (Transcript of Deposition of Eleanor Penniman ("Penniman Dep.")), dated Jan. 6, 2010, at 37:17-38:6; COL MSJ, Ex. 12 to Scott Decl. (Transcript of Deposition of Barry Bessler ("Bessler Dep.")), dated Aug. 21, 2009, at 84:5-15, 114:23-115:4; COL MSJ, Ex. 13 to Scott Decl. (Transcript of

Deposition of Dominick DiJulia ("DiJulia Dep.")), dated Jan. 6, 2010, at 36:10-23. The City has not imposed its supposed policy on all forum participants; rather, it has imposed it on one.

**b. The Membership and Leadership Policies of the Boy Scouts Are Protected By The First Amendment.**

In denying the City's motion to dismiss Cradle of Liberty's constitutional claims, the Court noted: "In *Boy Scouts of Am. v. Dale*, the Supreme Court held that the 'Boy Scouts is an expressive association and that the forced inclusion of [a gay scoutmaster] would significantly affect its expression.' 530 U.S. 640 (2000). Thus, it is clear that Cradle's membership policy is a form of expression protected by the First Amendment, which may be impacted by the government action here." MTD Opin. at 16 n.4.

Completely disregarding the Court's statement, the City now argues that *Dale* does not apply to this case. The Court should reject this desperate argument.

**i. The City Has Acted to Unconstitutionally Suppress a Disfavored Viewpoint.**

The City contends that *Dale* does not apply to its actions to evict Cradle of Liberty because counsel for the Boy Scouts of America responded to a question at the *Dale* oral argument and noted that local governments might decide not to fund the Boy Scouts. City Response at 10. First, anything said during the *Dale* oral argument is irrelevant. The City's reference to oral argument in a case decided a decade ago highlights the City's desperation. Second, even if that oral argument somehow mattered, counsel for the Boy Scouts never said that local governments could *unconstitutionally* rescind long-held public benefits because they disagreed with the Boy Scouts' policy.[3]

[3] The City mischaracterizes the discussion during the *Dale* oral argument. That discussion concerned instances of government agencies signing agreements with Boy Scouts of America to be chartered organizations for Scouting, in which the agency would itself agree to promote Duty to God and the other moral values of the Scout

(Continued)

*Dale* established that the Boy Scouts' leadership policy is protected under the First Amendment. 530 U.S. at 656. The City is correct that "[n]othing in *Dale* challenges the established principle that a government may selectively fund a program to encourage certain activities it believes to be in the public interest." City Response at 11. Where the City errs is in concluding that it also has the power to remove a long-held public benefit from a private organization simply because it disagrees with that organization's viewpoint. The City's demonstrated failure to impose its supposed policy of nondiscrimination on groups other than Cradle of Liberty, along with its repeated *admissions* that it only acted to remove Cradle of Liberty because it disagreed with Cradle of Liberty's leadership policy, shows that this is viewpoint discrimination in violation of the First Amendment.[4]

**ii. The City's Actions Are Directed at Suppressing Speech.**

In arguing that it is not trying to regulate Cradle of Liberty's speech, the City quotes from *Dale* and then ignores the parts of the quoted language that do not support its arguments.

As the Supreme Court noted, "The freedom of expressive association . . . could be overridden by regulations adopted to serve compelling state interests, *unrelated to the suppression of ideas*[.]" *Dale*, 530 U.S. at 648 (emphasis added). Indeed, as shown above and

---

(Continued)

Oath and Law through the leaders selected by the agency/chartered organization. It has no bearing on this case because the City does not here speak itself through the participants in the forum it has created, but instead has a forum in which private nonprofits have all manner of individual speech and remain qualified to be in the forum because the qualification is simply providing a community benefit. *See* Transcript of Oral Argument at *14-15, 2000 WL 489419, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).

