IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRADLE OF LIBERTY COUNCIL, INC.,        :
BOY SCOUTS OF AMERICA,                   :
                                         :
            Plaintiff,                   :        CIVIL ACTION
                                         :
      v.                                 :        NO. 08-2429
                                         :
CITY OF PHILADELPHIA,                    :
                                         :
            Defendant.                   :

## ORDER

AND NOW, this _____ day of _____, 2010, upon consideration of Defendant City of Philadelphia's Motion for Summary Judgment, the opposition of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America, and the City's reply memorandum in support of its motion, it is hereby ORDERED THAT Defendant's motion is GRANTED and judgment is entered in favor of Defendant on all counts of the Complaint and Defendant's Counterclaims.  It is hereby ORDERED THAT Plaintiff vacate Defendant's property by _____, 2010 and pay Defendant the sum of $_____ for their wrongful occupancy and possession of Defendant's property.

BY THE COURT:

_____

Buckwalter, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRADLE OF LIBERTY COUNCIL, INC., :
BOY SCOUTS OF AMERICA, :
 :
 Plaintiff, :  CIVIL ACTION
 :
 v. :  NO. 08-2429
 :
CITY OF PHILADELPHIA, :
 :
 Defendant. :

_____

**REPLY MEMORANDUM OF DEFENDANT CITY OF PHILADELPHIA
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

_____

The City is not required to subsidize the undisputed discrimination of the Cradle

of Liberty Council, Inc., Boy Scouts of America ("Boy Scouts") against gay and atheist youth

and adults.  The evidence in the record overwhelmingly establishes that the Boy Scouts fail to

meet their burden of establishing the necessary elements of a class of one equal protection claim

and similarly fail to prove their first amendment claims.[1]  The Boy Scouts do not raise any

genuine issue of material fact that could defeat the City's summary judgment motion.

The Boy Scouts' inflammatory rhetoric in their response brief opposing the City's

motion for summary judgment (Dkt. 85) ("Boy Scouts Resp. Br.") and their reply brief in

_____

[1] The City incorporates by reference its arguments and facts set forth in its Memorandum
in Support of its Motion for Summary Judgment (Dkt. 59) ("City Br. Summ. J."),
Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 68)
("City Resp. Br.") and Response to Plaintiff's "Statement of Undisputed Material Facts"
(Dkt. 68-1).

support of their motion for summary judgment (Dkt. 91) ("Boy Scouts Reply Br.") fails to refute the City's record evidence and legal support establishing the City's right to summary judgment.[2] As this Court has noted, inappropriate *ad hominem* attacks "do not compensate for sworn affidavits [or] competent evidence." *Di Loreto v. Costigan*, 600 F. Supp. 2d 671, 692 (E.D. Pa. 2009).

## ARGUMENT

### I.      Learning for Life is Irrelevant Other Than to Demonstrate the Boy Scouts' Discrimination Against Gay and Atheist Youth

The Boy Scouts spend significant portions of their brief attempting to establish irrelevant facts-- the good deeds of Learning for Life,  "a separate corporation affiliated with the Boy Scouts of America" ("BSA") with allegedly "separate accounts, books, and records and financial statements" from the Boy Scouts, and the service the Boy Scouts provide to select members of the public.  Boy Scouts Resp. Br. at 4-9.

If Learning for Life was the lessee of the city-owned property, and if the Learning for Life program does not, as the Boy Scouts assert, discriminate in violation of the City's laws and policies, the question of an alleged right to a government subsidy for their discriminatory conduct would not be before this Court.  Regardless, as the Boy Scouts themselves noted just

---

[2]      For example, the Boy Scouts gratuitously and misleadingly accuse the City of filing its affidavits in support of its motion for summary judgment "one day beyond the summary judgment deadline" as a part of an equally gratuitous snide remark about the length of the City's submission.  Boy Scouts Resp. Br. at 1 n.1. The electronic filing system did not accept the affidavits as attachments to the City's motion for summary judgment, filed at 11:56 p.m.  As soon as counsel for the City noted the affidavits had not attached, counsel re-filed the affidavits at 12:01 a.m.

after filing their complaint, "this case is not about the merits or the importance of the Scouting

program in the city."  BSA Today Building Statement, available at

lflexpore.org/openrosters/ViewNewsletters.asp and http://pack240.org/pages/fromcouncil.htm

(last visited March 31, 2010).  Indeed,  this case presents the issue of whether the City must

subsidize the Boy Scouts who openly discriminate against gays and atheists in their rent-free

occupancy of City-owned property.

The Boy Scouts' description of Learning for Life only serves to highlight the Boy

Scouts' own discrimination against gay and atheist youth.  The Boy Scouts distinguish Learning

for Life by noting that its employees "*are not* required to adhere to the Scout Oath and Law" and

its "programs are open to *any youth*" and are  "open to *all* public school children."  Boy Scouts

Resp. Br. at 8, 13 (emphasis added).  The Boy Scouts further confirm their discrimination against

gay and atheist youth by their gaping omission of any response to the City's argument that the

Boy Scouts' discrimination is not, as they attempt to assert, limited to their "leadership policy"

and that the Supreme Court's opinion in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), is

inapplicable because it applies only to the leadership policy and not to youth members.

