**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRADLE OF LIBERTY COUNCIL, INC.,<br>BOY SCOUTS OF AMERICA<br>22ND & Winter Streets<br>Philadelphia, Pennsylvania  19103<br><br>             Plaintiff,<br><br>                    v.<br><br>CITY OF PHILADELPHIA<br>1515 Arch Street<br>Philadelphia, PA  19102<br><br>             Defendant. | Civil Action No. 08-02429 |

**PRETRIAL MEMORANDUM OF PLAINTIFF
CRADLE OF LIBERTY COUNCIL, INC., BOY SCOUTS OF AMERICA**

Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America ("Cradle of Liberty"),

by and through its undersigned counsel and pursuant to Local Rule 16.1, respectfully submits its

pretrial memorandum.

**I.      SUMMARY OF THE CASE**

**A.      Introduction**

The central issue in this dispute concerns the use and possession of Cradle of Liberty's

headquarters at 22nd and Winter Streets in Philadelphia.  More than eighty years ago, Defendant

City of Philadelphia ("City") provided Cradle of Liberty's predecessor[1] a plot of land in

Fairmount Park to erect a building for Cradle of Liberty's activities.  Under this arrangement, the

building would become the property of the City but would remain for Cradle of Liberty's

---

[1]      The predecessor council was the Philadelphia Council of the Boy Scouts of America.  Both councils are referred to herein as "Cradle of Liberty."

exclusive use.  The arrangement did not require Cradle of Liberty to pay rent.  Over the years, numerous other nonprofit organizations have enjoyed the use of Fairmount Park properties on similar terms.  In fact, approximately 75 nonprofit organizations presently enjoy the exclusive use of Fairmount Park buildings for free or for nominal rent.

In 2000, the United States Supreme Court ruled that the leadership policy of the Boy Scouts of America, which excludes from leadership positions individuals whose conduct is inconsistent with values the Scouts seek to instill, is a constitutionally protected expressive association.  *See Boy Scouts of America v. Dale*, 530 U.S. 640, 653-54 (2000).  In reaction to that decision, political activists in the Philadelphia region initiated a campaign against the Scouts' local chapter, Cradle of Liberty, which serves tens of thousands of youth in the Philadelphia area. At the urging of these activists, the City demanded that Cradle of Liberty renounce the policy upheld in *Dale*.  When Cradle of Liberty declined to do so, the City resorted to coercion.  If Cradle of Liberty did not repudiate the policy, the City stated, then Cradle of Liberty must either vacate its headquarters or pay a punitive rent.

This lawsuit is not about Cradle of Liberty's leadership policy.  It is about the City's conduct, which violates Cradle of Liberty's First and Fourteenth Amendment rights.  The City's eviction efforts are motivated solely by its hostility to the viewpoint expressed through the leadership policy.  As such, the City has engaged in viewpoint discrimination in violation of the First Amendment.  Similarly, because the City is willing to allow Cradle of Liberty to remain in its headquarters only if it will renounce the leadership policy, the City has attempted to do indirectly what it knows it may not do directly.  An unconstitutional condition such as this violates the First Amendment.  Furthermore, the City's conduct violates the Fourteenth Amendment's guarantee of Equal Protection.  Several other nonprofit organizations that use

Fairmount Park properties have "exclusive" membership or leadership policies, but the City has not subjected them to scrutiny or sought to terminate their leases.

### B.    History of the Dispute

In 1928, Philadelphia Mayor Harry A. Mackey signed an ordinance providing Cradle of Liberty with the use of a City-owned plot of land to erect, at the council's own expense, a building for its activities.  The ordinance also provided that the building, erected on land under the control of the Fairmount Park Commission, would immediately become the property of the City but remain for the exclusive use of Cradle of Liberty for its activities.  For more than eight decades, Cradle of Liberty has had its headquarters on this plot of land at 22nd and Winter Streets on the northern edge of Philadelphia's Center City neighborhood.  Although the City owns the building and property, Cradle of Liberty built the headquarters and has maintained the headquarters and property at its own expense.

In 2003, the City Law Department, at the request of Mayor John F. Street and at the urging of certain political activists opposed to the Boy Scouts' constitutionally protected leadership policy, demanded that Cradle of Liberty repudiate the policy.  Cradle of Liberty declined to do so.  For the next several months, the City and Cradle of Liberty conducted negotiations to resolve the dispute amicably and, eventually, they did.

On January 23, 2004, at the City's request, Cradle of Liberty adopted the "Non Discrimination Statement of Cradle of Liberty Council, Boy Scouts of America."  Among other things, the Non Discrimination Statement affirmed Cradle of Liberty's opposition to "any form of unlawful discrimination."  Based on Cradle of Liberty's adoption of the Non Discrimination Statement and other protocols, the City agreed that it would not move to evict Cradle of Liberty from its headquarters based on the Boy Scouts' constitutionally protected leadership policy.  The

City has never alleged or even suggested that Cradle of Liberty has violated the Non Discrimination Statement.

