## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRADLE OF LIBERTY COUNCIL, INC., | : | |
| BOY SCOUTS OF AMERICA, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | NO.  08-2429 |
| | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                        March 20, 2012

         Defendant City of Philadelphia has filed the present Motion for Judgment as a Matter of

Law and, Alternatively, for a New Trial.  For the following reasons, the Motion is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

         Plaintiff is a local council of the Boy Scouts of America, and administers scouting

programs in Philadelphia, Montgomery, and Delaware counties.  (Trial Tr. 69:4-11, Eaton Test.,

June 15, 2010.)  In 1929, Plaintiff completed the construction of a building at 22nd and Winter

Street in Philadelphia, which it has used as its regional headquarters ever since.  (Id. at 119:2-5;

123:2-6.)  Defendant owns the building and the property on which it is situated, but has not

charged Plaintiff rent in exchange for its use.  (Id. at 119:20-120:18; Trial Tr. 212:15-19, Dwyer

Test., June 15, 2010.)  Beginning in 2003, however, a dispute arose between the two parties

---

         [1]  The Motion currently pending before the Court was filed subsequent to a five-day jury
trial, during which a plethora of evidence was introduced by both parties.  In order to place the
current Motion in its proper context without usurping the jury's role as fact-finder, the Court
provides only a brief account of the dispute giving rise to this litigation.

concerning Plaintiff's membership policy.  (Id. at 196:15-200:7.)  Plaintiff denies membership to openly homosexual men, and Defendant informed Plaintiff that this practice violates its nondiscrimination laws.  (Id.)

Over the course of several years, Plaintiff and Defendant attempted to negotiate a resolution that would satisfy both parties.  (Id. at 212:7-216:13.)  These negotiations failed and, in 2007, the Philadelphia City Council passed a resolution approving the eviction of Plaintiff from Defendant's property.  (Id.)  Plaintiff was left with three options: (1) it could continue its rent-free use of the building if it changed its policy with respect to homosexuals; (2) it could remain in the building and continue to discriminate if it paid rent in the amount of $200,000 per year; or (3) it could vacate the building.  (Id.)

On May 23, 2008, Plaintiff filed its Complaint in this Court, bringing six counts for relief. A subsequent Motion to Dismiss filed by Defendant was granted in part and denied in part on September 25, 2008, narrowing the scope of the litigation to the following claims: (1) Defendant's demand that Plaintiff relinquish its membership policy with respect to homosexuals in order to continue its rent-free use of the building was an unconstitutional condition that violated the First Amendment to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution (Counts I and III); (2) Defendant's attempt to evict Plaintiff because of its membership policy constituted viewpoint discrimination in violation of the First Amendment to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution (Counts I and III); and (3) Defendant's attempt to compel Plaintiff to change its membership policy while failing to take comparable action against other similarly-situated groups with discriminatory policies violated the Equal Protection Clause of the Fourteenth Amendment to the United States

2

Constitution and Article I, §§ 1 and 26 of the Pennsylvania Constitution (Counts II and IV).  (See Compl. ¶¶ 40-64); Cradle of Liberty Council, Inc. v. City of Phila., No. Civ.A.08-2429, 2008 WL 4399025 (E.D. Pa. Sept. 25, 2008).  On June 23, 2010, at the conclusion of a trial on these issues, the jury returned a verdict in favor of Defendant on the viewpoint discrimination and equal protection claims, and a verdict in favor of Plaintiff on the unconstitutional conditions claim.  (Jury Interrogs., Docket No. 120.)

On July 21, 2010, Defendant filed the present Motion for Judgment as a Matter of Law and, Alternatively, for a New Trial, and Plaintiff filed its Response in Opposition on August 23, 2010.  Shortly thereafter, however, the parties asked the Court to refrain from deciding Defendant's Motion while they attempted to negotiate a settlement agreement.  In December 2011, the Court was informed that those discussions failed.  Subsequently, Defendant filed a Reply Brief on February 28, 2012, and Plaintiff filed a Sur-Reply Brief on March 6, 2012. Defendant's Motion is now ripe for resolution.

## II.     STANDARDS OF REVIEW

### A.      Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(b), a party may move for judgment as a matter of law after the conclusion of a jury trial.  This remedy is "sparingly invoked" and "is appropriate only where 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  Cange v. Phila. Parking Auth., No. Civ.A.08-3480, 2010 WL 1254337, at *1 (E.D. Pa. Apr. 1, 2010) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000)).  In short, "a motion for judgment as a matter of law 'should be granted only if, viewing the evidence in the light most

favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" Id. (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).

### B.     Motion for a New Trial

After a jury trial, Federal Rule of Civil Procedure 59 allows a court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Reasons for granting a new trial may include the following: "(1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury." Sharrow v. Roy, No. Civ.A.08-0068, 2009 WL 3101031, at *1 (M.D. Pa. Sept. 23, 2009) (citing Maylie v. Nat'l R.R. Passenger Corp., 791 F. Supp. 477, 480 (E.D. Pa.)).  "Where the evidence is in conflict and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial." Id. (citing Klein v. Hollings, 992 F.2d 1285, 1295 (3d Cir. 1993)).

## III.   DISCUSSION

Defendant has raised four arguments in support of its Motion for Judgment as a Matter of Law and, Alternatively, for a New Trial: (1) the United States Supreme Court's decision in Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez, 130 S. Ct. 2971 (2010) requires judgment in its favor; (2) Plaintiff failed to meet its burden of proving an unconstitutional conditions claim; (3) the Part II Jury Interrogatories and instructions relating to the unconstitutional conditions claim were clearly erroneous; and (4) the jury verdict is inconsistent and therefore requires judgment in Defendant's favor or a new trial.

4

The Court considers each argument in turn.

### A.    The Impact of the <u>Martinez</u> Decision on the Present Case

Defendant first argues that the Supreme Court's decision in <u>Martinez</u> requires judgment as a matter of law in its favor.  (Def.'s Mem. Supp. Mot. J. Matter of Law & New Trial ("Def.'s Mem.") 3-10.)  In <u>Martinez</u>, the respondent was a public law school which, through its "Registered Student Organization" ("RSO") program, offered official recognition to student groups.  130 S. Ct. at 2978-79.  RSOs received certain benefits from the law school, including financial assistance, use of school space, access to the school's communication channels, and use of the school's name and logo.  <u>Id.</u> at 2979.  In order to qualify as an RSO, however, a student group was required to comply with the respondent's nondiscrimination policy, which prohibited unlawful discrimination "on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation.  This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities."  <u>Id.</u> (citation to the record omitted).

The petitioner, a group of Christian law students, was denied RSO status because it excluded students who engaged in homosexual conduct or held religious beliefs that differed from those contained in the group's bylaws.  <u>Id.</u> at 2980.  The petitioner then filed suit, claiming that the respondent's "refusal to grant the organization RSO status violated [its] First and Fourteenth Amendment rights to free speech, expressive association, and free exercise of religion."  <u>Id.</u> at 2981.

The Supreme Court rejected all of the petitioner's constitutional claims.  In doing so, it first found that both parties had stipulated that the nondiscrimination requirement at issue was an "all-comers" policy, which meant merely that all organizations had to offer every

student—regardless of his or her beliefs—the opportunity to apply for admission.  Id. at 2982.
The existence of this stipulation prevented the Supreme Court from considering the petitioner's
argument that the nondiscrimination policy—as written rather than as stipulated—targeted only
those groups who held beliefs based on religion or sexual orientation.  Id. at 2982-84.