4 *See* City MSJ at 49 ("The City focused on the Boy Scouts' discriminatory policy of excluding participation on the basis of sexual orientation following the highly publicized *Dale* decision."); *id.* at 59 ("The Boy Scouts' membership policy is a marked departure from the City's inclusive message of equality and fair treatment. As such, the City may terminate its subsidy to the Boy Scouts in a legitimate and appropriate attempt to ensure that its message is clearly presented."). Indeed, the *only* reason offered by the City for its actions is its disagreement with Cradle of Liberty's viewpoint – a reason this Court has found to be illegitimate. *See* PI Opin at 4 ("[E]vidence of justification has not yet been presented to counter Plaintiff's allegations.").

as consistently admitted by the City, the City acted *because* it disagreed with Cradle of Liberty's viewpoint and its actions *are* related to the suppression of ideas. Again, the City points to cases involving local councils of the Boy Scouts where the government action was not found to be unconstitutional; however, as Cradle of Liberty pointed out in its response to the City's motion, the Second Circuit cautioned in *Boy Scouts of America v. Wyman*: "Both the nonpublic-forum and the unconstitutional-conditions cases hold, however, that it is not enough that a law appear viewpoint neutral on its face. A reviewing court must also determine that the rule is not a façade for viewpoint discrimination." 335 F.3d at 93 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,, 472 U.S. 788, 811-13 (1985)). The uncontroverted evidence that the City has enforced its supposed policy on no entity other than Cradle of Liberty, as well as the numerous statements confirming the City's reasons for its actions, shows that its actions are the very definition of viewpoint discrimination.

Enforcing the provisions of the Fair Practices Ordinance on Cradle of Liberty – especially when the City has shown no interest in enforcing it on any other nonprofit with a Fairmount Park lease – impacts Cradle of Liberty's right of expressive association. Even if a local government has an interest in preventing discrimination that is aimed at regulating conduct, the Supreme Court has warned that such interest must be weighed against the intrusion upon an organization's speech. *Dale*, 530 U.S. 568-69 (reviewing previous cases involving freedom of expressive association and noting that "[i]n these cases, the associational interest in freedom of expression has been set on one side of the scale, and the State's interest on the other."). In the case of a local Boy Scouts council, the scale must tip toward the Boy Scouts' right of expressive association:

> We have already concluded that a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would significantly burden the organization's

> right to oppose or disfavor homosexual conduct. The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' right to freedom of expressive association. That being the case, *we hold that the First Amendment prohibits the State from imposing such a requirement through the application of its public accommodations law*.

*Id*. at 659 (emphasis added). "[U]nder *Dale*, it is clear that the City could not outright require Cradle to change its membership policies." MTD Opin. at 23. Of course, under the doctrine of unconstitutional conditions, the government is also prohibited from imposing a condition to achieve a goal that the Constitution prohibits the government from achieving directly. *See id*. at 18 (citing *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (noting that a government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially his interest in freedom of speech.")). In sum, the City's enforcement of its Fair Practice Ordinance in this context amounts to an effort to suppress Cradle of Liberty's speech.

**c. The City Has Selectively Targeted Cradle of Liberty.**

With its eyes firmly closed, the City again refuses to acknowledge the obvious evidence when it tries to argue that it has not applied its antidiscrimination policies inconsistently.

When Cradle of Liberty filed its motion for summary judgment, it attached copies of leases between the City and six other organizations for Fairmount Park property, yet the City continues to make the ridiculous assertion that there is no support in the evidentiary record that the City subsidizes other organizations that exclude certain people from membership. *See* COL MSJ, Ex. 11, 14-19 to Scott Decl. Furthermore, representatives of both Saint Joseph's University ("SJU") and the Colonial Dames of America, Chapter II ("Colonial Dames") confirmed that the City has never scrutinized their membership policies in connection with their leases. *See* COL MSJ at 13-16.

In the memorandum in support of its motion for summary judgment and its response to the City's motion, Cradle of Liberty has demonstrated that the City selectively targeted Cradle of Liberty for enforcement of its supposed policy. COL MSJ at 21-22; COL Response at 28-31. At this point, the City's continued misrepresentation of the factual record is rather tiresome.[5]

### 3. The City Imposed an Unconstitutional Condition Upon Cradle of Liberty's Continued Occupancy of its Headquarters.

The City begins its "argument" on Cradle of Liberty's unconstitutional conditions claim with this paragraph:

> The Boy Scouts build their argument on a false hypothetical: that the City has "demanded that [they] repudiate [their] constitutionally protected leadership policy, conditioning continued use of its headquarters on this change" and therefore has violated their First Amendment rights under *Dale*. Boy Scouts Br. Summ. J. 23. As discussed above, *Dale* is inapplicable and the facts are otherwise. The City gave the Boy Scouts the choice of either not discriminating in connection with their rent-free occupancy of the City property or paying fair market rent for the City property so that the City would not be subsidizing discriminatory conduct.