**II.    The City is Entitled to Summary Judgment Because the Boy Scouts Have Failed to Show a Genuine Issue for Trial on their Class of One Equal Protection Claim and Fail to Point to Record Evidence Supporting The Necessary Elements of Their Claim.**

As set forth in the City's memorandum in support of its motion for summary

judgment and the City's memorandum in opposition to the Boy Scouts' summary judgment

motion, incorporated herein, the Boy Scouts have clearly failed to establish the necessary

elements of their equal protection claim.

A.   **The City's Standards for Providing Rental Subsidies Are Based on Discretionary, Individualized Determinations That Cannot Support a Class of One Equal Protection Claim.**

The Boy Scouts ignore the Supreme Court standards governing class of one equal protection claims and confuse the existence of clear factors for non-discretionary decision making.  As the City set forth in its memorandum in support of its motion for summary judgment at pages 33-36, the Supreme Court and Courts of Appeals require a class of one equal protection plaintiff to prove "the existence of a clear standard against which departures . . . could be readily assessed."  *Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146, 2153 (2008).  Class of one equal protection claims do not apply to state action that involves "discretionary decision-making based on a vast array of subjective, individualized assessments."  *Id.* at 2154.

Fairmount Park's process for evaluating a non-profit entity's application to occupy city-owned property for no or nominal rent is not disputed.  *See* City Br. Summ. J. at 4-9, 34-36.  Indeed, the Boy Scouts concede, as they must, the multitude of factors that are considered by the Fairmount Park staff, including whether the proposed use is "'within the mission of Fairmount Park and an acceptable community use'" and is consistent with the "'goals of Fairmount Park.'"  Boy Scouts Resp. Br. at 11-12 (quoting Barry Bessler's testimony).

Contrary to the Boy Scouts' assertion, the City does not ignore Mr. Bessler's testimony, but relies upon it to demonstrate the individualized, discretionary nature of the decision to grant or deny subsidized occupancy of city-owned property.  Citing Mr. Bessler's testimony, the City established that the executive director and senior staff of Fairmount Park discuss each application "with everyone at the table having *input from their particular and appropriate perspective*."  Affidavit of Rebecca Lacher (Dkt. 60) ("Lacher Aff.") Ex. 2,

Deposition of Barry Bessler, dated Aug. 21, 2009 ("Bessler Dep.") at 41:21-42:14 (emphasis added). That discussion results in a discretionary recommendation by the executive director. Until July 1, 2009, the final decision to grant or deny an application was at the discretion of the individual votes of the sixteen board members of the Fairmount Park Commission. Since that date, the applications are subject to approval at the sole discretion of the Commissioner of Parks and Recreation. City Br. Summ. J. at 8.

The Boy Scouts reliance on Mr. Bessler's testimony is misplaced. Boy Scouts Resp. Br. at 13. Mr. Bessler testified only that the Boy Scouts' use of the City-owned property as a headquarters would be compatible with the Fairmount Park Commission's standards. He clarified elsewhere that the purpose of opening City-owned properties for occupancy by non-profit groups is to "provide an opportunity for those organizations to have a, a headquarters, a place to conduct their business *and assuming that that business again is for the benefit of the community at large and in keeping with the mission of the Fairmount Park Commission*." Lacher Aff. Ex. 3, Transcript of Nov. 17, 2009 Preliminary Injunction Hearing ("Inj. Tr.") (Testimony of Barry Bessler ("Bessler Test.")), at 105:4-11 (emphasis added).

The determination of whether a proposed use is "an acceptable community use," is for the "benefit of the community at large," and is within the mission of Fairmount Park is exactly the sort of "discretionary decision-making based on a vast array of subjective, individualized assessment" that cannot support a class of one equal protection claim. *See Engquist*, 128 S. Ct. at 2154. The City's motion for summary judgment should therefore be granted.

**B.      The Boy Scouts Cannot Meet Their Burden of Demonstrating Similarly Situated Entities Who Were Treated Differently.**

As the Third Circuit noted, a plaintiff "must do more than simply *allege* the existence of similarly situated [entities] and argue that [defendant] failed to disprove it discriminated against [plaintiff].  Rather, [plaintiff] must *produce evidence* of similarly situated [entities] that were treated differently from [plaintiff]."  *Young v. Township of Coolbaugh*, 276 Fed. App'x 206, 209 (3d Cir. 2008) (emphasis added) (upholding summary judgment against plaintiff).  The Boy Scouts tortured presentation of the facts and unsupported assumptions fail to meet this requirement.

"'Persons are similarly situated under the Equal Protection Clause when they are alike *in all relevant aspects*.'"  *Municipal Revenue Servs., Inc. v. McBlain*, 347 Fed. App'x 817, 825-26 (3d Cir. 2009) (emphasis added) (affirming summary judgment in favor of defendant and upholding district court finding that entities were "not 'alike in all relevant aspects'") (quoting *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (affirming summary judgment for City and Philly Pride and finding appellants failed to show they were similarly situated to Philly Pride volunteers because they were attendees of National Coming Out Day with no relationship to event organizers and disobeyed police orders)).  *See also,* City Br. Summ. J. at 36-37; *Mosca v. Cole*, 217 Fed. App'x 158, 164 (3d Cir. 2007) (finding plaintiff was not similarly situated to an individual investigated for sexual harassment where plaintiff was alleged to have made a derogatory racial comment outside the workplace).