More than a year passed without incident following Cradle of Liberty's adoption of the Non Discrimination Statement.  In 2005, however, Romulo Diaz, a new City Solicitor, wrote to Cradle of Liberty's Executive Director, William T. Dwyer, III, demanding that Cradle of Liberty "clarify" the meaning of the term "unlawful discrimination" as used in the Non Discrimination Statement.  Cradle of Liberty did not hear from the City again until July 20, 2006, when Mr. Diaz wrote to inform Cradle of Liberty that the City had concluded that the constitutionally protected leadership policy is "illegal under the Home Rule Charter and the Philadelphia Code." The letter provided Cradle of Liberty with an ultimatum:  repudiate the leadership policy or pay rent (which is punitive and not required of any other similarly situated non-profit community organization).  If Cradle of Liberty refused to meet either of the demands, the City declared Cradle of Liberty would be evicted from its headquarters.

### C.    Constitutional Violations

On May 31, 2007, Councilman Darrell Clark of the Philadelphia City Council introduced a resolution approving the eviction of Cradle of Liberty from its headquarters.  City Council passed the resolution without debate and demanded that Cradle of Liberty vacate its headquarters within one year.  The City's attempt to evict Cradle of Liberty is and has been motivated solely by its hostility to Cradle of Liberty's leadership policy.

In addition to Cradle of Liberty, the City leases approximately 75 other buildings on Fairmount Park property to nonprofit organizations which pay no rent or nominal rent. According to Barry Bessler, the chief of staff to the executive director of Fairmount Park, when deciding whether to confer a lease, the City considers whether the proposed use is "within the

mission of Fairmount Park and an acceptable community use." Among the organizations that have leases with the City in which they pay no rent or nominal rent are several groups – including the Colonial Dames of America, the Roman Catholic Church of Maternity, B.V.M. and Saint Joseph's University – which exclude from membership certain individuals based on supposed prohibited attributes in the City's Fair Practices Ordinance. The City has never asked any of these organizations to pay market or punitive rent, to abandon their membership policies or to leave their respective buildings.

In sum, by asking Cradle of Liberty to repudiate its constitutionally protected leadership policy and conditioning continued use of its headquarters building on this repudiation – and by not making similar demands of any other nonprofit organization with a lease for Fairmount Park property – the City has violated Cradle of Liberty's rights under the First and Fourteenth Amendments to the Unites States Constitution and the corresponding provisions of the Pennsylvania Constitution.

## II.     CRADLE OF LIBERTY'S TRIAL WITNESSES

### A.     Fact Witnesses for Liability

Cradle of Liberty may call the following fact witnesses with regard to liability. A brief description of some of their topics of testimony is included.

1.     William T. Dwyer, III. Mr. Dwyer served as the Scout Executive of Cradle of Liberty for 11 years prior to his retirement in November 2009. He may be called to testify to Cradle of Liberty's history and the programs and activities it provides for the youth of Philadelphia. He will also testify to the history of the dispute with the City over Cradle of Liberty's headquarters building at 22nd and Winter Streets.

2.     Charles Eaton. Mr. Eaton is the Scout Executive for the Boston Minuteman Council, Boy Scouts of America. Until May 2010, he served as the Assistant Scout Executive for Cradle of Liberty, and he also served as interim Scout Executive from November 2009 until January 2010. He may be called to testify to Cradle of Liberty's activities and programs, as well as to facts concerning the dispute with the City.

3.      The Honorable John L. Braxton.  Judge Braxton is a member of Cradle of Liberty's board of directors.  He may be called to testify to his experiences with Cradle of Liberty and the decision-making process of the board.

4.      Mark Chilutti.  Mr. Chilutti is a member of Cradle of Liberty's board of directors.  He may be called to testify to his experiences with Cradle of Liberty and the decision-making process of the board.

5.      Brian Wallace.  Mr. Wallace is an Eagle Scout and the current Scoutmaster of Troop 358.  He may be called to testify about his experiences with Cradle of Liberty.

6.      Aaron Gooding, Sr.  Mr. Gooding is an Eagle Scout and the former Scoutmaster of Troop 358.  He may be called to testify about his experiences with Cradle of Liberty.

7.      Barry Bessler.  Mr. Bessler is Chief of Staff to the Executive Director of Fairmount Park.  He may be called to testify to the City's program of leasing Fairmount Park properties to nonprofit organizations for nominal rent or no rent, as well as the standard that the City uses in granting those leases.

8.      Eleanor Penniman.  Mrs. Penniman is the vice president of The Colonial Dames of America, Chapter II.  She may be called to testify to the membership policy of the Colonial Dames, the Colonial Dames' lease with the City for the occupation of Lemon Hill Mansion in Fairmount Park, and any communications between the City and the Colonial Dames regarding the lease.