Next, analyzing the free speech and expressive association claims concurrently, the
Supreme Court held that the respondent could restrict access to the RSO program as long as the
restrictions were reasonable and viewpoint neutral.  Id. at 2984.  It then found that the
respondent's all-comers policy was reasonable in light of the forum's function and the
surrounding circumstances.  Id. at 2985-91.[2]  Finally, the Supreme Court concluded that because
the policy required "*all* student groups to accept *all* comers," it was "textbook viewpoint
neutral."  Id. at 2993.

In this case, Defendant contends that the Martinez decision mandates judgment as a
matter of law in its favor on the unconstitutional conditions claim.  Defendant argues that, in
Martinez, the Supreme Court "reviewed the unconstitutional conditions/expressive association
and nonpublic forum/viewpoint discrimination claims based solely upon its analysis of the
latter." (Def.'s Mem. 5.)  In other words, according to Defendant, the Supreme Court's decision
with respect to viewpoint discrimination controlled its ruling on all First Amendment claims.
Applying that logic to this case, Defendant argues that the jury's verdict with respect to the

---

[2]  Specifically, the Court recognized the respondent's interest in deciding how to structure
and implement its educational program; the desirability of ensuring that students are not forced to
subsidize a group that would reject them as members; the efficiency inherent in a policy that does
not require an examination of an RSO's reasons for restricting membership; the benefits of
bringing together individuals of diverse backgrounds; and the existence of state laws designed to
prevent discrimination.  Id. at 2988-91.

viewpoint discrimination claim—which was decided in Defendant's favor—must control the analysis of the unconstitutional conditions claim, on which the jury found for Plaintiff.  (Id. at 5-6.)[3]

      In order to properly compare Martinez with the current matter, it is necessary to accurately identify the nature of the claims made in the two cases.  Defendant characterizes the first Martinez claim as an "unconstitutional conditions/expressive association" claim and the second as a "nonpublic forum/viewpoint discrimination" claim.  What the petitioner in that case actually alleged was that the respondent violated its First Amendment rights to (i) free speech and (ii) expressive association.  While recognizing that two separate lines of decisions had emerged to address these distinct claims, the Supreme Court determined that, given the circumstances of that particular case, it would analyze the two claims concurrently.  See Martinez, 130 S. Ct. at 2985 ("[The petitioner] would have us engage each line of cases independently, but its expressive-association and free-speech arguments merge: *Who* speaks on its behalf, [the petitioner] reasons, colors *what* concept is conveyed. . . .  It therefore makes little sense to treat [the] speech and association claims as discrete.").  The Court further held that when speech and expressive association rights "arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive

---

    [3]  Defendant also relies on Martinez to explain why the jury was correct in returning a verdict in its favor on the viewpoint discrimination claim.  (Def.'s Mem. 6-10.)  Neither party, however, has questioned the soundness of that verdict, and so it is not relevant to the Court's comparison of the present case to Martinez.  To the extent Defendant relies on the viewpoint discrimination claim to demonstrate that the jury verdict is inconsistent, the Court addresses this argument in Section III.D.

association." 130 S. Ct. at 2985.  In other words, the petitioner in <u>Martinez</u> had made the same

allegation—that the government's policy violated its right to express its views—two different

ways, and so it was logical for the Supreme Court to treat them as one claim.

     Here, on the other hand, the First Amendment claims at issue are (i) unconstitutional

conditions and (ii) viewpoint discrimination in a government forum.[4]  (<u>See</u> Compl. ¶¶ 40-50.)

With respect to the former claim, Plaintiff alleges that "Defendant's efforts to condition

[Plaintiff's] continued use of its headquarters on [Plaintiff's] agreement to abandon its

constitutionally protected membership policy or to pay a punitive rental increase violates the First

Amendment doctrine of unconstitutional conditions." (<u>Id.</u> ¶ 44.)  The second claim alleges that

Defendant sought to evict Plaintiff solely because it disagreed with its membership policy, and

therefore unconstitutionally discriminated against Plaintiff on the basis of its viewpoint.  (<u>Id.</u> ¶

49.)  It is true that both claims are analyzed under the same "reasonable and viewpoint neutral"

framework under which the Supreme Court reviewed the First Amendment claim in <u>Martinez</u>,

but they address different questions.[5]  Specifically, the unconstitutional conditions claim

addresses *what* Defendant did to Plaintiff, while the viewpoint discrimination claim concerns the

---

    [4]  Prior to trial, this Court held that the forum alleged in the Complaint was a "nonpublic forum." <u>Cradle of Liberty</u>, 2008 WL 4399025, at *8-9.  A nonpublic forum consists of "public property that 'is not by tradition or designation a forum for public communication.'" <u>Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.</u>, 653 F.3d 290, 296 (3d Cir. 2011) (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 46 (1983)). "Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral." <u>Id.</u> (citing <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 800 (1985)).  The jury ultimately held that Defendant did in fact create such a forum.  (Jury Interrogs. I.1, Docket No. 120.)

    [5]  The elements of an unconstitutional conditions claim are more thoroughly discussed in Sections III.B and III.D of this Memorandum; viewpoint discrimination is addressed in Section III.D.

reasons *why* Defendant did what it did.  It is certainly possible to conclude, as the jury did in this case, that Defendant's purpose in imposing the condition was reasonable, but that the condition itself was unreasonable.  Thus, unlike the petitioner in Martinez, Plaintiff is not simply making one claim two different ways, and there is no "anomaly" inherent in two different verdicts on the viewpoint discrimination and unconstitutional conditions claims.

Furthermore, in comparing the condition imposed in Martinez to the condition at issue in this case, the Court finds a significant factual difference between the two that precludes judgment as a matter of law in Defendant's favor.  In Martinez, the nondiscrimination requirement covered only "admission, access and treatment in *Hastings-sponsored programs and activities*."  130 S. Ct. at 2979 (emphasis added).  Thus, to the extent the respondent in Martinez placed any indirect pressure at all on the petitioner to change its membership policy, it was only in the context of the law school itself, where the benefit would be enjoyed.  There was no evidence that the respondent attempted to influence the petitioner's activities that were unrelated to the law school.

In this case, Plaintiff alleges that Defendant did more than attempt to prohibit discrimination in city-owned property.  As addressed in detail in Section III.B.2 of this Memorandum, Defendant informed Plaintiff that if it wished to remain, rent-free, at its current location, it had to completely abandon its practice of denying membership to homosexuals, even in contexts unrelated to the subsidized building.  Defendant's attempt to compel Plaintiff to change its views in such a broad manner by threatening to remove a government benefit distinguishes this case from Martinez and, as discussed below, may have played a role in convincing the jury that the condition was unreasonable.

In sum, the Martinez case involved very different facts and, more importantly, different

claims from the present matter.  Accordingly, the Court finds that the holding in Martinez does

not mandate judgment as a matter of law for Defendant on the unconstitutional conditions claim.[6]

**B.      Whether Plaintiff Met its Burden of Proving its Unconstitutional Conditions Claim**

The doctrine of unconstitutional conditions holds that the government may not deny a

benefit to a party "on a basis that infringes his constitutionally protected interests—especially, his

interest in freedom of speech."  Perry v. Sindermann, 408 U.S. 593, 597 (1972).  More

specifically, the condition for receipt of a benefit must not "allow the government to 'produce a

result which (it) could not command directly.'"  Id. (quoting Speiser v. Randall, 357 U.S. 513,

526 (1958)).  This is true "even if the government may withhold that benefit altogether.  It

reflects the triumph of the view that government may not do indirectly what it may not do

directly over the view that the greater power to deny a benefit includes the lesser power to

impose a condition on its receipt."  Kathleen M. Sullivan, Unconstitutional Conditions, 102

Harv. L. Rev. 1413, 1415 (1989).