City Response at 16. What the City states in the last sentence of that paragraph is *exactly* what Cradle of Liberty has pointed out to be a violation of the First Amendment doctrine of unconstitutional conditions. That admission goes to the heart of this case. The City imposed an unconstitutional condition on Cradle of Liberty's continued occupancy of its headquarters: repudiate its protected leadership policy or lose the long-held benefit. That is unconstitutional – plain and simple. The only "false hypothetical" is in the City's imagination.

---

[5] Again, the City refuses to acknowledge the testimony of its own witness, Barry Bessler, simply because his testimony exposes the hollowness of the City's argument. Mr. Bessler's testimony that the City does not even know if any other organizations are following the City's policy of nondiscrimination, because the City has never bothered to check, confirms that the City only acted to suppress Cradle of Liberty's viewpoint. *See* Inj. Tr. 114:23-115:4.

**a. The Court Should Apply a Heightened Standard of Scrutiny.**

The Court has framed the "coherent analytical framework" for an unconstitutional conditions claim in the following way:

> The first question is whether the government's condition compromises a First Amendment right. The next question is the scope of the condition. If the condition seeks to limit the use of the government subsidy only, and the condition does not impose a penalty beyond the withdrawal of the subsidy itself, then the condition need merely be reasonable and viewpoint neutral. If the condition, on the other hand, is broader in scope, a heightened level of scrutiny may be applied.

MTD Opin. at 22. The City now tries to avoid a heightened level of scrutiny by saying that it is only asking Cradle of Liberty to repudiate its leadership policy for activities "in connection with [its] use of City property." City Response at 16-17. But the City never explains what "in connection with their use of City property" means. For example, Cradle of Liberty uses its headquarters building as office space for personnel who operate ScoutReach, its program for providing Cub Scouting to the hardest-to-reach boys in the most impoverished parts of Philadelphia. *See* Declaration of William T. Dwyer, III, in Support of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Opposition to Defendant City of Philadelphia's Motion for Summary Judgment ("Dwyer Decl."), ¶ 17. Is the City asking for the personnel who work in the building to repudiate the policy, or is it asking for all ScoutReach leaders to repudiate it because ScoutReach is "connected" to City property? Further, one letter cited by the City sought "assurances that the Boy Scouts will not *while headquartered on City property*, discriminate in violation of City policy[.]" *See* City Response (citing Ex. 36 to the Affidavit of Rebecca Lacher (July 20, 2006 Letter from Romulo L. Diaz to Sandra A. Girifalco)). That language suggests that any Scout Leader connected with Cradle of Liberty must repudiate the policy as long as Cradle of Liberty remains in its headquarters building.

The City cannot avoid a heightened level of scrutiny simply by being intentionally vague about its demands at this late date. As Cradle of Liberty has noted, numerous letters from the City made no mention of activities "in connection with the use of City property." *See* COL Response at 32-34.[6] Most importantly when the Philadelphia City Council passed a resolution to evict Cradle of Liberty, it made no mention of any limitation on the City's demand that Cradle of Liberty repudiate its leadership policy:

> RESOLVED, BY THE COUNCIL OF THE CITY OF PHILADELPHIA, That termination of the arrangement with the Boy Scouts, whereby the Boy Scouts occupy City land and a City building located at 22nd and Spring Streets, is hereby approved, subject to withdrawal upon agreement by the Boy Scouts to pay fair market rent *or the Boy Scouts ending its discriminatory policy and practice*.

COL MSJ, Ex. 6 to Scott Decl. (Resolution No. 070522 of the Council of the City of Philadelphia, dated May 31, 2007, authorizing ejectment of Cradle of Liberty, COL-0223-226 ("Resolution No. 070522")). There is not one mention in the entire resolution that the City's demand is limited to activities "in connection with use of the building." *See id*. Contrary to any litigation-driven explanations the City may now offer, its demand was that Cradle of Liberty repudiate its policy as long as it occupied its headquarters building at 22nd and Winter Streets. Any nebulous limitation regarding activities "in connection with use of the building" cannot save the City from heightened scrutiny.

---

6 *See, e.g.,* COL MSJ, Ex. 5 to Scott Decl. (July 20, 2006 Letter from Romulo L. Diaz to William T. Dwyer, III), Ex. 7 to Scott Decl. (June 1, 2007 Letter from Romulo L. Diaz to Sandra A. Girifalco); Ex. 8 to Scott Decl. (May 6, 2008 Letter from Shelley R. Smith to Sandra A. Girifalco).