The Boy Scouts resort to false assertions, hearsay, and a contortion of evidence in their attempt to define Saint Joseph's University ("SJU") and the Colonial Dames as similarly situated to themselves.  Contrary to the Boy Scouts' erroneous assertion, the admissible evidence

in the summary judgment record is not that "SJU clearly 'permits discrimination' on the basis of

religion, sex, and sexual orientation."  Boy Scouts Resp. Br. at 16.  Instead, as the Boy Scouts

concede just two pages earlier, SJU, unlike the Boy Scouts, committed in writing not to

"discriminate or permit discrimination against any person because of race, color, religion,

national origin, sexual orientation, sex, ancestry or disability."  *Id.* at 14; Lacher Aff. Ex. 18, SJU

Ground Sublease at § 22.1.  Furthermore, SJU's deponent, Dominick DiJulia, testified that SJU

(again unlike the Boy Scouts) does not discriminate on the basis of sexual orientation or religion

(among other factors) in SJU's leadership positions, the use of the city-owned property or the

rowing programs it provides at the city-owned property.  Lacher Aff. Ex. 4, Deposition of

Dominick DiJulia, dated January 7, 2010 ("SJU Dep.") at 29:9-30:9, 46:9-25, 49:15-55:18.  The

Boy Scouts' arguments -- unsupported by any admissible evidence in the summary judgment

record-- regarding the discrimination of the Society of Jesus and the Roman Catholic Church's

policy of excluding practicing homosexuals from the seminary do not refute SJU's written

commitment and sworn testimony, both of which are in the summary judgment record, that *SJU*

does not discriminate.  *See* City Resp. Br. at 22-23.

        Similarly, the Boy Scouts' dismissive rhetorical, "So what?"  fails to refute the

substantial differences between themselves and the Colonial Dames.  Boy Scouts Resp. Br. at 18.

As the City established (by admissible evidence) in its memoranda in support of its motion for

summary judgment and in opposition to the Boy Scouts' motion for summary judgment, the

Colonial Dames open the city-owned property to *all* members of the public.  City Br. Summ. J.

at 39-40; City Resp. Br. at 14.  Indeed, the provision of educational programming to "*any student*

*who would like to enter*" (*id.* at 19, emphasis added) is the salient difference between the

Colonial Dames and the Boy Scouts, who exclude gay and atheist youth and adults.

The Colonial Dames' use of a small portion of the property does not, as the Boy Scouts argue, imply that proportionate discrimination is permitted.  Instead, the distinction in the use of the City-owned properties illustrates the substantial difference between the Boy Scouts and the Colonial Dames.  While the Boy Scouts utilize the entire 19,000 square foot property for their exclusive use as a private headquarters, the Colonial Dames keep one filing cabinet in the basement and use just one corner of the kitchen, opening nine rooms of the house to the public on a non-discriminatory basis in keeping with the mission of Fairmount Park.  *See,* City Br. Summ. J. at 39; Lacher Aff. Ex. 5, Deposition of Eleanor Penniman, dated Jan. 6, 2010 ("Col. Dames Dep.") at 80:12-13.  Moreover, while the "Colonial Dames" themselves are by definition women descended from an ancestor who, between 1607 and 1775, served one of the thirteen original colonies (*id.* at 21:2-14), they broaden their membership with a diverse, non-discriminatory adjunct board, Friends of Lemon Hill, that shares responsibilities for the funding and operations of the City property.  Col. Dames Dep. at 31:24-32:8.   Moreover, The Colonial Dames non-discriminatory practice is demonstrated by their African American house director, whom they describe as their "best asset at Lemon Hill," and their employment of gay caretakers. *See,* City Br. Summ. J. at 38-40; Col. Dames Dep. at 56:6-10.

The Boy Scouts point to the names of the lessees in Exhibits 17-21 of the preliminary injunction hearing record, noted in the Court's opinion addressing the Boy Scouts' motion for a preliminary injunction.  Boy Scouts Resp. Br. at 14.  The Boy Scouts cannot rest on their *assumptions* at the summary judgment stage, but must provide admissible evidence of discriminatory conduct.  *See Boy Scouts of America v. Wyman,* 335 F.3d 80, 96-97 (2d Cir.

2003), discussed at City Resp. Br. at 23-24.  The Boy Scouts have deliberately failed to do that,[3]
and for that reason, their inferences must be rejected.

Finally, the Boy Scouts attempt to distinguish the lack of complaints against any
other subsidy recipient as a "frivolous" and meaningless distinction.  Boy Scouts Resp. Br. at 20-
21.  However, the case law is to the contrary.  *See* City Br. Summ. J. at 41-42 (discussing *Lerch
v. City of Green Bay*, 218 Fed. Appx. 502, 504 (7th Cir. 2007) and *Griffin Indus., Inc. v. Irvin*,
496 F.3d 1189, 1206 (11th Cir. 2007)).  As noted above and in the City's briefs, the Boy Scouts
have the burden of proving similarly situated entities who are "alike *in all relevant aspects*."
Complaints received against one entity and not another, especially where the City has limited
resources to investigate the discriminatory policy and conduct of over one hundred subsidized
lessees,[4] is a distinguishing factor, even if it is just one of many factors that render the Boy
Scouts distinct from any other allegedly similarly situated subsidy recipient.