9.      Rev. Paul S. Quinter.  Fr. Quinter is the pastor of the Roman Catholic Church of Maternity, B.V.M.  He may be called to testify to the Roman Catholic Church's standards for determining eligible candidates for the priesthood, Maternity, B.V.M.'s lease with the City for a church building in Pennypack Park, and any communications between the City and Maternity, B.V.M. regarding the lease.

10.     Dominick DiJulia.  Mr. DiJulia is the Director of Athletics at Saint Joseph's University.  He may be called to testify to the university's lease of a boathouse on Fairmount Park property as well as communications between the university and the City regarding that lease.

11.     Lucy Strackhouse.  Ms. Strackhouse is the Executive Director of the Fairmount Park Historic Preservation Trust.  She may be called to testify about the rehabilitation and preservation of Fairmount Park buildings, as well as finding nonprofit organizations to enter into leases.

12.     Romulo L. Diaz, Jr.  Mr. Diaz is the former City Solicitor for the City.  He may be called to testify about negotiations and discussions with Cradle of Liberty regarding its occupancy of its headquarters.  He may also testify to his communications with certain political activists opposed to Cradle of Liberty's leadership policy.

13.     Lewis Rosman.  Mr. Rosman is Director of Legislative Affairs in the Office of the Mayor for the City, and he formerly worked in the City Law Department.  He may be called to testify to his review of Cradle of Liberty's leadership policy and his discussions with Cradle of Liberty regarding the policy.

**B.     Expert Witness for Damages**

1.     John Doyle.  If the trial reaches a damages phase, Mr. Doyle will testify to the rental value of the Bruce S. Marks Scout Resource Center based on a real estate appraisal which he conducted.

## III.     LIST OF CRADLE OF LIBERTY'S TRIAL EXHIBITS

Cradle of Liberty's list of trial exhibits appears below in chart form.  On May 28, 2010, Cradle of Liberty served the City with its list of exhibits.

Cradle of Liberty reserves the right to supplement this exhibit list prior to trial, to use any exhibit that the City has listed on its exhibit list, to use any document that was used as an exhibit during discovery, and to use any other documents not identified herein for purposes of cross-examination and/or rebuttal.  It also reserves the right to present any of its exhibits in a demonstrative manner at trial.  Cradle of Liberty will provide the City with copies of all proposed exhibits in advance of the June 14, 2010 trial date.

| Plaintiff's Exhibit Number | Description |
| --- | --- |
| Exhibit 1 | "An Ordinance," dated December 14, 1928 and signed by Philadelphia Mayor Harry A. Mackey |
| Exhibit 2 | Photographs of interior and exterior of Bruce S. Marks Scout Resource Center |

| Plaintiff's Exhibit Number | Description |
|---|---|
| Exhibit 3 | Letter from Romulo L. Diaz, Jr., to William T. Dwyer, III, dated October 15, 2004 |
| Exhibit 4 | Letter from William T. Dwyer, III, and David H. Lipson, Jr., dated February 13, 2004 |
| Exhibit 5 | Non Discrimination Statement of Cradle of Liberty Council, Boy Scouts of America |
| Exhibit 6 | Letter from Romulo L. Diaz, Jr., to William T. Dwyer, III, dated June 15, 2005 |
| Exhibit 7 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated July 26, 2005 |
| Exhibit 8 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated August 17, 2005 |
| Exhibit 9 | Letter from Romulo L. Diaz, Jr., to William T. Dwyer, III, dated July 20, 2006 |
| Exhibit 10 | Meeting Minutes of the Fairmount Park Commission, dated July 24, 2006 |
| Exhibit 11 | Letter from Romulo L. Diaz, Jr., to William T. Dwyer, III, dated July 26, 2006 |
| Exhibit 12 | Letter from Romulo L. Diaz, Jr., to William T. Dwyer, III, dated November 29, 2006 |
| Exhibit 13 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated December 4, 2006 |
| Exhibit 14 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated December 15, 2006 |
| Exhibit 15 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated January 12, 2007 |
| Exhibit 16 | Letter from Sandra A. Girifalco to Romulo L. Diaz, Jr., dated February 15, 2007 |
| Exhibit 17 | Letter from Romulo L. Diaz, Jr., to Sandra A. |