---

[6] Plaintiff also argues that unlike the parties in the present case, the litigants in Martinez stipulated to the all-comers policy, and the existence of this stipulation precluded the Supreme Court from considering the issue of whether the respondent selectively enforced that policy. (Pl.'s Resp. Opp'n 8-11.)  Defendant responds that there is no meaningful distinction between its nondiscrimination laws and the policy at issue in Martinez.  (Def.'s Reply Br. 3-6.)  After reviewing the opinion, it appears that the Supreme Court declined to consider the issue of selective enforcement because none of the lower courts addressed the argument, not because a factual stipulation about the *type* of policy prohibited the petitioner from raising the issue.  See Martinez, 130 S. Ct. at 2995 ("Neither the District Court nor the Ninth Circuit addressed an argument that Hastings selectively enforces its all-comers policy, and this Court is not the proper forum to air the issue in the first instance.  On remand, the Ninth Circuit may consider [the petitioner's] pretext argument if, and to the extent, it is preserved.").  Regardless of the Supreme Court's reasons for deciding not to address selective enforcement, there is nothing in this case that would have precluded the jury from considering the issue.  Indeed, as discussed in Section III.B.2 of this Memorandum, Defendant's selective enforcement of its laws may have played a role in persuading the jury that the condition imposed was unreasonable.

In deciding Defendant's Motion to Dismiss on September 25, 2008, the Court engaged in a detailed analysis of what a party must establish in order to prevail on an unconstitutional conditions claim.  See Cradle of Liberty Council, Inc. v. City of Phila., No. Civ.A.08-2429, 2008 WL 4399025, at *9-12 (E.D. Pa. Sept. 25, 2008).  There, this Court held as follows:

> The first question is whether the government's condition compromises a First Amendment right.  The next question is the scope of the condition.  If the condition seeks to limit the use of the government subsidy only, and the condition does not impose a penalty beyond the withdrawal of the subsidy itself, then the condition need merely be reasonable and viewpoint neutral.  If the condition, on the other hand, is broader in scope, a heightened level of scrutiny may be applied.

Id. at *12.

At the end of the trial, the jury concluded "that Defendant would have permitted Plaintiff to continue to use its headquarters building on a rent-free basis if Plaintiff repudiated or renounced the policy of the Boy Scouts of America to gays." (Jury Interrogs. II.5, Docket No. 120.)  It also found that this condition was unreasonable.  (Id. at II.6.)  Accordingly, judgment was entered in favor of Plaintiff on the unconstitutional conditions claim.  (See J. Order of July 13, 2010 ¶ 1, Docket No. 123.)  Defendant now contends that it is entitled to judgment as a matter of law on this claim because Plaintiff failed to meet its burden of proof.  In support of this argument, Defendant avers the following: (1) there is no evidence that Plaintiff has a right of expressive association around the exclusion of gays that has been infringed; (2) Plaintiff failed to present evidence that complying with Defendant's viewpoint-neutral nondiscrimination policy is an unconstitutional condition; and (3) there is no evidence that Defendant's laws regulate speech, and not conduct.  (Def.'s Mem. 10-20.)  Because the Court finds no discernible difference

between Defendant's first and third arguments,[7] it considers them together in Section III.B.1, and

analyzes its second argument separately in Section III.B.2.

### 1.     Plaintiff's Evidence That a Right of Expressive Association to Exclude Homosexuals Has Been Infringed

In its brief, Defendant refers to the testimony of three of Plaintiff's

representatives—William Dwyer, Charles Eaton, and the Honorable John Braxton—who stated

that they disagreed with the Boy Scouts of America's policy with respect to homosexuals.

(Def.'s Mem. 11-13.)  According to Defendant, this testimony demonstrates that Plaintiff does

not actually associate around a viewpoint of excluding homosexuals.  (Id. at 10-13.)  Defendant

contends that Plaintiff has no First Amendment right to protect a viewpoint it does not hold, and

so its unconstitutional conditions claim must fail.

In making this argument, Defendant relies on the California Supreme Court's decision in

Evans v. City of Berkeley, 129 P.3d 394, 396 (Cal. 2006).  In that case, the plaintiffs were

participants in the Berkeley Sea Scouts ("Sea Scouts"), a group which taught teenagers "sailing,

seamanship . . . and other skills for a maritime career."  Evans, 129 P.3d at 397.  The Sea Scouts,

which apparently was not a party to the litigation, consisted of "volunteers joining together in a

nonprofit association with no formal administrative structure, no budget, and no employees."  Id.

The group described itself as a "subdivision of" or "associated/affiliated with" the Boy Scouts of

America, which "provide[d] the group with a low-cost maritime liability insurance policy but

[gave] it no direct funding."  Id.

---

[7]  Both arguments are premised on the idea that Plaintiff and the Boy Scouts are separate entities, that the former has disavowed the discriminatory beliefs of the latter, and that because Plaintiff does not share the Boy Scouts' ideas with respect to gays, it cannot claim that Defendant violated its expressive association right to exclude homosexuals.  (Def.'s Mem. 10-13,18-20.)

The defendant, which provided the Sea Scouts with free berths at its marina, required the group to "provide written assurance [that it] would not discriminate against homosexuals or atheists wishing to participate in the group's program." Id. at 396. The plaintiffs alleged that the Sea Scouts satisfied this requirement, but that the defendant nevertheless discontinued the free berth program because of the group's affiliation with the Boy Scouts, which did not comply with the defendant's nondiscrimination policy. Id. at 399. The plaintiffs then sued, claiming that the defendant violated their rights to free speech, free association, and equal treatment "by punishing them for being part of [the Boy Scouts] despite their having never violated [the defendant's] antidiscrimination laws and having 'solemnly promised' not to do so in the future." Id. at 400.

In rejecting the free association claim, the court found that "[i]n requiring assurances of nondiscrimination, [the defendant] did not in any way demand, even as a condition of the free berths, that the Sea Scouts quit [the Boy Scouts]. To the extent compliance with the city's requirement would have that effect, it would be by the choice of a third party, [the Boy Scouts]." Id. at 404. The court then held that the government does not "infringe[] on associational rights by offering one group a financial benefit that, if accepted, could lead another group to sever its association with the recipient." Id.

The Court finds that Defendant's reliance on Evans is misplaced for several reasons.[8] First, there is an important difference between the claim raised by the plaintiffs in Evans and the claim made by Plaintiff. In Evans, the plaintiffs argued that the defendant infringed upon their

---

[8] The Court notes that Evans, an opinion issued by the Supreme Court of California, is not a binding precedent. Nevertheless, the case provides a useful contrast to the present matter and helps to illustrate why Plaintiff has sufficiently established a right of expressive association to exclude homosexuals.

right to associate with the national Boy Scouts organization.  The court rejected that argument because the defendant never conditioned the Sea Scouts' use of the berths upon disassociating itself from the Boy Scouts.  The Boy Scouts' decision to end its relationship with the Sea Scouts was only an indirect consequence of the group's compliance with the defendant's nondiscrimination policy.  Here, Plaintiff never claimed that Defendant infringed upon its right to associate with the Boy Scouts.  Rather, Plaintiff alleged that Defendant unconstitutionally conditioned receipt of a benefit on abandoning its membership policy, namely, *its own* practice of excluding homosexuals.  (See Compl. ¶¶ 42-44.)  No comparable claim was made by the plaintiffs in Evans.  See 129 P.3d at 404 ("Plaintiffs repeatedly disavow, both in their complaint and in their briefs in this court, any desire to discriminate on the basis of sexual orientation or religion.  They therefore cannot, and do not, claim that [the defendant], by requiring them to refrain from such discrimination as a condition of the free berths, is restricting their freedom to limit their membership for purposes of expressive association.").