### B. Cradle of Liberty Has Proven a Violation of the Fourteenth Amendment's Guarantee of Equal Protection.

The City's blatant refusal to acknowledge the evidence permeates its First Amendment arguments. Its refusal to acknowledge the evidence in the context of Equal Protection, however, is even more ludicrous.

#### 1. The City Applied a Clear Standard in Granting Leases for Fairmount Park Property to Nonprofit Organizations.

As Cradle of Liberty demonstrated in its motion for summary judgment, the City employs a specific process and applies a clear standard in granting Fairmount Park leases to nonprofit organizations for nominal rent. See COL MSJ at 5-7; *see also* COL Response at 10-13.

To obtain the use of a Fairmount Park building, the entity must demonstrate that the proposal involves an "acceptable community use." Mr. Bessler confirmed that if a nonprofit organization followed the specific procedures for obtaining use of a Fairmount Park property and the proposed use was "something that the Fairmount Park Commission believes benefits the community at large," that organization would meet the City's standard. Inj. Tr. at 79:2-6. In addition, Mr. Bessler testified that Cradle of Liberty met this clear standard:

> Q: And the use that the Cradle of Liberty Council [made of] the building, is that something that was compatible with the Fairmount Park Commission's standards throughout the time that they've occupied the building?
>
> A: Yes.

Inj. Tr. at 112:18-22.

In claiming that the City does not employ a clear standard, the City again ignores Mr. Bessler's inconvenient testimony and erroneously claims that Cradle of Liberty points to no evidence. In reality, Cradle of Liberty only points to evidence that the City does not like.

**2. The City Has Treated Cradle of Liberty Differently Than Similarly Situated Entities.**

As Cradle of Liberty has demonstrated and as the Court recognized at an earlier stage of this litigation, Cradle of Liberty can definitively show that it is similarly situated to other nonprofit organizations with Fairmount Park leases. *See* PI Opin. at 3 ("Defendant argues that Plaintiff has not presented facts to find entities similarly situated, but the court disagrees. The Fairmount Park Lessees shown in Exhibit 15 and specifically, 17, 18, 19, 20 and 21 support the similarly situated argument of Plaintiff.").

**a. Saint Joseph's University**

The City argues that Cradle of Liberty has not shown that SJU has comparable speech, because Cradle of Liberty focused on the membership policy of the Society of Jesus. However, as SJU's designee testified, "We are, first, a university. We are Catholic. And its founding was inspired by the principles of the Society of Jesus, known as the Jesuits." DiJulia Dep. at 32:5-9.

To the City, the fact that women and homosexuals cannot serve as Catholic priests is immaterial, because the City's lawyers could only count 17 Jesuits on SJU's Web site. City Response at 22. This peculiar argument is similar to the City's contention that Colonial Dames is not similarly situated to Cradle of Liberty because it limits its "exclusive use" to only a portion of Lemon Hill Mansion. *See* City MSJ at 39. In the City's view, these particular facts – which in reality have nothing to do with whether these organizations are similarly situated – are sufficient reasons to overlook the groups' exclusionary membership policies.

Moreover, as Cradle of Liberty stated in its opposition to the City's motion for summary judgment, of the approximately 56,000 youth who participated in Cradle of Liberty's programs in Philadelphia last year, about 50,000 were public school children who participated in Learning for Life rather than a Scout program. Dwyer Decl. at ¶ 17. Learning for Life does not require

adherence to the Scout Oath and Law. *Id*. at ¶ 24. The contention that SJU gets a free pass from City scrutiny because there are only 17 Jesuits on its Web site – but that Cradle of Liberty is an object of scrutiny even though most of its work within city limits is focused on Learning for Life – makes absolutely no sense.

**b. Colonial Dames of America**

In its memorandum supporting its motion for summary judgment, Cradle of Liberty spent two pages showing that Colonial Dames is similarly situated to Cradle of Liberty. *See* COL MSJ at 11-13. After making nonsensical arguments about why Colonial Dames is not similarly situated in its own motion, *see* City MSJ at 38-40, the City has apparently abandoned this lost cause and has included no substantive argument on Colonial Dames in its response brief.