---

[3]     The Boy Scouts did not take discovery from the Women for Greater Philadelphia (Ex.
       18), the Royal Heritage Society of Delaware Valley (Ex. 19), the Philadelphia Girls
       Rowing Club (Ex. 20), and the Roman Catholic Church (Ex. 21).

[4]     The Boy Scouts erroneously dismiss the City's assertion that it has limited resources and
       has not yet completed its review of the hundreds of leases and license agreements for
       compliance with City law and policy.  Even if the testimony of the Deputy Commissioner
       of the City Department of Public Property, John Herzins, is deemed irrelevant, the City
       points to other record evidence supporting the City's limited resources and efforts to
       review its subsidy recipients, including Mr. Bessler's testimony that Fairmount Park
       "will, *to the extent that [its] resources allow*, conduct property management reviews of
       [its] tenants."  Bessler Dep. at 216:18-22 (emphasis added); City Br. Summ. J. at 50.

C.   **The Boy Scouts Fail to Prove That the City's Termination of the Boy Scouts' Subsidy Was Not Rationally Related to the City's Unquestionably Legitimate Interest in Enforcing its Nondiscrimination Laws and Policies**

The Boy Scouts fail to meet their "burden of negating every conceivable basis which might support [the City's rationality]." *Montanye v. Wissahickon Sch. Dist.*, 399 F. Supp. 2d 615, 622 (E.D. Pa. 2005), *aff'd*, 218 Fed. App'x 126 (3d Cir. 2007)*. See also, Eichenlaub v. Township of Indiana*, 214 Fed. App'x 218, 225 (3d Cir. 2007) (finding plaintiff failed to meet the "heavy burden of demonstrating that [defendant] had *no* rational justifications for any allegedly different treatment among similarly situated [entities]").

The Boy Scouts' reference to the "supposed" nondiscrimination laws and policies of the City do not refute the unquestionable legitimacy of the City's interest in protecting its citizens from discrimination. *See* City Br. Summ. J. at 44-49.  Instead, the Boy Scouts erroneously argue the City has not provided a legitimate reason for *enforcing* its nondiscrimination policy against the Boy Scouts.  However, the City, in its memorandum in support of its motion for summary judgment, clearly set forth its rational, legitimate reasons for investigating the Boy Scouts' discrimination against gay and atheist youth and adults -- discrimination to which the Boy Scouts openly admit -- which violates City law and policy.  City Br. Summ. J. at 49-50.  *See also,* City Resp. Br. at 24-27.  Indeed, it would be *irrational* for the City *not* to investigate the Boy Scouts' policy and practice of discrimination against gay and atheist youth and adults in light of: (1) the national press coverage of the Boy Scouts' discriminatory conduct and policies; (2) the City's knowledge of other municipal, charitable, and private organizations withdrawing support of the Boy Scouts because of the Boy Scouts' discriminatory conduct conflicting with the organizations' nondiscrimination policies; (3) and public complaints regarding the City's subsidy to the Boy Scouts.  The City's responsiveness to a

constituency expressing disagreement with the Boy Scouts' violation of the City's nondiscrimination laws and policies does not represent "ugly" politics, but is instead the essence of the democratic process.

The Boy Scouts do not provide any support for their contention that the City lacked a rational basis for terminating the Boy Scouts' subsidized occupancy of City-owned property.  The non-precedential cases on which they rely-- *Tapalian* and *Le Clair* -- are based on evidence of malice or bad faith.  *Tapalian v. Tusino*, 377 F.3d 1, 5-6 (1st Cir. 2004) (affirming judgment for plaintiff in equal protection claim based on malice or bad faith); *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir. 1980) (holding plaintiff failed to prove his equal protection claim based on malicious or bad faith intent of the defendants to treat him differently).  The Third Circuit does not utilize that standard and instead, applies the more rigorous rational basis test.  *See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (requiring plaintiff prove "no rational basis for the difference in treatment"); *Montanye*, 399 F. Supp. 2d at 620 (E.D. Pa. 2005) (rejecting *Tapalian* and finding "[t]he Third Circuit, however, has only articulated the rational basis approach and not the 'motivated by animus' standard"); *Strain v. Borough of Sharpsburg*, 2006 U.S. Dist. LEXIS 55618, *13 n.1 (W.D. Pa. June 28, 2006) (rejecting *Tapalian* because of the more rigorous Third Circuit standard "rational basis" test).

The City's motion for summary judgment should be granted and the Boy Scouts' class of one equal protection claim must be dismissed.

**III.    The City Remains Entitled To Summary Judgment On The First Amendment Claims Because The Undisputed Record Evidence Establishes That The City's Insistence Upon Compliance With Its Non-discrimination Laws is Viewpoint Neutral and Not An Unconstitutional Condition.**

The Boy Scouts erroneously insist that this case is about the City's attempt to suppress a disfavored viewpoint.  Rather, the question is whether the City may lawfully require subsidy recipients to comply with the City's non-discrimination laws and policies in the City-owned properties.  The Boy Scouts have failed to refute the arguments set forth in the City's motion for summary judgment and fully incorporated herein.  The City's motion should be granted.