| Plaintiff's Exhibit Number | Description |
| --- | --- |
|  | Girifalco, dated February 23, 2007 |
| Exhibit 18 | Resolution No. 070522 of the Council of the City of Philadelphia, dated May 31, 2007 |
| Exhibit 19 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated June 1, 2007 |
| Exhibit 20 | Letter from Sandra A. Girifalco to Romulo L. Diaz, Jr., dated June 11, 2007 |
| Exhibit 21 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated June 22, 2007 |
| Exhibit 22 | Letter from Sandra A. Girifalco to Romulo L. Diaz, Jr., dated June 28, 2007 |
| Exhibit 23 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated June 28, 2007 |
| Exhibit 24 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated August 6, 2007 |
| Exhibit 25 | Letter from Sandra A. Girifalco to Romulo L. Diaz, Jr., dated October 16, 2007 |
| Exhibit 26 | Letter from Romulo L. Diaz, Jr., to Sandra A. Girifalco, dated October 17, 2007 |
| Exhibit 27 | Letter from Shelley R. Smith to Jason P. Gosselin, dated March 25, 2008 |
| Exhibit 28 | Letter from Shelley R. Smith to Sandra A. Girifalco, dated May 6, 2008 |
| Exhibit 29 | Fairmount Park Commission Occupancy Practices Questionnaire |
| Exhibit 30 | Guidelines for Making a Proposal for a Fairmount Park Property to the Fairmount Park Commission |
| Exhibit 31 | Fairmount Park Commission, Policy for |

| Plaintiff's Exhibit Number | Description |
|---|---|
| | Properties |
| Exhibit 32 | Allen Lane Art Center Lease |
| Exhibit 33 | Pegasus Riding Academy, Inc. Lease |
| Exhibit 34 | Philadelphia Girls' Rowing Club Lease |
| Exhibit 35 | Sedgeley Club Lease |
| Exhibit 36 | Friends of Chamounix Mansion Lease for Chamounix Cottage |
| Exhibit 37 | Friends of Chamounix Mansion Lease for Chaminoux  Mansion & Carriage House |
| Exhibit 38 | Work to Ride, Inc. Lease |
| Exhibit 39 | Cobbs Creek Community Environmental Education Center, Inc. Lease |
| Exhibit 40 | Philadelphia Canoe Club Lease |
| Exhibit 41 | American Women's Heritage Society Lease |
| Exhibit 42 | The Philadelphia Cricket, Archery and Lawn Bowling Association, Inc. Lease |
| Exhibit 43 | Friends of the Japanese House and Garden Lease |
| Exhibit 44 | Huntingdon Valley Riding and Driving Association Lease |
| Exhibit 45 | 369 Incorporated Lease |
| Exhibit 46 | Women for Greater Philadelphia Lease |
| Exhibit 47 | Colonial Dames of America, Chapter II Lease |
| Exhibit 48 | Some Other Place, Inc. Lease |
| Exhibit 49 | Roman Catholic Church of the Maternity, B.V.M. Lease |

| Plaintiff's Exhibit Number | Description |
|---|---|
| Exhibit 50 | PTM II Limited Partnership Lease |
| Exhibit 51 | Boarders and Stewards of the Monastery Lease |
| Exhibit 52 | The Northeast Philadelphia Swim Coaches Association Lease |
| Exhibit 53 | Northwestern Stables, Inc. Lease |
| Exhibit 54 | Royal Heritage Society of the Delaware Valley Lease |
| Exhibit 55 | Hurricane Island Outward Bound School Lease |
| Exhibit 56 | Crispin Gardens Athletic Club Lease |
| Exhibit 57 | Philadelphia Museum of Art Lease |
| Exhibit 58 | Concern International Foundation, Inc. Lease |
| Exhibit 59 | Historic Rittenhouse, Inc. Lease |
| Exhibit 60 | Friends of River Field Lease |
| Exhibit 61 | Fidelity-Philadelphia Trust Company, trustee of will of Richard Smith Lease |
| Exhibit 62 | Riders of Pennypack Park Lease |
| Exhibit 63 | Saint Joseph's University Boathouse Lease |
| Exhibit 64 | Saint Joseph's University Boathouse Sublease |
| Exhibit 65 | Modern Club of Philadelphia Lease |
| Exhibit 66 | Philadelphia Rowing Program for the Disabled, Inc. Lease |
| Exhibit 67 | Fairmount Sports Association Lease |
| Exhibit 68 | Daniel Huntoon and Girard Trust Company, as trustees of the Estate of Naomi Wood |

| Plaintiff's Exhibit Number | Description |
|---|---|
| Exhibit 69 | Woodford Tennis Club, Inc. |
| Exhibit 70 | Arthur Ashe Youth Tennis and Education, Inc. Lease |
| Exhibit 71 | The Colonial Dames of America, Certificate of Incorporation and By-Laws |
| Exhibit 72 | Regulations, Chapter II, The Colonial Dames of America |
| Exhibit 73 | Mission Statement of the Roman Catholic Church of the Maternity, B.V.M. |
| Exhibit 74 | Mission Statement of Saint Joseph's University |
| Exhibit 75 | United Way of Southeastern Pennsylvania Nondiscrimination Disclosure |
| Exhibit 76 | Position Statement on the Cradle of Liberty Council's Stance Regarding the Leadership Standards of the Boy Scouts of America, dated June 9, 2003 |
| Exhibit 77 | Letter from Rebecca W. Rimel to William T. Dwyer, III, dated June 13, 2003 |
| Exhibit 78 | Application for Professional Commission, Boy Scouts of America |
| Exhibit 79 | Summary Appraisal Report for 231-51 N. 22nd Street, Philadelphia, PA 19103, prepared by Dwaine Whitley for Keystone Appraisal Co. |
| Exhibit 80 | Summary Appraisal Report for 231-51 N. 22nd Street, Philadelphia, PA 19103, prepared by Binswanger |
| Exhibit 81 | Rent Comparability Study Appraisal for 231-51 N. 22nd Street, Philadelphia, PA 19103, prepared by Doyle Real Estate Advisors, LLC |
| Exhibit 82 | Rent Comparability Study Appraisal for 231-51 N. 22nd Street, Philadelphia, PA 19103, prepared |