Second, in analogizing the present case to Evans, Defendant suggests that, like the Sea Scouts, Plaintiff is a separate organization that exists independent of the Boy Scouts and does not adhere to its discriminatory practices.  The Court disagrees.  Plaintiff is a local chapter of the national Boys Scouts organization, and the evidence presented at trial established that the viewpoints of the Boy Scouts are shared by Plaintiff.  At multiple points during his testimony, William Dwyer, Plaintiff's former CEO, made this explicitly clear:

> •  Q.  Were you at liberty, as a local organization, to disavow the policies of national?
> A.  No.
> (Trial Tr. 184:25-185:2, Dwyer Test., June 15, 2010.)

14

- Q.  And the—did Cradle of Liberty Council, were they required to adhere to the national organization's policies?
  A.  Absolutely.
  (Trial Tr. 183:16-18, Dwyer Test., June 15, 2010.)

- Q.  Is it true—or does that apply with respect to other policies? Policies that don't even relate to this but the—are you at liberty to disregard any of the policies from national?
  A.  No.  No.
  (Trial Tr. 185:11-15, Dwyer Test., June 15, 2010.)

- Q.  This document . . . is titled "Position Statement: Homosexuality and the BSA".  Do you understand BSA to be Boy Scouts of America?
  A.  Yes.
  Q.  And I'd like you to read, please, the third paragraph beginning with "We believe".
  A.  "We believe that homosexual conduct is inconsistent with the requirements in the Scout oath that a Scout be morally straight and in the Scout law that a Scout be clean in word and deed and that homosexuals do not provide a desirable role model for Scouts."
  Q.  That paragraph accurately states the national policy, is that correct?
  A.  Back when that was written, yes.[9]
  Q.  All right.  And the Cradle of Liberty Council regards itself as bound to the national policy, correct?
  A.  That's correct.
  (Trial Tr. 29:4-20, Dwyer Test., June 16, 2010.)

In addition, Romulo L. Diaz, Jr., who worked for Defendant as city solicitor, testified that Plaintiff told him it would not change its policy or sign a lease that included a nondiscrimination provision.  (Trial Tr. 35:20-22, Diaz Test., June 18, 2010.)  Finally, R. Duane Perry, who was on Defendant's Lesbian, Gay, Bisexual, and Transgender Advisory Board, stated that the Board "advised the mayor and the mayor's office about the concerns about the *discriminatory policies of the Cradle of Liberty Council*."  (Trial Tr. 25:14-16, Perry Test., June 21, 2010 (emphasis

---

[9]  The record shows that the document was written in 1991, but that the Boy Scouts organization still believes homosexual conduct to be inconsistent with the obligations of the Scout Oath.  (Trial Tr. 29:4-32:6, Dwyer Test., June 16, 2010.)

added).)  In short, there can be no dispute that Plaintiff—and not merely the national Boy Scouts organization—has a policy of discriminating against homosexuals.  Furthermore, because Plaintiff's exclusion of homosexuals is designed to transmit the values contained in the Scout Oath, it is expressive activity, and so the condition imposed by Defendant was an attempt to regulate speech, not merely conduct.  See Boy Scouts of Am. v. Dale, 530 U.S. 640, 649-50 (2000).

Next, the fact that several of Plaintiff's leaders disagreed with this policy is irrelevant to the constitutional claim of Plaintiff itself.  Mr. Dwyer, Mr. Eaton, and Judge Braxton are not parties to this litigation—indeed, none of Plaintiff's individual members are named in the caption to the Complaint—and there is a crucial distinction between the views of a group and the views of the individuals who comprise that group.  This difference was illustrated at trial, when it was revealed that Plaintiff's leaders attempted to adopt a policy that did not discriminate against homosexuals, but were rebuffed by the national Boy Scouts organization.  (See Trial Tr. 38:5-14, Dwyer Test., June 16, 2010.)  The evidence established that Plaintiff's message remained identical to the Boy Scouts, even while some of its own members tried, unsuccessfully, to reform that message.[10]  Finally, as noted by Plaintiff, the Supreme Court has made clear that the "First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'"  Dale, 530 U.S. at 655.

The Court therefore rejects Defendant's claim that Plaintiff failed to establish a right of

_____

[10]  This illustrates another important difference between the present case and Evans.  In Evans, the plaintiffs themselves averred that they did not discriminate.  Here, while some of Plaintiff's members may not wish to discriminate, Plaintiff itself holds that homosexual conduct is inconsistent with the Scout Oath.

expressive association that excludes homosexuals.[11]

### 2. Whether Plaintiff Presented Evidence that Complying with Defendant's Nondiscrimination Policy is an Unconstitutional Condition

Defendant next argues that it is not required to subsidize private speech and that it may condition participation in its programs on compliance with its nondiscrimination policies. (Def.'s Mem. 15-18.)  It contends that Plaintiff was under no obligation to accept the subsidy, and that its condition would not have prohibited Plaintiff from espousing its views.  (Id. at 17.)  Thus, according to Defendant, Plaintiff failed to establish that the condition imposed was unconstitutional.

Defendant is certainly correct that, in general, it has the authority to dictate the parameters of its funding programs.  As discussed above, however, when a condition for receipt of a government benefit compromises a First Amendment right, it must be reasonable and viewpoint neutral.  Here, the jury found that the condition imposed on Plaintiff by Defendant was not reasonable, and returned a verdict in favor of Plaintiff on the unconstitutional conditions claim. Accordingly, the issue faced by the Court is whether there was a sufficient basis for the jury to reach this decision.

In order to make this determination, it is necessary to precisely identify the condition

---

[11]  The Court is also unpersuaded by Defendant's argument that the right to expressive association discussed by the Supreme Court in Dale is limited to the exclusion of scout leaders, and does not include the right to exclude gay scouts.  (See Def.'s Mem. 13-15.)  While the facts of Dale may have involved only gay leaders, the holding broadly encompasses all members. Dale, 530 U.S. at 648 ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." (citation omitted)). Furthermore, the Scout Oath—which forms the basis for Plaintiff's expressive association right to exclude homosexuals—applies to all Scouts, not just the organization's leaders.

placed upon Plaintiff.  At trial, Mr. Dwyer testified that the termination of Plaintiff's lease was "subject to withdrawal upon agreement by the Boy Scouts to either pay fair market rent or end its discriminatory policy and practice with respect to homosexual members." (Trial Tr. 213:19-22, Dwyer Test., June 15, 2010; see also Trial Tr. 4:5-8, Dwyer Test., June 16, 2010.)  Mr. Dwyer understood Defendant's position to mean that Plaintiff could choose one of three options: "Number one, change your policy.  Number two, pay fair market rent as determined by [Defendant].  Or, number three, leave the building." (Trial Tr. 4:11-13, Dwyer Test., June 16, 2010.)  Thus, the only way Plaintiff could have continued to receive the government subsidy was to comply with Defendant's demand that it "end its discriminatory policy and practice with respect to homosexual members."