To recap, Colonial Dames, which has a lease with the City for the rent-free occupancy of Lemon Hill Mansion, limits membership to "women legitimately descended from an ancestor of worthy life who within the period beginning with the settlement of Jamestown, Virginia, May 13, 1607, and extending to but not including the Battle of Lexington, April 19, 1775, served one or more of the thirteen original Colonies by: (a) Holding public office, (b) Holding a commission in the armed forces, or (c) Serving in any capacity specified in the Eligibility List of the Society." Ex. 10 to Scott Decl. (Colonial Dames Certificate of Incorporation and By-Laws) at 3; Penniman Dep. at 20:17-21:14. The City has never contacted the Colonial Dames regarding its membership policy and the group's lease to occupy Lemon Hill Mansion. Penniman Dep. at 37:17-38:6; Bessler Dep. at 84:5-15, 118:9-13.

**c. Other Similarly Situated Entities**

The City contends that, at best, Cradle of Liberty has established that "(a) the City was aware of the Boy Scouts' discriminatory policy in their use of City-owned property; (b) the City

was not aware of any other subsidy recipient having a discriminatory policy; and (c) the City was likewise unaware of another subsidy recipient using the City-owned property in a discriminatory manner." City Response at 24. The City's attempt to avoid an Equal Protection violation does not hold up.

The City's avoidance of inconvenient evidence is again on display as it skips over the Colonial Dames' membership policy, the Code of Canon Law's prohibition on female priests, and Mr. Bessler's testimony that the City has never considered examining any other group's membership policy. *See* COL Response at 20-21. That the City bowed to political pressure from a vocal interest group and moved to evict Cradle of Liberty after the Supreme Court found that the Boy Scouts' leadership policy was protected under the First Amendment does not prove that Cradle of Liberty was a fairly distinguishable entity from the other nonprofits in the leasing program. *See* COL Response at 21-23. It shows just the opposite: that the City acted solely to suppress Cradle of Liberty's disfavored viewpoint while ignoring groups that were not opposed by any political factions.

**3. The City Had No Rational Basis for the Differential Treatment of Cradle of Liberty.**

In every argument it has made in this case, the City's sole explanation for its attempted eviction of Cradle of Liberty is its disagreement with the Boy Scouts' leadership policy. Punishing a group for exercising its constitutional rights cannot serve as a rational basis for treating it differently from similarly situated entities, yet the City has never offered any other explanation. *See* MTD Opin. at 13-14 ("[E]ven if this Court assumes that there was a legitimate government interest for ending subsidized use of city properties to those who engage in discrimination, there is still the question of selective enforcement – why did the City target Cradle specifically?"); PI Opin. at 3-4 ("Defendant then argues that even if Plaintiff can establish

the 'similarly situated' issue, it fails to demonstrate that there is no rational basis. However, the City has offered no evidence to contradict the reason alleged by Plaintiff; namely, to punish Plaintiff for its policy. While there may be legitimate justification, Defendant has yet to present evidence to support that position.").

In the almost two years since Cradle of Liberty filed its complaint, the City has never offered a rational basis that extended beyond its disagreement with Cradle of Liberty's policy. In fact, it has even admitted that it "focused on the Boy Scouts' discriminatory policy of excluding participation on the basis of sexual orientation following the highly publicized *Dale* decision." City MSJ at 49. The suppression of constitutional rights is not a rational reason for treating similarly situated entities differently. *See* COL MSJ at 28-30; COL Response at 22-24. Cradle of Liberty is entitled to summary judgment on its Equal Protection claim.

## III. CONCLUSION

For the foregoing reasons, Plaintiff Cradle of Liberty respectfully requests that this Court grant its motion for summary judgment.

Respectfully submitted,

Dated: April 5, 2010

/s/ Jason P. Gosselin
Jason P. Gosselin
William M. McSwain
Daniel B. Scott
Richard M. Haggerty
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103

*Counsel for Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America*

**CERTIFICATE OF SERVICE**

I, Richard M. Haggerty, hereby certify that on this day I caused a true and correct copy of the foregoing Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America's Reply Memorandum to Defendant City of Philadelphia's Opposition to Plaintiff's Motion for Summary Judgment to be filed electronically, such that it is available for viewing and downloading from the ECF system, and to be served thereby upon counsel listed below:

David Smith, Esquire
Stephenie W. Yeung
Rebecca Lacher, Esquire
Schnader, Harrison, Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Dated: April 5, 2010

/s/ Richard M. Haggerty
Richard M. Haggerty