**A.    The City Is Exercising Its Discretion To Make Selective Funding Decisions, Not Suppressing A Disfavored Viewpoint.**

Perhaps not surprisingly, the Boy Scouts fail to raise any issue of material fact to dispute the City's legitimate efforts to terminate a City subsidy of discriminatory conduct.  Instead, they broadly rely on *Boy Scouts of America v. Dale*, 530 U.S. 640, and allege that the City is attempting to circumvent *Dale's* holding by demanding that the Boy Scouts change their membership policy to comply with City laws and policies.  Boy Scouts Resp. Br. at 25-26.  The Boy Scouts are wrong.

*Dale* is inapplicable and the Boy Scouts' reliance upon it is misplaced.  The *Dale* Court held that the BSA may discriminate in their exclusion of gay leaders[5] and that New Jersey's antidiscrimination laws could not compel them to include a gay activist scout leader.  530 U.S. at 655-656, 659.  However, this case presents a question of government subsidy, not

---

[5]    The Boy Scouts apparently concede that *Dale* does not address the Boy Scouts' discriminatory youth membership policies.

one of forced inclusion.  As discussed fully in the City's memorandum in opposition to the Boy

Scouts' motion for summary judgment, nothing in *Dale* requires the City to subsidize the Boy

Scouts' discriminatory conduct.  City Resp. Br. at 10-13.

Nor does the *Dale* opinion prohibit all forms of enforcement of nondiscrimination

laws and policies.  Indeed, the *Dale* Court cautioned that a membership organization is not

wholly exempt from nondiscrimination laws: "an expressive association [cannot] erect a shield

against antidiscrimination laws simply by asserting that mere acceptance of a member from a

particular group would impair its message."  530 U.S. at 653.  The Boy Scouts' attempt to shield

themselves against the City's requirement that subsidy recipients comply with its

nondiscrimination laws likewise fails.

As the City demonstrated in its memorandum in support of its motion for

summary judgment, the City has not forced the Boy Scouts to adopt any viewpoint or make any

statement about religion or sexual orientation.  City Br. Summ. J. at 66-70.  To the contrary, the

City has offered the Boy Scouts continued rent-free occupancy, provided they not engage in

discriminatory conduct in their use of the property.  The City has also offered to rent the property

to the Boy Scouts for fair market value without insisting on a prohibition against discriminatory

conduct.  Even if the Boy scouts were to elect to retain the rent-free occupancy, they would be

free to make any statement and engage in any expressive association other than in connection

with their rent-free occupancy of the City-owned property.  Indeed, if suppression were the

City's goal, it would not offer the Boy Scouts the option to pay fair market value rent.

The City's decision to discontinue its subsidy of an organization that refuses to

comply with City laws and policies does not constitute impermissible viewpoint discrimination.

Indeed, the two appellate courts to consider similar subsidy issues have held that a government's termination of a subsidy provided to BSA affiliates did not violate the affiliates' First Amendment rights.  *Wyman,* 335 F.3d at 83 (removal of the Connecticut Boy Scouts from Connecticut's workplace charitable campaign did not violate the Connecticut Boy Scouts' First Amendment rights); *Evans v. City of Berkeley*, 129 P.3d 394 (Cal. 2006) (termination of the city's marina berth subsidy did not violate the Berkeley Sea Scouts' First Amendment rights).

**B.      The Boy Scouts Fail To Demonstrate That The City Has Created A Forum.**

The Boy Scouts do not -- and cannot -- cite to any law or provide any evidence to support their argument that this Court should ignore the purpose of a subsidy in determining whether the City has created a forum.  As the Supreme Court has made clear, not all government provisions create fora to which First Amendment forum analysis is applicable.  *See Locke v. Davey,* 540 U.S. 712, 720 n.4 (2004) (where the purpose of the subsidy is to help low and middle-income families with the cost of post-secondary education and not to encourage a diversity of views from private speakers, the subsidy was not a forum); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 205-207 (2003) (forum analysis did not apply to decide whether federal assistance for public libraries to provide patrons with internet access could be conditioned upon installing software to block obscene or pornographic images because public libraries do not provide internet access to encourage a diversity of view from private speakers and the internet terminals did not constitute a public forum).

The purpose of the subsidy controls.  *See Locke,* 540 U.S. at 720 n.4.  Here, the undisputed purpose of the City's subsidized leases of City-owned properties is to benefit the

community at large[6] and to ensure that City-owned properties are restored, preserved and maintained at minimal cost to the City, not for speech and not to encourage a diversity of views. The City has not created a forum.

The critical flaw in the Boy Scouts' argument, however, is that they focus on the activities of the subsidy recipient, not the purpose of the government subsidy, as the controlling factor of whether a forum exists. Their argument, in essence, is that a forum exists because some recipients engage in speech. The Boy Scouts are wrong. Whether a subsidy recipient engages in speech does not dictate whether a forum has been created. The recipients in *Locke* and *American Library Ass'n* arguably engaged in speech when they pursued a degree in theology and made use of internet terminals at the public library, respectively, yet the Supreme Court found that neither subsidy had created a forum. Here, the City's purpose for providing the subsidy -- to benefit the community at large and to ensure that City-owned properties are restored, preserved and maintained at minimal cost to the City -- is similarly incompatible with establishing a forum. The City has not created a forum.

After urging the Court to ignore the City's purpose in providing the subsidy, the Boy Scouts nevertheless proceed to attack the City's undisputed purpose as at once inapplicable and consistent with the Boy Scouts' activities. Both positions lack merit.