| Plaintiff's Exhibit Number | Description |
| --- | --- |
| | by Reaves C. Lukens Company |
| Exhibit 83 | Transcript of a Public Hearing of the Council of the City of Philadelphia, July 27, 1982 |
| Exhibit 84 | Memorandum from Roy L. Williams to Scout Executives |
| Exhibit 85 | Cradle of Liberty Council News Release |
| Exhibit 86 | Cradle of Liberty Council Statement on Registration Review Panel |
| Exhibit 87 | Print-outs from Boy Scouts of America Website |
| Exhibit 88 | Print-outs from Boy Scouts of America Website – Frequently Asked Questions |
| Exhibit 89 | Canon 1024, Code of Canon Law, available at *http://www.vatican.va/archive/ENG1104/__P3P.HTM* |
| Exhibit 90 | Instruction Concerning the Criteria for the Discernment of Vocations with regard to Persons with Homosexual Tendencies in view of their Admission to the Seminary and to Holy Orders, available at *http://papalencyclicals.net/Ben16/Instructions.htm* |
| Exhibit 91 | "Fairmount Park's gem status hyped," *Philadelphia Business Journal*, May 1, 2009 |
| Exhibit 92 | "Hidden gem," *The Philadelphia Inquirer*, March 4, 2010. |
| Exhibit 93 | Fairmount Park Press Release, "Fairmount Park's Lemon Hill Mansion Comes Into View," available at *http://fairmountpark.org/pdf/LemonHillViewshed.pdf*. |
| Exhibit 94 | Fairmount Park Historic Preservation Trust Website – "About Us," available at |

| Plaintiff's Exhibit Number | Description |
| --- | --- |
|  | *http://www.fairmountparktrust.org/main-about.php* |
| Exhibit 95 | Fairmount Park Historic Preservation Trust Website – "Leasing Program," available at *http://www.fairmountparktrust.org/main-leasing.php* |
| Exhibit 96 | Fairmount Park Conservancy Annual Report 2008, available at *http://www.fairmountparkconservancy.org/downloads/AnnualReport2008.pdf.* |
| Exhibit 97 | Photographs of Lemon Hill Mansion |
| Exhibit 98 | Photographs of the Saint Joseph's University Boathouse |
| Exhibit 99 | Photographs of the Roman Catholic Church of Maternity, B.V.M. |

## IV.     OBJECTIONS TO THE CITY'S TRIAL EXHIBITS

Cradle of Liberty's objections to the City's proposed trial exhibits are attached to this pretrial memorandum in chart form as Exhibit A.

## V.     ITEMIZED STATEMENT OF DAMAGES AND RELIEF SOUGHT

Cradle of Liberty seeks the following relief due to the City's violation of Cradle of Liberty's rights under the First and Fourteenth Amendments:

1.     A permanent injunction preventing the City from commencing any proceedings to evict Cradle of Liberty from its headquarters building at 22nd and Winter Streets based on Cradle of Liberty's adherence to Boy Scouts of America's constitutionally protected leadership policy.

2.     A judicial declaration that the City's attempts to evict Cradle of Liberty and its refusal to afford Cradle of Liberty the same privileges available to other individuals and groups violates Cradle of Liberty's rights guaranteed

by the Constitution and laws of the United States and the Commonwealth of Pennsylvania.

3.      Attorneys' fees of approximately $800,000.

4.      Litigation costs of approximately $60,000.

## VI.    ANTICIPATED LEGAL ISSUES

Each of Cradle of Liberty's three constitutional claims involves threshold issues that require appropriate rulings and jury instructions from the Court.  Cradle of Liberty outlines such issues below.