At first glance, it may appear that Defendant, in imposing this condition, merely wished to prevent a public subsidy from being used in conjunction with discriminatory activity.  The jury was confronted with evidence, however, that Defendant's demand was actually much broader.  Mr. Dwyer and Mr. Eaton testified that Plaintiff's organization encompasses over 500 units and provides Scout programs in Philadelphia, Montgomery, and Delaware counties.  (Trial Tr. 5:4-23, Dwyer Test., June 16, 2010; Trial Tr. 69:9-11, Eaton Test., June 15, 2010.)  During trial, Mr. Dwyer was asked how Plaintiff interpreted the condition that Defendant imposed upon it:

> Q. . . . [D]id you understand that the City was asking the Cradle of Liberty Council to change the policy with respect to leadership only in the building or they wanted to change the policy that applied to all those other 500—other units?
> A. It's my understanding they wanted policy change related to everything.

(Trial Tr. 5:25-6:6, Dwyer Test., June 16, 2010.)  From this testimony, the jury could have concluded that Defendant's condition went beyond prohibiting discrimination at or in connection

18

with the city-owned building.  Rather, it could have found that Defendant was attempting to
compel Plaintiff to renounce its policy towards homosexuals in its entirety, even in contexts and
locations that were entirely unrelated to the use of the city's property.  The jury may have
concluded that while Defendant had an interest in enforcing its nondiscrimination laws, it could
not use the promise of a benefit to coerce Plaintiff into relinquishing its First Amendment rights
in such a categorical manner.

Furthermore, Plaintiff introduced evidence that another Boy Scouts troop, located on
Wigard Avenue, was also receiving rent-free access to city-owned property, but that Defendant
never imposed any similar condition on that group.  Lewis Rosman, an attorney who worked for
Defendant, testified that Defendant knew that the other Boy Scouts troop was also being
subsidized:

> Q.  Okay, so you would agree with me that as of June 19th, 2006, which was
> approximately thirty-one days before the notice of ejectment was sent with respect
> to the headquarters property, people in the law department were fully aware that there
> was another Boy Scouts property in the Fairmount Park system, correct?
> A.  Yes.
> Q.  Okay, and nobody in the law department ever took any action to evict Boy Scouts
> from the Wigard Avenue property, correct?
> A.  Not that I'm aware of.

(Trial Tr. 10:6-16, Rosman Test., June 17, 2010.)  Mr. Rosman was then asked if he knew the
reason for the disparate treatment of the two Boy Scouts groups:

> Q.  And you're—as the lawyer who began looking into the relationship between [the]
> City of Philadelphia and the Boy Scouts almost ten years ago, as you sit here today,
> you have no idea why the City has moved to evict the Scouts from one property but
> not the other?  Is that fair?
> A.  Well, the one property was the headquarters building, so it was much more
> symbolic of the discrimination that was going on.

(Id. at 12:2-9.)  Hearing this, the jury could have concluded that Defendant was selectively

19

enforcing its nondiscrimination laws in a manner that lacked any rational basis.  If Plaintiff and

the Wigard Avenue Boy Scouts had identical policies, and if the existence of those policies was

supposed to have precluded participation in Defendant's free rent program, it may have seemed

illogical to the jury that Plaintiff alone was asked to renounce its policy simply because it

possessed more "symbolic" attributes than the other Boy Scouts troop.[12]

Finally, the record supports the finding that the condition was unreasonable if the jury

believed Plaintiff's argument with regard to what both sides referred to as "the working group."

The working group consisted of private citizens, led by a man named Arthur Kaplan, who

advocated for the rights of homosexuals and urged Defendant to evict Plaintiff if it did not

change its membership policy.  Needless to say, the positions of Plaintiff and Defendant do not

coincide with respect to the role played by the working group in this dispute.

Plaintiff argued in its closing that "[t]he reason the city is trying to evict the Boy Scouts is

because Arthur Kaplan and his working group are demanding it."  (Trial Tr. 17:24-25, June 22,

2010.)  According to Plaintiff, the working group put pressure on Romulo L. Diaz, Jr., the then

city solicitor, to promote the interests of the gay community, of which Mr. Diaz—a gay man—is

a part.  (Trial Tr. 21:12-22:16, June 22, 2010.)  To support this theory of improper influence,

Plaintiff referred to a series of communications between Mr. Diaz and Mr. Kaplan, excerpts from

some of which follow:

---

[12]  The different treatment of these two groups may also explain why the jury found for
Defendant on the viewpoint discrimination claim but for Plaintiff on the unconstitutional
conditions claim.  If Plaintiff and the Wigard Avenue Boy Scouts had the same policies, the jury
could have concluded that Defendant was not necessarily targeting Plaintiff because of its
viewpoint, but that it was acting unreasonably by imposing the condition on one group and not
the other.

1.     Plaintiff's Ex. 116, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (June 15, 2005, 19:42 EST):

>    By not circulating a DRAFT, by last Friday, as promised to our working group (despite reminders before and since); and by instead hand-delivering to the Scouts today a revised letter that shares the same fundamental ambiguity as your initial letter, you are coming close to public criticism.
>    . . . .
>    The Scouts could sign this letter, as you drafted it, and continue to enjoy the benefit of a free building, while still engaging in discrimination in membership on the basis of sexual orientation.  If that letter hasn't gone over to the Scouts yet, please stop it.  Otherwise, please withdraw and revise it, as stated above, in advance of this Friday's meeting.

2.     Plaintiff's Ex. 116, E-mail from Romulo L. Diaz, Jr. to Arthur Kaplan (June 15, 2005, 20:07 EST):

>    The letter sent was a good faith attempt to address the shortcomings discussed with respect to the lack of public awareness of the non-discrimination policy and countersignatures.  In addition, the letter explicitly provides for possible additional protections, particularly in light of the conversation scheduled with Boy Scouts on Friday.
>
>    As for your point about circulating a draft letter, if that was your understanding (I asked Victor who did not recall that), I apologize.  The bottom line, I respectfully suggest, is what greater assurances do community representatives desire, and how might they be accommodated by the Boy Scouts.  We all have our work cut out for us on this—and we should be working together to achieve it rather than attacking each other.

3.     Plaintiff's Ex. 116, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (June 15, 2005, 22:35 EST):

>    Your letter to the Scouts today is an improvement in some respects, but basically still lets the Scouts off the hook.  That may or may not serve the perceived interests of some people in the Street administration, but it really is a disservice to the LGBT community of which you are a part.

4.     Plaintiff's Ex. 119, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (July 26, 2005, 15:08 EST):

>    At the conclusion of our conversation, Friday morning, you agreed to send the Scouts a letter noting that the City's recent draft Agreement

proved unacceptable both to the Cradle of Liberty Council and to the Community, therefore pointing to the need for a meeting.

If you have not already sent that letter, you might want to circulate in draft to the Working Group (which I will "cc" for convenience), by attaching a draft to your reply to this email. If you have already sent it to the Scouts, please likewise attach it to your reply to this email.

5.    Plaintiff's Ex. 119, E-mail from Romulo L. Diaz, Jr. to Arthur Kaplan (July 26, 2005, 15:31 EST):

I signed it earlier today, and will ask Jim Leonard to send you a copy.

6.    Plaintiff's Ex. 121, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (Aug. 3, 2005, 23:27 EST):

I assume that, by now, you have read the front page article in PGN about the Chicago injunction against public subsidy of the Boy Scouts, as well as the underlying decision in Winkler v. Chicago School Reform Board of Trustees, 2005 WL 627966 (N.D. Ill).