---

[6]     The City notes that the Boy Scouts characterize Mr. Bessler's testimony about the purpose of the subsidy as "benefiting the community" in parts of their brief. Mr. Bessler actually testified that the purpose is to benefit "the community *at large*." Inj. Tr. (Bessler Test.) at 105:4-18 (emphasis added).

First, the Boy Scouts mistakenly assert that the City's goal to ensure that the City-owned properties are restored, preserved, and maintained at minimal cost to the City does not apply to either the Boy Scouts or SJU because "[a]t the time these entities entered into leases for Fairmount Park property, there were no structures on the land to restore, preserve or maintain." Boy Scouts Resp. Br. at 27.  The Boy Scouts' misstatement is unsupported by the record evidence: they ignore the City's lease agreements which specifically contemplate that structures are to be built and maintained.  *See* Lacher Aff. Ex. 9, Philadelphia Ordinance approved on December 14, 1928 ("the Philadelphia Council of the Boy Scouts of America to have the privilege of erecting at its own expense on the lot at the northeast corner of Twenty-second and Spring streets a suitable building to become at once the property of the City … *to be kept in good order* by said Boy Scouts during their occupancy…") (emphasis added); SJU Ground Sublease at § 4.1.  ("Subtenant may use the Premises solely to construct, maintain, and operate a boathouse, docs and related ancillary facilities.") and § 7.1(a) (SJU "at its sole cost and expense, shall take good care of the Premises and the Improvements *now or hereafter located* in, on and about the Premises").

Second, the Boy Scouts argue that their use of the property has been consistent with the City's purpose to benefit the community.  However, it is clear that the Boy Scouts' use of the 22nd Street Property does not benefit the community *at large* because they exclude gay and atheist youth and adults.

**C.      The Boy Scouts Fail To Demonstrate That The City's Termination Of The Subsidy Is Viewpoint Biased.**

The Boy Scouts' misinterpret *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819 (1995) to argue that the City has impermissibly censored them because they are a disfavored group.  Boy Scouts Resp. Br. at 28-30 (relying on *Rosenberger*).

In *Rosenberger*, unlike this case, the University of Virginia created a limited public forum by making student activity fee funds available to pay the publication expenses of student organizations providing "student news, information, opinion [and] entertainment . . ." 515 U.S. at 824.  However, the University excluded from the forum any activity that "'primarily promotes or manifests a particular belief in or about a deity or our ultimate reality.'"  *Id.* at 825. The Supreme Court found that the University had expended funds to encourage a diversity of views from private speakers and held that "having offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints."  *Id.* at 834-835.

However, as the City demonstrated in its memorandum in support of its summary judgment motion, the City has not created a public forum of any kind in its provision of rent-free occupancy of City-owned properties.  City Br. Summ. J. at 57-59.  The rent-free occupancy is not for the expression of viewpoints.  It is to benefit the community at large and maintain the properties.  *Id.  See also,* City Resp. Br. at 6-8.  Indeed, if there is any viewpoint to be presented, it is that of the City that City facilities should be used in a non-discriminatory manner for the benefit of all.  *See* City Br. Summ. J. at 59-62.  Even if the subsidy were deemed a nonpublic forum, the City's reasons for terminating the rent-free occupancy of the Boy Scouts is reasonable in light of the purposes of the nonpublic forum.

17

The Boy Scouts' argument that they provide a benefit to the community simply misses the mark.  As discussed above, Mr. Bessler testified that one of the City's purposes in providing subsidized leases of City-owned properties at no or nominal rent is to benefit "the community *at large*."  Inj. Tr. (Bessler Test.) at 105:4-18 (emphasis added).  Any benefit provided by the Boy Scouts' activities falls well short of benefiting the community at large, as it excludes those against whom the Boy Scouts discriminate.  The Boy Scouts are also incorrect in denying that the City's message of equality and fair treatment is not a purpose of the forum.  Contrary to the Boy Scouts' assertion, the City's purpose in ensuring that all its citizens are treated equally and fairly is supported by record evidence.  Indeed, the very policy to which subsidy recipients and all lessees must adhere -- the Fairmount Park Commission Policy for Properties -- specifically requires non-discrimination.  Lacher Aff. Ex. 15, Fairmount Park Policy For Properties, at 3.

Finally, the Boy Scouts erroneously argue that the City's message of equality and fair treatment is fabricated for litigation purposes.  In support, the Boy Scouts assert that the City has not taken any action against other subsidy recipients-- the Roman Catholic Church, SJU and the Colonial Dames-- whom the Boy Scouts argue-- but do not prove-- also have discriminatory policies.[7]  From that, the Boy Scouts' infer that the City has targeted the Boy Scouts impermissibly based on viewpoint.  That inference makes no sense, as the Boy Scouts argue that the discriminatory viewpoints the City *has not* targeted are substantially the same as those the Boy Scouts claim *have been* targeted.  The Boy Scouts' argument is unavailing as well, because,

---

[7]      As noted above, the Colonial Dames broaden their membership by way of their diverse, non-discriminatory adjunct board, Friends of Lemon Hill.

as discussed above and advanced in the City's motion for summary judgment, there is no

evidence that any the organizations the Boy Scouts rely upon discriminate in their use of the

City-owned property.  City Br. Summ. J. at 36-42; City Resp. Br. at 14-15, 21-24.  Furthermore,

unlike the Boy Scouts, SJU has agreed to and executed a non-discrimination agreement.  SJU

Ground Sublease § 22.1.  The City has not targeted the Boy Scouts.  There is simply no reason

for the City to take action against other subsidy recipients.