### A.      Viewpoint Discrimination – Existence of a Forum

Whether the City's program of leasing Fairmount Park properties to nonprofit organizations for no rent or for nominal rent constitutes a forum is a complex constitutional question that is properly answered by the Court before Cradle of Liberty's claim for viewpoint discrimination is submitted to the jury.[2]

A plaintiff makes out a claim for viewpoint discrimination under the First Amendment by first establishing that the relevant forum is either a "traditional public forum, [a] public forum created by government designation, [or a] nonpublic forum."  Mem. on Def.'s Mot. to Dismiss ("MTD Opin."), Dkt. #13, dated Sept. 25, 2008, at 15 (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985)).  When government action "facilitates the expression of a 'diversity of views from private speakers,'" a government forum has been created.  *Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d

---

[2]      When Cradle of Liberty moved the Court for a preliminary injunction to prohibit the City from prosecuting its parallel state court claim for ejectment, the Court found that it was likely that this program was a forum.  Mem. on Pl.'s Mot. for Prelim. Inj., Dkt. #29, dated Nov. 19, 2009 ("PI Opin.") at 4.

Cir. 2004) (quoting *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995)).  Although a government forum may be characterized as public, limited public, or nonpublic, the government cannot engage in viewpoint discrimination in any type of forum.  *Id.* at 526.  Thus, the government cannot exclude an organization from any government forum based on the organization's views.  *E.g.*, *Rosenberger*, 515 U.S. at 828-29.

A "nonpublic forum" is a forum that is created by the government and for which the government "reserve[s] eligibility for access to a particular class of speakers," whose members must then obtain permission to access the forum.  MTD Opin. at 17 n.5 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (citations omitted)).  As Cradle of Liberty demonstrated at the preliminary injunction hearing, when deciding whether to confer a lease upon a nonprofit organization for free or nominal rent, the City considers whether the proposed use is "within the mission of Fairmount Park and an acceptable community use."  Transcript of Preliminary Injunction Hearing, dated Nov. 17, 2009, Dkt. #37 ("Inj. Tr.") at 78:22-79:6.  Accordingly, the Court has already found that it is likely that the City has created a forum in which a variety of nonprofit organizations participate and engage in speech.  PI Opin. at 4.

While the jury would ultimately decide the factual question of whether the City discriminated against Cradle of Liberty because it disagreed with Cradle of Liberty's viewpoint, it is proper for the Court to determine the complex threshold issue of whether a forum exists.  When First Amendment liberties are at stake, courts necessarily must retain tight control over juries to ensure those liberties are not violated.  As the Seventh Circuit has noted:  "To any suggestion that the outer bounds of liability should be left to a jury to decide we reply that in cases involving the rights protected by the speech and press clauses of the First Amendment the

courts insist on firm judicial control of the jury."  *Haynes v. Alfred A. Knopf, Inc*., 8 F.3d 1222,

1234 (1993) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964); *Greenbelt*

*Cooperative Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 11 (1970); *Bose Corp. v. Consumer*

*Union*, 466 U.S. 485, 505-11 (1984)).

 As Cradle of Liberty has shown, the City has a program of providing access to City-

owned property at subsidized rates to non-profit organizations that "do good work" for the

citizens of the city of Philadelphia, particularly within Fairmount Park.  Transcript of the

Deposition of Barry Bessler ("Bessler Dep."), Ex. 12 to Pl.'s Mot. Summ. J., at 130:16-136:16,

155:19-156:10, 156:20-159:6, and 164:17-165:10.  As Mr. Bessler testified, the City has

permitted and continues to permit a number of non-profit organizations to occupy property

within Fairmount Park for free or at subsidized rates.  *Id*. at 107:17-108:5, 118:9-120:6, 146:20-

147:6, 150:9-152:4, 155:19-166:14, 161:1-162:21, 163:11-166:14, 179:9-19, 188:3-191:2, 213:7-

216:5, and 218:5-221:24.  Indeed, the City only asks that the nonprofit organizations which

participate in its Fairmount Park do work that "benefits the community."  Inj. Tr. at 84:20-25.

Because the City cannot rebut the evidence that Cradle of Liberty has presented on the

Fairmount Park forum and because it is necessary for  Courts to maintain "firm judicial control

of the jury" when First Amendment rights are at stake, the Court should decide whether a forum

exists.  *Haynes*, 8 F.3d at 1234.

 At trial, the jury can decide whether the City engaged in viewpoint discrimination by

trying to evict Cradle of Liberty due to the City's opposition to Cradle of Liberty's

constitutionally protected leadership policy.  If the jury decides that the City acted to evict Cradle

of Liberty because it disagreed with the viewpoint expressed in Cradle of Liberty's

constitutionally protected policy, then the City's limitation on access to the forum would

necessarily be neither reasonable nor viewpoint-neutral and Cradle of Liberty will have proven

its claim for viewpoint discrimination.[3]

Cradle of Liberty thus proposes the following decision-making process on its claim for

viewpoint discrimination:

1.  The **Court** decides whether the City has created a forum.

2.  The **jury** decides whether the City decided to limit Cradle of Liberty's
    access to the forum because the City disagreed with the viewpoint
    expressed in Cradle of Liberty's leadership policy.  If the jury answers this
    question in the affirmative, then the limitation on access to the forum is
    neither reasonable nor viewpoint-neutral and Cradle of Liberty has proven
    its claim for viewpoint discrimination.