Does any of this lead you to reconsider your refusal to tell the Scouts that the City will not subsidize discrimination, through a rent-free building??

I would very much appreciate a timely response to this.

7.    Plaintiff's Ex. 121, E-mail from Romulo L. Diaz, Jr. to Arthur Kaplan (Aug. 4, 2005, 23:56 EST):

I have not read the PGN article, but, more importantly, you have mischaracterized my position.

The point I have been trying to clarify through a face-to-face meeting with the Boy Scouts Council and community leaders is whether the Council is acting in conformity with the City's fair practices ordinance. My position is that the fair practices ordinance establishes a standard of nondiscriminatory conduct. The City is free to require adherence to that standard by those upon whom the City confers discretionary privileges, including the use of City-owned land on a rent-free basis.

I hope that this clarifies my position.

8.    Plaintiff's Ex. 126, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (Sept.

22

15, 2005, 23:41 EST):

> I appreciate the logistical problem of finding a time convenient for you and other administration officials (which I assume means Joyce and Pedro). I also think that your recent communication with the Scouts may indicate a willingness on your part to move in the right direction.
>
> On the other hand, a meeting in the near future really does mean the near future. You know from an email that another member of the Working Group sent to you over the summer that he (and some other) members of the Group advocate going public about the City's October, 2004 secret agreement, the Scouts formal "don't ask don't tell" policy, and subsidized discrimination.
>
> I surmise that patience among other members of the Working Group is wearing thin. The initial responses that I received tonight from two fellow members of the Working Group read:
>
> "[Hurricane] Katrina. It's always something." (Response 1)

9. Plaintiff's Ex. 126, E-mail from Romulo L. Diaz, Jr. to Arthur Kaplan (Sept. 17, 2005, 17:39 EST):

> Having gotten that off my chest [the reference is to aiding Katrina victims taking time], let me say that, yes, I very much want to include the Chief of Staff and if possible, Managing Director in our meeting. Joyce and I are coordinating calendars so I can send you suggested times next week. The implications are large, so I want to do this right. However, I also want to do this timely. Should I not be able to get some coordinated dates by next week, I will provide times when I will be available, so I can update folks and hopefully eliminate any misperceptions about the City's direction.

10. Plaintiff's Ex. 129, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. and Joyce Wilkerson (Oct. 17, 2005, 22:09 EST):

> Hi Joyce and Romy,
> Thanks again for a productive meeting, last week! I want to follow up on a couple of messages that I left for you about scheduling our meeting with the Mayor.
>
> Near the conclusion of our October 12 meeting, Joyce, you suggested that you would get back to us by the end of the week with the date/time for a meeting with the Mayor, this week.

As I mentioned to Romy immediately after our October 12 meeting, prompt scheduling of a meeting this week is of particular importance to Duane and me, because we will be in Spain thereafter from October 23 to November 15.  We'd like to participate if at all possible.

We also are concerned that delay may give the Scouts an opportunity to regroup, if they get wind of this, and launch a lobbying campaign. That might complicate life, and further delay the resolution of subsidized discrimination (which, as Joyce aptly stated, is well past the time of needing resolution).

Please let me know whether the meeting will be scheduled for this week, and if so the date and time.  I've cc'd this to the Working Group so that a "reply all" with the time/date will notify all.

Again, thanks.

Warm regards
    – Arthur.

11.    Plaintiff's Ex. 134, E-mail from Arthur Kaplan to Romulo L. Diaz, Jr. (Oct. 7, 2006 11:25 EST):

Hi Romy and Lewis,
The meeting with the Mayor was terrific.  (Subsequent to the meeting, Abbe spoke with Councilman Ramos, and he too is now on board.)

One of the action items was your drafting a Resolution for the Mayor's review by November 7.  Would you please share that with us in draft a few days before November 7 to avoid any miscommunication?

If you prefer, we could schedule a meeting with you for a date shortly before November 7 to discuss the proposed Resolution face to face. I'll be away through November 1 (in Turkey and Croatia), so I'd prefer a date such as Friday, November 3 or Monday, November 6, if you prefer to meet face to face.

We suggest that the Resolution (in addition to whatever else) clearly state that "as a matter of public policy", the City does not want to "subsidize or provide special privileges to organizations that discriminate." This alternative ground trumps potential appeals based on Dale, or based on the reach of city ordinances.  It was, I believe,

24

the ground on which the California Supreme Court in 2006 unanimously upheld the right of municipalities to withhold subsidies or special privileges from the Boy Scouts.

It also resonates with the public. For example, the thrust of the Daily News editorial was that the Boy Scouts have a right to discriminate, but the City is right in withholding public subsidies.

12.    Plaintiff's Ex. 134, E-mail from Romulo L. Diaz, Jr. to Arthur Kaplan (Oct. 12, 2006, 15:09 EST):

I'd be pleased to host a meeting on the draft resolution when you return. Will get Maria to confirm time and location.

Glad to hear C. Ramos on board.

Referring to the repeated pressure placed on Mr. Diaz by Mr. Kaplan, Plaintiff's counsel stated

the following in his closing address to the jury:

My point, ladies and gentlemen, that this is not the way that city governments are supposed to behave. It's this kind of behavior that makes people distrust city governments. Special access, secret communications, secret deals, special treatment. The city government is supposed to represent all the residents of the city. And the city solicitor is the highest ranking lawyer in the city government. That city solicitor is supposed to serve all residents, not just the chosen few. And they're supposed to consider all viewpoints and make decisions that are in the best interests of all residents. And the way the city was treated here, ladies and gentlemen, and the way the city solicitor's office allowed itself to be manipulated by Arthur Kaplan and the working group is nothing short of disgraceful.

Now, there was a [S]upreme [C]ourt justice named Lewis Brandeis with an opinion, he wrote a famous line. And the line is "That Sunlight is the Best Disinfectant." And what he meant by that is that when government action is exposed to the public when the public sees what's going on—instead of having it back written you can see the communications—the government tends to be on its best behavior. Sunlight is the best disinfectant. And this whole smelly, dirty process by the city and Arthur Kaplan who's secretly working together to punish the Boy Scouts has now been exposed to the light of this courtroom.

(Trial Tr. 34:20-35:19, June 22, 2010.)

Of course, as stated earlier, the opinions of Plaintiff and Defendant with respect to the

role of Arthur Kaplan and the working group do not coincide. In discussing the group,

Defendant's counsel stated as follows:

> I want to review with you what was the testimony and what do the documents show
> about Arthur Kaplan and the working group and how they became involved.  Before
> we get there, what they demonized Mr. Kaplan and the working group for is for
> petitioning the government.  This is America, and one of the things that makes
> America the country that it is is that each of us has the right to petition the
> government.  We do it every day.
> . . .
> Now, they are zealous advocates.  Did I cringe a couple of times when I read things
> that Mr. Kaplan wrote?  Of course I did.  And I assume each of you did as well.  But
> remember what Romy Diaz said, remember what all of the city witnesses said, they
> are public servants, and as a public servant, not on the judiciary, but a public servant
> in the executive branch, they are constantly pressured by those with specific interests
> to see things their way.  Ceisler Jubilirer is in the business of providing that sort of
> pressure for the Boy Scouts.  It's the job of Romy Diaz as city solicitor to listen, to
> learn what there is to learn, to take advantage of whatever knowledge or insight that
> Ceisler Jubilirer, or Mr. Kaplan or other members of the working group, or anybody
> else provided, then to make his own judgment.