Because the Boy Scouts have failed to demonstrate any genuine issue of fact or

law disputing the viewpoint neutrality of the City's subsidy decision, the City is entitled to

summary judgment on the Boy Scouts' viewpoint discrimination claim.

### D.      The Boy Scouts Fail To Demonstrate That The City Imposed An Unconstitutional Condition.

The City agrees that the Boy Scouts' unconstitutional condition claim should be

analyzed under the framework derived in part from *Evans v. City of Berkeley,* 129 P.3d 394

(2006).  Indeed, as shown in the City's motion for summary judgment, requiring the Boy Scouts

to comply with the City's non-discrimination laws and policies is not an unconstitutional

condition under this analysis.  City Br. Summ. J. at 66-70.

#### 1.      The Boy Scouts Remain Free To Exercise Their First Amendment Rights to Expressive Association.

The Boy Scouts are a wealthy organization sponsored by an even wealthier parent

organization.  They do not need a subsidized occupancy of City property to express their

discriminatory message.  Indeed, at oral argument in the *Dale* case, counsel for the BSA

represented as follows:

19

> QUESTION:  Anyway, your point is if Government giving any assistance to the Scouts is a problem, you'd rather, no thank you, not have the assistance than have to change your policies.
>
> MR. DAVIDSON:  Right.  The Scouts said many times that their policies are not for sale, and if it costs the sponsorship, well that's-- so be it.

Transcript of Oral Argument at *17-18, 2000 U.S. Trans. LEXIS 44, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).

The City has consistently offered the Boy Scouts three alternatives:  they can keep their rent-free occupancy if they agree not to discriminate in connection with their use of the property; they can pay fair market rent and continue to discriminate to the extent authorized by *Dale*; or they can vacate the property.  None of those alternatives infringe the Boy Scouts' first amendment rights.

> 2. The Evidence Demonstrates That The Scope Of The City's Condition Is <u>Limited To Activities In Connection With The 22nd Street Property.</u>

Even assuming that the Boy Scouts' First Amendment Rights have been affected, the Boy Scouts have failed to raise any genuine issue of material fact as to the scope of the condition.  The Boy Scouts cannot point to any evidence that contradicts the City's record evidence establishing that the City's compliance condition has always been limited to activities connected to their use of the 22nd Street Property.  *See* Lacher Aff. Exs. 38 (Letter from Diaz to Girifalco (Nov. 29, 2006)), 39 (Letter from Diaz to Girifalco (Dec. 4, 2006)) and 40 (Letter from Diaz to Girifalco (Dec. 15, 2006)).  The Boy Scouts offered no evidence to contradict the City's position, presented in a meeting with the Boy Scouts on December 12, 2006, and memorialized in a proposed nondiscrimination agreement for the Boy Scouts' consideration, which read, in relevant part:

**WHEREAS**, the Boy Scouts hereby agree that it will not *utilize the City owned Property in furtherance of any discriminatory policy or practice*; and. . .

**NOW THEREFORE**, in consideration of the mutual covenants set forth herein, the Boy Scouts and the City hereby agree as follows:

The Boy Scouts agree that it and its employees, subsidiaries, members and other entities controlled by them will not discriminate nor permit discrimination against any person because of race, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, physical handicap or marital status *in connection with use of the Property*, including in connection with programs administered in whole or in part from the City owned Property.

Letter from Diaz to Girifalco (Dec. 15, 2006) (emphasis added).

Indeed, none of the evidence referred to by the Boy Scouts is inconsistent with the City's position. The July 20, 2006 letter from then City Solicitor Romulo L. Diaz, Jr. to William T. Dwyer, III, clearly reflected that the City sought to "obtain adequate assurances that the Boy Scouts will not, *while headquartered on City Property,* discriminate in violation of City policy." Lacher Aff. Ex. 36 (Letter from Diaz to Dwyer (Jul. 20, 2006))(emphasis added). Resolution 070522 made no demands upon the Boy Scouts at all; rather, it simply recited the history behind the City's termination of the subsidy. Lacher Aff. Ex. 13, Philadelphia City Council Resolution 070522. Solicitor Diaz's June 1, 2007 letter to Ms. Girifalco served as notice of City Council's adoption of Resolution 070522 and an invitation to discuss whether the Boy Scouts would "consider a change in policy or, alternatively, [was] willing to pay fair market rent for the property." Lacher Aff. Ex. 46 (Letter from Diaz to Girifalco (Jun. 1, 2007)). Finally, the purpose of the May 6, 2008 letter from City Solicitor Shelley R. Smith to Ms. Girifalco was to offer anew, on behalf of the new Mayor Nutter Administration, a lease for the 22nd Street Property at fair market rental value to the Boy Scouts. Lacher Aff. Ex. 56 (Letter from Smith to

Girifalco (May 6, 2008)).  None of these letters challenge the City's stated scope of the condition, nor do they demonstrate that the condition extended beyond the activities connected to the 22nd Street Property.