## B.  Unconstitutional Conditions – Heightened Scrutiny

The Court has described the analytical framework of Cradle of Liberty's unconstitutional

condition claim as follows:

> The first question is whether the government's condition
> compromises a First Amendment right.  The next question is the
> scope of the condition.  If the condition seeks to limit the use of the
> government subsidy only, and the condition does not impose a
> penalty beyond the withdrawal of the subsidy itself, then the
> condition need merely be reasonable and viewpoint-neutral.  If the
> condition, on the other hand, is broader in scope, a heightened
> level of scrutiny may be applied.

*See* MTD Opin. at 23. The Court has already answered the first question in the affirmative at

earlier stages of the litigation.  *Id*. (quoting *Dale*, 530 U.S. at 656) ("In *Boy Scouts of Am. v.*

*Dale*, the Supreme Court held that the 'Boy Scouts is an expressive association and that the

forced inclusion of [a gay scoutmaster] would significantly affect its expression.' . . . [U]nder

---

[3]     For that reason, Cradle of Liberty has submitted just one jury interrogatory for this claim.  Because a forum
exists, the jury will only need to decide the single question of whether the City unconstitutionally limited Cradle of
Liberty's access to the forum based on its disagreement with Cradle of Liberty's exercise of its First Amendment
rights.

*Dale*, it is clear that the City could not outright require Cradle to change its membership policies. According to Cradle's Complaint, the City has explicitly demanded that Cradle change its policy of excluding homosexuals, conditioning Cradle's continued use of its headquarters on this change.  Allegation of such conditions, assuming they were imposed, constitute a claim that Cradle's First Amendment rights were compromised."); PI Opin. at 4 ("Having concluded the possible compromising of a First Amendment right, which the testimony at the hearing supports, here again, no evidence has been offered as to the scope of the condition.").  Because *Dale* has already established that Cradle of Liberty has a First Amendment right in its leadership policy, the jury must decide if the City actually imposed the unconstitutional condition that Cradle of Liberty has alleged.

It is appropriate for the jury to address the factual question of whether the City sought to limit the condition simply to the use of Cradle of Liberty's headquarters – or if the condition is broader in scope.  If the condition is broader in scope, then the Court will decide the remainder of this claim by applying heightened scrutiny.  If the jury decides that the condition was limited simply to the use of the headquarters, then the jury must decide whether the City's reasons for imposing the condition were reasonable and viewpoint-neutral.

Of course, if the jury decides that the City's only reason for imposing the condition was its opposition to the viewpoint expressed in the policy, then the reason will be neither reasonable nor viewpoint-neutral.

In sum, Cradle of Liberty proposes the following process for deciding its claim for unconstitutional conditions:

> 1.     The **jury** decides whether the City conditioned Cradle of Liberty's continued occupancy of its headquarters on Cradle of Liberty abandoning its leadership policy.

2.      If the jury finds that the City did impose this condition, then the **jury** must decide whether the City limited its demand to the use of the headquarters building or whether the scope of the condition was broader.

3.      If the jury decides that the scope of the condition was broader, then the **Court** must apply a heightened level of scrutiny to this claim.

4.      If the jury decides that the scope of the condition was narrow and extended only to the use of the building, then the **jury** must decide whether the City's reason for imposing this condition was its disagreement with Cradle of Liberty's leadership policy.  If the jury decides that the City's disagreement with the policy was its reason for imposing the condition, then that reason is neither reasonable nor viewpoint-neutral and the **Court** must enter judgment in Cradle of Liberty's favor on this claim.

5.      If the jury finds that the City had a reason for imposing the condition beyond its disagreement with the policy, then the **jury** must decide whether that other reason is reasonable and viewpoint-neutral.

**C.     Equal Protection – Similarly Situated Entities**

In order to prove that the City violated its Equal Protections rights, Cradle of Liberty must show "(1) that the defendant, acting under the color of state law, intentionally treated plaintiff differently from others similarly situated, and (2) that there was no rational basis for the difference in treatment."  MTD Opin. at 10 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) and *Jackson v. Gordon*, 145 Fed. Appx. 774, 776-77 (3d Cir. 2005)).

In determining whether other nonprofit organizations with Fairmount Park leases are "similarly situated" to Cradle of Liberty, the following two questions are appropriate for jury determination:

1.      Do other nonprofit organizations have leases with the City for Fairmount Park properties in which they pay no rent or nominal rent?

2.      Do any of these nonprofit organizations limit membership in any way based on ancestry, color, disability, gender identity, marital status, national origin, race, religion, sex or sexual orientation?

In attempting to evict Cradle of Liberty from its headquarters building, the City claimed that Cradle of Liberty's constitutionally protected leadership policy violated the City's Fair Practices Ordinance.  *See* Resolution 070522 of the Council of the City of Philadelphia, attached as Ex. 6 to Pl.'s Mot. Summ. J., Dkt. #49.  Because the Fair Practices Ordinance prohibits discrimination based on each of the attributes mentioned in the second proposed question above, these two jury interrogatories are the only ones needed to address the issue of whether other entities are similarly situated to Cradle of Liberty.