(Trial Tr. 79:12-19, 86:3-16, June 22, 2010.)

Defendant's argument was very well presented and made clear its ongoing commitment

to not subsidizing discrimination.  Throughout its closing, however, Defendant never took any

blame for what was, at the least, an appearance of impropriety in the solicitor's office in what

could be looked upon as preferential treatment to a group that had the inside track to the solicitor.

Above all, it could have been argued that even if these overzealous advocates had special access

to the solicitor, this should not obscure the laudable goal of Defendant.  Sometimes, it could be

argued, the end does justify the means.

In sum, Defendant's account of the role played by the working group is certainly credible,

but the jury was free to give more weight to Plaintiff's argument.  More specifically, the jury

could have found that a group dedicated to evicting Plaintiff unless it changed its policy had an

unfair advantage in advancing its agenda—an advantage that certainly an average citizen would

26

not have if she or he wanted to advocate a particular position with the assistance of the office of

the city solicitor.  Put simply, it smells of cronyism—the same sort of cronyism that perhaps got

Plaintiff its sweetheart no-rent deal in the first instance.  As suggested above, if the jury accepted

this argument, then it follows that the condition imposed upon Plaintiff, crafted by improper

influence, was unreasonable.

For all of these reasons, the Court finds that the jury did not err in finding that

Defendant's condition was unreasonable and therefore unconstitutional.

**C.   Whether the Jury Interrogatories and Instructions Relating to the Unconstitutional Conditions Claim Were Clearly Erroneous**

**1.   Whether the Court's Instructions on the <u>Dale</u> Decision Were Clearly Erroneous**

When instructing the jury, this Court stated that the Supreme Court's decision in <u>Dale</u>

was relevant to the present case because it held "that the Boy Scouts could revoke membership

based or around homosexuality."  (Trial Tr. 9:18-19, June 22, 2010.)  Defendant contends that

this description was "misleading in its reference to 'Boy Scouts' without instructing that the

parties to that case were the Boy Scouts of America and the Monmouth Council, and not

[Plaintiff].  [Defendant] has carefully distinguished the [Plaintiff] from the Boy Scouts of

America—just as [Plaintiff] does in attempting to distinguish itself as an organization that does

not, in fact, practice discrimination."  (Def.'s Mem. 24.)  Here, Defendant is essentially making

the same argument that was discussed and rejected in Section III.B.1 of this Memorandum, and

the Court declines to analyze this issue any further.  Put plainly, there is simply no evidence that

Plaintiff—as opposed to its individual members—did not associate around a viewpoint that

homosexual conduct was incompatible with the Scout Oath.  The Court therefore finds that it did

27

not err in instructing the jury on the significance of the <u>Dale</u> decision.

###### 2.     Whether the Court Failed to Instruct the Jury on the Requirements of an Expressive Association Claim

Jury Interrogatory Number 5 asked as follows: "Do you find that Plaintiff proved by a preponderance of the evidence that Defendant would have permitted Plaintiff to continue to use its headquarters building on a rent-free basis if Plaintiff repudiated or renounced the policy of Boy Scouts of America to gays?"  (Jury Interrogs. II.5, Docket No. 120.)  According to Defendant, "this instruction did not cause the jury to properly consider the requisite existence of a protected viewpoint . . . around which [Plaintiff] associates, and failed to instruct the jury to assess the effect of [Defendant's] condition on [Plaintiff's] expressive association."  (Def.'s Mem. 26.)  In addition, Defendant contends that "the Interrogatory did not permit the jury to properly consider the condition imposed by [Defendant]: comply with City laws and policies *or* pay fair market rent to maintain both occupancy and the discriminatory policy."  (<u>Id.</u>)  The Court is unpersuaded.  First, with respect to the existence of a protected viewpoint, the jury's consideration of this issue was encompassed in the Interrogatory's reference to "the policy of Boy Scouts of America to gays."  To the extent Defendant is again arguing that Plaintiff did not have such a policy and therefore had no right of expressive association, the Court rejects this contention for all the reasons set forth in Section III.B.1.  Second, consideration of the condition imposed was an element of the ensuing Interrogatory, which addressed the reasonableness of the condition.

Next, Defendant takes issue with Interrogatory Number 6, which asked as follows: "Do you find that the reason Defendant imposed a condition on Plaintiff's continued occupation of its

headquarters building was reasonable?"  (Jury Interrogs. II.6, Docket No. 120.)[13]  Defendant

contends that this question was improper because it did not directly ask whether the restrictions

imposed were reasonable.  (Def.'s Mem. 27.)  The Court finds no error in the phrasing of the

Interrogatory, which allowed the jury to consider both the condition and the attendant

circumstances—specifically, Defendant's purpose in imposing the restrictions—in assessing

whether Plaintiff met its burden of proof on the reasonableness element of its unconstitutional

conditions claim.

Finally, Defendant contends that the Court erred in instructing the jury that in determining

whether Defendant's attempt to evict Plaintiff was "reasonable," it merely had to decide whether

there was a rational basis for Defendant's actions.  (Def.'s Mem. 27; see also Trial Tr. 14:3-6,

June 22, 2010.)  According to Defendant, the Court should have told the jury that "'[t]he

reasonableness of the Government's restriction of access to a nonpublic forum *must be assessed*

*in light of the purpose of the forum and all surrounding circumstances*.'"  (Def.'s Mem. 27-28

(quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 809 (1985)).)  The

Court disagrees.  In assessing "reasonableness" in terms of whether there was a rational basis for

Defendant's actions, the jury was free to consider all aspects of those actions, including their

nature and purpose.  Furthermore, Interrogatory Number 6—to which, as discussed above,

Defendant also objected—specifically asked the jury to consider Defendant's reasons for

_____

[13]  Defendant also objects to the use of the pronoun "its" in this Interrogatory, claiming
that it falsely suggested that Plaintiff, rather than Defendant, owned the building.  (Def.'s Mem.
27 n.14.)  The Court disagrees.  Plaintiff never disputed Defendant's ownership of the property at
trial, and the pronoun was merely used in this context to reflect the fact that Plaintiff used the
building as its headquarters.  Furthermore, there is no suggestion that the jury believed the
property belonged to Plaintiff, or that it allowed the issue of ownership to affect its decision in
any way.

imposing its condition on Plaintiff.  The Court therefore finds no error in how it instructed the jury on this issue.

### D.        Whether the Jury Verdict is Inconsistent

"[V]erdicts are inconsistent when a jury renders different verdicts on two different causes of action, even though the only contested elements were the same as to both causes of action." Directv v. Crespin, 224 F. App'x 741, 757 (10th Cir. 2007) (citing Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 912 (10th Cir. 2004)).  The Third Circuit Court of Appeals has provided district courts with four potential approaches when faced with an inconsistent verdict:

> [A] court may (1) allow an apparently inconsistent verdict to stand; (2) read the verdict in a manner that will resolve the inconsistencies; (3) resubmit the question to the jury; and finally, (4) "if verdicts are genuinely inconsistent and if the evidence might support either of the 'inconsistent' verdicts, the appropriate remedy is ordinarily . . . not simply to accept one verdict and dismiss the other, but to order an entirely new trial."

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 217-18 (3d Cir. 2009) (quoting Mosley v. Wilson, 102 F.3d 85, 90-91 (3d Cir. 1996)) (footnote omitted).