The Boy Scouts assert that the City has "never limited its demand to the Boy Scouts repudiating the leadership policy only for staff members who work within the headquarters building at 22nd and Winter."  Boy Scouts Resp. Br. at 33.  The City's demands, reproduced above, speak for themselves.  The Boy Scouts' specious argument -- that the condition must extend beyond the confines of City-owned property because the City has not so limited its compliance agreement -- is unavailing.  The Boy Scouts have failed to cite to any authority requiring such an artificially drawn limitation.  Instead, in assessing the scope of the condition, courts look to whether the condition is imposed upon the particular program or upon the recipient of the subsidy.  *Rust v. Sullivan,* 500 U.S. 173, 197 (1991).  The Supreme Court has deferred to a government's definition of the scope of its programs.  *See e.g., Rust,* 500 U.S. at 194 (holding that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program"); *Am. Library Ass'n, Inc.*, 539 U.S. at 211 (same). The evidence shows that the City has only required compliance with its non-discrimination laws and policies on the Boy Scouts' activities that are connected with the 22nd Street Property.  The Boy Scouts do not and cannot point to any evidence that disputes this limited scope.

3.     The Boy Scouts Fail To Demonstrate That The Termination Of The Rent-Free Occupancy Is Not Viewpoint Neutral.

The Boy Scouts continue to argue incorrectly that the City's termination of their rent-free occupancy fails the viewpoint neutrality test because the termination is prompted solely by "the City's disagreement with the membership policy for Scout programs." Boy Scouts Resp.

Br. at 34.  The Boy Scouts' argument lacks evidentiary support and is legally incorrect.  The

City's disagreement with the Boy Scouts' membership policy -- the viewpoint disparity -- alone

does not constitute proof of viewpoint discrimination.  *Wyman,* 335 F.3d at 93-94 (citing *R.A.V.*

*v. City of St. Paul,* 505 U.S. 377, 385 (1992)).  As the City set forth in its motion for summary

judgment, it is the Boy Scouts' discriminatory conduct that prompted the City to terminate the

subsidy, not the Boy Scouts' views on religion and sexual orientation.  City Br. Summ. J. at 73-

74.

The Boy Scouts argue that "the City's enforcement of the Fair Practices

Ordinance on a single Fairmount Park lessee shows that this ordinance is nothing more than a

façade for viewpoint discrimination."  Boy Scouts Resp. Br. at 32, n. 17.  This argument is

unsupported by evidence and is without merit.  As explained in the City's motion for summary

judgment and above, the Boy Scouts present no record evidence of any subsidy recipients who

discriminate in their membership policy and services in connection with their City-owned

property.  City Br. Summ. J. at 36-42.  The City has in fact taken action against the single

subsidy recipient who is known to discriminate both in its membership policy and in its services

in connection with its City-owned property -- the Boy Scouts themselves.

    4.    The Boy Scouts Offer No Evidence To Dispute The Reasonableness Of
           The City's Termination Of The Rent-Free Occupancy.

It is undisputed that all lessees of Fairmount Park property must comply with the

Fairmount Park Non-discrimination Policy and the City's non-discrimination laws.  City Br.

Summ. J. at 9-12.  The Boy Scouts offer no evidence that the City's insistence that they, like all

subsidized occupants of City property, adhere to the City's policy of nondiscrimination is

unreasonable.  As discussed in the City's memorandum in support of its motion for summary

judgment, the City may condition its subsidy on compliance with its reasonable (and viewpoint neutral) non-discrimination laws.  City Br. Summ. J. at 66-70, 72-73.  In short, the reasonableness of a governmental restriction limiting access to a nonpublic forum must be assessed in light of the purpose of the forum and all of the surrounding circumstances.  *Perry Edu. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983); *Christian Legal Soc'y v. Kane*, 2006 U.S. Dist. LEXIS 27347 at *43.  Requiring compliance with the City's non-discrimination laws and policies is reasonable in light of the City's undisputed purpose for providing the subsidy to benefit the community at large.  Inj. Tr. (Bessler Test.) at 105:4-18, (Herzins Test.) at 131:17-132:2.

The Boy Scouts have raised no genuine issue of fact or law that the City's compliance condition is anything other than narrow in scope, reasonable and viewpoint neutral. The City's motion for summary judgment on the unconstitutional conditions claim should be granted.

## CONCLUSION

For these reasons, and those set forth in the City of Philadelphia's initial memorandum in support of its motion for summary judgment and the City's memorandum in opposition to the Boy Scouts' motion for summary judgment, the City respectfully requests this Honorable Court grant summary judgment in its favor and dismiss all remaining counts of the Complaint and grant the City's counterclaim, ejecting the Boy Scouts and requiring the Boy Scouts to pay fair market rent for their occupancy from June 2, 2008 through the date of this Court's order.

Respectfully,


_____/s/ David Smith_____
David Smith (Attorney I.D.  21480)
Stephenie Yeung (Attorney I.D. 84415)
Rebecca Lacher (Attorney I.D. 203938)

*Attorneys for Defendant,*
 *City of Philadelphia*

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

Of Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of April, 2010, I electronically filed a copy of the Defendant City Of Philadelphia's Reply Memorandum in Further Support of Its Motion for Summary Judgment, which will send notification of such filings to CM/ECF participants, including:

Jason P. Gosselin, Esquire
William M. McSwain, Esquire
Daniel B. Scott, Esquire
Richard M. Haggerty, Jr., Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

/s/ Rebecca Lacher
Rebecca Lacher (Attorney I.D. 203938)