In its summary judgment briefing, the City argued that a relevant consideration in determining whether other entities were "similarly situated" was whether the City had received complaints about the organization.  However, when the City approved the termination of its lease with Cradle of Liberty, it never mentioned complaints as a basis for that decision.  More fundamentally, that the City allegedly received complaints only about Cradle of Liberty has no impact on the constitutional question here.  Otherwise, fundamental constitutional rights would be subject to the whims of who complains about what.  *See* Pl.'s Response to Def.'s Mot. Summ. J., Dkt. #85, dated March 29, 2010, at 20-22.[4]  Moreover, if that irrelevant detail enters into the determination of whether an entity is similarly situated, it simply opens the door for numerous other details to enter into this determination (*i.e.*, Is the entity a religious organization?  Does the entity have a written lease with the City?  On which listed attribute does the entity limit its membership?).  In short, if supposed "complaints" about Cradle of Liberty matter, then the constitutional inquiry becomes meaningless.

---

[4]      As Cradle of Liberty pointed out in response to the City's motion for summary judgment, the City only received complaints from certain political activists *after* the Supreme Court's decision in *Dale*.  Thus, every complaint related to Cradle of Liberty's exercise of a protected First Amendment right.  That no activists complained about other organizations exercising their protected rights is not a reason to find that such organizations were not similarly situated.

On its Equal Protection claim, therefore, Cradle of Liberty proposes the following decision-making process:

1.   The **jury** decides whether other nonprofit organizations have leases with the City for Fairmount Park properties in which they pay no rent or nominal rent.

2.   If the jury answers the first question in the affirmative, the **jury** then decides whether any of these nonprofit organizations limit membership in any way based on ancestry, color, disability, gender identity, marital status, national origin, race, religion, sex or sexual orientation.  If the jury finds that at least one other organization has limited membership based on one of those attributes, then that entity is similarly situated to Cradle of Liberty.

3.   If the jury answers both of the first two questions in the affirmative, the **jury** then decides whether the City treated at least one of those other nonprofit organizations differently than it treated Cradle of Liberty.

4.   If the jury does find that there was differential treatment, the **jury** then must decide whether the City had a rational basis for treating similarly situated entities differently.  If the sole reason for the differential treatment is disagreement with Cradle of Liberty's policy, then the City does not have a rational basis and the **Court** must enter judgment for Cradle of Liberty on its Equal Protection claim.

## VII.   STIPULATIONS OF COUNSEL AND ADMISSIONS

Counsel for Cradle of Liberty and the City have agreed that the trial would best be conducted if bifurcated into liability and damages phases.  Both parties agree that bifurcation could conserve expenses and judicial resources if it becomes unnecessary to try the City's counterclaims for ejectment and holdover rent.

The parties have not entered into any other stipulations, and Cradle of Liberty has no admissions to be read into evidence.

## VIII.   PROPOSED POINTS FOR CHARGE

Cradle of Liberty's proposed jury instructions and jury interrogatories/verdict form are attached to this pretrial memorandum as Exhibits B and C, respectively.

## IX.    ESTIMATED LENGTH OF TRIAL

Cradle of Liberty estimates that the trial should be concluded within five days.


                                        Respectfully submitted,

Dated:  June 4, 2010                    /s/ Jason P. Gosselin_____
                                        Jason P. Gosselin (PA Id. No. 76382)
                                        William M. McSwain (PA Id. No. 86499)
                                        Daniel B. Scott (PA Id. No. 87468)
                                        Richard M. Haggerty (PA Id. No. 209479)
                                        Tara S. Sarosiek (PA Id. No. 208598)
                                        Robyn S. Stoter (PA Id. No. 307040)
                                        DRINKER BIDDLE & REATH LLP
                                        One Logan Square, Ste. 2000
                                        Philadelphia, PA  19103-6996
                                        (215) 988-2700
                                        (215) 988-2757 Fax

## CERTIFICATE OF SERVICE

I, Richard M. Haggerty, hereby certify that on this day I caused a true and correct copy of the foregoing Proposed Jury Interrogatories/Verdict Sheet of Plaintiff Cradle of Liberty Council, Inc., Boy Scouts of America to be filed electronically, such that it is available for viewing and downloading from the ECF system, and to be served thereby upon counsel listed below:

> David Smith, Esquire
> Stephenie W. Yeung, Esquire
> Rebecca Lacher, Esquire
> Schnader, Harrison, Segal & Lewis, LLP
> 1600 Market Street, Suite 3600
> Philadelphia, PA  19103-7286
>
> *Counsel for Defendant City of Philadelphia*

Dated:  June 4, 2010                                    /s/ Richard M. Haggerty
                                                                     Richard M. Haggerty