Here, Defendant argues that the jury's verdict in its favor on the viewpoint discrimination and equal protection claims is inconsistent with its verdict in favor of Plaintiff on the unconstitutional conditions claim.  (Def.'s Mem. 28-31.)  Specifically, Defendant contends that "[t]he jury's negative response to Interrogatory No. 6 in Part II asking whether the City 'imposed a condition on [Plaintiff's] continued occupation of its headquarters building [that] was reasonable' is on its face inconsistent with the remainder of the verdict . . . ."  (Id. at 29.) Defendant argues that the inconsistency must be resolved in its favor, and that it is entitled to either judgment as a matter of law or a new trial.  (Id. at 28-31.)  In addressing this argument, the

30

Court looks to the verdicts themselves and the questions the jury was required to answer in making its decisions.[14]

The elements of Plaintiff's unconstitutional conditions claim and the Interrogatories submitted to the jury in conjunction with this claim are discussed at length above.  To reiterate, in order to have found in favor of Plaintiff on the unconstitutional conditions claim, the jury had to conclude that Defendant's condition compromised a First Amendment right and was either unreasonable or lacked viewpoint neutrality.  Having found that the condition affected a First Amendment right and was unreasonable, the jury did not decide whether it was viewpoint neutral.

With respect to Plaintiff's nonpublic forum/viewpoint discrimination claim, the jury was asked the following four questions:

1.   Do you find that Plaintiff proved by a preponderance of the evidence that Defendant created a nonpublic forum in its program of leasing Fairmount Park properties to nonprofit organizations?

2.   Do you find that Plaintiff proved by a preponderance of the evidence that Defendant sought to evict Plaintiff from its headquarters building because Defendant opposed the viewpoint expressed in the leadership policy of the Boy Scouts of America with respect to gays?

3.   Do you find that the reasons that Defendant's attempts to evict Plaintiff from its headquarters building were reasonable?[15]

---

[14]   In responding to Defendant's argument that the jury verdict was inconsistent, Plaintiff cites to post-trial comments made by one of the jurors to a newspaper journalist.  (Pl.'s Resp. Opp'n 18.)  Defendant disputes the relevance and admissibility of this evidence.  (Def.'s Reply Br. 19-20.)  Because the Court gives no weight to the juror's comments, it declines to address the parties' arguments with respect to this issue.

[15]   Defendant argues that this Interrogatory is identical to Interrogatory Number 6 of the unconstitutional conditions claim, which asked, "Do you find that the reason that Defendant imposed a condition on Plaintiff's continued occupation of its headquarters building was

4.      Do you find that the reasons that Defendant's attempts to evict Plaintiff from its headquarters building were viewpoint-neutral?

(Jury Interrogs. I.1-4, Docket No. 120.)  The jury answered all four questions in the affirmative, and found in favor of Defendant on the viewpoint discrimination claim.  (Id.)  Finally, the jury was asked four questions in connection with Plaintiff's equal protection claim:

8.      Did Plaintiff prove, by a preponderance of the evidence, that Defendant has established clear standards for the granting or continuance of rent-free occupancy of City property by non-profit organizations?

9.      Did Plaintiff prove, by a preponderance of the evidence, that there are other organizations who were substantially similarly situated in all relevant aspects to Plaintiff that occupy rent-free City property?

10.     Did Plaintiff prove, by a preponderance of the evidence, that other substantially similarly situated organizations received different treatment from Plaintiff in contravention of Defendant's standards for the granting or continuance of rent-free occupancy of City property?

11.     Did Plaintiff prove, by a preponderance of the evidence, that Defendant's termination of the Plaintiff's rent-free occupancy of City-owned property had no rational basis related to Defendant's legitimate interest in eliminating discrimination against gays?

(Jury Interrogs. III.8-11, Docket No. 120.)  The jury answered "Yes" to the first three questions and "No" to the final question, resulting in a verdict in favor of Defendant.  (Id.)

After careful review, the Court finds no inconsistency among the three verdicts.  In the

---

reasonable?"  (Def.'s Reply Br. 13-15.)  The jury found that the reasons Defendant attempted to evict Plaintiff were reasonable, while the reasons for imposing the condition were unreasonable, and Defendant contends that "[t]here is simply no way to reconcile these two answers." (Id. at 15.)  Again, the Court disagrees.  While it is true that the jury *could* have found that the reasons Defendant attempted to evict Plaintiff and the reasons it imposed the condition were identical, it was not required to do so.  It is possible that the jury found that Defendant's purpose in attempting to evict Plaintiff was to enforce its nondiscrimination laws, and therefore reasonable, but that the condition it imposed before pursuing the eviction went beyond what was necessary to enforce those laws, and was therefore unreasonable.

nonpublic forum/viewpoint discrimination Interrogatories, the jury found that Defendant opposed Plaintiff's views with respect to homosexuals, but that its reasons for attempting to evict Plaintiff were reasonable and viewpoint neutral.  In other words, although Defendant may have disagreed with Plaintiff's policy, the jury concluded that its purpose in attempting to terminate the lease was to enforce compliance with its nondiscrimination laws, not to suppress Defendant's viewpoint.  In its equal protection analysis, the jury concluded that while Defendant treated Plaintiff differently than other similarly situated groups, it had a rational basis for wanting to terminate Plaintiff's lease, and therefore any disparate treatment did not rise to the level of a constitutional violation.

These two verdicts can be easily contrasted with the jury's decision on the unconstitutional conditions claim, which held that the particular condition imposed by Defendant was unreasonable.  Whereas the viewpoint discrimination and equal protection claims addressed *why* Defendant did what it did to Plaintiff—especially in relation to other groups with different views—the unconstitutional conditions claim dealt more specifically with *what* Defendant did to Plaintiff.  As previously stated, the jury could have determined that the condition was too broad, and therefore unreasonable, because it interfered with First Amendment activity unrelated to the subsidy at issue.  Such a conclusion would not require a concomitant finding of viewpoint discrimination or an equal protection violation.

Furthermore, even if the jury's verdict could be considered inconsistent, the Court has the discretion to allow an apparent inconsistent verdict to stand, and is not convinced that a new trial is warranted in this case.  As discussed before, in addition to creating an overly broad speech restriction, the condition at issue was not imposed on another Boy Scouts group with the same

policy, and was implemented at the behest of an advocacy group that may have had an improper influence on the solicitor's office. All three of these factors support a finding of unreasonableness. Therefore, regardless of how the jury decided the viewpoint discrimination and equal protection claims, there is ample evidence to support a verdict in Plaintiff's favor on the unconstitutional conditions claim, and so there is no inherent unfairness in denying Defendant a new trial on this issue. As such, Defendant's Motion for Judgment as a Matter of Law and, Alternatively, for a New Trial is denied.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court finds that the United States Supreme Court's decision in <u>Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez</u>, 130 S. Ct. 2971 (2010) does not mandate judgment as a matter of law in Defendant's favor on Plaintiff's unconstitutional conditions claim. The Court also concludes that Plaintiff introduced sufficient evidence for the jury to find in its favor on the unconstitutional conditions claim, that the Court did not err in issuing its instructions and interrogatories to the jury, and that the jury's verdict is not inconsistent. In the alternative, even if the verdict could be considered inconsistent, the record is replete with evidence to support a verdict in favor of Plaintiff on the unconstitutional conditions claim, and so a new trial is not warranted. Accordingly, Defendant's Motion for Judgment as a Matter of Law and, Alternatively, for a New Trial is denied.

An appropriate Order follows.